UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

HANK HANEY and
HANK HANEY MEDIA, LLC,

Plaintiffs,

-against-

PGA TOUR, INC.,

Defendant.

Case No. ________________

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Hank Haney ("Haney") and Hank Haney Media, LLC ("HHM") (collectively, the "Plaintiffs"), by their attorneys, Rice Pugatch Robinson Storfer & Cohen PLLC and Sullivan & Worcester LLP, for their Complaint against Defendant PGA TOUR, Inc. (the "PGA TOUR" or "Defendant"), state as follows:

## NATURE OF THE ACTION

1. Plaintiffs seek damages for the harm the PGA TOUR caused when it improperly intimidated, enticed and threatened Sirius XM Radio, Inc. ("Sirius XM") to suspend and ultimately terminate Haney's radio broadcast on Sirius XM's PGA Tour Radio station. Sirius XM had a binding contract with Plaintiffs for Haney to conduct golf radio broadcasts. The PGA TOUR was not a party to the Sirius XM – Haney Agreement.

2. Following an incident during one of Haney's broadcasts for which Haney immediately publicly apologized, Sirius XM accepted Haney's apology for the remarks and agreed that there would be minimal, if any, consequences.

3. Nonetheless, the PGA TOUR seized upon long-standing animus towards Haney from its desire to settle an old score relating to the professional golfer Tiger Woods, meddled in

Plaintiffs' business relationship with Sirius XM and demanded that Sirius XM severely punish and ultimately terminate Plaintiffs. This third-party interference led directly to the termination of Sirius XM's contract with Plaintiffs.

**THE PARTIES**

4. Plaintiff Hank Haney is an individual and citizen of the State of Texas.

5. Plaintiff Hank Haney Media, LLC is a Texas limited liability company. The sole member of Hank Haney Media, LLC is an individual and citizen of the State of Texas.

6. Defendant PGA TOUR, Inc. is a Maryland corporation with its principal place of business at 112 PGA Tour Boulevard, Ponte Vedra Beach, Florida 32082.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs are citizens of Texas and Defendant is a citizen of Maryland and Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the PGA TOUR, an entity that does continuous and systematic business in Florida, including employing personnel and hosting events in Palm Beach Gardens and Miami, is subject to the Court's personal jurisdiction and is a resident of this District pursuant to 28 U.S.C. § 1391(c)(2) and (d).

**FACTUAL BACKGROUND**

*Plaintiffs' Contract with Sirius XM*

8. Following several years of good relations in which Haney served as the host of "Hank Haney Golf Radio," a sports radio program covering news and topics in the world of golf, on or about November 30, 2017, Sirius XM and HHM entered into a new letter agreement,

personally guaranteed by Haney, for Haney to continue to host his program (the "Letter Agreement"). The Letter Agreement was amended and restated by a separate letter agreement dated December 21, 2017 (the "Second Letter Agreement") and again later amended by a first amendment thereto, effective as of October 1, 2018 (the "First Amendment," collectively with the Letter Agreement and Second Letter Agreement, the "Agreement"), although neither the First Amendment nor Second Amendment changed material terms of the Letter Agreement. A true copy of the Letter Agreement is attached hereto as **Exhibit A.**

9. The Letter Agreement was to continue until February 15, 2021.

10. Per Section 4 of the Agreement, in exchange for Haney performing a minimum of 235 radio programs per year, Sirius XM agreed to compensate HHM the sum of $250,000.00 per year, plus a percentage of the advertising revenue generated by the program.

11. Section 4(b) of the Agreement gave Sirius XM the exclusive right, in its sole discretion, to use, sell and/or dispose of the commercial sponsorship and advertising time during the radio broadcasts, provided that HHM had the right to one (1) sixty second (:60) promotional spot in each hour of the broadcasts, solely to promote Haney's website and products. Based upon the net advertising revenue derived each year from sales of advertising space deemed directly attributable to the sales assistance of HHM, whether or not occurring during the Haney radio broadcasts or at some other time, HHM was entitled to:

> receive the following percentages of Net Advertising Revenue (as defined below) each year of the Term derived from sales to an entity on the Partners List that are directly attributable to the sales assistance of the company: (A) seventy-five percent (75%) of Net Advertising Revenue for sales of Commercial Time, which share percentage shall be reduced to fifty percent (50%) in any year when Company has earned $300,000 of such revenue; and (B) fifty percent (50%) of Net Advertising Revenue for sales of commercial time outside of the Programming, which share percentage shall be reduced to twenty-five percent (25%) on a per entity (from the Partners List) basis in any year when gross sales to such entity exceed $300,000 of

