UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:19-CV-63108-RAR

--------------------------------------------- X

HANK HANEY and                                :
HANK HANEY MEDIA, LLC,                         :
                                               :
                        Plaintiffs,            :
                                               :
            -against-                          :
                                               :
PGA TOUR, INC.,                                :
                                               :
                        Defendant.             :
                                               :
--------------------------------------------- X

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

PRELMINARY STATEMENT ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................................. 1

ARGUMENT ..................................................................................................................................... 7

CONCLUSION ................................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Adria MM*,
  2018 WL 4268886 .................................................................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................................. 7

*Bezeau v. Cable Equip. Servs.*,
  2015 WL 3540009 (S.D. Fla. May 27, 2015) .......................................................................... 9

*Blash v. City of Hawkinsville*,
  2021 WL 1561347 (11th Cir. Apr. 21, 2021) ................................................................... 7, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................................. 7

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*,
  797 F.3d 1248 (11th Cir. 2015) ......................................................................................... 8, 14

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
  647 So. 2d 812 (Fla. 1994) ....................................................................................................... 8

*Int'l Yacht Bureau, Inc. v. Int'l Registries, Inc.*,
  2015 WL 5118121 (S.D. Fla. Sept. 1, 2015) ........................................................................ 17

*Liebherr-Mining*,
  2013 WL 85179 ........................................................................................................ 12, 13, 14

*Mattocks v. Black Ent. Television LLC*,
  43 F. Supp. 3d 1311 (S.D. Fla. 2014) .............................................................................. 16, 17

*Monco Enterprises, Inc. v. Ziebart Corp.*,
  673 So. 2d 491 (Fla. 1st DCA 1996) ....................................................................................... 9

*Morsani v. Major League Baseball*,
  663 So. 2d 653 (Fla. 2d DCA 1995) ...................................................................................... 16

*Palm Beach Cty. Health Care Dist. v. Pro. Med. Educ., Inc.*,
  13 So. 3d 1090 (Fla. 4th DCA 2009) ....................................................................................... 9

*Pisani*,
  2009 WL 10667906 ................................................................................................................ 19

*Poole & Kent Co. v. Tetra Tech, Inc.*,
  2010 WL 11505134 (S.D. Fla. Sept. 2, 2010) ....................................................................... 14

*Sekula v. Residential Credit Solutions, Inc.*,
  2016 WL 1559142 (M.D. Fla. Apr. 18, 2016) ........................................................................ 8

*Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*,
  2007 WL 473273 (S.D. Fla. Feb. 8, 2007) ............................................................................ 16

*Stanley Indus. of S. Fla., Inc. v. AIM Garments Corp.*,
  2019 WL 2009336 (S.D. Fla. Mar. 15, 2019) ....................................................................... 17

*Sun Life Assur. Co. of Can. v. Imperial Premium Fin., LLC*,
  904 F.3d 1197 (11th Cir. 2018) ............................................................................................... 8

*United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.*,
  845 F. Supp. 2d 1303 (S.D. Fla. 2012) .................................................................................... 7

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
  2015 WL 12550911 (S.D. Fla. June 3, 2015) .......................................................................... 9

Rules

Fed. R. Civ. P. 56(a) ................................................................................................................ 7
Federal Rule of Civil Procedure 56 ........................................................................................ 1

Other Authorities

Restatement (Second) of Torts § 769 (1979) ......................................................................... 9

Plaintiffs Hank Haney ("Haney") and Hank Haney Media LLC ("HHM" and, collectively, Plaintiffs) submit this memorandum of law in opposition to Defendant PGA TOUR, INC. ("Defendant" or "PGA TOUR")'s motion ("Motion" or "Mot."), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 of the United States District Court for the Southern District of Florida, for summary judgment on all claims in the Complaint.

## PRELMINARY STATEMENT

The PGA TOUR, after years of attacks on Haney and his business interests, exercised its influence and wrongfully imposed its domination of the professional golf world to interfere with Plaintiffs' contractual and business relationships with Sirius XM Radio, Inc. ("Sirius XM"). Despite not being a party to the radio broadcast contract between the Plaintiffs and Sirius XM (the "Talent Agreement"), without any other legal justification, and acting with malice, the PGA TOUR seized on comments Haney made during a radio program to continue its years-long onslaught on Haney's career, ultimately imposing its unique market power and influence to force Sirius XM to terminate the Talent Agreement.  All post-event excuses for its wrongful actions are pretextual and the speciousness of those rationalizations is laid bare by the record developed during discovery. In sum, the PGA TOUR's contention that its interference was "justified" or that it had a "privilege" to act in this wantonly malicious manner ignores and misconstrues the plethora of facts that necessitate a jury trial to resolve Plaintiffs' claims.

