UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:19-CV-63108-RAR

-------------------------------------------- X
:
HANK HANEY and :
HANK HANEY MEDIA, LLC, :
:
:
                         Plaintiffs, :
:
      -against- :
:
:
PGA TOUR, INC., :
:
:
                        Defendant. :
-------------------------------------------- X

PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Hank Haney ("Haney") and Hank Haney Media LLC ("HHM" and, collectively, Plaintiffs), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 of the United States District Court for the Southern District of Florida, respectfully submits the following Statement of Material Facts in Opposition to Defendant PGA TOUR, INC. ("PGA TOUR")'s Motion for Summary Judgment.[1]

---

[1] This Statement of Undisputed Material Facts is supported by the following, which are expressly incorporated herein by reference:
**Exhibit 1**: Relevant portions of the deposition testimony of Scott Greenstein, taken on March 11, 2021 ("Greenstein Dep., Page:Line"), and Exhibit 2 [license agr], 31 [Davis email], 2 [tarde email) attached hereto as Ex. 1-[#]."
**Exhibit 2**: Relevant portions of the deposition testimony of Jay Monahan, taken on December 8, 2020 ("Monahan Dep., Page:Line"), and Exhibits 27 [Schuchmann loose email], 28 [David Logue email], 30 [Peter Moulder email] and attached hereto as "Ex. 2- [#]."
**Exhibit 3**: Relevant portions of the deposition testimony of Laura Neal, taken on December 15, 2020 ("Neal Dep., Page:Line"), and Exhibits 24 [Kisner tweet], 25 [article with Kisner apology], 26 [tiger woods lynching] attached hereto as "Ex. 3-[#]."
**Exhibit 4**: Relevant portions of the deposition testimony of Hank Haney, taken on November 20, 2020 ("Haney Dep., Page:Line"), and Exhibits attached hereto as "Ex.4-[#]."
**Exhibit 5**: Relevant portions of the deposition testimony of Jeremy Aisenberg, taken on January 12, 2021 ("Aisenberg Dep., Page:Line"), and Exhibits attached hereto as "Ex.5-[#]."
**Exhibit 6**: Relevant portions of the deposition testimony of Irving Azoff, taken on February 12, 2021 ("Azoff Dep., Page:Line"), and Exhibits 1 [criminal], 22 [Haney settlement] attached hereto as "Ex.6-[#]."

1

1. Disputed. The License Agreement does not support the PGA TOUR's characterization. The License Agreement governs and characterizes the relationship between the PGA TOUR and Sirius XM. (Ex. 1-1)

2. Disputed. The License Agreement does not support the PGA TOUR's characterization. The License Agreement speaks for itself.

3. Disputed. The License Agreement does not support the PGA TOUR's characterization. The License Agreement provides specific conditions to which the PGA TOUR must adhere if it is to exercise control over programming on the PGA TOUR Radio channel. Further the PGA TOUR mischaracterizes the Licensing Agreement by ignoring that it does not provide any role for the PGA TOUR in the content of a show. The License Agreement provides the ability for the PGA TOUR to be involved in selecting programming before a talent is hired to run a show. No provision allows for any involvement by the PGA TOUR in the content of shows on the air, (Ex. 7, Aisenberg Expert Dep., 91:17-99:17.), and the PGA TOUR omits the distinction between programming and content. (Ex. 7, Aisenberg Expert Dep., 91:17-99:17.).

Furthermore, the PGA TOUR Statement omits that the PGA TOUR has waived any right it may have had with regard to Sirius XM programming. Section 2.01(f) of the License Agreement requires that the selection of programming only must be consistent "with the [PGA TOUR's] standards of appropriateness as may be provided to Sirius XM in writing." (Ex. 1-1 [Greenstein Dep. Ex. 2].) The PGA TOUR did not provide Sirius XM with standards of appropriateness nor, as the PGA TOUR admitted, do any such standards exist. (Ex. 1, Greenstein Dep. 19:7-10; Ex. 2, Monahan Dep. 75:2-4; Ex. 3, Neal Dep., 45:1-46:1.)

