UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:19-CV-63108-RAR

---------------------------------------------- X

HANK HANEY and                                  :
HANK HANEY MEDIA, LLC,                          :
                                                :
                              Plaintiffs,        :
                                                :
                    -against-                   :
                                                :
PGA TOUR, INC.,                                 :
                                                :
                              Defendant.        :
                                                :
---------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY OF
JEREMY AISENBERG AND PATRICK MCGEE**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ....................................................................................................... iii

**PRELMINARY STATEMENT** ..................................................................................................... 1

**FACTUAL BACKGROUND** ........................................................................................................ 2

**LEGAL STANDARD** ................................................................................................................... 4

**FLAWS IN THE PGA TOUR'S ATTACKS ON PLAINTIFFS' EXPERTS** ...................................... 7

**CONCLUSION** ........................................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

Cases

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ................................................................................ 5, 6
*Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ........................................................................................... 4, 5
*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ............................................................................................. 5
*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................................................................................. 5
*Milward v. Acuity Specialty Products Group, Inc.*,
   639 F.3d 11 (1st Cir. 2011) .................................................................................. 5
*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ........................................................................... 4
*United States v. Frazier*,
   387 F.3d 1244 (11th Cir.  2004) .......................................................................... 4
*Wendell v. GlaxoSmithKline LLC*,
   858 F.3d 1227 (9th Cir. 2017) ............................................................................. 5, 6
*Williams v. Mast Biosurgery USA, Inc.* ...................................................................... 6, 8

Rules

Fed. R. of Civ. P. 26(a)(2)(A) .................................................................................. 6
Fed. R. of Evid. 702, 703, or 705 and Rule 26(a)(2)(B) ............................................. 6
Federal Rule of Civil Procedure 701 ......................................................................... 1

Other Authorities

making process." *See Kaplan v. Kaplan*, 2012 U.S. Dist. LEXIS 66114, at *5 (M.D. Fla. May,
   11, 2012)making process." *See Kaplan v. Kaplan*, 2012 U.S. Dist. LEXIS 66114, at *5 (M.D.
   Fla. May 11, 2012) ............................................................................................. 6
*Moshe Ashkenazi v. South Broward Hosp. Dist.*, 2012 U.S. Dist. LEXIS 30692, at *1 (S.D. Fla.
   Mar. 8, 2012)*,
   Moshe Ashkenazi v. South Broward Hosp. Dist.*, 2012 U.S. Dist. LEXIS 30692, at *1 (S.D. Fla.
   Mar. 8, 2012) .................................................................................................... 6
opinions be disclosed in a written report.  *See Pediatric,
   Nephrology Assocs. v. Variety Children's Hosp.*, 2017 U.S. Diopinions be disclosed in a
   written report.  *See Pediatric Nephrology Assocs. v. Variety Children's Hosp.*, 2017 U.S. Di .. 6
R. Civ. P. 26(a)(2)(C); *Pedia,
   tric Nephrology Assocs.*, 2017 U.S. DiR. Civ. P. 26(a)(2)(C); *Pediatric Nephrology Assocs.*,
   2017 U.S. Di .................................................................................................... 6, 8

*PediatricNephrology* *8 *Assoc*.,
   2017 U.S. Dist. LEXIS 200023, at *4*PediatricNephrology* *8 *Assoc*., 2017 U.S. Dist. LEXIS
   200023, at *4 ..................................................................................................................... 6, 8

Plaintiffs Hank Haney ("Haney") and Hank Haney Media LLC ("HHM" and, collectively, Plaintiffs) submit this memorandum of law in opposition to Defendant PGA TOUR, Inc. ("Defendant" or "PGA TOUR")'s motion ("Motion" or "Mot."), pursuant to Federal Rule of Civil Procedure 701 and Local Rule 7.1 of the United States District Court for the Southern District of Florida, to exclude both of Plaintiffs' expert witnesses, Jeremy Aisenberg ("Aisenberg") and Patrick McGee ("McGee").  PGA TOUR's Motion fails to recognize – or provide the Court with -- the standard governing the experts as hybrid fact and expert witnesses, ignores data and financial information Plaintiffs produced to support the expert testimony, and seeks to use its own strategic, cursory examination to complain that certain information is lacking regarding the expert opinions.