> commercial time outside of the Programming. Additionally, Company shall receive fifty percent (50%) of the Net Advertising Revenue derived from any Sirius XM sales of Commercial Time each year to an entity that is not on the Partners List (all Net Advertising Revenue received by Company in accordance with Section 4(b) shall be referred to collectively as, the "Company Advertising Revenue"). "Net Advertising Revenue" shall mean gross revenue (determined in accordance with United States generally accepted accounting principles, as in effect from time to time) recognized from Sirius XM's sales of Commercial Time and commercial time outside of the Programming (as applicable), less: (y) a deduction for commissions and sales costs equal to fifteen percent (15%) of such revenue; and (z) an allowance for doubtful accounts equal to two percent (2%) of such revenue….

12. For the year ended December 31, 2018, HHM earned $463,931.30 from Net Advertising Revenue pursuant to Section 4(b) of the Agreement.

13. The rising success of the show led to significantly improved Net Advertising Revenue in the first part of 2019.

14. For the four months ended April 30, 2019, HHM earned $364,141.96 from Net Advertising Revenue pursuant to Section 4(b) of the Agreement.

15. The Parties to the Agreement reasonably expected revenues earned under the Agreement to continue to rise through the remainder of 2019, 2020 and 2021.

*The Events of May 29, 2019*

16. On May 29, 2019, during a regularly scheduled program, Haney and co-host Steve Johnson ("Johnson") discussed the U.S. Women's Open, scheduled to begin the next day.

17. Johnson stated: "This week is the 74th U.S. Women's Open, Hank."

18. Haney replied: "Oh it is? I'm gonna predict a Korean."

19. South Korean women accounted for 11 of the 16 individuals who placed or tied for first, second or third in the U.S. Women's Open competitions of 2015, 2016, 2017 and 2018, including first place in 2015 and 2017, and sweeping the top three spots in 2017.

20. Johnson acknowledged: "OK, that's a pretty safe bet."

21. Haney responded: "I couldn't name you six players on the LPGA Tour. Maybe I could. Well . . . I'd go with Lee. If I didn't have to name a first name, I'd get a bunch of them right."

22. Johnson stated, "We've got six Lees."

23. In fact, six women with the surname "Lee" were competing in the tournament. For the week of May 27, 2019, four of those six golfers with the surname Lee were ranked in the top 100 of the 1339 women professional golfers worldwide: second (Minjee Lee), seventeenth (Jeongeun Lee), thirty-fourth (Mi Hyang Lee) and eighty fourth (Mirim Lee).

24. In the context of the discussion and given Haney's admitted lack of detailed knowledge about women's golf, he chose the surname that was most likely to be the name of the winner. His prediction was correct: the winner was Jeongeun Lee of South Korea. His statements were not intended to be disrespectful or ethnically insensitive in any manner.

25. While still on the air, Haney learned that certain people on the internet, and especially twitter, had been offended by the remark.

26. Haney immediately apologized on air for his comments.

27. That same day, after the program concluded, Haney issued a formal written apology and said that he regretted saying anything that was considered insensitive. The formal apology read:

> This morning I made some comments about women's professional golf and its players that were insensitive and that I regret. In an effort to make a point about the overwhelming success of Korean players on the tour I offended people and I am sorry. I have the highest respect for the women who have worked so hard to reach the pinnacle of their sport and I never meant to take away from their abilities and accomplishments. I've worked in this game with men and women players from many different cultures and I look forward to continuing to do so.

28. Sirius XM's PGA Tour Radio Program Director, Jeremy Davis, sent an e-mail the day of the broadcast, at 2:02 p.m., to all of the Sirius XM PGA Tour Radio talent and producers, business managers of all talent, Sirius XM programming executives including the VP of Sports, Steve Cohen, and the President, Scott Greenstein. The e-mail had a subject line of "Hank's Comments Today," and read:

> Hello All,
>
> Obviously this has gotten a lot of attention today, but this is not a PGA TOUR Radio story that we need to cover. There is no benefit to discussing this on our air so we should avoid it. Listeners are likely to bring it up on phone calls so we may need to address it there, but we should not be having any guests on, or any discussions on this as it is not a golf story. Hank made a comment that some people found offensive, he apologized, end of story. Any questions just ask.