## FACTUAL BACKGROUND

Haney is a professional golf instructor and media expert who coached Tiger Woods ("Woods") for years.  In 2012, Haney authored a book, *The Big Miss*, which focused on Haney's time as Woods's swing coach from 2004 through 2010.  *The Big* Miss provided an inside look at a professional golfer whose reputation far-outshined his real-life persona.  The PGA TOUR

recognized that the negative disclosures about Woods would be financially damaging to its brand as well as to the marketability of its highly-aggrandized and protected star.  Fearing damage to its own financial interests, the PGA TOUR began campaigning to discredit Haney and his book.  As the content of the book became public through previews in 2012, and debuted as #1 on the New York Times bestseller list, SOF ¶ 51, the PGA TOUR used its unique power and authority in the golf world to induce both "PGA Tour Superstores" and "PGA Tour Shops" to cancel previously placed orders of *The Big Miss*.  (SOF ¶ 45, Ex. 4).  The PGA TOUR also induced smaller shops to back out of their preorders for the book.  (SOF ¶ 51, Ex. 5) Woods viciously attacked Haney and his integrity while the PGA TOUR did its best to combat what was becoming one of the most successful sports books in history. (SOF ¶ 51, Ex. 5).

Despite the PGA TOUR's attempts to disrupt his business ventures, Haney enjoyed great success with Sirius XM.  For several years starting in 2013, Haney served as the host of "Hank Haney Golf Radio," a sports radio program on Sirius XM covering news and topics in the world of golf.  Plaintiffs' relationship with Sirius XM was governed by the Talent Agreement.  (SOF ¶ 59) The PGA TOUR is not a party to the Talent Agreement.  As of the time the PGA demanded his termination, Haney had become Sirius XM's most popular talent on the Sirius golf network. (SOF ¶ 52, Ex. 6)

On his May 29, 2019 broadcast, Haney and a co-host discussed the U.S. Women's Open, which was scheduled to begin the next day.  Haney made several remarks during this program about the LPGA Tour and its players.  The relevant exchange was:

JOHNSON:   This week is the 47th U.S. Women's Open, Hank.

HANEY:       Oh it is?  I'm gonna guess a Korean.

JOHNSON:   OK, that's a pretty safe bet.

> HANEY:     I couldn't name you six players on the LPGA Tour. Maybe I could. Well...I'd go with Lee. If I didn't have to name a first name, I'd get a bunch of them right.
>
> JOHNSON:    We've got six Lees.

(Compl., ECF 1, ¶¶ 17-18, 20-22.). While still on the air, Haney learned that some listeners had been offended by these remarks. During this same broadcast, Haney apologized for what he said, and the next day issued a formal, written apology, expressing regret for saying anything that could be considered insensitive. (SOF ¶ 53, Ex. 1-2).

Haney's apology, in Sirius XM's view, sufficiently rectified any offense he may have committed. (SOF ¶ 53, Ex. 1-2). Following Haney's formal apology, Sirius XM's PGA Tour Radio Program Director, Jeremy Davis, sent an e-mail to all Sirius XM PGA Tour Radio talent and producers, business managers of all talent, Sirius XM programming executives including the VP of Sports, Steve Cohen, and the President, Scott Greenstein ("Greenstein"):

> Obviously this has gotten a lot of attention today, but this is not a PGA TOUR Radio story that we need to cover. …. Hank made a comment that some people found offensive, he apologized, end of story….

(SOF ¶ 53, Ex. 1-2).

Despite Sirius XM's determination—and decision—that Haney's apology was the "end of [the] story" and that no punitive measures were necessary or appropriate, the PGA TOUR seized on this opportunity to punish Haney. The PGA TOUR almost immediately instructed Sirius XM to suspend and essentially terminate Haney from his radio broadcasts. (SOF ¶ 53, Ex. 1-2).

The PGA TOUR's internal communications made its goal clear. As PGA Commission Jay Monahan ("Monahan") wrote in an internal email to Laura Neal ("Neal"), a PGA TOUR Senior Vice President, copying the Chief Operating Officer, Chief Administrative Officer, Senior Vice President of Media Business Development, and Chief Media Officer: "This man needs to lose his job. Please let me know what I can do to assist you to ensure this happens." (SOF ¶ 24).

Internal PGA TOUR email traffic from the time period reveals that the PGA TOUR understood that it lacked any legal basis to effectuate this decision but was determined not to be deterred by its lack of a legal basis to strip Haney of his high-profile position on the airwaves.  On May 29, 2019,  the day of the broadcast, Joel Schuchmann ("Schuchmann"), the PGA TOUR's Vice President of Communications, described a "'loose' affiliation with Sirius/XM" and acknowledged that "we don't control these shows."  (SOF ¶ 54, Ex. 2, Ex 2-3).  The next day, , Schuchmann reiterated to individuals at the U.S. Golf Association that the PGA TOUR had no legal authority to impose punishment on Haney: "while it is the 'PGA TOUR Network' we don't own or manage any of the original content on the show (ie don't hire/fire talent) . . .."  (SOF ¶ 54, Ex. 2, Ex 2-3).  Again, on May 30th, Schuchmann confirmed in an email, "The network is not owned or operated by the PGA TOUR so we don't have any oversight on items such as talent, so that complicates the situation."  (SOF ¶ 54, Ex. 2, Ex 2-3).