4. Undisputed.

---

**Exhibit 7:** Relevant portions of the expert deposition testimony of Jeremy Aisenberg, taken on March 31, 2021 ("Aisenberg Expert Dep.., Page:Line"), and Exhibits attached hereto as "Ex.7-[#]."

5. Undisputed. The provision quoted by the PGA TOUR is additional support for the fact that programming relates to shows selected "in *advance of distribution* on the channel," and not to the content once the shows have been selected.

6. Undisputed. However, the PGA TOUR ignores that no "standards of appropriateness" were ever provided by the PGA TOUR, which is a prerequisite to having a say in programming as set forth in the provision herein quoted.

7. Disputed. When asked to describe any collaborative efforts between PGA and the LPGA, Neal only offered the following: "LPGA players hosted at our tournaments, and we've created content around that that lives on both the LPGA social channels and the PGA Tour social channels." (Ex. 2, Neal Dep., 144:2-10.) On the same topic, Monahan spoke of a "commitment" to "promote the LPGA Tour on our broadcast and the LPGA Tour to promote the PGA Tour and our tour on their broadcast. That's the spirit of the partnership." (Ex. 2, Monahan Dep., 123:13-18.) However, neither was able to provide any examples of the supposed collaboration. (Ex. 2, Neal Dep., 144:2-10); (Ex. 2, Monahan Dep., 123:13-18, 124:15 – 125:4.)

8. Disputed. In fact, The PGA TOUR has usurped any, albeit minimal, commercial value that the LPGA at one time enjoyed by entering into an agreement that gives "north of 90 percent" of revenue from LPGA events on Golf Channel to the PGA TOUR and "[n]orth of 95 percent of the revenue with NBC to the PGA TOUR." (Ex. 2, Monahan Dep., 124:15-125:4.)

9. Undisputed.

10. Undisputed.

11. Undisputed.

12. Undisputed.

13. Undisputed.

14. Disputed. As Greenstein testified, the Hank Haney Golf Radio show was not going to expire, Sirius XM was planning to continue the show, and Haney would remain on Sirius XM today had it not been forced by the PGA TOUR to terminate Haney. XXX.

15. Undisputed.

16. Undisputed.

17. Undisputed.

18. Undisputed.

19. Undisputed.

20. Disputed. In fact, any negative reaction quickly dissipated. (Ex. 7, Aisenberg Expert Dep., 28:10-29:3.) This quantitative analysis confirms what is common sense: "the audience forgives and forgets quite quickly." (*Id*.)

21. Disputed. Christine Brennan wrote the quoted article but it was not an "example" of anything but her own opinion.

22. Undisputed.

23. Undisputed.

24. Disputed. Monahan wrote that "Haney needs to lose his job," but that was not in reaction to social media or Whan's comments.

25. Undisputed.

26. Disputed. Greenstein's response was in sharp contrast. He did not believe that Haney's comments warranted any adverse reaction by Sirius XM or anyone else. Greenstein not only opposed the termination as being against Sirius XM's business interests but believed that the broadcast did not justify any adverse action. (Ex. 1, Greenstein Dep. 22:18-23:13.) As Azoff testified "[Greenstein] definitively told me that he did not want to lose Hank off the show and did

4

not believe that whatever the incident created was grounds for dismissal." (Ex. 6, Azoff Dep., 15:16-20).

27. Disputed. Monahan did not testify at pages 58 to 59 of his deposition that Haney's on-air comments were creating issues for the PGA TOUR with respect to the PGA TOUR's relationship with the LPGA. (Ex. 2, Monahan Dep., 58:5-59:12.) In fact, the Commissioner of the LPGA was not disturbed by Haney's comments. Whan's reactions are memorialized in an email from Jerry Tarde of Golf Digest sent to Azoff, Haney, and Aisenberg. In particular, Whan did not support Haney's termination and, instead, believed that a short suspension, perhaps as long as thirty days, more than sufficiently sent a message. Monahan admitted that Whan did not ask him to "assist in getting Mr. Haney terminated." (Ex. 2, Monahan Dep., 130:13-23). Indeed, based on communications with Whan, Tarde concluded that Whan "didn't seem too upset" about the incident. (Ex. 1-3).