## PRELMINARY STATEMENT

The PGA TOUR, after years of attacks on Haney and his business interests, used its domination of the professional golf world to force Sirius XM Radio, Inc. ("Sirius XM") to terminate its most important and profitable golf radio show, against Sirius XM's desire and best interests.[1]  The PGA TOUR's action, without any legal justification, and done with malice, destroyed Haney's ability essentially to make a living, causing significant financial and reputational injury.  Aisenberg and McGee provided hybrid fact - expert testimony regarding the scope of the financial damage the PGA TOUR caused to Plaintiffs (using  a conservative methodology and measure for such damages), Haney's expected longevity as perhaps the premier

---

[1] Scott Greenstein, Sirius XM's President, when asked, "Was it in your best business interest to take Mr. Haney off the air?" responded: "No.  It was not."  When asked, "Was it contrary to Sirius's best business interest to take Mr. Haney off the air?" responded: "Well, I – it was – the firing was contrary, yes." (Tr. .)  As Aisenberg testified: "I have specific data related to advertisers that reduced their investments in Sirius XM as a result of Haney's show being terminated.  I have specific data related to the lack of popularity of the shows that were added in its place, specific reports from advertisers and Sirius XM sales executives regarding the lack of interest in advertising on the program that replaced Hank's show…") (Aisenberg Tr. II 99 vol II).  The PGA TOUR made no follow-up inquiries regarding the data or analysis.

golf media personality but for the PGA TOUR's wrongful action, and the falsity of the made-for-litigation pretextual rationalizations the PGA TOUR now provides for its actions.

## FACTUAL BACKGROUND

Following his authorship in 2012 of *The Big Miss*, a New York Times #1 best seller, exposing information about Tiger Woods ("Woods") that threatened Woods' unblemished reputation and the PGA TOUR's extraordinary profit center, the PGA TOUR commenced a multi-year campaign of retribution. In coordination with Woods' own vicious attacks on Haney, the PGA TOUR used its unique power in the golf world to force both *PGA Tour Superstores* and *PGA Tour Shops*, as well as smaller shops, to cancel previously placed orders of *The Big Miss*.

Despite the PGA TOUR's attempts to disrupt his business ventures, Haney enjoyed great success with Sirius XM. Starting in 2013, Haney served as the host of "Hank Haney Golf Radio," a sports radio program on Sirius XM covering news and topics in the world of golf. All that came to an end following a May 29, 2019 broadcast (the "Broadcast") that displayed Haney's confessed lack of knowledge about the Ladies Professional Golf Tour ("LPGA") and the upcoming U.S. Women's Open, a lack of knowledge which, ironically, still was dwarfed the PGA TOUR Commissioner's own lack of knowledge (on full display in the Commissioner's deposition, which included an inability to identify any of the top five women golfers in the world). The PGA TOUR seized upon the Broadcast. As Commissioner Jay Monahan made clear to one of his top lieutenants, the Broadcast gave him an avenue to make sure that Haney "lose[es] his job" and said he wanted to do whatever was necessary "to ensure this happens."

Despite acknowledging in internal communications its lack of any legal right or justification, the PGA TOUR bullied Sirius XM until it terminated its contractual and business relationship with Plaintiffs. Sirius XM's leadership was adamantly against such an action, but

ultimately determined that the PGA TOUR could destroy its own business if it did not adhere to the PGA TOUR's demand to destroy Haney's.   The press statement announcing Plaintiffs' termination, dated May 30, 2019, made it absolutely clear—at Sirius XM's insistence—that the PGA TOUR forced the termination:   "[a]t the PGA TOUR's *instruction* Mr. Haney has been suspended from the Sirius XM PGA TOUR Radio Channel."

Based upon their unique involvement with Plaintiffs as well as their expertise and analyses, Aisenberg and McGee provided expert opinions regarding many of the seminal issues underlying the instant dispute: (a) immediate and long-term financial and professional damage Plaintiffs sustained following Haney being removed from Sirius XM, based upon the Sirius XM agreement, Plaintiffs' historic revenue and income, the unique platform Sirius XM offered to Plaintiffs,[2] and the projected revenue trend in the golf industry; (b) Haney's standing in the golf industry and expected longevity, including by comparing other media personalities' careers; (c) Sirius XM's business prior to Plaintiffs joining the outlet and the impact of Haney's radio show on Sirius XM's financial condition as well as its standing in the golf industry based upon Sirius XM's own financial information as well as Aisenberg's representation of the majority of major golf media talent on Sirius XM; (d) the unique success of Haney's book *The Big Miss* and its financial benefit for book distributors and sellers; (e) the PGA TOUR's unique business and marketing relationship with golfer Woods and his agent Mark Steinberg, including but not limited to Woods' unprecedented involvement, including operational rights, in certain PGA TOUR competitions; (f) the PGA TOUR's relationship with Sirius XM and Sirius XM's dependency on the PGA TOUR to survive; (g) the industry distinction between "programming" and "content," and the application

---

[2] Aisenberg: Haney was "able to create incremental business opportunities with the platform that Sirius XM provided with the dedicated audience that consumed the golf programming on Sirius XM … That model provided tremendous value to the brands that worked with him … long-term sustainable business relationships ...")(Id. 85 – 86 vol. II).

of those terms to the PGA TOUR – Sirius XM relationship, and the absence of any right by the PGA TOUR to interfere with Sirius XM content, based upon collectively five decades of experience and crafting and interpreting such agreements; (h) analyses of the PGA TOUR's pretextual rationalizations for its actions, based upon analyses of the PGA TOUR's reaction to other highly-publicized and controversial statements by members of the PGA TOUR industry, the PGA TOUR's relationship with the LPGA, and the PGA TOUR's lack of effort with regard to gender, ethnic, and racial equality and hiring and promotional practices based upon the experts' personal experiences, social media data and analyses, and analyses of, for example, the PGA TOUR – LPGA financial arrangements (Aisenberg Tr. II 100, 101, 106 and 128); and (i) analyses of social media data following the Broadcast compared to other, similar disputes in the golf world.