A true copy of this e-mail is attached hereto as **Exhibit B**.

*PGA TOUR's Past Interference with Haney's Business*

29. The PGA TOUR has long attempted to disrupt and interfere in Haney's business. This interference began in 2012 when Haney released his book, The Big Miss, which in part discussed Haney's time as Tiger Woods ("Woods")' swing coach from 2004 through 2010.

30. Woods' success has driven the economic engine of the PGA TOUR since 1997. As such, the PGA TOUR systematically accommodates his requests and expectations through the tailoring of policies such as scheduling, sponsor obligations and tournament operating rights to his benefit.

31. Because the PGA TOUR potentially is financially damaged by negative press about Woods, it worked to discredit Haney and his book release in 2012 to protect its own financial interests.

32. At the time of the release in 2012, as the substantive content of the book became public through previews, the PGA TOUR induced both "PGA Tour Superstores" and "PGA Tour Shops" to cancel previously placed orders of The Big Miss. Upon information and belief, the PGA TOUR further induced smaller shops to back out of their preorders for the book.

33. In 2013, again under pressure from the PGA TOUR, the Golf Channel discontinued the very successful "Haney Project" show – one of the highest rated programs on the network at the time.

34. The PGA TOUR yet again exerted influence in 2016 to have Avis cancel another program with Haney.

35. An Avis representative with knowledge told Haney that the PGA TOUR was not supportive of Avis working with Haney and that this lack of support from the golf behemoth led to the cancellation of the 2016 program.

36. Upon information and belief, the PGA TOUR has been working to ingratiate itself with the LPGA. This sought-after partnership in part is so the PGA TOUR can continue to monopolize all of professional golf. As such, the PGA TOUR has the motive to attack anyone it perceives is damaging the LPGA brand.

*PGA TOUR's Attack on Haney*

37. Despite Sirius XM's internal determination that no punitive measures were necessary or appropriate, the PGA TOUR seized on this latest opportunity to punish Haney based on Haney's remarks and certain initial negative media reports and almost immediately "instructed" Sirius XM to suspend Haney from his radio broadcasts.

38. Because the PGA TOUR has numerous business connections with Sirius XM, and can cause severe harm to Sirius XM's golf radio programming, it can and did exert unusually strong pressure on Sirius XM.

39. The PGA TOUR and Sirius XM issued a joint statement the next day, May 30, 2019, reading:

> **Joint PGA TOUR/SiriusXM Statement on Hank Haney**
>
> **NEW YORK – May 30, 2019 –** Mr. Haney's comments on women's professional golf were insensitive and do not represent the views of the PGA TOUR or Sirius XM. The PGA TOUR is committed to and proud of the increasingly diverse makeup of our fan base, not to mention the power and accomplishments of the game's world-class, global players – both on the PGA TOUR and LPGA, whom we are working with more closely than ever before. SiriusXM proudly covers and supports both women's and men's golf and the athletes that make them great. **At the PGA TOUR's instruction** Mr. Haney has been suspended from the SiriusXM PGA TOUR Radio channel. SiriusXM is reviewing his status on SiriusXM going forward.
>
> Mr. Haney added, "I accept my suspension and apologize again."

(Emphasis added.)

40. After its "instruction" that Sirius XM suspend Haney, the PGA TOUR's vendetta against Haney continued and, in the early summer of 2019, the PGA TOUR pressured Sirius XM to terminate the Agreement and Plaintiffs' business relationship with Sirius XM.

41. As a result, Plaintiffs' financial position suffered, and continue to suffer to this day, and Haney's reputation has been permanently damaged.

42. Callaway Golf Company ("Callaway"), one of Haney's largest collaborators, declined to renew its collaboration agreement with Haney when it expired in December 2019.

43. Callaway made clear through discussions with Plaintiffs that it felt compelled to decline a renewal because of the loss of Haney's position broadcasting with Sirius XM. Had

Haney been allowed to complete the term of the Agreement, Callaway would have renewed its collaboration agreement with Haney.

44. PGA TOUR's actions have cost Plaintiffs advertising revenues that would have amounted to millions of dollars over the life of the Agreement in addition to sales of Haney's individually marketed merchandise that markedly decreased as a result of the PGA TOUR's interference with the Agreement and the PGA TOUR-fueled attack on Haney's reputation.