Despite acknowledging its lack of any legal right or justification, the PGA TOUR bullied Sirius XM until it terminated its contractual and business relationship with Plaintiffs.  Sirius XM's leadership was adamantly against such an action, but ultimately determined that PGA TOUR could destroy its own business if it did not adhere to the PGA TOUR's demand to destroy Haney's. (SOF ¶ 55)

The press statement announcing Plaintiffs' termination, dated May 30, 2019, made it absolutely clear—at Sirius XM's insistence—that the PGA TOUR forced the termination: "[a]t the PGA TOUR's *instruction* Mr. Haney has been suspended from the Sirius XM PGA TOUR Radio Channel."  (SOF ¶ 32) (emphasis added).  Terminating Haney was contrary to Sirius XM's business interests, undermined the success of its golf network, and was contrary to promises Greenstein had made to Haney regarding Haney's freedom to talk freely on his show.  (SOF ¶ 55,

Ex. 1, Ex. 5). However, in light of the PGA TOUR's threats to Sirius XM, it was left with no choice but to succumb to the PGA TOUR's draconian and malicious. (SOF ¶ 56).

The evolution of the press release itself is testament to the intensity of the PGA TOUR's pressure. The first proposed statement came from the PGA TOUR, chastised Haney, and stated:

> We shared our position with SiriusXM's leadership that Hank and his commentary have no place on PGA TOUR Radio. We hope Sirius/XM does the right thing.

(SOF ¶ 56, Ex. 6-1). Greenstein forwarded this version of the proposed statement to Irving Azoff ("Azoff"), a Sirius XM consultant and high-powered entertainment executive, Chairman of Full Stop Management, (SOF ¶ 56). Greenstein wrote, "Look what the tour wants to put out. Like Hank is a criminal." (SOF ¶ 56, Ex. 6-1). The clear message being, of course, that Greenstein did not think of Haney's comments as deserving of termination.

The next proposed statement tried somewhat to placate Sirius XM: "[a]fter discussion with the PGA TOUR, and at their request, we have suspended Mr. Haney…." (SOF ¶ 57, Ex. 6-1). Sirius XM's reaction was swift. Greenstein, commenting to Andrew Fitzpatrick, Sirius XM's Vice President of Corporate Communications, wrote: "This is a terrible statement by a partner." (SOF ¶ 57). Greenstein rejected that statement, made it clear that any action adverse to Plaintiffs was being demanded by the PGA TOUR, and said that the PGA TOUR alone had to take responsibility for any such action: "[t]his is all on PGA they want it they better have balls to stand behind it." (SOF ¶ 57, Ex. 6-1). Greenstein's opposition to punishing Plaintiffs was apparent: if the PGA TOUR was going to force Haney's termination, Sirius XM wanted the public to know that it was not Sirius XM's decision to end "Hank Haney Golf Radio," the most successful golf show of all time, but being demanded by the PGA TOUR.

Greenstein not only opposed the termination as being against Sirius XM's business interests but believed that the broadcast did not justify any adverse action. (SOF ¶ 58). As Azoff

testified "[Greenstein] definitively told me that he did not want to lose Hank off the show and did not believe that whatever the incident created was grounds for dismissal." (SOF ¶ 58),.[1]

Because the evidence overwhelmingly establishes that the PGA TOUR forced Haney's termination out of malice and without any legal justification, the PGA TOUR since the commencement of this lawsuit has fabricated a pseudo-concern for cultural appropriateness and conjured up a phony concern for women's golf to rationalize its actions and defend against the instant action.

The PGA TOUR's professed concern for the Ladies Professional Golf Association ("LPGA") is destroyed by its track record of minimal involvement between the two organizations, a history that belies any claim of support for women's golf, and by the fact that the PGA TOUR ignored the LPGA's conclusion for how to resolve any issues stemming from Haney's May 29th broadcast. (SOF ¶ 67). Indeed, the PGA TOUR Commissioner's own abject ignorance about the LPGA, fully displayed at his deposition, reflects the PGA TOUR's own lack of concern about women's golf. (SOF ¶ 65).

Likewise, the cultural sensitivity made-for-litigation pretext for its actions is belied by the PGA TOUR's consistent failure to act when other individuals associated with its brand have made racist, homophobic, and generally insensitive public remarks. (SOF ¶¶ 70-72).. Further, social media tracking data shows that any minor public reaction adverse to Haney's broadcast dissipated within a matter of days, if not hours. (SOF ¶ 72).

---

[1] On July 8, 2019, Plaintiffs and Sirius XM entered into a Settlement Agreement and Release ("Settlement Agreement") to resolve any claims emanating from the termination of the Talent Agreement. While Plaintiffs provided Sirius XM with a release of any claims, the "Sirius XM Released Parties" was defined to exclude the PGA TOUR. This intentional drafting reflects Defendant's wrongdoing. As Azoff testified, *Greenstein was "consistent that . . . he didn't want this to happen* and that he was not going to put his company in any sort of legal jeopardy over it" and that *Greenstein was "not going to let his company cover for the PGA by effectuating the release for the PGA*." (SOF ¶ 39). (Emphasis added.) Greenstein reiterated that there was a specific carve-out so that Haney justifiably could pursue remedies against the PGA TOUR.