28. Undisputed.

29. Disputed. When asked "were you concerned, and did the PGA threaten in an implied way, that that would occur?" Greenstein admitted, "I was certainly concerned." (Ex. 1, Greenstein Dep., 73:16-23.)

30. Undisputed.

31. Undisputed.

32. Disputed. Neal did not testify at pages 130 to 131 of her deposition that once the decision had been made to suspend Haney, Neal and her counterparts at SiriusXM worked together to prepare a joint public statement by SiriusXM and PGA TOUR. (Ex. 3, Neal Dep. 130:9-131:13.) And, in fact, Sirius XM refused to have any press statement released that hid the

5

fact that the decision was made exclusively by the PGA TOUR and at the "instruction" of the PGA Tour.  (Ex. 1, Greenstein Dep. 75:2-5.)

33.     Undisputed.

34.     Disputed.  After May 30, 2019, Greenstein testified that "I don't recall if Irving [Azoff] or anyone else had reached out to Jay [Monahan], but I believe -- and, again, I could be wrong because it's a couple years now -- I thought somebody did try to reach out and see if they could help with the situation."  He further testified that he did not reach out to Monahan because "[t]hat one phone call was enough."  (Ex. 1, Greenstein Dep. 112:18-113:1.)

35.     Undisputed.

36.     Undisputed.

37.     Undisputed.

38.     Disputed.  As both Aisenberg and Haney testified, the iHeart Media option was not a substitute nor a viable alternative to the Sirius XM arrangement.

39.     Disputed.  Recognizing that it had been forced by the PGA TOUR to breach its duties and obligations to Plaintiffs, Sirius XM engaged Plaintiffs in seeking out a resolution for its actions while specifically refusing to include PGA TOUR in that resolution, concluding that the PGA TOUR.  On July 8, 2019, Plaintiffs and Sirius XM entered into a Settlement Agreement and Release ("Settlement Agreement") to resolve any claims emanating from the termination of the Talent Agreement.  While Plaintiffs provided Sirius XM with a release of any claims, the "Sirius XM Released Parties" was defined to exclude the PGA TOUR.  This intentional drafting reflects Defendant's wrongdoing.  As Azoff testified, Greenstein was "consistent that . . . he didn't want this to happen and that he was not going to put his company in any sort of legal jeopardy over it" and that Greenstein was "not going to let his company cover for the PGA by effectuating

the release for the *PGA*." (Ex. 6-1).  Greenstein reiterated that there was a specific carve-out so that Haney justifiably could pursue remedies against the PGA TOUR.

40. Disputed.  The Settlement Agreement speaks for itself.

41. Disputed.  Plaintiffs' termination warranted a payment of over $600,000.00 in damages.

42. Undisputed.

43. Undisputed.

44. Undisputed.

45. Disputed.  Haney testified "when I wrote my book, The Big Miss, about my years coaching Tiger Woods, we had a big order with PGA Tour Superstores through -- I believe it was through a company called Booklegger, which is a book distribution company.  It was a large order.  PGA Superstore is a big store, sells a lot of books.  And right before that order was delivered, we were told it was cancelled at the behest of the PGA Tour.  PGA Tour wanted to cancel.  They didn't want that book in their stores." (Ex. 4, Haney Dep. 35:20-36:4.)

46. Disputed.  Aisenberg testified that he spoke to Tina Constable, Rick Horgan, and Tammy Blake of Crown Archetype at Random House, and that "they explained that . . . someone associated with PGA Tour called the PGA Tour Shops and said that Tour-related enterprise shouldn't be supporting this book that is not favorable for our -- our biggest star." (Ex. 5, Aisenberg Dep. 20:9-21:6.)

47. Undisputed.

48. Disputed.  Aisenberg testified that he spoke to Thomas Stathakas and Kieth Allo of the Golf Channel and that these individuals told him "they were 'efforting' to strengthen and renew a relationship with Tiger and in order to ensure Tiger's openness to working with Golf

Channel, who, you know, Golf Channel viewing -- the new leadership with Golf Channel . . . and they essentially made the decision that they were going to work hard to -- to win Tiger's favor, and -- and, you know, getting rid of Hank Haney on the Golf Channel was -- was the -- part of the price of renewing their relationship with Tiger."  (Ex. 5, Aisenberg Dep. 43:1-22, 44:13-45:10.)