As set forth below, the above-identified areas and issues are presented and analyzed by two prominent and qualified experts with decades-long experience, using appropriate methodologies and analyses that will be beneficial to a jury delegated with the responsibility to accept or reject the claims and award damages.

## LEGAL STANDARD

Under *Daubert*, a court's gatekeeping obligation is straightforward—to ensure that the proffered expert testimony is relevant and based on reliable methods. *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993). Courts determine admissibility based upon "qualifications, reliability, and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *see also Rink v. Cheminova, Inc*. 400 F.3d 1286, 1291 (11th Cir. 2005)(expert sufficiently qualified; methodology sufficiently reliable; and, testimony assists the trier of fact to understand the evidence or determine a fact in issue). Courts should not weigh evidence or draw

conclusions about the strength of any particular piece of evidence; a court's focus "'must be solely on principles and methodology, not on the conclusions that they generate.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (quoting *Daubert*, 509 U.S. at 595). In other words, although the mere *ipse dixit* of an expert is inadmissible, *see Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997*)*, it is not a court's task to decide whether an expert's conclusions are correct. *See Daubert v. Merrell Dow Pharm., Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) (*Daubert II*) ("[T]he *Daubert* test "is not the correctness of the expert's conclusions but the soundness of his methodology"). Nor is a court empowered "to determine which of several competing scientific theories has the best provenance." *Milward v. Acuity Specialty Products Group, Inc*., 639 F.3d 11, 15 (1st Cir. 2011). *Daubert* demands that an expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Supreme Court has identified several non-exhaustive factors that a court may consider: "whether the theory or technique employed by the expert is generally accepted in the relevant industry or community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *See Daubert II,* 43 F.3d at 1318 (citing *Daubert*, 509 U.S. at 593-94). A further consideration is whether experts are testifying "about matters growing naturally" out of their independent research, or whether "they have developed their opinions expressly for purposes of testifying." *Wendell*, 858 F.3d at 1232. The absence of independent research, however, does not render an expert's methodologies unreliable as an expert may "instead present 'other objective,

verifiable evidence that the testimony is based on scientifically valid principles.'"  *Id*. at 1235 (quoting *Daubert II*, 43 F.3d at 1317-18).

The PGA TOUR ignores a crucial element of a *Daubert* analysis.  Fed. R. of Civ. P. 26(a)(2)(A) requires parties to disclose the identity of any  witness who is expected to provide expert testimony under Fed. R. of Evid. 702, 703, or 705 and Rule 26(a)(2)(B) requires that the expert's opinions be disclosed in a written report.  *See Pediatric Nephrology Assocs. v. Variety Children's Hosp.*, 2017 U.S. Dist. LEXIS 200023, at *9 (S.D. Fla. Nov. 6, 2017).  However, for hybrid witnesses, parties are only required to disclose "a summary of the facts and opinions to which the witness is expected to testify."  *See* Fed. R. Civ. P. 26(a)(2)(C); *Pediatric Nephrology Assocs.*, 2017 U.S. Dist. LEXIS 200023, at *12 (citing *Moshe Ashkenazi v. South Broward Hosp. Dist.*, 2012 U.S. Dist. LEXIS 30692, at *1 (S.D. Fla. Mar. 8, 2012)) (internal quotes omitted).  Hybrid witnesses are non-retained  expert witnesses who can provide both fact and opinion testimony that is grounded in their technical or specialized knowledge. *See PediatricNephrology *8 Assoc.*, 2017 U.S. Dist. LEXIS 200023, at *4.  Hybrid witnesses may testify on "their observations based on personal knowledge as well as their lay opinions, consistent with Rule 701, when such opinion testimony is based upon the witness' experience as a professional and is helpful in understanding the witness' decision making process."  *See Kaplan v. Kaplan*, 2012 U.S. Dist. LEXIS 66114, at *5 (M.D. Fla. May 11,2012) (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011).