**FIRST CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**

45. Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 44 as if fully set forth herein.

46. The Agreement constitutes a valid, binding contract between Plaintiffs and third-party Sirius XM to provide regular radio broadcast programming.

47. The PGA TOUR had knowledge of the Agreement.

48. The PGA TOUR intentionally and unjustifiably interfered with Plaintiffs' rights under the contract by inducing Sirius XM's termination of the Agreement.

49. Plaintiffs have suffered significant damages reasonably believed to be millions of dollars in lost advertising revenue and lost merchandise sales as a result of the improper interference with and resulting termination of the Agreement and the improper attacks on Haney's reputation.

**SECOND CLAIM FOR RELIEF**
**(Tortious Interference with Business Relations)**

50. Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 49 as if fully set forth herein.

51. Plaintiffs and third-party Sirius XM had a business relationship whereby Plaintiffs provided regular radio broadcast programming in exchange for compensation.

52. The PGA TOUR had knowledge of the relationship as well as the business relationships alleged above.

53. The PGA TOUR intentionally and unjustifiably interfered with these business relationships by instructing Sirius XM to suspend and ultimately terminate Haney.

54. The PGA TOUR engaged in this conduct in order to inflict intentional harm on Plaintiffs.

55. The PGA TOUR's improper actions caused significant harm to Plaintiffs' relationship with Sirius XM and the other businesses alleged above. This harm is reasonably believed to have cost Plaintiffs millions of dollars in lost advertising revenue and lost merchandise sales.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

(a) Compensatory damages in an amount to be proven at trial;

(b) Punitive damages for the PGA TOUR's intentional tortious conduct;

(c) Costs; and

(b) Such other relief as this Court may determine as fair and just.

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: Fort Lauderdale, Florida
December 18, 2019

Respectfully submitted,

RICE PUGATCH ROBINSON STORFER & COHEN, PLLC
By: /s/ Arthur Halsey Rice______
Arthur Halsey Rice
Florida Bar No. 224723
Riley W. Cirulnick
Florida Bar No. 0333270
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300
arice@rprslaw.com
rcirulnick@rprslaw.com

SULLIVAN & WORCESTER LLP

By: /s/ Peter R. Ginsberg________
Peter R. Ginsberg (*pro hac vice pending*)
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3000
Facsimile: (212) 660-3001
prginsberg@sullivanlaw.com

*Attorneys for Plaintiffs*

# Exhibit A

((SiriusXM))

1290 Avenue of the Americas
New York, NY 10104
tel 212 584 5100
fax 212 584 5200
www.siriusxm.com

November 30, 2017

Hank Haney Media, LLC
c/o Octagon, Inc.
One Shockhoe Plaza
Richmond, VA 23219
Attention: Jeremy Aisenberg

Dear Hank:

This letter agreement (this "Agreement") sets forth the agreement between Sirius XM Radio Inc. ("Sirius XM") and Hank Haney Media, LLC ("Company") in connection with the hosting services to be provided by you ("Artist"), as described below:

1. The Programming.

(a) Company shall cause Artist to serve as the host of "*Hank Haney Golf Radio*", the sports talk radio program featuring discussions, call-ins and interviews covering various news and topics in the world of golf (each episode of such program, a "Show", with all Shows collectively referred to as, the "Programming") available as a: (i) two (2) hour Show for daily broadcast (i.e., Monday through Friday from 10:00 a.m. to 12:00 p.m. (Eastern Time), or such other time as mutually agreed upon by the parties); and (ii) a live or pre-recorded Show up to two (2) hours in length for weekend broadcast (i.e., Saturday and Sunday) and Company shall notify Sirius XM in writing (email sufficient) whether a Show will be live or pre-recorded no later than 12:00 p.m. (Eastern Time) on the Wednesday before the following weekend such Show will air; on Sirius XM's *PGA TOUR Radio* (or such other channel(s) as Sirius XM may designate from time to time in its sole discretion) as distributed and redistributed throughout the world, in whole or in part, on a live, time-shifted and/or "on demand" basis, by means of any and all methods (now known or hereafter devised) in any and all media in which Sirius XM elects to make its audio entertainment service available, including without limitation, satellite radio (including transmissions through non-satellite infrastructure to enhance signal delivery where satellite signal is limited or unavailable), internet streaming and downloads, audio-only channels of cable and satellite television, mobile telephony and other wireless devices and platforms (collectively, the "Sirius XM Service"). The Programming shall be produced by Sirius XM, at its sole cost and expense, with a production schedule mutually determined by the parties. Company shall cause Artist to host a minimum of two hundred thirty-five (235) new, live Shows each year during the Term (as defined below). Sirius XM shall determine all broadcast and rebroadcast times of the Programming and may edit previously aired Shows to create and broadcast "best of" programming. Company shall cause Artist to follow Sirius XM's reasonable direction in providing all services set forth above and any additional services requested by Sirius XM in connection therewith, which shall include Artist recording a reasonable number of promotional spots for the Programming and the Sirius XM Service as well as performing advertising and