# ARGUMENT

## I.     Legal Standard

A motion for summary judgment should only be granted when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The PGA TOUR "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The moving party is entitled to 'judgment as a matter of law' when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the burden of proof."  *United States Life Ins. Co. in the City of New York v. Logus Mfg. Corp.*, 845 F. Supp. 2d 1303, 1311 (S.D. Fla. 2012). "Further, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Summary judgment is not appropriate where, as here, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To succeed at this stage, the PGA TOUR would have had to present evidence that is "so one-sided that [it] must prevail as a matter of law."  *Id.* at 252.  Importantly, "Courts must not undertake the jury's function of weighing the evidence, making credibility determinations, or deciding what inferences should be drawn from the facts."  *Blash v. City of Hawkinsville*, No. 20-10337, 2021 WL 1561347, at *4 (11th Cir. Apr. 21, 2021).

## II.     Plaintiffs Raise Triable Issues on Their Tortious Interference Claims

Plaintiffs' two claims for relief—tortious interference with contract and tortious interference with business relations—essentially require proof of the same elements.  In both

instances, Plaintiffs must show (1) the existence of a contract or business relationship; (2) Defendant's knowledge of the contract or business relationship; (3) Defendant's intentional and unjustified procurement of a breach of the contract or interference with the relationship; and (4) damages as a result of Defendant's actions.[2]

The PGA TOUR argues that both of Plaintiffs' tortious interference claims can be decided at the summary judgment stage on the misplaced contention that its interference with Sirius XM was "justified" or "privileged." This argument fails. The PGA TOUR has not met the legal standard for justified interference. And equally fatal to the PGA TOUR's contention, summary judgment is inappropriate where the propriety of the interference is questioned. As explained below, the facts evidence that the PGA TOUR's actions against Plaintiffs were grounded in malice. A jury must determine the propriety of the interference and whether the PGA TOUR acted out of malice. *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) ("when there is room for different views about the propriety of a defendant's interference with a plaintiff's business relationships, the determination of whether the interference was improper or not is ordinarily left to the jury") (citation omitted).

### a. The PGA TOUR's Relationship With Sirius XM Does Not Justify Its Interference

---

[2] *See Sun Life Assur. Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018) ("The elements of a Florida law tortious interference with contractual relations claim are: (i) the existence of a contract; (ii) the defendant's knowledge thereof; (iii) the defendant's intentional and unjustified procurement of a breach thereof; and (iv) damages"); *Sekula v. Residential Credit Solutions, Inc.*, No. 6:15-cv-2104-Orl-31KRS, 2016 WL 1559142, at *6 (M.D. Fla. Apr. 18, 2016) ("To state a claim for tortious interference with business relations under Florida law, a plaintiff must allege: '(1) the existence of a business relationship… (2) knowledge of the relationship on the part of the defendant; (3) an intentional unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship'") (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (ellipses in original)).

The facts here undermine the PGA TOUR's assertion that its interference with Plaintiffs' relationship with Sirius XM was justified.

The PGA TOUR's argument addressing its supposed legal justification for its actions hinges on its inaccurate statement that it was not a "stranger" to the agreement between Plaintiffs and Sirius XM as that term is applied to such situations.  Under Florida law, to be a non-stranger to an agreement, a defendant must have a direct, *express* beneficial or "economic interest in or control over the underlying relationship."  *XTec, Inc. v. Hembree Consulting Servs., Inc.*, No. 14-21029-CIV, 2015 WL 12550911, at *3 (S.D. Fla. June 3, 2015) (citation omitted).  To have a beneficial or economic interest, the party must have an interest akin to that of an owner, partner, or stockholder.  *See Bezeau v. Cable Equip. Servs.*, No. 14-24538-CIV, 2015 WL 3540009, at *8-*9 (S.D. Fla. May 27, 2015); Restatement (Second) of Torts § 769 (1979).  To have a supervisory interest, courts look to a legally controlling supervisory relationship, not a simple "association" with a party.  *Palm Beach Cty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).  Likewise fatal to the PGA TOUR's argument that it was somehow "privileged" to interfere in Plaintiffs' relationship with Sirius XM, Defendant fails to recognize that the "question of whether an action is privileged is a jury question."  *Monco Enterprises, Inc. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. 1st DCA 1996).  In other words, simply saying that the content of a Sirius XM broadcast somehow effects the PGA TOUR's business interest does not make it so.

Here, the PGA TOUR vaguely describes an "economic and financial interest in the SiriusXM PGA TOUR radio channel."  Mot. at 10.  However, claiming an economic or other interest does not mean that the PGA TOUR had a legal right to force Sirius XM to terminate its

relationship with Plaintiffs.  The PGA TOUR's coverage on Sirius XM is governed by a License Agreement (the "License Agreement"). (Ex. 1-1).  The PGA TOUR negotiated for a measure of control over what *programming* would be approved on "SiriusXM PGA TOUR Radio" *in advance of the talent being hired*.  The PGA TOUR, in contrast, did not negotiate for any role in determining the *content* of what was broadcast or a right to interfere with any *disciplinary* issues that arose during a broadcast, and certainly not for any role in demanding that talent be removed from the air.  (SOF ¶ 60, Ex. 1-1).