49. Disputed.  Plaintiffs do not dispute the facts regarding the allegations in the Complaint.  Plaintiffs dispute the facts regarding lack of personal knowledge.  Haney testified: "I had a relationship with Avis, a rental car company. I did a big outing for them. . . . And we were led to believe that we were on our way to a very lucrative, longstanding relationship with Avis, and that never materialized.  And it was told to me by Jeremy Aisenberg that that was because the PGA Tour told Avis they -- they did not want them doing anything with Hank Haney."  (Ex. 4, Haney Dep., 38:17-39:8.)  Aisenberg testified "8 to 12 weeks following that event, those discussions continued with the various parties with Avis and their agency.  Lisa or Allison Botto was the -- their marketing contact at Avis at the time, and a woman named Heather Breen ran the account for their agency" and that "So after many months of those discussions . . . Allison and Heather reported back to us that the PGA Tour had asked them to hold off on the partnership and to explore other potential opportunities, which in Tour -- official Tour partners to execute similar types of marketing activations instead of the -- the plan that we had developed . . . with Avis and Mr. Haney.  (Ex. 5, Aisenberg Dep. 30:19-24, 32:22-33:4.)

50. Disputed.  Plaintiffs do not dispute the facts regarding the allegations in the Complaint.  Plaintiffs dispute the facts regarding lack of admissible evidence.  Haney testified that "Jeff Neubarth from Callaway" told him "that [the agreement with Callaway] did not go

8

forward because of the fact that I had lost my platform on Sirius XM, PGA Tour Radio." (Ex. 4, Haney Dep., 70:14-18.)

## Additional Facts

51. In 2012, Plaintiff Hank Haney authored a book, *The Big Miss*, which focused on Haney's time as Woods's swing coach from 2004 through 2010. Fearing damage to its own financial interests based on the book's revelations about one of its most important profit-centers, the PGA TOUR began campaigning to discredit Haney and his book. As the substantive content of the book became public through previews in 2012, and debuted as #1 on the New York Times bestseller list, the PGA TOUR used its unique power and authority in the golf world to induce both "PGA Tour Superstores" and "PGA Tour Shops" to cancel previously placed orders of The Big Miss. (Ex. 5, Aisenberg Dep. 17:10-25, 19:21-7.)

52. As of the time the PGA demanded his termination, Haney had become Sirius XM's most popular talent on the Sirius golf network. By the time the PGA TOUR forced Sirius XM to terminate Plaintiffs, the "show was very successful, and the audience was growing." (Ex. 6, Azoff Dep., 15:2-7.)

53. Following Haney's apology following his May 29th broadcast, Sirius XM's PGA Tour Radio Program Director, Jeremy Davis, sent an e-mail to all Sirius XM PGA Tour Radio talent and producers, business managers of all talent, Sirius XM programming executives including the VP of Sports, Steve Cohen, and Greenstein. The e-mail had a subject line of "Hank's Comments Today," and read:

> Obviously this has gotten a lot of attention today … Hank made a comment that some people found offensive, he apologized, end of story. Any questions just ask.

(Ex. 1-2.)

54. The PGA TOUR has admitted its lack of authority over Sirius XM broadcast content. On May 29, 2019, the day of Haney's broadcast, Joel Schuchmann ("Schuchmann"), the PGA TOUR's Vice President of Communications, described a "'loose' affiliation with Sirius/XM" and wrote that "we don't control these shows." (Ex. 2, Monahan Dep., 27:10-15, and Ex. 2-3.) The next day, May 30, 2019, Schuchmann reiterated to individuals at the U.S. Golf Association that the PGA TOUR had no legal authority to impose punishment on Haney: "while it is the 'PGA TOUR Network' we don't own or manage any of the original content on the show (ie don't hire/fire talent) . . ." Again, on May 30th, Schuchmann confirmed in an email, "The network is not owned or operated by the PGA TOUR so we don't have any oversight on items such as talent, so that complicates the situation." (Ex. 2, Monahan Dep., 97:1-12 and Ex. 2-3.) Furthermore, Neal asked David Logue of PGA TOUR Radio if there was "credibility" to Christine Brennan's statement that Haney's comments were "said on the PGA Tour's flagship Sirius XM show." In response, Logue wrote, "I would submit that, since we have nothing to do with Hank or his show, calling it 'the PGA TOUR's flagship SiriusXM show' is inaccurate. . . ." (Ex. 2-3.)