Aisenberg is the very essence of a hybrid witness – a non-retained, high-ranking member of the world's largest sports and media agency, Octagon Worldwide, Inc., where Aisenberg holds the position of Vice President, Strategic Initiatives.  Aisenberg has been Haney's agent at all relevant times to this dispute, was intimately involved in the rollout of *The Big Miss* as well as the

6

PGA TOUR's and Woods' retribution for its publication, negotiated the Sirius XM agreement, and continues to represent Haney in his commercial efforts to recover from the damage done to him by Defendant.  Aisenberg also is perhaps the country's most prominent representative of media stars in the golf world, has negotiated hundreds of broadcasting and endorsement agreements, is an expert in the field of talents' financial value and expected longevity, and has intimate knowledge of the golf world generally.

Similarly, McGee is a hybrid witness.  During his 32 years in the business of promoting and conducting sports-related endorsements, events, and appearances, including while at Octagon before establishing his own sports-endorsement business, ProVentures, McGee has worked with Haney, as well as Aisenberg, and helped to shape Haney's career.  As an expert with extensive experience in the golf industry, McGee has drafted and negotiated countless endorsement and promotion agreements, studied branding, professional development, and focused on maximizing companies' and media and sports personalities' earning potential.  He also has studied, and for purposes of the instant case analyzed, social media reactions to Haney as well as to other similar events.  He thus is appearing as an experienced and knowledgeable hybrid fact and expert witness.

## FLAWS IN THE PGA TOUR'S ATTACKS ON PLAINTIFFS' EXPERTS

The PGA TOUR's attack on Haney's experts has four vital flaws: (1) it ignores the proper standard for evaluating a hybrid fact-expert witness; (2) it ignores the entirety of Aisenberg's first day of testimony as a fact witness during which he set forth his qualifications to serve in the proffered role (counsel chose not to explore those qualifications again during the expert deposition testimony) (*see* Exhibit 1); (3) it strategically chose not to explore in any detail the experts' disclosed methodology, apparently in order to argue that the record is not sufficiently robust to qualify Aisenberg and McGee as experts; and (4) it mischaracterizes the bases of the proffered

expert opinions.

Both Haney experts easily satisfy the relevant expert standards for professionals in their position: each indisputably disclosed "a summary of the facts and opinions to which the witness is expected to testify," *see* Fed. R. Civ. P. 26(a)(2)(C); *Pediatric Nephrology Assocs.*, 2017 U.S. Dist. LEXIS 200023, at *12, and provide both fact and opinion testimony grounded in their technical, specialized knowledge, *see PediatricNephrology* *8 *Assoc.*, 2017 U.S. Dist. LEXIS 200023, at *4. As set forth in their expert disclosures and testimony, each is well qualified to testify on "their observations based on personal knowledge as well as their lay opinions," consistent with Rule 701, *PediatricNephrology* *8 *Assoc.* (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d at 1317. Finally, each used a rational and reliable methodology to support their expert conclusions.

1. **Jeremy Aisenberg**

Aisenberg proffered expert opinions addressing:

- Sirius XM's business prior to Plaintiffs joining the outlet and the impact of Haney's radio show on Sirius XM's financial condition as well as its standing in the golf industry based upon analyses of media listenership and financial records, including Sirius XM's records produced pursuant to subpoena (Ex. 1), and personal experience;
- Haney's standing in the golf industry;
- An analysis of Haney's monetization as a result of his broadcasting agreement with Sirius XM;
- An analysis of Sirius XM's financial success as a result of Mr. Haney's broadcasting agreement with Sirius XM;
- An analysis of immediate and long-term financial and professional damage sustained by Plaintiffs following Haney being removed from Sirius XM based upon an analysis of financial records relating to four categories of revenue streams;
- The unique position of Haney's book *The Big Miss* and its financial benefit for book distributors and sellers;
- The PGA TOUR's unique business and marketing relationship with Woods and his agent Steinberg, including but not limited to Woods' involvement, including operational rights, in certain PGA TOUR competitions;

- The PGA TOUR's relationship with Sirius XM;
- The industry distinction between "programming" and "content," and the application of those terms to the PGA TOUR – Sirius XM license agreement, and the absence of any right of the PGA TOUR to interfere with Sirius XM content based upon industry standards, involvement with scores of similar agreements in the industry, and the language of the license agreement;
- The dependency of Sirius XM on the PGA TOUR;
- The absence of impact on Sirius XM, both financially and in terms of listenership, in reaction to the Broadcast, had Sirius XM not been forced to remove Haney's program from its platform based upon extensive social media analyses and the results from similar occurrences;
- The PGA TOUR's reaction and purported efforts to "protect its brand" in response to other highly-publicized and controversial statements by members of the PGA TOUR industry and sphere based upon social media analyses, personal experience, and knowledge of and experience in the golf and media industry;
- The structure and business operations of the PGA TOUR, including any effort with regard to gender, ethnic, and racial equality and hiring and promotional practices based upon analyses of PGA TOUR information and personal experience; and
- Any effort by the PGA TOUR to support the LPGA (Aisenberg Tr. II 104 – 105).