2

promotional reads within the Programming. Company and Artist shall comply with all applicable Sirius XM policies, rules and procedures in effect during the Term.

(b) Company shall cause Artist to host the Programming from Artist's residences or such other location(s) as mutually approved by the parties. Sirius XM, at its sole cost and expense, shall provide Company with all equipment necessary for Artist to host and record the Programming, including from remote sites and, if necessary, an ISDN line to deliver the Programming to Sirius XM. Any equipment provided by Sirius XM shall remain the property of Sirius XM and Company shall return such equipment upon Sirius XM's request. Company shall deliver the Programming to Sirius XM in a quality suitable for distribution on the Sirius XM Service via a mutually agreeable method and delivery schedule. In the event Sirius XM reasonably determines that any Show delivered by Artist does not meet Sirius XM's requirements for technical quality or are contrary to Sirius XM's standards of appropriateness (as reasonably determined by Sirius XM), Artist shall promptly create a replacement Show that conforms to such requirements or standards, as applicable.

(c) Company and its representatives (including Artist) shall not incorporate any musical composition or sound recording into the Programming without the prior written approval of Sirius XM.

(d) In order to prevent potential, apparent or actual conflicts of interest, Company shall not, and shall ensure that its representatives (including Artist) shall not, solicit, encourage or accept any cash, goods, merchandise or other consideration from any third party as compensation for, in return for, or in connection with promoting, recommending, advocating or encouraging the playing of any artist, music or other specific content over any of Sirius XM's distribution channels. Any such conduct shall give Sirius XM the immediate right to terminate this Agreement.

2. Intellectual Property; Publicity.

(a) Except for the Company IP (as defined below), Sirius XM shall own the copyrights and other intellectual property rights relating to the Programming and all recordings thereof, including the name of the Programming, in any and all present and future media. Company hereby grants Sirius XM a perpetual, worldwide, non-exclusive, royalty-free and irrevocable license to use the name, voice, images and likenesses of Artist (collectively, the "Company IP") as part of: (i) the Programming and to promote the Programming; and (ii) Sirius XM-related advertising, marketing and promotional materials, including product packaging, channel guides, circulars and point of sale materials, whether such materials are produced by Sirius XM or a third party on Sirius XM's behalf. Company hereby waives all moral rights associated with Sirius XM's use and promotion of the Programming set forth in this Section 2(a).

(b) Sirius XM may issue a press release to announce and promote its distribution of the Programming, subject to Company's approval, which shall not be unreasonably withheld, conditioned or delayed.

(c) Sirius XM hereby grants Company a limited, worldwide, non-exclusive, royalty-free license throughout the Term to: (i) use Sirius XM's name and logo in connection with Company's promotion and publicity of the Programming, as previously approved by Sirius XM; and (ii) distribute five (5) minute clips of each Show on Company and/or Artist-branded websites.

3. Restrictions.

(a) During the Term, Company shall not, and shall ensure that Artist shall not, directly or indirectly, enter into the employment of, render services to or acquire any interest whatsoever in (whether for Artist's own account as an individual proprietor, or as a partner, associate, shareholder, officer, director,

consultant, trustee or otherwise), or otherwise assist, any person or entity other than Sirius XM that is engaged, or proposes to engage, in any operations in North America involving the transmission or production of radio entertainment programming or that competes with any material aspect of the radio business of Sirius XM, without the prior written consent of Sirius XM in each instance; provided that such consent shall not apply to: (i) the purchase or ownership by the Company or Artist by way of investment of up to four percent (4%) of the shares or equity interest of any corporation or other entity; or (ii) personal appearances, station IDs or drop-ins made by Artist, or Artist's participation in promotional events. For purposes of this Agreement, the term "radio" shall be defined broadly and shall include any and all audio-only media, including traditional radio, terrestrial radio, satellite radio, digital radio, internet broadcasts, internet streaming, internet radio and radio devices and methods hereinafter developed.