Specifically, Section 2.01(f) of the License Agreement provides that "Sirius XM shall ensure that Sirius XM and its representatives do not incorporate into the Programming any material which is . . . inconsistent with the [PGA TOUR's] standards of appropriateness as may be provided to Sirius XM in writing."  First, the PGA TOUR did not provide Sirius XM with standards of appropriateness in writing, , and thus abandoned any role which it may have negotiated about determining who would be given a show on the air, and, in fact, has never weighed in on Programming. (SOF ¶ 60, Ex. 1-1).  In other words, it did not even have the right to weigh in on the talent *before* being hired by Sirius XM, having failed to fulfill that predicate condition.  But more importantly, the License Agreement provided PGA TOUR with absolutely no role in content, *i.e.*, what the talent broadcast *after* they had been hired and were on the air. (SOF ¶ 60, Ex. 1-1)

Multiple witnesses made clear the difference between having a role in programming and having a role in content.  Greenstein testified that, with regard to Programming, the License Agreement "requires an agreement by the parties in advance of distribution on the channel."  In contrast, Greenstein testified that the PGA TOUR could not exercise "any veto power or authority over the content of a show" and had never attempted to interfere with content or assert discipline about the content of a show "other than [with] Mr. Haney."  (SOF ¶ 63).   Azoff, the Sirius XM

consultant and one of the deans of the broadcast world, agrees that the License Agreement does not provide the PGA TOUR with any control over the content of shows on Sirius XM, and added that he would "expect that the PGA would have sufficient sophistication to negotiate the right to control content on SiriusXM if it believed it should have that right."  (SOF ¶ 63).  As Haney's agent, Jeremy Aisenberg ("Aisenberg"), testified, programming relates solely to determining what talent would be hired to conduct a show.  (SOF ¶ 63).  In contrast, "Mr. Haney could create the content … [and the content never] would be a problem" subject to the PGA TOUR's review: the PGA TOUR had no authority or right to do "anything to affect the content of [Haney's] programming."  (SOF ¶ 63)

The issue of Haney's broadcast addresses the *content* of his show.  As Azoff testified, the PGA TOUR could have negotiated with Sirius XM for a role in overseeing content but failed to do so.

Even the PGA TOUR acknowledged in discovery that it had no right to interfere with the content of a show.  For example, the PGA TOUR's Vice President of Communications wrote "while it is the 'PGA TOUR Network' we don't own or manage any of the original content on the show (ie don't hire/fire talent) . . . ."  Even Monahan agreed that the PGA TOUR had "no oversight" on what was broadcast on Sirius XM.  (SOF ¶ 62).  Monahan surprisingly even admitted at his deposition that the PGA TOUR "didn't have the right to instruct Sirius to discipline Mr. Haney" and that doing so was "contrary" to the PGA TOUR's rights.  (SOF ¶ 63).[3]  Neal similarly was not "aware of any such oversight" right over content.  (SOF ¶ 62).

---

[3] Indeed, Monahan seemed either unmindful or conveniently ignorant of the facts in the record, including the press release that made clear that the termination was being done as a result of the PGA TOUR's "instruction," (SOF ¶ 32), and his own email in which he made it clear that he was going to effectuate Haney's termination from Sirius XM, (SOF ¶ 39).

The License Agreement reflects that the PGA TOUR knew how to negotiate the right to be involved in particular aspects of Sirius XM's business.  In addition to having a right—although waiving that right by not providing PGA TOUR standards to Sirius XM, as the License Agreement required as a prerequisite to being involved with programming—to participate in selecting talent before being hired, the PGA TOUR negotiated the right to protect certain intellectual property, defined in the License Agreement as the "TOUR Marks."[4]  As Greenstein testified, that provision applied solely "for marketing purposes … a brochure or something else."  (SOF ¶ 64).

Unsurprisingly, given the paucity of its legal justification argument, the PGA TOUR also crafts a fallback rationalization for its actions based on a *USA Today* article by Christine Brennan published the same day as Haney's Sirius XM broadcast.  The PGA TOUR now seeks to justify its interference based on self-serving conclusions that articles such as Brennan's "assumed the PGA TOUR had oversight or control over" Haney's Sirius XM program, Mot. at 11, and that such a non-existent connection somehow justified the PGA TOUR's actions.  This baseless assumption is irrelevant as a matter of law; indeed, summary judgment has been denied on tortious interference claims even when there was an *actual*—not a made up, manufactured—connection between the defendant and the third party.  *See Liebherr-Mining*, 2013 WL 85179, at *5 (denying summary judgment and rejecting defendant's argument that it was not a stranger because "absent [plaintiff's] sale of its parts to [defendant], [defendant] would have had nothing to sell" to the third party); *Adria MM Prods*, 2018 WL 4268886, at *9 (declining to hold that defendant was not a stranger as a matter of law even when the relevant agreement provided that defendant was a third party beneficiary of contracts forming the basis of the tortious interference claim).  Here, the mere self-

---

[4] The TOUR Marks include "names, logos and trademarks owned and/or controlled by [the PGA TOUR], including the name "PGA TOUR," and the PGA TOUR's Swinging Golfer Logo[.]"  (SOF ¶ 64)

serving perception of oversight or control – stated by the PGA TOUR with no basis or support—is legally insufficient to sustain Defendant's burden at this stage.