55. Terminating Haney was contrary to Sirius XM's business interests, undermined the success of its golf network, and was contrary to promises Greenstein had made to Haney regarding Haney's freedom to talk freely on his show. (Ex. 1, Greenstein Dep., 22:18-23:13; Ex. 5, Aisenberg Dep., 68:6-69:8.)

56. After the PGA TOUR determined that it would cause Sirius XM to fire Haney, efforts were made to craft a joint media release. The first proposed press statement related to Haney's comments came from the PGA TOUR alone:

> Hank Haney's comments were insensitive, irresponsible and uneducated. We shared our position with SiriusXM's leadership that Hank and his commentary have no place on PGA TOUR Radio. We hope Sirius/XM does the right thing.

(Ex. 6-1.) Greenstein forwarded this version of the proposed statement to Irving Azoff ("Azoff"), a Sirius XM consultant, his personal friend, and a high-powered entertainment executive, Chairman of Full Stop Management. Greenstein wrote, "Look what the tour wants to put out. Like Hank is a criminal." (Ex. 6-1; Ex. 6, Azoff Dep., 23:1-15.)

57. The next statement included: "[a]fter discussion with the PGA TOUR, and at their request, we have suspended Mr. Haney. . .." Greenstein rejected that statement, and said that the PGA TOUR alone had to take responsibility for any such action: "[t]his is all on PGA they want it they better have balls to stand behind it." (Ex. 6-1; Ex. 1, Greenstein Dep., 75:2-15.)

58. Greenstein not only opposed the termination as being against Sirius XM's business interests but believed that the broadcast did not justify any adverse action. As Azoff testified "[Greenstein] definitively told me that he did not want to lose Hank off the show and did not believe that whatever the incident created was grounds for dismissal." (Ex. 6, 15:16-20.)

59. On July 8, 2019, Plaintiffs and Sirius XM entered into a Settlement Agreement and Release ("Settlement Agreement") to resolve Plaintiffs' claims against Sirius XM as a result of the termination of the Talent Agreement. The released parties purposely excluded the PGA TOUR. (Ex. 6-2.) This intentional drafting was a result of Plaintiffs and Sirius XM's recognition of the PGA TOUR's wrongful insistence on having Plaintiffs terminated. As Azoff testified, Greenstein was "consistent that . . . he didn't want this to happen and that he was not going to put his company in any sort of legal jeopardy over it" and that Greenstein was "not going to let his company cover for the PGA by effectuating the release for the PGA." (Ex. 6, 21:21-25.) Greenstein reiterated that there was a specific carve-out so that Haney justifiably could pursue remedies against the PGA TOUR. (Ex. 1, 82:7-12.)

60. The relationship between the PGA TOUR and Sirius XM is governed by a License Agreement (the "License Agreement"). PGA TOUR negotiated for a measure of control over what *programming* would be approved on "SiriusXM PGA TOUR Radio" in advance of the talent being hired. The PGA TOUR, in contrast, did not negotiate for any role in determining the *content* of what was broadcast or a right to interfere with any disciplinary issues that arose during a broadcast, and certainly not for any role in demanding that talent be removed from the air. (Ex. 1-1; Ex. 1, Greenstein Dep., 27:23-28:5; Ex. 6, Azoff Dep., 64:8-16.)

61. Section 2.01(f) of the License Agreement provides that "Sirius XM shall ensure that Sirius XM and its representatives do not incorporate into the Programming any material which is . . . inconsistent with the [PGA TOUR's] standards of appropriateness as may be provided to Sirius XM in writing." (Ex. 1-1.) The PGA TOUR did not provide Sirius XM with standards of appropriateness in writing, has never weighed in on Programming, and has thus abdicated any role which it may have negotiated about determining who would be given a show on the air. (Ex. 1, Greenstein Dep., 19:7-10; Ex. 2, Monahan Dep., 75:8-11; Ex. 3, Neal. Dep., 54:14-23.)