The PGA TOUR's only *Daubert* challenge is to Aisenberg's damage calculations other than a vague reference (Mot. at 2) to other "topics." Thus, there is no challenge to Aisenberg's expert opinions addressing: Sirius XM's status before hiring Haney and the impact Haney had on Sirius XM's financial success; Haney's standing in the golf community; both Haney's and Sirius XM's monetization and financial success as a result of Haney's agreement with Sirius XM; the distinction between "programming" and "content" [3] in the broadcasting world; the PGA TOUR's power in the golf industry, including its relationship with Sirius XM and Sirius XM's dependency on the PGA TOUR; the PGA TOUR's unique relationship with Woods; social media analyses

---

[3] The PGA TOUR, pursuant to its agreement with Sirius XM, under certain circumstances had a right to weigh in on "Programming" (before talent was hired for a radio show), but not "Content," meaning the actual substance of a broadcast: "PGA TOUR has the ability to approve the programming that is added to the schedule … [o]nce those programs are determined, the data content of those programs is subject to the management and production, supervision of the Sirius XM … executive team") (Aisenberg Tr. II 92:4-9), citing industry standard practices and his own experiences (Id. at 96 - 97).

following Haney's broadcast and termination, including as compared to other, similar incidents in

the golf world; the PGA TOUR's reaction to similar incidents in the golf world; and, the PGA's

commitment, or lack of commitment, to women's golf in the context of its pretextual

rationalization for forcing Haney's termination.

      a.   Qualifications

As a preliminary matter, the PGA TOUR attacks Aisenberg for being neither an economist

nor an accountant.  Aisenberg is one of the most successful sports representatives in the world of

golf and sports media (Tr. 18), has negotiated agreements for and represented literally hundreds of

people in that industry, has developed business plans and financial projections for hundreds of

businesses (Tr. 16), routinely prepares models and projections for anticipated business

opportunities as well as the costs associated with such opportunities and projected net revenue (Tr.

17), is highly educated  and spends a good deal of his professional life analyzing both the potential

value of clients and opportunities offered to those clients in the golf and media industry while

developing content-driven profitable business models (Tr. 18).[4]  (See Resume, attached to PGA

Exh. A.)  Aisenberg identified the following areas of expertise: Sports Marketing and Marketing

Strategy, Sponsorships, New Business Development, Broadcasting, Talent Representation, Media

Rights, Social Media Marketing, Content Monetization, Strategic Partnerships, Strategic Planning,

Social Media, Digital Marketing, Relationship Marketing, Marketing Communications, and Public

Relations.

      b.   Records Analyzed for Damage Calculations

For purposes of the damage calculation, Aisenberg reviewed and analyzed internal

accounting records produced by Sirius XM pursuant to a subpoena to the parties in the litigation

---

[4] The PGA TOUR attacks Aisenberg for not explaining how his experience as a talent agent since 2003 formed his expert opinions.  (Mot. 18.)  Tellingly, the PGA TOUR chose not to examine him about that topic.

(Exh. 2), as well as Octagon financial and accounting revenue for Haney's gross and net income dating back to 2018 (including a summary of such data prepared and kept in the ordinary course of Octagon's business, Exhibit 32; Tr. 53 - 54), Haney bank records (Exhibit 43; Tr. 53), and financial information showing gross and net revenue from Haney's sale of his wholly-owned therapy product sold by e-commerce and on the Sirius XM platform (including a summary chart prepared and kept in the ordinary course of Octagon's business, Exhibit 5). In formulating his expert opinion regarding damages, Aisenberg identified four categories of value to Haney: media and advertising; endorsement and appearances; licensing and royalties; and, e-commerce. For each category, Aisenberg analyzed Plaintiffs' past earnings capacity, earning at the time of his termination from Sirius XM, the revenue stream already in the works near-time, and Haney's earning capacity based upon his standing in the industry, projected growth of the industry, and expected longevity based upon comparisons provided for similarly-situated media golf personalities. Aisenberg is familiar with, and analyzed, both in the course of helping to prepare contemporaneous profit and loss statements for Haney and for preparing his export report, financial reports for Haney's business initiatives and Octagon's financial reports detailing Haney's gross revenue from his broadcasting, endorsements, and appearances, and Sirius XM's financial reports relating to Haney's radio show. (Tr. 14 – 15.) And ironically, as Aisenberg explained, he used a flat-line, conservative projection rather than using an increasing factor based upon the growth of the golf industry generally because predicting future damages in any scenario is subject to variance.

### c. Longevity

The PGA TOUR challenges Aisenberg's premise that Haney would have continued on Sirius XM had it not been for his forced termination. (Motion at 10.) In making that argument,

11

the PGA TOUR ignores Aisenberg's testimony (Tr. II 2o6, 29), expert testimony (Tr. 21 - 23),  as

well as the testimony of Sirius XM's President, Stanley Greenstein (Greenstein Tr. 13), and Sirius

XM's consultant and media superstar Irving Azoff (Aisenberg Tr. 15).