(b) Company shall not, and shall ensure that Artist shall not, participate in any interview for publication or broadcast in any media regarding Sirius XM, its business or prospects, except for incidental references for personal promotion.

4. Financial Matters.

(a) For each year of the Term (with the first "year" commencing upon the date the first Show is initially broadcast on the Sirius XM Service), Sirius XM shall pay Company the sum of Two Hundred Fifty Thousand Dollars ($250,000) (the "Fee"). All payments of the Fee shall be paid monthly in arrears in equal installments of $20,833.33 and due no later than thirty (30) days following the end of each month.

(b) Sirius XM shall have the exclusive right, in its sole discretion, to use, sell and/or dispose of the commercial sponsorship and advertising time in the Programming as distributed via the Sirius XM Service ("Commercial Time"); provided that Company shall receive one (1) sixty second (:60) promotional spot in each hour of the Programming, solely to promote Artist's website and any Artist-owned and/or branded products (e.g., mobile apps, instruction videos) sold through Artist's website (the "Company Spots"). Company shall be entitled to assist with Sirius XM's sales efforts of Commercial Time as well as in commercial time sold outside of the Programming by providing a list to Sirius XM of potential advertising partners for such time (the "Partners List") (Company may update the Partner List with new advertising partners during the Term, subject to Sirius XM's prior approval), as set forth on Exhibit A attached hereto, and shall receive the following percentages of Net Advertising Revenue (as defined below) each year of the Term derived from sales to an entity on the Partners List that are directly attributable to the sales assistance of Company: (A) seventy-five percent (75%) of Net Advertising Revenue for sales of Commercial Time, which share percentage shall be reduced to fifty percent (50%) in any year when Company has earned $300,000 of such revenue; and (B) fifty percent (50%) of Net Advertising Revenue for sales of commercial time outside of the Programming, which share percentage shall be reduced to twenty-five percent (25%) on a per entity (from the Partners List) basis in any year when gross sales to such entity exceed $300,000 of commercial time outside of the Programming. Additionally, Company shall receive fifty percent (50%) of the Net Advertising Revenue derived from any Sirius XM sales of Commercial Time each year to an entity that is not on the Partners List (all Net Advertising Revenue received by Company in accordance with Section 4(b) shall be referred to collectively as, the "Company Advertising Revenue"). "Net Advertising Revenue" shall mean gross revenue (determined in accordance with United States generally accepted accounting principles, as in effect from time to time) recognized from Sirius XM's sales of Commercial Time and commercial time outside of the Programming (as applicable), less: (y) a deduction for commissions and sales costs equal to fifteen percent (15%) of such revenue; and (z) an allowance for doubtful accounts equal to two percent (2%) of such revenue. Sirius XM shall submit payment of the Company Advertising Revenue, together

with reasonable supporting statements, to Company within forty five (45) days following each calendar quarter that Company Advertising Revenue is owed.

(c) Company, at its sole cost and expense, shall produce the Company Spots and obtain all necessary releases, authorizations, consents and waivers necessary to transmit the Company Spots on the Sirius XM Service. Company shall not sell, barter or grant the Company Spots to a third party.

(d) No regular deductions shall be made from any payments to Company. For all purposes, including deductions and payments pursuant to all federal, state and local laws, rules and regulations, Company, including Artist, shall be treated as independent contractors and not as employees of Sirius XM. Company acknowledges and agrees that Sirius XM has made no representations regarding the tax consequences of any amounts paid to Company by Sirius XM and that Company is responsible for payment of any and all applicable taxes as provided above. Company agrees to comply with all tax laws related to amounts paid to Company by Sirius XM and to file all necessary tax returns, declarations and schedules and to pay all taxes due concerning compensation earned by Company under this Agreement. Sirius XM will report the amount it pays to Company on an IRS Form 1099 to the extent required to do so under applicable Internal Revenue Code provisions and/or state or local law.

5. <u>No Obligation</u>. Nothing contained in this Agreement shall be deemed to obligate Sirius XM to distribute any Programming or use Company's or Artist's services except as it may elect, in its sole discretion. Accordingly, Sirius XM shall have fully discharged its obligations hereunder by payment to Company of the amounts set forth in Section 4 above.