Contemporaneously with the events at issue, the PGA TOUR acknowledged internally that this 'perception' argument has no basis in the relationship between Plaintiffs and Sirius XM. For example, Neal asked David Logue of PGA TOUR Radio if there was "credibility" to Christine Brennan's statement that Haney's comments were "said on the PGA Tour's flagship Sirius XM show." In response, Logue wrote, "I would submit that, since we have nothing to do with Hank or his show, calling it 'the PGA TOUR's flagship SiriusXM show' is inaccurate . . .." (SOF ¶ 54, Ex. 2-3).

As detailed above, additional contemporaneous emails further prove that the PGA TOUR—before it needed to justify its actions in a lawsuit—did not itself believe it had any legal authority to intervene in Plaintiffs' relationship with Sirius XM. (*See, e.g.,* Neal: "we don't control these shows,"; "while it is the 'PGA TOUR Network' we don't own or manage any of the original content on the show (ie don't hire/fire talent)"; and, "[t]he network is not owned or operated by the PGA TOUR so we don't have any oversight on items such as talent, so that complicates the situation." (SOF ¶ 54, Ex. 2-3)

Summary judgment has been denied on tortious interference claims in instances in which the defendant has presented evidence that is far more supportive than the PGA TOUR's. For example, *Liebherr-Mining Equip. Colmar SAS v. Castec, Inc.*, No. 11-CV-22887, 2013 WL 85179, at *5 (S.D. Fla. Jan. 7, 2013), involved a distributor suing a manufacturer for interference with a third-party buyer relationship. Defendant argued that "it was an indispensable party to the relationship" between defendant and the third party because "absent [plaintiff's] sale of its parts to [defendant], [defendant] would have had nothing to sell" to the third party. *Id.* (citation and

internal alteration omitted).  The court denied summary judgment, holding that simply contending that there was an economic consequence to the actions of others was not sufficient to support an argument that defendant was "a party to the business relationship such that the tortious interference claim must fail" and that defendant could not "avoid liability on the argument that it was an essential party to the business relationship."  *Id.*

In sum, the PGA TOUR's conclusory statements in the Motion fail to support the argument that its actions meet the standard for justified interference as a matter of law.  At best, when viewed in the context of the entirety of the evidence, Defendants' argument creates "room for different views," meaning that a jury must resolve this issue.  *Duty Free*, 797 F.3d at 1280.  *See also Poole & Kent Co. v. Tetra Tech, Inc.*, No. 09-21749-CIV, 2010 WL 11505134, at *5 (S.D. Fla. Sept. 2, 2010) (denying summary judgment and declining to find that defendant was not a stranger to the relevant agreement where the defendant had not shown that it was "the source of the business opportunity with which it allegedly interfered," and could not prove "a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed").

### b.  The PGA TOUR's Relationship With the LPGA Does Not Justify its Interference

Another of the PGA TOUR's made-for-litigation justifications for its wrongdoing is based on its "burgeoning relationship with the LPGA."  Mot. at 13.  That claim has no basis in fact. Indeed, Neal was unable to name the top-ranked LPGA golfers.  (SOF ¶ 65).  Monahan showed even greater ignorance about women's golf.  Monahan admitted that, as PGA TOUR Commissioner, he has never attended an LPGA event and he could not recall the last time he attended an LPGA event.  Furthermore, while he remembered that a player named Angela Stanford won the previous week's LPGA tournament, he could not name any of the top five ranked players.

(SOF ¶ 65).  When pressed, he said that Mike Whan, the LPGA Commission, is the "person who is in a position to tell you the top players in the world" of women's golf.  (SOF ¶ 65).

Asked about the "strategic alliance" between the PGA and the LPGA, Neal described vaguely that the PGA had "LPGA players hosted at our tournaments, and we've created content around that that lives on both the LPGA social channels and the PGA Tour social channels."  (SOF ¶ 66).  Monahan was equally unable to articulate any "strategic alliance": he spoke vaguely of a "commitment" to "promote the LPGA Tour on our broadcast and the LPGA Tour to promote the PGA Tour and our tour on their broadcast.  That's the spirit of the partnership," (SOF ¶ 66), yet could not identify any evidence of such a commitment.  Instead, the facts show that the PGA TOUR has usurped any, albeit minimal, commercial value that the LPGA at one time enjoyed by entering into an agreement that gives "north of 90 percent" of revenue from LPGA events on Golf Channel to the PGA TOUR and "[n]orth of 95 percent" of the revenue with NBC to the PGA TOUR.  Rather than supporting women's golf, the PGA TOUR has deprived it of any media returns, adequate media attention, or any other kind of support.

Tellingly, when presented with an opportunity to turn Haney's comments into an avenue for raising the image of the LPGA by accepting a compromise position recommended by the LPGA Commissioner and supported by Sirius XM that included Sirius XM creating a radio show focusing on women's golf, the PGA TOUR chose instead to sacrifice this opportunity to benefit the LPGA so that it could exact revenge upon Haney.  No radio show was ever created.  When asked if he remembered Whan "suggesting . . .  an attempt be made to pursue Sirius to suspend Mr. Haney for 30 days and to obtain for the LPGA a show . . . relating to women's golf, in particular," Monahan testified that Whan said that "Sirius XM coverage of the LPGA was . . . not meaningful prior to that point in time," although he claimed to not "recall talking about any specific solutions with Mr.