62. The PGA TOUR had no oversight rights over Plaintiffs' relationship with Sirius XM or right to interfere with that relationship. Even Monahan at his deposition admitted that the PGA TOUR had "no oversight" on talent at Sirius XM. (Ex. 2, Monahan Dep., 97:9-12.) Monahan further admitted at his deposition that the PGA TOUR "didn't have the right to instruct Sirius to discipline Mr. Haney" and that if the PGA TOUR had done so "that would have been contrary" to the PGA TOUR's rights. (Ex. 2, Monahan Dep., 84:6-20.) Neal similarly was not "aware of any such oversight." (Ex. 1, 54:3-7.)

63. Multiple witnesses made clear the difference between having a role in programming and having a role in content. Greenstein testified that, with regard to Programming, the License Agreement "requires an agreement by the parties in advance of distribution on the channel." In contrast, according to Greenstein, the PGA TOUR could not exercise "any veto power or authority over the content of a show" and had never attempted to interfere with content or assert discipline about the content of a show "other than [with] Mr. Haney." (Ex. 1, Greenstein Dep., 17:23-18:3; 27:21-28:5, 87:21-88:7.) The License Agreement does not provide the PGA TOUR with any control over the content of shows on Sirius XM. *Id*. Azoff agreed that he would "expect that the PGA would have sufficient sophistication to negotiate the right to control content on SiriusXM if it believed it should have that right." (Ex. 6, Azoff Dep., 64:8-16.) As Haney's agent, Jeremy Aisenberg ("Aisenberg"), testified, programming relates solely to determining what talent would be hired to conduct a show. ("I am . . . . aware that [the PGA TOUR has] the ability to approve the programs that are added to the programming lineup.") (Ex. 5, Aisenberg Dep., 59:12-20.) In contrast, as Aisenberg testified, "Mr. Haney could create the content … [and the content never] would be a problem." Further, the PGA TOUR had no authority or right to do "anything to affect the content of [Haney's] programming." (Ex. 5, Aisenberg Dep., 69:5-8, 81:9-13.)

64. The PGA TOUR, as it did with Programming but did not do with regard to content, negotiated certain protections for its intellectual property (*i.e.*, "names, logos and trademarks owned and/or controlled by [the PGA TOUR]"), as applied "for marketing purposes, whether it's in a brochure or something else." (Ex. 1-1; 2, 96:4-6.)

65. In depositions, Neal, was unable to name the top-ranked LPGA golfers. (Ex. 3, Neal Dep., 33:2-9.) Jay Monahan, the PGA Commissioner, showed even greater ignorance about women's golf. Monahan admitted that, as PGA Commissioner, he has never attended an LPGA

event and he could not recall the last time he attended an LPGA event. (Ex. 2, Monahan Dep., 136:2-18.) Furthermore, while he remembered that a player named Angela Stanford won the previous week's LPGA tournament, he could not name any of the top five ranked players. (Ex. 2, Monahan Dep., 153:16-19, 156:13-21.) When pressed, he said that Mike Whan, the LPGA Commission is the "person who is in a position to tell you the top players in the world" of women's golf. (Ex. 2, Monahan Dep., 154:13-19.)

66. When asked to describe any collaborative efforts between PGA and the LPGA, Neal only offered the following: "LPGA players hosted at our tournaments, and we've created content around that that lives on both the LPGA social channels and the PGA Tour social channels." (Ex. 2, Neal Dep., 144:2-10.) On the same topic, Monahan spoke of a "commitment" to "promote the LPGA Tour on our broadcast and the LPGA Tour to promote the PGA Tour and our tour on their broadcast. That's the spirit of the partnership." (Ex. 2, Monahan Dep., 123:13-18.) Neither provided any examples. The PGA TOUR has usurped any, albeit minimal, commercial value that the LPGA at one time enjoyed by entering into an agreement that gives "north of 90 percent" of revenue from LPGA events on Golf Channel to the PGA TOUR and "[n]orth of 95 percent of the revenue with NBC to the PGA TOUR." (Ex. 2, Monahan Dep., 124:15-125:4.)