Aisenberg explained that he based that projection upon a conservative comparison with

other, similarly-situated golf media personalities, including Butch Harmon, Eddie Merrins, and

Gary Player.  (Tr. 21:1 - 22:8 – 18.)  He also bases that analysis on his own communications and

experience with Haney spanning 13 years.  (Expert Tr. At 10.)  If the PGA TOUR believes that

those comparisons, or the methodology, is flawed, it can attempt to persuade the jury, but its effort

to block that information from a jury cannot succeed.

    d.     Categories of Damages

Aisenberg analyzed the damages based upon four categories of revenue stream.

    1.   Media and Advertisers Damages

Aisenberg provided a damage calculation based upon lost media and advertising revenue

as a result of his termination from Sirius XM.  Aisenberg combined his professional experience

with an analysis of Plaintiff's situation (experience, historical revenue, and particular data

addressing trends in the golf industry, all of which was produced to the PGA TOUR, and are

retained in Octagon's and Sirius XM's normal course of business, Aisenberg Tr. II 117).

The PGA TOUR's primary attack on this category of damages is that Aisenberg used a flat

line projection rather than predicting either an increase or decrease of revenue generated.  (Mot.

11-14.) Aisenberg explained:

> [T]here's a significant shift in advertising dollars to talent-driven media
> enterprises.  It is the direct result of the incredibly competitive nature of major
> media companies and their need to provide more efficient models….  [W]ith the
> rise of virtually infinite number of digital platforms with which to reach audiences
> … the potential business opportunity for people like Hank Haney … who have a
> high degree of affinity for those people ….  I was quite conservative in applying

the overall growth metrics of those trends ….

(Aisenberg Tr. II 114 – 116.)

As Aisenberg noted, a significant increased projection, rather than a flat-line calculation, also would have been appropriate: "… the exact nature of a model that could be used to provide this type of a pro forma analysis could take almost infinite number of forms that would be reasonable, none of which are going to be scientifically precise when measured against the real-world outcome over time, all of which are based on some assumptions.  You do the best you can to base those assumptions in the data experience, expertise, history of the business …." (Id. at 116 – 117.)  For the 2020 calculation, for example, Aisenberg testified: "…but for the fact that Sirius XM was told to terminate Mr. Haney's agreement by the PGA TOUR, he would have earned $1.2 million in compensation and revenue shares in 2020, conservatively." (Aisenberg Tr. II 25.)  For 2021, "the concerted projection of what reasonably – and again, very conservatively, would have been his income in 2021 [is] based on the existing advertising and projecting no incremental growth of those advertisers."  (Aisenberg Tr. II 26.)  The PGA TOUR asked no questions for any years after 2021.

The PGA TOUR's argument that Aisenberg failed to provide a present value for the damage calculation (Mot. at 13) falls for the same reason.  The conservative, flat-line approach offsets the need to calculate a discounted value.  (Aisenberg Tr. II 39: goal was to "provide a reasonable projection of the revenue" without a need to discount for a present value).  Moreover, if a damage amount is awarded at trial, the trial court can modify that amount to a present value, or instruct the jury regarding a present value calculation, if the Court deems that appropriate.

The PGA TOUR also argues that Aisenberg did not take into consideration events, such as Haney's May 29, 2019 comments or the COVID-19 pandemic.  (Mot. 12.)  That is not correct.  As

13

Aisenberg made clear based upon data analyses of social media reactions, any reaction to Haney's remarks was short lived, lasting less than four days (Aisenberg Tr. II 34 – 37), and paled in comparison to other similar events (Justin Thomas' use of a homophobic epithet generated ten times the negative reaction and lasted significantly longer, yet had little if any negative consequence, Aisenberg Tr. II 30??; Exh. 6; Monahan's own negative social reaction essentially mirrored Haney's, Exhibit 6, and he has had no long-term negative consequence).  Regarding the pandemic, Aisenberg explained that golf's revenue in fact has increased.  (Aisenberg Tr. II 46 and 55.)