6. <u>Term and Termination</u>.

(a) The term of this Agreement shall commence on February 16, 2018 and continue through February 15, 2021, unless previously terminated pursuant to the terms of this Agreement (the "<u>Term</u>").

(b) Sirius XM may terminate this Agreement with no liability to Company and/or Artist other than the payment of amounts accrued and owing: (i) without reason upon thirty (30) days' prior written notice; or (ii) immediately without notice in the event that (A) Artist dies, becomes incapacitated or unable to perform the obligations and services set forth herein; or (B) Artist engages in any behavior that disparages Sirius XM or satellite radio, brings Company or Artist into public disrepute, contempt, scandal, or ridicule or that otherwise reflects unfavorably upon the reputation or the moral or ethical standards of Sirius XM.

(c) Either party may terminate this Agreement in the event that the other party (the "<u>Defaulting Party</u>") materially breaches this Agreement or any representation or warranty made by the Defaulting Party under this Agreement ceases to be true and correct in all material respects, and such breach or cessation continues uncured for a period of five (5) days after the Defaulting Party receives notice thereof from the non-Defaulting Party.

7. <u>Representations and Warranties; Indemnification</u>.

(a) Each party represents and warrants to the other that it has the power and authority to enter into this Agreement and to perform all of its obligations and grant all rights provided hereunder and that neither the execution and delivery of this Agreement, nor the performance of its obligations hereunder, will violate any agreement to which it is a party or any federal, state, or local law or regulation to which it is subject.

(b) Company hereby represents and warrants to Sirius XM that: (i) it has all requisite rights, waivers, permissions, clearances, power and authority to provide the services of Artist in accordance with this Agreement and the rights granted hereunder and for Sirius XM to use, transmit, distribute, perform and promote the Programming incorporating the Company IP and any other materials provided by Company or performed by Artist and (ii) Sirius XM's use, distribution, transmission, performance and promotion of the Programming, the Company IP and any other materials provided by Company or performed by Artist in accordance with this Agreement will not, give rise to any claim by any third party, including claims arising from or relating to copyright, rights of publicity, trademark infringement or any other intellectual property right, defamation, libel, slander or of any other right of any third party.

(c) Company shall defend, indemnify and hold harmless Sirius XM from and against any loss, damage, expense or claim, including reasonable outside attorney's fees and expenses brought by a third party (collectively, "Third Party Claims"): (i) arising from or out of any breach of Company's representations, warranties or obligations under this Agreement; (ii) arising from or out of any claim or allegation that the Programming, the Company IP and/or any materials provided by Company or performed by Artist violated any intellectual property right or other right of a third party, including the right of privacy, or was defamatory or slanderous in any manner; and/or (iii) that Sirius XM may incur by reason of Sirius XM's failure to withhold and pay taxes pursuant to this Agreement or Company's failure to pay any tax or other sum required to be paid or withheld by an employer with respect to Company's services under this Agreement (collectively, "Assessments"), except in each case to the extent due to the acts and omissions of Sirius XM that would give rise to indemnifiable claims as set forth in Section 7(d) below. In addition, at the time of any Assessments, Company shall pay Sirius XM the assessed amounts, including any interest and penalties, upon demand. Sirius XM shall not be required to challenge, dispute or litigate any Assessments.

(d) Sirius XM shall defend, indemnify, and hold harmless Company, Artist, Artist's representatives (including, without limitation, Octagon, Inc.), and their respective employees and agents, from and against any and all Third Party Claims: (i) arising from or out of any breach of Sirius XM's representations, warranties or obligations under this Agreement; (ii) the acts and omissions of Sirius XM and/or its employees, officers, or directors constituting gross negligence or willful misconduct; and (iii) the misuse of the rights granted hereunder by Company, except in each case to the extent due to the acts and omissions of Company that would give rise to indemnifiable claims as set forth in Section 7(c) above.

8. Confidentiality. Neither Company (including Artist) nor Sirius XM shall disclose any information reasonably understood to be confidential, including, without limitation, the terms and conditions of this Agreement to any third party, except that either party may disclose such information to its employees, representatives, officers, directors and advisors who are obligated to maintain the confidentiality of such information.