Whan." (SOF ¶ 67). That alone is a telling remark about Monahan's lack of any care about the LPGA.

Whan's wishes, however, are memorialized in an email from Jerry Tarde of Golf Digest sent to Azoff, Haney, and Aisenberg. In particular, Whan did not support Haney's termination and, instead, believed that a short suspension, perhaps as long as thirty days, more than sufficiently sent a message. Monahan admitted that Whan did not ask him to "assist in getting Mr. Haney terminated." (SOF ¶ 68). Indeed, based on communications with Whan, Tarde concluded that Whan "didn't seem too upset" about the incident. (SOF ¶ 69).

Instead of acting in a way that actually could have benefited the LPGA, the PGA TOUR opted to carry out its own revenge, and to cause harm to Haney and his valuable relationship with Sirius XM. Again, the parties' differing views on the justification of Defendant's interference mean that this matter cannot be resolved at the summary judgment stage. *See, e.g.*, *Blash*, 2021 WL 1561347, at *4.

### c. The PGA TOUR Acted with Malice and Improper Means

Even if the Court were to conclude that the PGA TOUR was not a "stranger" to Plaintiffs' relationship with Sirius XM, Defendant still could not avoid scrutiny from a jury. Any privilege to interfere in a business relationship is defeated if the interfering party acts in bad faith. *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, No. 05-21113-CIV-TORRES, 2007 WL 473273, at *4 (S.D. Fla. Feb. 8, 2007). An interference is not justified when the defendant is interfering in order "to do harm, or for some other bad motive." *Mattocks v. Black Ent. Television LLC*, 43 F. Supp. 3d 1311, 1319 (S.D. Fla. 2014) (citation omitted). Furthermore, "[w]here there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper." *Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. 2d DCA

1995)*.*  Under this legal principle, "a determination of malice is generally a matter for the jury to decide."  *Stanley Indus. of S. Fla., Inc. v. AIM Garments Corp.*, No. 16-62658-CIV, 2019 WL 2009336, at *3 (S.D. Fla. Mar. 15, 2019)*; see also Int'l Yacht Bureau, Inc. v. Int'l Registries, Inc.*, No. 13-60947-CIV, 2015 WL 5118121, at *4 (S.D. Fla. Sept. 1, 2015) ("Under Florida law, the issue of whether a defendant has gone beyond its limited and qualified privilege is generally a question for the trier of fact").

The yarn spun by the PGA TOUR that its actions were justified to protect its brand is unraveled both as a legal matter (as discussed above) and by the PGA TOUR's history, which evidences the hypocrisy and speciousness of its current rationalizations.  There have been numerous instances of individuals associated with the PGA TOUR making racist, misogynistic, homophobic, or otherwise culturally insensitive remarks that are far more offensive than Haney's comments and which the PGA TOUR ignored or countenanced.  This evidence alone raises a genuine question as to whether the PGA TOUR pressured Sirius XM to fire Haney "solely out of spite, to do harm, or for some other bad motive."  *Mattocks*, 43 F. Supp. 3d at 1319.

For example, PGA TOUR golfer Kevin Kisner, in a tweet, callously attributed COVID-19 deaths to the inability of an identified person's family members and friends to follow guidelines. Specifically, Kisner replied to former basketball player Rex Chapman's tweet that described his loss of his friends' parents and his own parents being in and out of the hospital, stating "[g]uess they can't follow the guidelines."  Barely six months into the unprecedented deadly pandemic, his insensitivity was decried on social media.  (SOF ¶ 70).  After Kisner apologized, however, the PGA TOUR made a public statement that "We were pleased to see Kevin take ownership of the situation and have since spoken to him directly."  (SOF ¶ 70).  Kisner was not suspended from the

PGA TOUR for any length of time and, indeed, remained a member of the prestigious PGA TOUR Policy Board without interruption.

When Golf Channel Anchor Kelly Tilghman said that other players should gang up on Woods—one of the few African American professional golfers—because of his playing and "lynch him in a back alley," she was suspended for two weeks and the PGA TOUR took no action to harm her career. (Ex. 3-3). Most recently, Justin Thomas, a PGA TOUR golfer, was caught on a hot mic saying "faggot" after he missed an easy putt. (SOF ¶ 71). Again, the PGA TOUR took no disciplinary action to correct this insensitivity or to evidence that the PGA TOUR cared at all about such homophobic and wrong comments. (SOF ¶ 71).

When compared to its inaction in the situations described above, the PGA TOUR's justification that Haney had to be terminated because of the "public's response on social media" is flimsy at best. Mot. at 4-5. Neal and Monahan testified that they monitored the social media reaction, and it indicated to them that Haney had to be terminated. The PGA TOUR, however, has failed to support that rationalization with any readily available analysis of the social media reaction. Indeed, empirical analysis of the social media reaction undercuts its position and would have alleviated any legitimate concerns. Plaintiffs produced social media analyses that track the reaction to Haney's commentary. Aisenberg conducted a "sentiment analysis using a variety of third party software tools." (SOF ¶ 72). The results show the opposite of what Defendant contends—that "sentiment had returned to a net positive sentiment [of Haney] within seven days of the remarks." (SOF ¶ 72). This quantitative analysis confirms what is common sense: "the audience forgives and forgets quite quickly." (SOF ¶ 72). Furthermore, social media analysis reflects that after Thomas's homophobic remark, his negative sentiment on a single day was "three

times worse than all of the comments ever made about Mr. Haney since May 29, 2019."  (SOF ¶ 72).