67. When asked if he remembered LPGA Commissioner Mike Whan "suggesting . . . an attempt be made to pursue Sirius to suspend Mr. Haney for 30 days and to obtain for the LPGA a show . . . relating to women's golf, in particular," Monahan testified that Whan said that "Sirius XM coverage of the LPGA was . . . not meaningful prior to that point in time," although he claimed to not "recall talking about any specific solutions with Mr. Whan." (Ex. 2, Monahan Dep., 130:7-12.)

14

68. Furthermore, Monahan admitted that Whan did not ask him to "assist in getting Mr. Haney terminated." (Ex. 2, Monahan Dep. 130:21-23.)

69. Indeed, based on communications with Whan, Tarde concluded that Whan "didn't seem too upset" about the incident. (Ex. 1-3.)

70. PGA TOUR golfer Kevin Kisner, in a tweet, attributed COVID-19 deaths to the inability of an identified person's family members and friends to follow guidelines. Specifically, Kisner replied to former basketball player Rex Chapman's tweet that described his loss of his friends' parents and his own parents being in and out of the hospital, stating "[g]uess they can't follow the guidelines." (Ex.3-1.) Neal testified that this was a "hot topic" on social media. (Ex. 3, Neal Dep., 131:20-23.) After Kisner apologized, however, the PGA TOUR made a public statement that "We were pleased to see Kevin take ownership of the situation and have since spoken to him directly." (Ex. 3-2.) Kisner was not suspended from the PGA TOUR for any length of time and, indeed, remained a member of the prestigious PGA TOUR Policy Board without interruption. (Ex. 3, Neal Dep. 135:3-5.)

71. Recently, Justin Thomas, a PGA TOUR golfer, was caught on a hot mic saying "faggot" after he missed an easy putt. Again, the PGA TOUR took no disciplinary action to correct this insensitivity or to evidence that the PGA TOUR cared at all about such homophobic and wrong comments. (Ex. 1, Greenstein Dep., 87:6-20.)

72. Plaintiffs' experts have conducted a "sentiment analysis using a variety of third party software tools." The results show the opposite of what Defendant contends—that "sentiment had returned to a net positive sentiment [of Haney] within seven days of the remarks." (Ex. 7, Aisenberg Expert Dep., 28:10-29:3.) This quantitative analysis confirms what is common sense: "the audience forgives and forgets quite quickly." Furthermore, social media analysis

reflects that when Thomas issued his homophobic statement, his negative sentiment on a single day was "three times worse than all of the comments ever made about Mr. Haney since May 29, 2019."  (Ex. 7, Aisenberg Expert Dep., 29:22-30:5.)

| | | |
|---|---|---|
| Dated: | New York, New York<br>May 3, 2021 | Respectfully submitted,<br><br>MICHELMAN & ROBINSON, LLP<br>By:  /s/ *Peter R. Ginsberg*  <br>     Peter R. Ginsberg (*admitted pro hac vice*)<br>800 Third Avenue, 24th Floor<br>New York, New York 10022<br>Telephone:  (212) 730-7700<br>Facsimile:  (212) 730-7725<br>prginsberg@mrllp.com<br><br>*Attorneys for Plaintiffs* |

## **CERTIFICATE OF SERVICE**

Hank Haney et al. v. PGA TOUR, Inc.
Case No. 0:19-cv-63108-RAR

I hereby certify that on May 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel listed on the attached Service List.

/s/ *Riley Cirulnick*
Riley Cirulnick

## **SERVICE LIST**

Hank Haney et al. v. PGA TOUR, Inc.
Case No. 0:19-cv-63108-RAR

**Attorneys for Defendant:**

**William E. Davis**
Foley & Lardner LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, FL 33131-2320
(305) 482-8404
wdavis@foley.com

**Angelica L. Novick**
Foley & Lardner LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, FL 33131-2320
(305) 482-8432
anovick@foley.com