Finally, the PGA TOUR challenges Aisenberg's opinion that "but-for" the PGA TOUR's wrongful actions, Plaintiffs would have been able to continue their success.  (Mot. at 12.)  As Greenstein testified, he would have kept Haney on Sirius XM indefinitely. (Q: "Had it not been for Mr. Monahan and his position, would you have terminated Mr. Haney?  A: "No, we would not."  Greenstein Tr. 14.) (Exhibit 7)  Azoff supports that view:  "Greenstein definitely told me that he did not want to lose Hank off the show and did not believe that whatever the incident created was grounds for dismissal."  (Azoff Tr. 15) (Exhibit 8) And, as Aisenberg testified: "We had been told repeatedly by Scott Greenstein, the President of Sirius XM, that Mr. Haney would have a job on Sirius XM PGA's whole radio as long as he wanted one.  So there was no -  there was no factual basis with which to think that, but for the PGATOUR's actions in this matter, he would not have continued to serve in his role with Sirius XM for as long as he chose."  (Aisenberg Tr. II 26.)  When specifically asked if he considered the consequences to Sirius XM if Haney had not been terminated, Aisenberg said that was an element in his analysis and he based his opinion on "conduct[ing] a sentiment analysis using a variety of third-party software tools to assess the sentiment among golf audiences regarding Mr. Haney.  That sentiment had returned to a net

positive within seven days of the remarks.  So, but for dismissal from Sirius XM … the feedback from all of the major sponsors of his programming, that they had no intention of ending their relationship with Hank until he lost his platform … the impact was a direct relationship of the loss of the platform."  (Aisenberg Tr. II 29.)  It was thus appropriate for Aisenberg to base his projections on a conclusion that Haney's position at Sirius XM would have been safeguarded.  The PGA TOUR can challenge that position at trial if it has any contrary evidence.

## 2.   Endorsement and Appearances/Licensing and Royalties

Aisenberg's second and third categories of damages resulted from lost endorsements and appearances and other marketing-relating activities apart from Haney's Sirius XM activities.

The PGA TOUR contends that Aisenberg did not identify the endorsements and appearances that Plaintiffs lost as a result of the PGA TOUR's actions.  (Mot. 15.)  That is not correct.  Aisenberg based his calculations on "historical actual revenues associated with these types of business activities (Aisenberg Tr. II Tr. 40) and provided extensive financial records, revenue records, and contracts that identified the source of his damage calculation, including the endorsements and appearances that came to an end because Haney lost his platform.  (Id.  55-56.) Aisenberg identified and provided financial information, including revenue, from those agreements, including with Charles Schwab, Club Champion, Sky Golf.  (Aisenberg Tr. II 41.)  As Aisenberg testified, "Callaway was very clear that without the Sirius XM platform… they were unable" to renew.  (Id. 43.)  Club Champion, Sky Golf, and Charles Schwab were lost for the same reason.  (Id. 43 – 45.)  Regarding the ability to replace those lost endorsements, Aisenberg testified: "Based on the marketplace reaction to Mr. Haney at this point … it's my expert opinion that the marketplace for Hank Haney's endorsements, as a result … of how he's been labeled is nonexistent going forward."  (Id. 48.)   The revenue stream was included and identified in the financial records

produced to the PGA TOUR.  ( Exhibit 5.)

Regarding his calculation of damages from lost endorsements, appearances, and licensing agreements, Aisenberg explained that he also opted for a conservative analysis: he chose not to supplement the historical-information calculation with incremental opportunities based upon other clients' experiences despite golf being "in the midst of an unprecedented increase in popularity…. So it [would have been] quite reasonable to forecast that those numbers would have been substantially greater than what [Aisenberg provide]." (Aisenberg Tr. II 40 – 41.) [5]

The remainder of the PGA TOUR's attack on this category of damages is repetitive of its previous argument regarding his flat line, most likely overly conservative appropriate to future projections.

3.  E-Commerce

The damages falling within the E-Commerce category mainly relate to revenue lost from Haney's business, VooDoo Labs, LLC ("VooDoo labs").  The business creates and sells a pain relief cream, VooDoo Pain Relief Cream.  (Aisenberg Tr. II. 20, 56.)

The PGA TOUR contends that the damage calculation is inflated in that its sales for the year preceding the Sirius XM termination were approximately $1,000,000.00, and Aisenberg calculated a material increase over 10 years.  (Mot. 17.)

First, Aisenberg explained that the PGA TOUR ignores that the business plan was for Haney to sell the company in approximately.  (Tr. 20.)  Based on Aisenberg's analysis of the alternative-care market, Aisenberg opined that the business plan was viable, (Aisenberg Tr. II 11), and that the expected profit from such a sale of the business was approximated by his damage

---

[5] The PGA TOUR also contends that Aisenberg did not produce the entire history of Plaintiffs' revenues during Aisenberg's involvement.  Aisenberg produced records dating back to 2018, as did Sirius XM, and the PGA TOUR has never requested any additional records.

calculation, (Aisenberg Tr. II 20).  Ironically, the PGA TOUR's own expert recently invested in a

similar product,  and reaped profits of approximately 3 to 4 time the original investment.  (Orzag

115-117.)

Aisenberg explained that, in the absence of a sale of the business, his analysis of the

projected revenue loss was as follows:

> That's the projected loss of sales of VooDoo [is] based on the month-over-month
> sales that he had developed … and the forecasted incremental increasing in
> advertising.  He had gotten to the point where he had a very successful advertising
> campaign and had an incredible strategic advantage in buying Sirius XM at a
> favored nations price and then also received a rebate essentially as a royalty on
> the advertising dollars of his own company.  So his effective advertising cost on
> Sirius XM was approximately 40 percent of the lowest possible cost that any
> other advertiser was able to purchase advertising on Sirius XM.