9. Miscellaneous.

(a) All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or when telecopied (with confirmation of transmission received by the sender), one (1) business day after being delivered to a nationally recognized overnight courier with next day delivery specified or three (3) business days after being deposited in the United States mail, first class postage prepaid, with return receipt requested, to the addresses specified below, or at such other address as either party may supply by written notice delivered in accordance herewith. Notices to Company shall be sent to the address set forth above with a copy sent to Octagon, Inc., 7950 Jones Branch Drive, Suite 700N, McLean, VA 22102, Attention: General Counsel. In the case of Sirius XM, notices should be sent to: Sirius XM Radio Inc., 1290 Avenue of the Americas, 11th Floor, New York, NY 10104, Attention: General Counsel.

(b) This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of principles of conflicts of laws that may require the application of the laws of another jurisdiction. Any action or litigation concerning this Agreement shall take place exclusively in the federal or state courts sitting in New York, New York, and the parties expressly consent to the jurisdiction of and venue in such courts and waive all defenses of lack of jurisdiction and inconvenient forum with respect to such courts.

(c) All provisions of this Agreement which must survive in order to give effect to their meaning (including, without limitation, the grant of rights, representations, warranties, indemnities and confidentiality obligations) shall survive any expiration or earlier termination of this Agreement.

(d) This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between Sirius XM and Company with respect to the subject matter hereof. Neither this Agreement nor any of the terms hereof may be amended, supplemented, waived or modified except by an instrument in writing signed by both parties. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by Company (whether by operation of law or otherwise) without the prior written consent of Sirius XM, and any purported assignment without such consent shall be null and void.

(e) This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. Delivery of a counterpart by facsimile or via email in .pdf (or similar) format shall be as effective as physical delivery of an original signed counterpart.

[END OF PAGE; SIGNATURE PAGE FOLLOWS]

If Company and Artist agree with the foregoing, please execute this Agreement in the spaces provided below.

Very truly yours,

SIRIUS XM RADIO INC.

By: ________________________________
Scott A. Greenstein
President and Chief Content Officer

AGREED AND ACCEPTED:

HANK HANEY MEDIA, LLC

By: ________________________________
Name: Hank Haney
Title: Manager

To induce Sirius XM to enter into the foregoing Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I hereby: (1) confirm this Agreement and the authority of Company to enter into this Agreement with respect to me, (2) agree to perform all services and obligations required of me in this Agreement, (3) personally guarantee the performance by Company of all of its obligations under this Agreement, (4) agree that all payments to Company shall discharge any obligations of Sirius XM to me in connection with this Agreement and (5) without limiting any of the foregoing, waive any of the rights I may have, including without limitation, any rights set forth in subsection 2(a), with respect to the Programming.

________________________________
HANK HANEY

**EXHIBIT A**

List of Potential Advertising Partners

**18 Birdies**
**ACER**
**American Express**
**AVIS**
**Bank of America**
**BMW**
**Callaway Golf**
**Celebrity Greens**
**Charles Schwab**
**Club Champion**
**ClubCorp**
**Chase**
**cPrime**
**Crocs**
**Datamash**
**Dell**
**Delta**
**GFore**
**Garia Golf**
**Golf Digest**
**Golf Tailor**
**Golfsmith**
**Hilton**
**Hyundai**
**Jaguar**
**Marriott**
**Mastercard**
**Microsoft**
**Morgan Stanley**
**Omega**
**SkyGolf**
**TopGolf**
**Troon Golf**
**Vizio**
**Voodoo Labs**

# Exhibit B

**From:** Davis, Jeremy <Jeremy.Davis@siriusxm.com>
**Sent:** Wednesday, May 29, 2019 2:02 PM
**To:** Albanese, Jon
**Subject:** [EXTERNAL] Hank's Comments Today

Hello All,

Obviously this has gotten a lot of attention today, but this is not a PGA TOUR Radio story that we need to cover. There is no benefit to discussing this on our air so we should avoid it. Listeners are likely to bring it up on phone calls so we may need to address it there, but we should not be having any guests on, or any discussions on this as it is not a golf story. Hank made a comment that some people found offensive, he apologized, end of story. Any questions just ask.

Thanks,

Jeremy Davis | Program Director – PGA TOUR Radio SIRIUS 208 & XM 92 |
**SIRIUS XM SATELLITE RADIO** | 1500 Eckington Place NE | Washington, DC 20002
☎: Mobile: 202.279.1425 | ☎: Office: 202.380.1252 | ✉: jeremy.davis@siriusxm.com
((SiriusXM)) pandora