The fact that the PGA TOUR did not provide written standards of conduct for its Sirius XM programming casts additional doubt on its "brand protection" justification.  (SOF ¶ 61).  Prior to its seizing on a pretext to fire Haney, the PGA TOUR did not care enough about cultural sensitivity to put its standards in writing.  Furthermore, until it saw a chance to consummate the years of hatred it had developed for Haney with this act of destruction, the PGA TOUR never reached out to Sirius XM regarding the appropriateness of any programming  to put on the station or the content of any of its broadcasts.  (SOF ¶ 61).

This significant amount of evidence, when viewed in the light most favorable to Plaintiffs, creates a triable issue regarding the PGA TOUR's motive in pressuring Sirius XM to remove Haney from the air.  *Pisani*, 2009 WL 10667906, at *4.  Intent is generally "a question of fact for the factfinder and only in rare instances is the question appropriate for summary judgment."  *Pisani v. Sunrise Lakes Condo. Phase 4, Inc. III*, No. 07-61762-CIV, 2009 WL 10667906, at *4 (S.D. Fla. Apr. 9, 2009) (citation omitted).  The disputed evidence necessitates a jury trial.

### III.    Plaintiffs Have Presented Evidence of Defendant's Breach of the Sirius XM Agreement

Defendant's argument that Plaintiffs have not shown a breach of the Sirius XM agreement also is without merit.  The parties do not dispute that Plaintiffs and Sirius XM entered into the Settlement Agreement effective June 14, 2019.  (SOF ¶ 39).  As Greenstein testified, Haney would be broadcasting today on Sirius XM if it were not for the PGA TOUR's actions.  (SOF ¶ 14).  Furthermore, the Settlement Agreement between Sirius XM and Plaintiffs following the termination alone suffices as evidence of a breach of the Talent Agreement.  The Settlement Agreement was to "resolve all matters that may be in controversy or dispute between [the parties]

related to the termination of the Talent Agreement." Sirius XM paid Plaintiffs $646,951.00 to resolve its liability for allowing Haney to be terminated. Sirius XM would not have paid that amount of money, or any amount of money, without recognizing that Plaintiffs had suffered the consequences of a breach of their legal rights.

As discussed above, the parties to the Settlement Agreement purposely chose not to include the PGA TOUR as a Released Party. Sirius XM and Haney both believed that the termination of the Talent Agreement was wrongful and that the PGA TOUR should be made to answer for its direction of that breach. Azoff testified that Greenstein was "consistent that . . . he didn't want this to happen and that he was not going to put his company in any sort of legal jeopardy over it" and that Greenstein was "not going to let his company cover for the PGA by effectuating the release for the PGA." (SOF ¶ 39). Greenstein reiterated that there was a specific carve-out so that Haney could pursue remedies against the PGA TOUR. (SOF ¶ 39). Aisenberg testified that "Greenstein believed that Hank had a very strong case to be brought against the PGA Tour for interfering with his relationship with SiriusXM and gladly ensured that they in no way, shape, or form represent that they . . . weren't in . . . support of Hank's ability to raise his concerns through whatever remedies the law allows in regard to the PGA Tour's interference with a very . . . successful partnership between SiriusXM and Hank Haney." (SOF ¶ 39). The PGA TOUR carve-out evidences that there was a breach of the Talent Agreement and a jury must be allowed to decide the scope of the injury the PGA TOUR caused by procuring that breach.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Court should deny Defendant's motion for summary judgment.

Dated:   New York, New York
         May 3, 2021

Respectfully submitted,

MICHELMAN & ROBINSON, LLP

By: /s/ *Peter R. Ginsberg*
       Peter R. Ginsberg (*admitted pro hac vice*)
800 Third Avenue, 24th Floor
New York, New York 10022
Telephone:  (212) 730-7700
Facsimile:   (212) 730-7725
prginsberg@mrllp.com

RICE PUGATCH ROBINSON STORFER &
COHEN PLLC

By: /s/ Riley W. Cirulnick
      Arthur H. Rice
      Riley W. Cirulnick
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300
arice@rprslaw.com
rcirulnick@rprslaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

Hank Haney et al. v. PGA TOUR, Inc.
Case No. 0:19-cv-63108-RAR

I hereby certify that on May 3, 2021, I electronically filed the foregoing document with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to all

counsel listed on the attached Service List.


/s/ *Riley Cirulnick*
Riley Cirulnick

## <u>SERVICE LIST</u>

Hank Haney et al. v. PGA TOUR, Inc.
<u>Case No. 0:19-cv-63108-RAR</u>

**Attorneys for Defendant:**

**William E. Davis**
Foley & Lardner LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, FL 33131-2320
(305) 482-8404
<u>wdavis@foley.com</u>

**Angelica L. Novick**
Foley & Lardner LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, FL 33131-2320
(305) 482-8432
<u>anovick@foley.com</u>