(Aisenberg Tr. II 57 – 58.)

Aisenberg supported the analysis with financial records reflecting gross monthly sales of the

product from the launch of the business until Haney was terminated, and explained in detail his

calculations.  (Id. 57 – 64, 68 - 76.)

Aisenberg further explained that the projected reduction in expenses disclosed in his analysis

over that time period was based upon his review of the financial records and an analysis reflecting

an economy of scale that increased, and brought expenses down, as sales increased.  (Aisenberg

Tr. II 67-69).

## 2. **Patrick McGee**

### (a)  Qualifications

The PGA TOUR's Motion lacks any substantive challenge to McGee.  The reason is clear:

McGee has 32 years of experience in the sports promotion and representation industry, negotiating

and crafting endorsement, appearance, and promotion deals, both at the world's largest talent

agency, Octagon, and for his own business, ProVentures. (McGee Tr. 8 – 9) (Exhibit 10).  For

purposes of formulating his opinions in this matter, he reviewed and analyzed Plaintiffs' endorsement deals (McGee Tr. 10, 33), and applied that expert analyses to his own experiences and knowledge about Plaintiffs (McGee Tr. 11 – 12), along with his extensive experience negotiating, formulating, and analyzing such agreements and appearances, and his review of media articles and social media analyses.  McGee analyzed the relationship between Plaintiffs and Sirius XM (McGee 14), and analyzed how that platform allowed Haney, described by McGee as one of the world's top golf coaches and golf personalities (McGee Tr. 14 – 15), to expand his business opportunities, brand, and audience (Id.).  In McGee's expert opinion, the Sirius XM platform could not be replicated (McGee Tr. 16 – 17), and offered Plaintiffs a unique business opportunity (McGee Tr. 18 – 19).

Based on his knowledge and experience about the golf industry, Haney, and business opportunities generated by the golf and media industry, as well as his review of the relevant Haney endorsement and business deals, financial records, and his review of media and social media analyses relating to Haney as well as to other similar highly-publicized incidents involving people in the golf industry (McGee Tr. 29 – 31; 99 – 100), McGee provided his expert opinion regarding issues seminal to this dispute:

- Aisenberg's damage calculations were consistent with trends in the golf and media industry (McGee Tr. 31 – 32) and, in fact, were overly conservative (McGee Tr. 34);
- The ten-year longevity projection for Plaintiffs was overly conservative, and a projection based upon a 15 – 20 year time span would have been appropriate (McGee Tr. 33);
- The social media reactions to Haney's broadcast were a "blip on the screen" (McGee Tr. 28), lasted three to four days and had entirely dissipated within four to five days (McGee 45);
- In contrast, based upon his analysis of social media data (Ex. XX), McGee opined that adverse reaction to, for example, Thomas, was ten times higher and had more and longer adverse reaction than any adverse reaction to Haney (McGee Tr. 45 – 47), adverse reaction to Monahan during the same period largely paralleled the reaction to Haney (McGee Tr. 47 – 48), and McGee

18

likewise provided opinions regarding other publicized events in the golf industry (McGee 48), which the PGA TOUR chose not to explore at McGee's deposition (<u>Id</u>.);

- The PGA TOUR's supposed concern that media linked Sirius XM to the PGA TOUR and any fallback from the Broadcast would be attributed to PGA TOUR was pretextual and flawed based upon his review of media attention and social media commentary and analysis (McGee Tr. 24).

The PGA TOUR, in addition to failing to explore those opinions, or to challenge them in the instant Motion, likewise ignores the remainder of McGee's expert report.

## <u>CONCLUSION</u>

For the foregoing reasons, it is respectfully submitted that the Court should deny Defendant's motion to exclude both of Plaintiffs' expert witnesses, Jeremy Aisenberg and Patrick McGee.

Dated:   New York, New York
         May 12, 2021

Respectfully submitted,

MICHELMAN & ROBINSON, LLP


 /s/ Peter R. Ginsberg
Peter R. Ginsberg (*admitted pro hac vice*)
800 Third Avenue, 24th Floor
New York, New York 10022
Telephone:  (212) 730-7700
Facsimile:   (212) 730-7725
prginsberg@mrllp.com

RICE PUGATCH ROBINSON STORFER & COHEN PLLC

By: /s/ Arthur H. Rice
    Arthur H. Rice
    Riley W. Cirulnick
101 NE 3rd Ave., Suite 1800
Fort Lauderdale, Florida 33301
Telephone: (954) 462-8000
Facsimile: (954) 462-4300
arice@rprslaw.com
rcirulnick@rprslaw.com