# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3              Civil Action No. 19-cv-63108-RAR

4

5    HANK HANEY and HANK HANEY MEDIA,

6    LLC,

7                    Plaintiffs,

8     -vs-

9

10   PGA TOUR, INC.,

11                   Defendant.          /

12

13                  VOLUME II

14   VIDEOTAPED DEPOSITION VIA REMOTE VIDEOCONFERENCE OF

15                  JEREMY AISENBERG

16

17            Wednesday, March 31, 2021

18             10:09 a.m. - 2:20 p.m.

19

20

21

22   Job No. 363245

23   Pages 1 - 135

24   Reported by:  Lora Lee Knorr-Fierro, RPR/FPR

25

1      Deposition of Jeremy Aisenberg, held via Zoom

2   conference:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20      Pursuant to agreement, before Lora Lee Knorr,

21   Fierro, RPR/FPR, Notary Public in and for the State of

22   Florida.

23

24

25

```
 1   APPEARANCES:

 2   On behalf of the Plaintiffs:

 3       MICHELMAN & ROBINSON, P.A.

 4       800 Third Avenue

 5       24th Floor

 6       New York, New York  10022

 7       (212) 730-7700

 8       BY: PETER R. GINSBERG, ESQUIRE

 9       (Appearing via videoconference)

10       Pginsberg@mrllp.com

11

12   On behalf of the Defendant:

13       FOLEY & LARDNER, LLP

14       Two South Biscayne Boulevard

15       Suite 1900

16       Miami, Florida  33131

17       (305) 482-8400

18       BY:  WILLIAM E. DAVIS, ESQUIRE

19           KELLY S. MILLIRON, ESQUIRE

20       (Appearing via videoconference)

21       Wdavis@foley.com

22       KMilliron@foley.com

23

24   VIDEOGRAPHER:   Jodie Dineen

25   REMOTE VIDEO TECHNICIAN:  Vane Morrison
```

```
 1    ALSO PRESENT:

 2        Neena Shetty, House Counsel for PGA TOUR, Inc.

 3

 4

 5                    INDEX OF PROCEEDINGS

 6    WITNESS - JEREMY AISENBERG                    PAGE

 7    DIRECT EXAMINATION BY MR. DAVIS                6

 8    CROSS-EXAMINATION BY MR. GINSBERG             108

 9    REDIRECT EXAMINATION BY MR. DAVIS             129

10    RECROSS EXAMINATION BY MR. GINSBERG           129

11

12

13                    DEFENDANT EXHIBITS

14    EXHIBIT              DESCRIPTION              PAGE

15    40        PLAINTIFF'S AMENDED EXPERT

16              DISCLOSURES                          18

17    41        SENTIMENT ANALYSIS                   32

18    42        VOODOO LAB, LLC SALES                58

19

20

21    ACKNOWLEDGEMENT OF DEPONENT                   133

22    CERTIFICATE OF OATH                           134

23    CERTIFICATE OF REPORTER                       135

24

25
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                        5

1    Thereupon,

2    the following proceedings began at 10:09 a.m.:

3            THE VIDEOGRAPHER:  Here begins disk number

4        1 in the videotaped deposition of Jeremy Aisenberg

5        in the matter of Haney, et al. v. PGA TOUR, Inc.

6        in the United States District Court for the

7        Southern District of Florida, Case Number

8        019-cv-631008-RAR.

9            Today's date is March 31st, 2021.  The time

10       on the video monitor is 10:09.  The videographer

11       today is Jodi Dineen, representing Planet Depos.

12       This video deposition is taking place remotely.

13           Would counsel please voice identify

14       themselves and state whom they represent.

15           MR. GINSBERG:  This is Peter Ginsberg on

16       behalf of the Plaintiffs.

17           MR. DAVIS:  This is William Davis and my

18       colleague, Kelly Milliron, on behalf of the PGA

19       TOUR, and with us is the Tour representative,

20       Neera Shetty.  She's a Senior Vice President and

21       General Counsel, Assistant General Counsel, Deputy

22       General Counsel.  Excuse me.

23           THE VIDEOGRAPHER:  The court reporter today

24       is Lora Lee Knorr-Fierro, representing Planet

25       Depos.  Would the reporter, please, swear in the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    6

1    witness.
2         THE STENOGRAPHER:  The attorneys
3    participating in this deposition acknowledge that
4    I am not physically present in the deposition room
5    and that I will be reporting this deposition
6    remotely.  They further acknowledge that in lieu
7    of an oath administered in person, I will
8    administer the oath remotely.
9         This arrangement is pursuant to the Florida
10   Supreme Court Administrative Order No. AOSC 20-23.
11   The parties and their counsel consent to this
12   arrangement and waive any objections to this
13   manner of reporting.  Please indicate your
14   agreement by stating your name and your agreement
15   on the record.
16        MR. GINSBERG:  This is Peter Ginsberg.  I
17   agree.
18        MR. DAVIS:  William Davis.  We agree.
19        THE STENOGRAPHER:  Okay.  Mr. Aisenberg,
20   raise your right hand, please.
21        Do you solemnly swear the testimony you're
22   about to give in this matter will be the truth,
23   the whole truth, nothing but the truth so help you
24   God?
25        THE WITNESS:  I do.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    7

1              THE STENOGRAPHER:  Thank you.

2              Counsel, I'm gonna mute myself, and you can

3         proceed.

4              MR. DAVIS:  Okay.

5    Thereupon,

6                   JEREMY AISENBERG,

7    having been first duly sworn, was examined and testified

8    as follows:

9                   DIRECT EXAMINATION

10   BY MR. DAVIS:

11        Q.    Good morning; and you pronounce your name

12   Aisenberg; is that correct?

13        A.    Yes, it is.

14        Q.    Okay.  Let me ask you this:  You have been

15   engaged to testify as an expert witness in this case; is

16   that correct?

17        A.    Yes.

18        Q.    Now, is the engagement -- does the

19   engagement run to you personally or does it run to

20   Octagon, Inc. or what?

21        A.    In my professional capacity as an employee

22   of Octagon.

23        Q.    And is there an engagement agreement, a

24   written document, which engages you specifically as an

25   expert in this case?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                8

1          A.    Other than a written request that I
2    participate as an expert, no.
3          Q.    And are you being compensated for your time
4    as an expert in this case?
5          A.    No.
6          Q.    Is Octagon being compensated for your time
7    as an expert in this case?
8          A.    Not directly, not in relation to serving as
9    an expert in this case, no.
10         Q.    If Mr. Haney were to recover any of the
11   damages that you are testifying to in this case, would
12   Octagon receive a commission or a fee?
13         A.    None has been discussed.
14         Q.    Is there any relationship between Octagon
15   and Mr. Haney where Octagon would receive any type of
16   compensation as a result of the outcome of this case?
17         A.    None has been discussed.
18         Q.    Is it contemplated?
19         A.    No.
20         Q.    Have you ever testified as an expert
21   witness before on behalf of one of your clients at
22   Octagon?
23         A.    Personally, I have not.
24         Q.    Okay.  Then it would follow that you have
25   never been qualified to testify before in a courtroom as

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                           9

1    an expert witness; is that correct?

2          A.    What are the -- what would count as

3    qualification as an expert witness?

4          Q.    Have you been presented in any court of law

5    to render an opinion as an expert in a case?

6          A.    I've been retained on numerous occasions as

7    an expert by independent research outfits looking for

8    expertise in sports-media-related matters that may or

9    have been used in court.  I don't -- I don't know the

10   answer to that.  Uhm, I've never --

11         Q.    Well, my specific question --

12               MR. GINSBERG:  Well, wait, Bill.  He's

13         still answering the question.

14               MR. DAVIS:  All right.

15               THE WITNESS:  But never directly under oath

16         in a -- in a similar circumstance as this.

17   BY MR. DAVIS:

18         Q.    When were you engaged to be an expert in

19   this case?

20         A.    Peter Ginsberg, Hank Haney's attorney,

21   inquired as to my abilities to serve as an expert perhaps

22   four to six weeks ago.  I can't recall exactly when.

23         Q.    And was it discussed at that time as to

24   what the scope of your engagement would be?

25         A.    To speak based on my professional

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    10

1    experience to the projected damages related to Hank's --

2    related to this case and Hank's dismissal from SiriusXM.

3           Q.    And how much time have you spent up until

4    this point in time in formulating your opinions as an

5    expert?

6           A.    Related to this matter or in general?

7           Q.    Yes.  Yes.

8           A.    I have spent 13 plus years developing an

9    expertise related to Hank Haney's business enterprise,

10   understand both directly related to Hank's business

11   enterprise and through the course of work on numerous

12   similar types of business enterprises for other people.

13          All I'm simply doing in this case is

14   providing my expertise regarding these types of

15   businesses and reasonable projections for what the impact

16   of Hank's losses, his platform would have -- does have on

17   his business.  So it's because of the nature of my

18   expertise on this subject matter, I, candidly, did not

19   have to prepare much more than to show up here this

20   morning to see your smiling face.

21          Q.    So, if you could -- I want you to focus

22   specifically though on any time that you've spent in

23   formulating the projections that are part of the Amended

24   Disclosure, which has been filed in this proceeding, as

25   opposed to the general relationship that you've had with

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    11

1    Mr. -- with Mr. Haney.  How much time have you spent in

2    formulating those projections?

3          A.    It did not require a significant amount of

4    time.  I -- many hours, less than ten hours perhaps.  It

5    didn't require a substantial amount of time because the

6    business was very clear and de -- the business plan was

7    very clear and defined.  The historic revenues were very

8    clear and defined, and the absence of those revenues and

9    the ability to reasonably forecast what those revenues

10   would have continued to be is also very clearly defined.

11         So it may seem -- it may seem confusing or

12   complex, but it really is very straightforward; and, in

13   the normal course of business for talent representation,

14   a reasonable level of ability to project what you expect

15   to generate in revenue for talent that you represent is

16   an important part of that.  So if I couldn't make a

17   reasonable determination as to the potential revenue for

18   talent, I wouldn't have much of a business to be able to

19   build.

20         Q.    When did you first start representing Mr.

21   Haney, and I mean you in your capacity with Octagon?

22         A.    2006.

23         Q.    And have you represented Mr. Haney, in

24   whatever capacity, at Octagon continuously since that

25   date?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              12

1              A.    Yes.

2              Q.    And in how many of those years did Mr.

3       Haney's gross revenue exceed $3 million?

4              A.    I can't recall exactly how many years.

5       Many of those years.

6              Q.    What -- in those years, what was the

7       highest amount of revenue that Mr. Haney had received

8       from all sources through Octagon?

9              A.    I don't know the exact figure.  I can find

10      that for you.

11             Q.    Well, is it --

12                   MR. GINSBERG:  Are you asking for an

13             estimate?

14                   MR. DAVIS:  Sure.  I'm asking for his best

15             recollection.

16                   THE WITNESS:  There are -- there are

17             numerous revenue streams for Hank Haney's business

18             enterprise that don't directly pass through

19             Octagon's accounting.  As an example, stock in

20             publicly-traded companies, in 2000 -- from 2012 to

21             2016 he had a significant stock holdings in the

22             Crocs shoe company, as an example.

23                   When he liquidated those shares, it created

24             a significant windfall that did not pass through

25             Octagon's accounting.  It wasn't subject to any of

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    13

1              our processes for recording.

2                    Then there are other examples like that,

3              real estate that was granted to him as part of a

4              business transaction, automobiles that were

5              provided to him as part of a business transaction,

6              leaseholds on golf academy properties that were

7              provided to him as part of a commercial

8              transaction, all of which did not flow through

9              Octagon.

10   BY MR. DAVIS:

11              Q.    Are you through?

12              A.    Yes, sir.

13              Q.    I was gonna ask you another question.

14              A.    Okay.  Yes, sir.

15              Q.    I'd like you to refer to the Plaintiff's

16   Amended Expert Disclosures, which have been filed in this

17   proceeding.  They're dated, I believe, March 5th, 2021,

18   and they probably appear in the binder that you have

19   there as Tab Number 1.  Do you have that in front of you?

20              A.    Yes, sir.

21              Q.    And could you go to the eighth page in,

22   which I believe is your CV?

23              A.    Okay.

24              Q.    Now, starting with your education, have you

25   taken any courses in forensic accounting?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    14

1          A.    No.

2          Q.    Have you taken any courses in econometrics?

3          A.    No.

4          Q.    Have you taken any courses with respect to

5    accounting and establishing balance sheets and financial

6    statements?

7          A.    I've taken routine training through the

8    course of learning Octagon standards and practices for

9    the course of how we analyze and report our clients'

10   revenues.  It's part of the regular course of training

11   for staff at Octagon, but not university coursework.

12         Q.    Have you ever testified in a court of law

13   with respect -- involving anything involving forensic

14   accounting?

15         A.    No.

16         Q.    Or econometrics.

17         A.    Nope.

18         Q.    In your engagement with Mr. Haney, do you

19   involve yourself in preparing profit and loss statements

20   for him?

21         A.    I have assisted his accounting -- his CPA,

22   personal CPA for his businesses in compiling the

23   necessary materials for profit and loss statements, yes.

24         Q.    And what kind of information are you

25   providing his CPA?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    15

1          A.     Reports from various platforms related to

2    various business initiatives, obviously the reports from

3    Octagon, any other relevant financial documents that

4    Octagon may have or been provided by third parties that

5    Hank Haney is doing business with.

6          Q.     Let me direct your attention to the

7    category on your CV, "Publications, Presentations and

8    Guest Lectures."

9          A.     Uh-hm.

10         Q.     Is this exhaustive?

11         A.     No.  No.  I've spoken numerous other

12   instances in regard to the sports marketing and media

13   landscape, a number of national and international

14   conferences.  So there's a number of -- a number of

15   things that should have been added to this.

16         Q.     Have you spoken -- strike that.

17                Have you published any articles,

18   peer-review articles in the areas of damage calculation

19   or forensic accounting?

20         A.     Nope.

21         Q.     And I'd ask you the same question with

22   regard to the field of econometrics.

23         A.     Have not.

24         Q.     Okay.  Have you been involved in the

25   creation of mathematical models or algorithms that

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                16

```
1    project revenues for businesses?
2           A.    Can you restate the question?
3           Q.    Have you been involved in the creation of
4    algorithms or mathematical models involved in
5    projecting --
6           A.    I have.  I have.
7           Q.    -- profits and --
8                 MR. GINSBERG:  Let him finish his question.
9                 THE WITNESS:  I have.
10                MR. GINSBERG:  Let him finish his question.
11                THE WITNESS:  Sorry.
12   BY MR. DAVIS:
13          Q.    And describe for me what you've done in
14   that regard.
15          A.    I started my first company while in
16   graduate school in 2001 or 2002.  I started raising
17   capital to fund companies at that time.
18                I have been involved in the development of
19   business plans and financial projections related to
20   hundreds of businesses that have gone on to be realized,
21   at various levels, with various degrees of success in
22   real-world practice every -- throughout my -- throughout
23   my career repeatedly and continuously and to this day in
24   relation to every client that we work with, as well as
25   business initiatives for Octagon, which is a
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    17

1    publicly-traded company, and preparing models and

2    projections for anticipated business opportunities, the

3    cost associated with those, the likely net revenue of

4    those opportunities.  It is a core aspect of what I do in

5    business.

6         Q.    Is your job experience described here in

7    your CV under category called "Experience?"

8         A.    Some of it.

9         Q.    Is there anything that you can point out in

10   the various bullet points under "Experience" that address

11   the issue or involve you doing mathematical or

12   algorithmic projection of profits?

13        A.    Virtually every bullet here would relate to

14   something that would require financial projections, yes.

15        Q.    Okay.

16        A.    Would you like me to go bullet by bullet?

17        Q.    Let's talk about the one -- the second one,

18   "Developed highly profitable content partnerships with

19   global media companies, including CBS, NBC, iHeart,

20   Sirius, Facebook, Discovery" and more.  What are you

21   addressing in that bullet point?

22             MR. GINSBERG:  Objection, form.  Do you

23        understand the question?

24             THE WITNESS:  I mean, the question would --

25        to explain what is underlying that bullet is --

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    18

1   would take the entire window of time we have -- we

2   have scheduled here today.  The work that I do on

3   behalf of the most successful and high-profile

4   golf content creators in the world, the client

5   list that I work with are, without question, the

6   most influential talent who produce content

7   dedicated to golf outside of anyone who plays

8   professionally on a professional tour for a

9   living.

10       Every aspect of what I do is related to

11  helping those clients develop content-driven

12  business models that are profitable.  That

13  includes the idea, the plan, the execution of the

14  plan, the budgets and sales projection related to

15  the plan, the actual sales and marketing of those

16  initiatives, the cultivation of long-term

17  extensions of those initiatives.

18       It's a -- it is a core component of

19  everything, in fact, that we do with our clients.

20  If it's not -- if we can't analyze and clearly

21  define the potential value, which is a profit

22  calculation, it's very difficult, if not

23  impossible, to convince a client and/or business

24  partners to consider it.

25       (Thereupon, Defendant's Exhibit Number 40

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    19

1              was marked for identification, which is attached

2              hereto and made a part hereof.)

3    BY MR. DAVIS:

4              Q.    Let me direct your attention to the last

5    page of Plaintiff's Amended Expert Disclosures, which I

6    believe is exhibit -- will be now Exhibit Number 40.  I

7    mean, the entire Plaintiff's Amended Expert Disclosures

8    we're gonna mark as Exhibit 40, but I'm directing your

9    attention to the last page.

10             A.    The very last page of the book?  Can you --

11             Q.    No, the last page of the Plaintiff's

12   Amended Exhibit Disclosures, Expert Disclosures, which

13   would be tab number 1.

14             A.    Okay.

15             MR. GINSBERG:  Can you put it on the

16             screen?

17             MR. DAVIS:  Yeah, sure.

18             THE WITNESS:  The last page I have is a

19             "next steps" slide.

20             MR. DAVIS:  No, the last page should be a

21             document titled "Hank Haney Financial Damages

22             Calculation."

23             THE WITNESS:  Okay.

24   BY MR. DAVIS:

25             Q.    Do you see that?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    20

```
 1              A.    Yup.

 2              Q.    Did you prepare that?

 3              A.    I did.

 4              Q.    How long did it take you to prepare that?

 5              A.    Several hours.

 6              Q.    Okay.  Now, on the bottom left it says

 7    "Total Projected Damages."  So this is what your

 8    characterize as a damage calculation; is that correct?

 9              A.    I was asked to provide projections to Mr.

10    Haney's lawyers that calculated reasonable lost business

11    revenue and opportunity for ten years out.

12              Q.    You use the term "revenue."  Do you mean

13    profits or just gross revenue?

14              A.    In the -- every line item there, except the

15    e-commerce, it is -- it is a net revenue to Mr. Haney

16    calculation or projection, an e-commerce tab, that

17    business basically would be the pain relief cream

18    business.  Mr. Haney's sole objective was to drive

19    top-line revenue to compel a larger company to purchase

20    that business.  So his focus there was creating the

21    largest possible top-line-sales figures in order to -- to

22    attract a potential buyer.

23              Q.    The document titled "Financial Damages

24    Calculation" spans a period from 2019 through 2030.  How

25    did you come about establishing that time period?
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    21

1          A.    So the actual damages are those highlighted

2    in red that were going back on those lost figures and to

3    provide some reasonable window projecting that out

4    through 2030, which would put Mr. Haney in his early

5    70's, was the time horizon that Mr. Haney and Mr.

6    Ginsberg felt was reasonable.

7                You know, preparing calculations or

8    projections throughout my -- the course of my career,

9    they're -- any suggestion that they're anything more than

10   best estimates is very difficult.  That would -- I would

11   be surprised if you could produce an expert who would say

12   that any projections are gonna be 100 percent accurate.

13               So what I attempted to do was provide a

14   reasonable and, frankly, somewhat conservative analysis

15   of what Hank Haney's business would look like if he

16   stayed the course over the proceeding ten-year window

17   through 2030.

18         Q.    How did you -- how did you -- what

19   methodology did you employee to come up with 10 years

20   rather than 15 or 12 or 5?

21         A.    It was -- the discussion was to project out

22   through 2030.  So that's what I did.

23         Q.    Was there a methodology though that you

24   employed to make a determination that that was a more

25   reliable period of time?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    22

1          A.     That was based on Hank Haney's likelihood

2     to continue to work at the rate that he's been working

3     that would facilitate the ongoing business opportunities

4     over that -- over a reasonable period of time.  Mr. Haney

5     is young.  He's very healthy.  He's got a young wife.

6     He's got a young child.  He had no intention of slowing

7     down.

8                 There are plenty of his peers -- Butch

9     Harmon, as an example, is another high-profile teacher

10    whose in his -- he's at least 75 years old.  I represent

11    Gary Player, who is 85 years old.  So 2030 seemed like a

12    reasonable timeframe.  I could have projected out longer.

13    We could have continued on.

14                Eddie Merrins is a high-profile golf

15    instructor who's continued to teach in his 80's.  Harvey

16    Penick taught into his 80's.  There are many examples of

17    high-profile golf personalities who have taught well past

18    the age that this projects out for Hank Haney.

19         Q.     Other than approaching it from that

20    standpoint, was there any other methodology which you

21    employed to establish a ten-year window?

22         A.     I think the methodology I described is

23    pretty sound.  No.

24         Q.     The answer is no; is that correct?

25         A.     I employed plenty of very sound

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                23

1    methodologies to determine that window based on the

2    reasonable analysis of Hank Haney's business and his

3    projected desire to continue to work at the pace and

4    capacity that he had been, and that seemed like more than

5    a reasonable -- a reasonable window and sufficient

6    methodology based on, you know, practical business

7    experience, not theoretical business experience.

8           Q.   Well, what kind of variables did you

9    analyze to ascertain what his income-producing capability

10   would be in year 2030?

11          A.   I -- because I base these figures on a

12   conservative analysis of maintaining essentially all of

13   the core business -- businesses of Mr. Haney, other than

14   the growth of the one business that he was focused on

15   aggressively growing.  I could very, very easily and

16   reasonably provided a growth metric on the media and

17   advertising revenues.

18               Those numbers had grown every year from the

19   time that he signed with SiriusXM.  So it would have been

20   very reasonable to project those numbers to continue to

21   grow, ah, but --

22          Q.   Did you engage in that --

23               MR. GINSBERG:  I'm not sure he was done,

24          Bill.

25               THE WITNESS:  I chose to be conservative on

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    24

```
 1              the analysis and the media and advertising
 2              revenues.  I could have very easily provided a
 3              metric to have those revenues grow year over year.
 4              It would have been reasonable.
 5                   The historic data would have easily --
 6              would have easily validated that analysis, but in
 7              the interests of projecting out something that was
 8              reasonable and fair to all parties, that seems
 9              like a reasonable methodology.
10   BY MR. DAVIS:
11         Q.    Has the historic data that you've relied on
12   in calculating this projected damages all been produced,
13   to your knowledge?
14         A.    I believe so.
15         Q.    And what kind of historic data did you rely
16   on with respect to establishing the column "Media and
17   Advertisers?"
18         A.    That was or is specifically built around
19   the SiriusXM PGA TOUR Radio partnership and the ongoing
20   revenue shares tied to those various advertisers.
21         Q.    So the area under "Media and Advertisers,"
22   which is in red, does that reflect actual income derived
23   from the SiriusXM contract by Haney Media?
24         A.    No.  No.  In 2019, as your expert, who
25   analyzed this table, mentioned in his report, there was a
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                25

1    600 and -- approximately $680,000 settlement between Hank

2    and SiriusXM, settlement payment.  That -- Haney was

3    projecting approximately 1.2 million in total revenues

4    that year from SiriusXM.  He had been paid approximately

5    $200,000 up until that point in May in his guaranties,

6    and then the $680,000 settlement left a loss of

7    approximately $300,000 related to income that he expected

8    to earn had he remained on the air the rest of that year.

9    So that was the way that the 2019 number was calculated.

10                   I'd need to double-check the records, but

11   he collected in the neighborhood of $900,000.  $300,000

12   was a result of his being -- the $300,000 loss was the

13   result of his early termination for the 2019 year.  It

14   very reasonably would have been -- could have been

15   projected that that number would increase in 2020 and so

16   on and so forth, but for the purposes of this table, I

17   elected not to introduce some arbitrary growth metric.

18           Q.    So then the number for the year 2020 is

19   predicated upon what?

20           A.    Had he remained on -- but for the fact that

21   SiriusXM was told to terminate Mr. Haney's agreement by

22   the PGA TOUR, he would have earned at least $1.2 million

23   in compensation and revenue shares in 2020,

24   conservatively.

25           Q.    And then for the year 2021, how did you

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          26

1    arrive at the sum of $1,200,000?

2           A.    The -- again, as I stated already, the

3    concerted projection of what reasonably -- and, again,

4    very conservatively, would have been his income for 2021

5    based on the existing advertising and projecting no

6    incremental growth of those advertisers.

7           Q.    Isn't it true that the SiriusXM contract

8    ran to term February 15th, 2121?

9           A.    Yes.

10          Q.    And, therefore, what you've projected for

11   2021 presupposes that that contract was going to be

12   renewed on its same terms; is that correct?

13          A.    We had been told repeatedly by Scott

14   Greenstein, the President of SiriusXM, that Mr. Haney

15   would have a job on SiriusXM PGA's whole radio as long as

16   he wanted one.  So there was no -- there was no factual

17   basis with which to think that, but for the PGA TOUR's

18   actions in this matter, he would not have continued to

19   serve in his role with SiriusXM for as long as he chose.

20          Q.    Did Mr. Greenstein confirm to you that they

21   would renew that contract after February 15th of 2021 on

22   its same terms?

23          A.    Indirectly, yes.

24          Q.    How so?

25          A.    Vis-a-via the description of the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                27

1    representations that had been made regarding Hank's

2    ongoing role with the network for as long as he -- as

3    long as he wanted to work with them.

4            Q.    Okay.  Is it fair to say, sir, though that

5    your projections for 2021 through 2030 are predicated

6    upon the assumption that the SiriusXM contract would have

7    been renewed --

8            A.    Yes.

9            Q.    -- at least in its essential terms?

10           A.    Yes.

11           Q.    Is that correct?

12           A.    Yes.

13           Q.    Now, other than the SiriusXM contract and

14   the documents that were generated in relation to net

15   advertising revenue under that contract, were there any

16   other documents that you reviewed in order to create

17   these projections in the "Media and Advertisers" column?

18           A.    No.

19           MR. GINSBERG:  And, so, you're talking

20           about for purposes of this report and not general

21           experience.

22           MR. DAVIS:  The question was asked.  I

23           think it was understandable.

24           MR. GINSBERG:  I wouldn't ask for

25           clarification if I thought it was understandable,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    28

1          but it's your deposition.

2    BY MR. DAVIS:

3          Q.    Now, the fact that you've included all

4    these years '22 through -- well, actually 2021 through

5    2030, did you conduct any kind of an evaluation as to

6    whether or not Mr. Haney could have replaced his earning

7    capacity that he had with SiriusXM through some other

8    media relationship?

9          A.    Yes.

10         Q.    And what consideration did you give to that

11   in formulating your opinions as expressed in this "Media

12   and Advertisers" column?

13         A.    Most specifically and relevantly, the

14   experience of Mr. Haney with his podcast and the general

15   sentiment in the marketplace as a result of the impact of

16   his dismissal from SiriusXM on the association with Mr.

17   Haney given the Tour's dis-favorable position on him.

18         Q.    Did you factor in the impact of the actual

19   remarks that he made on May the 29th, 2019 as affecting

20   his employability on a go-forward basis?

21         A.    I did.

22         Q.    Okay.  And how did you go about quantifying

23   the impact of that?

24         A.    We conducted a sentiment analysis using a

25   variety of third-party software tools to assess the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    29

1    sentiment among golf audiences regarding Mr. Haney.  That

2    sentiment had returned to a net positive sentiment within

3    seven days of the remarks.

4              So, but for his dismissal from SiriusXM, it

5    is -- and, in addition, the feedback from all of the

6    major sponsors of his programming, that they had no

7    intention of ending their relationship with Hank until he

8    lost his platform, it was clear that -- it was clear that

9    the impact was a direct result of the loss of the

10   platform.

11        Q.   I'm confused because you're suggesting that

12   the sentiment either returns a neutral or positive, and,

13   if that's the case, why would Mr. Haney have difficulty

14   being employed in future years?

15        A.   The -- number 1, he lost the platform.  He

16   had to -- he then, therefore, needed to rebuild his plat

17   -- rebuild a platform, and in parallel to the need to

18   rebuild a platform, he was labeled as a result of the

19   actions that were taken as a someone who wasn't worth the

20   risk because of the -- because of the dynamics of his

21   dismissal from SiriusXM.

22              Had he been given the opportunity to remain

23   on SiriusXM -- the audience forgives and forgets quite

24   quickly, as illustrated by other by other sentiment

25   analysis that we've analyzed, including Justin Thomas'

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                30

1    remarks, which were very public and received a

2    significantly larger amount of attention relative to Mr.

3    Haney's across all forms of media, and Mr. Thomas'

4    sentiment has returned to net positive, you know, since

5    his remarks in January.

6              Had Mr. Haney been given the opportunity to

7    remain on SiriusXM and perhaps use the platform in

8    collaboration with the LPGA TOUR and the PGA TOUR to

9    provide more attention to women's golf through that

10   platform, it's very reasonable to predict that he

11   would -- he would have continued with no impact at all

12   related to this -- related to his remarks.  It was simply

13   the decisive and, frankly, unreasonable action that was

14   taken that ultimately led to the PGA TOUR's blackballing

15   of Hank Haney is very difficult to overcome in the golf

16   business.

17        Q.    You had mentioned a sentiment analysis.

18        A.    Yes.

19        Q.    And there's a document that's been produced

20   to me, and I suspect you have it in front of you, but I'd

21   like to mark it as Exhibit 41.

22        A.    It's not here.

23        Q.    Do you have the copy there?

24              MR. GINSBERG:  Could you put up on the

25        screen?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                     31

1              MR. DAVIS:  I can hold it up like this.

2         It's this document.  You all produced it the other

3         night.

4              THE WITNESS:  I can -- I believe I can find

5         that one.

6    BY MR. DAVIS:

7         Q.   Can you find it?

8         A.   I believe so, if you bear with me.

9         Q.   Sure.  The only reason it's not in the

10    binder is it in late and just didn't get in.

11             MR. GINSBERG:  I'm just looking for it,

12        too.  Hang on one second.

13             MR. DAVIS:  Yeah, we can go off the record

14        if we need time to find it.

15             MR. GINSBERG:  Yeah, why don't we just take

16        5 minutes or 10 minutes or something.  It's been

17        an hour anyhow.

18             MR. DAVIS:  All right.  Let's go off the

19        record, let's find the document and come back.

20             THE VIDEOGRAPHER:  We're going off the

21        record at 10:55.

22             (Thereupon, the following proceedings took

23        place at 11:03 a.m., following a short recess at

24        10:55 a.m.)

25             THE VIDEOGRAPHER:  We are back on the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              32

```
1              record at 11:03.
2                      MR. DAVIS:  Okay.  For some reason I have
3              Jodi Dineen on my screen as opposed to the
4              witness.
5                      MR. GINSBERG:  Hm, I don't see Jodi.
6                      MR. DAVIS:  There we go.  There we go.  We
7              back on the record.
8      BY MR. DAVIS:
9              Q.    Mr. Aisenberg, were you able to locate that
10     document?
11             A.    Yes.
12             Q.    You called it sensitivity.
13             A.    The sentiment document that --
14             Q.    Yeah.
15             A.    -- spans May 28th through July 1st?
16             Q.    Yes, that's the one.
17             A.    Okay.
18             Q.    Do you have that in front of you?
19             A.    Yes.  Yes, sir.
20                     MR. DAVIS:  Okay.  Let's make that
21             Exhibit 41 for our record.
22                     (Thereupon, Defendant's Exhibit Number 41
23             was marked for identification, which is attached
24             hereto and made a part hereof.)
25     BY MR. DAVIS:
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    33

1          Q.    Now, who conducted this sentiment analysis?

2          A.    I used a platform that Octagon subscribes

3    to.  There are a number of different platforms that can

4    conduct these types of analyses.

5          Q.    And is that done contemporaneously with the

6    event?  How is it done?

7          A.    I'd refer you, for the exact methodology,

8    to their documentation.  In this case it is -- Infegy

9    Atlas is the platform, but it conducts an analysis of

10   several or -- you can filter, you know, the platforms

11   that you choose to survey to conduct the analysis.

12               It can include news articles.  It can

13   include social media.  In this case, I believe it

14   included social media, including Twitter, Instagram,

15   Facebook, as well as news articles, and specifically

16   related to the sentiment and any and all content that

17   is -- that comes up in the query with the term Hank Haney

18   in the query.

19         Q.    Did you order this?

20         A.    This is a piece of software we have access

21   to.  There are many similar platforms.  I'm sure that the

22   PGA TOUR has a sentiment analysis tool that they use, and

23   it's common practice now in marketing.

24         Q.    My question is does this automatically

25   happen or do you have to put something in motion to make

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    34

1    it happen?

2           A.    I logged into a tool that I have access to,

3    and I entered in Hank Haney.  Frankly, I was -- I

4    observed this empirically at the time with the social

5    media and commentary after the fact, at the time,

6    contemporaneously, but, you know, it validated what I

7    observed at the time.

8           Q.    Now, the vertical axis on the left, what

9    is -- what are the values that are measured there?

10          A.    That is the instances of comments that were

11   included in that particular query.  So the peak on the

12   axis is 1421 that coincides with a positive sentiment

13   that was -- regarding Haney that happened on the event

14   day, 1, 2, 3 -- that would have been that approximately

15   June 3rd.

16          I can go back into the raw data and confirm

17   that that high point of June 3rd, the day -- I believe

18   the date of the final round of the U.S. Women's Open when

19   it became clear that Lee -- Miss Lee6 was winning the

20   U.S. Women's Opening.

21          Q.    And, just so the record is clear here, the

22   graft depicted in green is considered to be positive

23   comments that were picked up through this analysis; is

24   that correct?

25          A.    Correct, yes, sir.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              35

1          Q.    And in gray it would be neutral comments?

2          A.    Correct.

3          Q.    And the red would be considered to be

4    negative comments; is that correct?

5          A.    Negative sentiment of the comment, correct.

6          Q.    Negative sentiment, okay.  And the

7    horizontal axis of this graph runs from 8/28th, 2019 to

8    July 1st, 2019; is that correct?

9          A.    Yes.

10         Q.    And it looks like the negative sentiments

11   continue on out through the end of the graph, at least in

12   terms of a red depiction; is that correct?

13         A.    Both red that green pop up in very small

14   occurrences.  Those data points are likely not to be

15   statistically significant because the sampling is so

16   small.

17               So, yeah, approximately halfway into the

18   chart, where there are two very small red peaks -- I can

19   go back into the raw data, but that is likely to be one

20   or two occurrences total.  So it would -- it would be

21   difficult to conclude that that is a reliably negative

22   sentiment at that moment because the instance are so low.

23   There's --

24         Q.    What is -- okay.

25         A.    It's noise.  There's essentially no ongoing

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    36

1    widespread activity after the positive sentiment that

2    does actually rise above noise, and I can provide that

3    date, but, you know, within a few additional days of the

4    peak positive sentiment.

5           Q.    Well, in just looking at the graph, the

6    positive sentiment ends, it looks like, 1, 2, 3, 4 data

7    points from the end of the graph.  Do you see that?

8           A.    You know, if -- you would see a similar

9    noise level if you -- if I pulled the data on an even

10   longer trend.  You'd see a random tweet, from a random

11   person one time will create the trend there.  That -- for

12   the purposes of analyzing the widespread sentiment, that

13   is -- there is essentially no discourse of consequence

14   occurring past the initial moment.

15              You can see on May 28th, where the graph

16   starts, on that day there was zero sentiment in any

17   direction related to Hank Haney.  There was no widespread

18   public discourse.  I can pull -- you can pull back and

19   probably see similar noise based on 1, 2 or 3 people's

20   opinion at any given time that they choose to share on

21   social media.

22              The peaks, you can see there's a -- the

23   first peak of any consequence is May 29th, where it's

24   approximately a 40 percent of the peak instance of

25   overall sentiment is negative there on the day of the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                37

1    comment, which we know.  The comments were generally

2    viewed as negative.  There was some positive sentiment at

3    the time, some support of Hank's comments.  That

4    negativity continued for the next 24 hours and quickly

5    levelled off.

6              Then when the Lee6 victory occurred, both

7    the positive and negative sentiments spiked because it

8    really became a conversation at that point, you know,

9    people discussing Mr. Haney's comments, the accuracy

10   ultimately factually of those comments, the sensitivity

11   or lack thereof of those comments, the nature of the

12   issue where the Lees need to be numbered as part of that

13   discourse.

14             You can see -- you know, there's quite a

15   bit of ongoing neutral discussion of the subject matter

16   in more of a thoughtful style without heavily charged

17   emotion, and then within days the overall conversation

18   virtually disappears.

19        Q.   So -- and I'm clear on "Media and

20   Advertisers" in this column.  It's your testimony, sir,

21   as an expert, that not withstanding the sentiment, which

22   has been displayed here on Exhibit 41, Mr. Haney would

23   not have been employable by other media or advertisers

24   from 2021 through 2030; is that correct?

25        A.   No.  Could he -- is he potentially

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    38

1   employable?  There are -- as evidenced by the fact that

2   he has a podcast on a major platform, like iHeart media,

3   his expertise is still valued in the golf content

4   landscape, but the relative business opportunities are

5   diminished almost completely because of the impact of the

6   labeling of him as a racist, sexist, xenophobe by

7   arguably the most authoritative and influential group in

8   the sport of golf, being the PGA TOUR.

9           The PGA TOUR's labeling of Mr. Haney as his

10  remarks being so deplorable that he deserved to be

11  dismissed from SiriusXM has been taken as gospel by the

12  marketplace because they are the most influential

13  organization in the sport globally.

14          Q.    Now, the total that you arrive at for this

15  column is $13,500,000 of lost revenue; is that correct?

16          A.    Yes.

17          Q.    Did you engage in any exercise to present

18  value that?

19          A.    Why would you?

20          Q.    You're projecting, as an increment of

21  damage, 1 million 2 a year over the next ten years; and

22  is it your testimony, sir, that it would not be

23  appropriate to present value that for the purposes of a

24  damage model?

25          A.    I think that would be something that you

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    39

1    and Mr. Haney's attorneys would negotiate in the course

2    of a damage settlement.  It's not my place to project

3    what the discount for present value should be there.  I

4    simply was asked to provide a reasonable projection of

5    the revenue that he would incur without the TOUR's

6    interference.

7              Q.    In your position, sir, are you aware of any

8    methodology to project future damages that does not

9    include a present value analysis?

10             A.    I refer to my previous answer.  I was asked

11   to provide an analysis of the income that Haney would

12   anticipate generating over the course of that timeframe.

13   Should the -- in the course of negotiating a settlement

14   with Mr. Haney and his attorneys, should he choose to

15   negotiate a discount for present value, I'm certain you

16   guys will cross that bridge when you get to it.

17             Q.    I'm not talking, sir, in terms of

18   negotiating settlement.  I'm talking in terms of your

19   expert opinion, which presumably will be presented to a

20   jury in this case, and my question to you is do you not

21   consider present valuing a revenue stream where you're

22   projecting out ten years to be appropriate?

23             A.    You certainly can.  I believe that a jury

24   will also understand that, but for the actions here by

25   the PGA TOUR, Haney would have remained in a position to

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    40

1    generate that income and would have rather have earned

2    that income over time than be put in a position where he

3    was unable to generate income and had to be suing for

4    damages.

5            Q.    Okay.  So, just to leave this topic then,

6    you did not give any consideration to present valuation

7    for the column "Media and Advertisers;" is that right?

8            A.    I was not asked to do so, so I did not.

9            Q.    Let's go over to "Endorsement and

10   Appearances."  What does that cover?

11           A.    Those are contracts with third parties for

12   various marketing-related activities beyond the scope of

13   his media activities with SiriusXM.  So that's --

14           Q.    Are the numbers in red based on actual

15   historical experience?

16           A.    It's all based on historical actual

17   revenues associated with those types of business

18   opportunities.

19           Q.    The numbers in red, correct?

20           A.    Correct.  The numbers in red were simply

21   through 2021, the actual numbers.  So that -- and, again,

22   those numbers in 2020 and 2021 may have been greater than

23   that.  Contractually they would have been at least that

24   amount.  Could I have reliably projected exactly how many

25   incremental opportunities would have presented

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    41

1    themselves?  No.

2              I would say that other clients that I work

3    with have experienced a significant amount of incremental

4    growth over the last 12 months.  Golf is in the midst of

5    an unprecedented increase in popularity as brought on by

6    COVID.  Revenues of all of the major golf equipment

7    manufacturers are at near highs.  Unit sales are at all

8    time highs.  Golf retail sales are all time highs.

9              Many of Hank Haney's business partners have

10   some of their best years since his dismissal in 2019.  So

11   it's quite reasonable to forecast that those numbers

12   would have been substantially greater than what was

13   provided here as an estimate.

14        Q.   Let's focus on 2019.

15        A.   One can say I provided a time value of

16   money discount.

17        Q.   Let's focus on 2019.  You have a $200,000

18   loss in that year; is that correct?

19        A.   It is.

20        Q.   And what endorsement appearances or

21   appearances did Mr. Haney lose to arrive at that

22   $200,000?

23        A.   Charles Schwab, Callaway, Club Champion,

24   Sky Golf.

25        Q.   Let's talk about Callaway for a minute.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    42

1    When did the Callaway endorsement agreement expire of its

2    own terms?

3          A.    I don't recall off the top of my head.  I

4    believe that the contract has been provided.

5          Q.    I believe the contract expired of its own

6    terms in December of 2019.

7          A.    Okay.

8          Q.    Are you saying that Callaway did not pay

9    its obligations under that contract through the

10   expiration of its term in 2019?

11         A.    Well, there are other aspects of the

12   Callaway agreement that weren't able to be materialized

13   as a result of the loss of the platform.

14         Q.    And what were they?

15         A.    That includes the developments, the ongoing

16   sales and marketing of products they had created with

17   Callaway, namely a the club called Sure Out Wedge, which

18   they did not aggressively market following the -- it was

19   intended to be launched over the subsequent months in

20   2019 and did not come into market after the loss of

21   Hank's platform.

22         Q.    And how much of the $200,000 do you

23   attribute to that?

24         A.    I'll need to go back and check his records,

25   but at least $50,000 in income from that in 2018.  So I

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                        43

1    would estimate it at --

2           Q.    And it's your testimony, sir, that that

3    endorsement relationship was not carried through because

4    Mr. Haney was not broadcasting on the PGA TOUR radio

5    channel?

6           A.    That's 100 percent accurate.  Callaway was

7    very clear that without the SiriusXM platform and without

8    understanding what his platform would look like going

9    forward, they were unable to exercise the automatic

10   renewal provision in his agreement.  I believe the

11   termination letter is provided in the materials.

12          Q.    Now, with respect to the other endorsement

13   opportunities, I think you mentioned Champion?

14          A.    Club Champion.

15          Q.    What was that?

16          A.    That was an endorsement relationship with a

17   custom-club-fitting company that included Haney's name

18   and likeness, appearances in their stores, advertising.

19   Participation in their advertising included a lease of

20   property at his Texas -- at Hank Haney's Texas golf

21   location, included a revenue share related to referrals

22   and incremental sales attributable to Hank.

23          Q.    Was that an agreement that expired of its

24   own terms or was it terminated?

25          A.    It was terminated.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                      44

1          Q.     And what was the reason given for

2    termination?

3          A.     That he lost his platform.

4          Q.     And how much of the 200,000 would be

5    attributable to that?

6          A.     I believe approximately $50,000 I think.

7          Q.     And what were the other endorsements or

8    appearances that were lost?

9          A.     Sky Golf.

10         Q.     And what was the nature of that

11   relationship?

12         A.     It was a similar endorsement agreement that

13   Sky Golf is a portfolio of technologies related to golf

14   distance measuring devices and simulators.  That

15   relationship -- was a contract provided?  Do you have

16   that contract in the exhibits?

17         Q.     And is there another endorsement

18   relationship that you mentioned?

19         A.     Charles Schwab.

20         Q.     Charles Schwab.  What was the nature of

21   that relationship?

22         A.     Similar endorsement and use of Haney in

23   their content marketing.

24         Q.     Now, was that an agreement which was

25   terminated or was it expired of its own terms?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                      45

1          A.     That was terminated.

2          Q.     And it was terminated why?

3          A.     Because of the loss of Haney's platform.

4          Q.     And, so, all of those totaled, with regard

5    to 2019, $200,000; is that correct?

6          A.     In approximate net losses with some

7    consideration to appearances that would have been

8    generated as well, fairly conservative number in

9    aggregate of what he didn't generate the rest of that

10   year.

11         Q.     How was the $500,000 calculated for 2020?

12         A.     That would have been the conservative

13   estimate of the total value of his endorsements for many

14   years prior to, you know, up to the event.

15         Q.     Did Mr. Haney not endorse anything in 2020?

16         A.     The only agreement that was not terminated

17   or allowed to expire for Mr. Haney was his association

18   with Omega, the watch company or the Swatch Group, which

19   that agreement was reduced to essentially product, the

20   product allowance of time pieces from what had been 75,

21   $80,000 a year up to 2019.

22         Q.     Was the methodology you employed for the

23   figure in 2021 the same as what you've described for

24   2020?

25         A.     Yes, a conservative approximately portfolio

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    46

```
 1    of endorsements.  You know, Haney had stopped his focus

 2    on growing endorsement-related relationships that weren't

 3    also part of the media and advertising model.  So his

 4    desire was not to go out and execute lots of appearances.

 5              He was very content to have a portfolio of

 6    world-class brands that he was able to work with and

 7    support those brands vis-a-via the platforms that he had

 8    developed and the reach he had and the influence he had

 9    over golf audiences and his ability to help them drive

10    their businesses.

11              And, so, I took a conservative estimate of

12    the ongoing endorsement revenue that he would have been

13    in a position to generate.  Had he been able to continue,

14    it very likely would have been more.  All of the talent

15    that I work with who are similar in their business models

16    to Mr. Haney's saw significant increase in incremental

17    appearance revenue during COVID because of the

18    substantial demand for virtual events.

19              So it's reasonable to believe that he would

20    have experienced a similar demand, and that number could

21    have actually increased, but, again, I wanted to be

22    conservative with these estimates.

23        Q.    Did you make pitches for him to do

24    endorsements and appearances in 2020?

25        A.    Yes, my myself and others at Octagon --
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              47

```
1              Q.    To whom?

2              A.    To many companies, many --

3              Q.    How about a name, a name or two?

4              A.    Callaway, as an example, getting them to

5     renew, tailor made, when it became clear that Callaway

6     wasn't going to renew.  Club Champion, PGA Superstore,

7     again, many companies that I'd be happy to provide you

8     with a report of the pitches that were made.

9              Q.    Now, does he currently have any endorsement

10    or appearance relationships?

11             A.    He's been secured for a handful of virtual

12    appearances in the last 12 months, a small number in

13    relation to other clients of our firms.

14             Q.    And what kind of revenue is he generating

15    from those?

16             A.    Very minimal been, 5,000, $10,000 per

17    virtual appearance.  He's probably -- I believe I

18    provided a report of his income for 2020 the may have

19    listed one or two of those to Mr. Ginsberg.

20             Q.    And you now project here 500,000?

21             MR. GINSBERG:  Bill, I'm not sure -- Bill,

22        I think Jeremy was still talking.

23             MR. DAVIS:  All right.

24             THE WITNESS:  He may have one or two of

25        those on the books for 2021.  I don't recall off
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                         48

1            the top of my head.

2  BY MR. DAVIS:

3       Q.    Your projection here encompasses $500,000 a

4  year, 2022 through 2030.  In looking at this, are you

5  presupposing, sir, that he is not going to be able to

6  replace his endorsement and appearance income over that

7  period of time?

8       A.    Based on the marketplace's reaction to Mr.

9  Haney at this point, I think it's my expert opinion that

10 the marketplace for Hank Haney endorsements, as a result

11 of his labeling -- of how he's been labeled is

12 nonexistent going forward.

13      Q.    Okay.  And, again, the total here of

14 $5,700,000 is a gross number.  It's not reduced to

15 present value; is that correct?

16      A.    Correct.

17      Q.    Let's go to "Licensing and Royalties."

18 What does that column encompass?

19      A.    Those are various revenue shares related to

20 direct-consumer product and content marketing efforts

21 that Haney has been involved in throughout his career, a

22 product called Haney University, a product called The

23 Haney Blueprint, the endorsement and development of

24 numerous training and practice products.  It's a very

25 meaningful pillar of revenue for personalities like Mr.

1    Haney.

2         Q.    What did he actually lose in 2019 to that

3    come up to $250,000?

4         A.    The entire -- every aspect of his direct

5    consumer marketing activities following his dismissal

6    from SiriusXM essentially came to a halt.

7         Q.    And direct-consumer marketing activity with

8    whom?

9         A.    Of products and services that Haney had

10   developed that he was continuing to -- to support, in

11   some instances, in collaboration with third parties, in

12   some instances business that he had been building and/or

13   had launched himself.  He has an extensive library of

14   content that he has developed that he was providing

15   subscription access to that came to a stop.

16        Q.    And what documents did you rely on to

17   calculate the numbers contained here in the

18   "Licensing and Royalties" column?

19        A.    His historical revenues over the course of

20   our long-term representation of him in that category.

21   Some years those numbers were substantially larger.  Some

22   years this was essentially -- this was approximately the

23   four likely.

24              There are many instances of similar

25   content-related businesses like that that -- subscription

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    50

```
1    and licensed product-related businesses for other
2    instructors that are generating with far less prominence
3    than Haney that are generating substantially more income
4    than is outlined though for sure.
5              Q.    Well, the documents that reflect the
6    historical revenues in this regard, have they been
7    produced in this proceeding?
8              A.    I believe so.
9              Q.    Are they in that binder there in front of
10   you?
11             A.    I have not had a chance to review what's in
12   this binder.  I can't answer that question.
13             Q.    Well, there are 15 tabs in that binder.
14   One of them is tab 2, which is ledger of payments to
15   Haney throughout 2018.  Is that document supportive of
16   the historical --
17             A.    Golf Tailor is listed here.  That would
18   have been one of those revenue streams, yes.
19             Q.    That's for 2018, correct?
20             A.    Uh-hm.
21             Q.    Anything prior to 2018?
22             A.    Yeah, there was substantial revenues year
23   over year related to that going back virtually Haney's
24   entire -- at least his entire association with Octagon.
25             Q.    Now, the "Licensing and Royalties" column,
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    51

1   again, is a total of $5,750,000, correct?

2          A.    It is.

3          Q.    And it's created by -- including a

4   projection from 2022 to 2030; is that correct?

5          A.    It is.

6          Q.    And it's -- without being present value,

7   correct?

8          A.    Correct, yes.

9          Q.    And are there direct costs involved in the

10  licensing process or securing of royalties that Mr. Haney

11  would incur?

12         A.    These are net numbers to Mr. Haney in that

13  column.  This takes into consideration those costs under

14  "Licensing and Royalties."

15         Q.    And what are the costs listed that are

16  netted out to arrive at these numbers?

17         A.    There would be royalty statements, as an

18  example, in any of these sales commission figures from

19  Golf Tailor in 2018.  There's a corresponding statement

20  that would show how that $36,000 number was calculated,

21  and that would show that there was X dollars in gross

22  sales, Y dollars in processing fees for filming costs and

23  the ultimately net revenue and net royalty being a

24  calculation thereof.  So it takes into -- that statement

25  would have all of the associated deductions that went

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          52

1    into ultimately the amount that was paid to Haney.

2           Q.    Has the statement been produced?

3           A.    I don't know.  I would presume it would

4    have been if it was requested.

5           Q.    Did you rely on that statement in

6    determining what the net was or statements of that type?

7           A.    I had been assessing statements of that

8    type on behalf of Haney and, in fact, all of our other

9    clients for many, many years and was quite familiar with

10   those calculations; and, yes, that type of data informed

11   the analysis that was provided to you.

12          Q.    And that type of data informed the analysis

13   that is set forth here in the column of "Licensing and

14   Royalties;" is that correct?

15          A.    It is.

16          Q.    And would generally those have been

17   statements that were issued by the entity that would be

18   paying the license or the royalty?

19          A.    Yes.

20          Q.    And, just for the sake of clarification,

21   give me some names of those entities that would generate

22   licensing and royalty income.

23          A.    Well, Golf Tailor is a great example there.

24          Q.    Anything else that comes to mind?

25          A.    He had a training-practice-aid product

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                        53

```
1    business relationship with a variety of products, some of
2    which would have flowed through Octagon.
3          Q.    And, just for the record, the document
4    you're referring to is tab number 2, which is marked as
5    Haney Exhibit Number 26; is that correct?
6          A.    Yes, sir.
7          Q.    And that is not a document which is
8    generated by the payor of the royalty.  It's a document
9    that's created by Octagon; is that correct?
10         A.    This is simply a ledger of incoming --
11   that's correct.  This is simply a ledger of transactions
12   that have passed through Octagon's client escrow account.
13         Q.    Okay.  That ledger would be a product of
14   other documents received by Octagon in its calculation,
15   correct?
16               MR. GINSBERG:  Object to form.
17               THE WITNESS:  Yes, I believe that we --
18               Octagon's accounting department produced -- yeah,
19               it's the followup tab 3, the corresponding
20               specific bank transactions associated with each
21               lane item on that ledger.
22                    So when a payment comes in on behalf of one
23               of our clients, it's reported through Octagon's
24               banking platform and then provided for our
25               internal reporting and client reconciliation
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    54

1           process.

2    BY MR. DAVIS:

3           Q.    But tab 3 is not a compilation of documents

4    received from the payor.  It's just a compilation of

5    payments; is that correct?

6           A.    It looks like there are some royalty

7    statements in here.  There's a royal statement from

8    Turner Publishing in here.  Haney-00120, 00121, 00122,

9    royalty statements 123, 124.  I believe all of these were

10   provided by Octagon's accounting department to Mr.

11   Ginsberg.

12          Q.    Now, again, your projection --

13          A.    This is a royalty statement.

14          Q.    I mean, I -- okay.  Are you through or --

15          A.    Well, I'm just telling you where the

16   royalty records are provided.

17               MR. GINSBERG:  You can go on, Bill.  I

18          think he's given -- you know, he's given you an

19          example of what statements he's referring to.

20   BY MR. DAVIS:

21          Q.    Okay.  So in this column of "Licensing and

22   Royalties," you do this projection from 2022 to 2030,

23   which, again, as in the other columns, presuppose that

24   Mr. Haney is not going to be the beneficiary of any

25   licensing or royalties during those years; is that

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    55

1    correct?

2            A.    Not exactly.  It estimates that there would

3    be no growth to any of those types of opportunities,

4    which is not the case in many other instances of similar

5    businesses as Mr. Haney's, including the unprecedented

6    growth of product sales across the board in golf, the

7    significant increase in consumption of digital media

8    related to golf, all of which happened in the last

9    12 months during the pandemic.

10            So the scale and scope of those

11   opportunities going forward is very small and a very

12   small fraction of what it would have been had he not lost

13   his platform.  There's likely to be some amount of

14   licensing-related revenue that he'll be able to generate,

15   but it is a small fraction of what it would have been.

16           Q.   Do you have any idea as to who the

17   licensors or payors of royalties would be in some of

18   these outer years, like 2025, 2026?

19           A.    It likely could have been a number of

20   different organizations.  It could have been major

21   retailers who -- throughout the course of Haney's career

22   he's had licensed product lines with major big box

23   retail.  We were in the process of those discussions with

24   Dick's Sporting Goods and Golf Galaxy in relation to a

25   similar type of opportunity at the time that Mr. Haney

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    56

1    lost his platform.

2            The flow of training and practice-related

3    products and services transacting or looking for business

4    relationships with people like Mr. Haney are significant

5    and continue to grow in the marketplace.  Those

6    opportunities are a significant aspect of Mr. Haney's --

7    were a significant aspect of Mr. Haney's business.

8    They're a significant aspect of all of our other clients'

9    businesses.  So it's pretty conservative to project that

10   those would have continued on.

11           Q.    Let's move to "e-commerce."  What makes up

12   the "e-commerce" column?

13           A.    That's almost exclusively the VooDoo Pain

14   Relief Cream company that Hank Haney founded in 2018 and

15   began test marketing in the spring of 2018 and been

16   investing in and growing since that time.

17           Q.    And this was a product was marketed through

18   an entity known as VooDoo Labs, LLC; is that correct?

19           A.    It is.

20           Q.    Was it manufactured by VooDoo Labs, LLC?

21           A.    It was manufactured by a formulation

22   laboratory, I believe, in Oklahoma.  I don't recall the

23   name of the group.

24           Q.    And what was Mr. Haney's interest in VooDoo

25   Labs, LLC?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                57

1          A.    He owned the company and -- founded the

2    company, owned the company, funded the company entirely.

3          Q.    No partners?

4          A.    He had a collaborator that helped him with

5    the development of the formulation, a nurse practitioner

6    I believe in Oklahoma also.  I can't remember his name

7    off the top of my head.

8                I believe Mr. Haney provided him with a

9    revenue share per a tube of cream that he purchased from

10   the lab.  I believe that was his arrangement with him.

11   He factored that into his product costs.

12         Q.    So looking at these numbers here, for 2019,

13   $1,400,000, what does that number reflect?

14         A.    That's the projected loss of sales of

15   VooDoo based on the month-over-month sales that he had

16   generated up till -- and the forecasted incremental

17   increasing in advertising.  He had gotten to the point

18   where he had a very successful advertising campaign and

19   had an incredible strategic advantage in buying SiriusXM

20   at a favored nations price and then also received a

21   rebate essentially as a royalty on the advertising

22   dollars of his own company.

23               So his effective advertising cost on

24   SiriusXM was approximately 40 percent of the lowest

25   possible cost that any other advertiser was able to

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    58

1    purchase advertising on SiriusXM.  So over the course of

2    the proceeding 12, 13 months since he launched VooDoo,

3    until he lost the platform with SiriusXM, he had

4    developed and refined a very effective advertising model

5    and was beginning to scale at advertising spent

6    significantly as he had a very unique strategic advantage

7    to market that product on SiriusXM thanks to his business

8    relationship with the company.

9            Q.    Let me direct your attention to tab number

10   4, and let's go ahead and mark this -- we'll make this

11   Exhibit Number 42.

12              (Thereupon, Defendant's Exhibit Number 42

13          was marked for identification, which is attached

14          hereto and made a part hereof.)

15              MR. GINSBERG:  Bill, you said 42?

16              MR. DAVIS:  Yeah.

17   BY MR. DAVIS:

18           Q.    Do you have tab number 4 in front of you?

19           A.    I do.

20           Q.    It purports to be a document that says,

21   "VooDoo Lab, LLC sales."  Do you see that?

22           A.    Yup.

23           Q.    What is this document, to your knowledge?

24           A.    This a simply a ledger of gross monthly

25   sales on Haney's e-commerce channels of VooDoo Pain

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                     59

1   Relief Cream from the launch of the business in April of

2   '18 through the -- I'm not sure exactly what date this

3   was reported, but February of '21 at the point that this

4   report was generated there had been $11,000 in sales of

5   VooDoo Pain Relief Cream on those platforms.

6          Q.    So did you use this document to formulate

7   your calculations contained in the "e-commerce" column,

8   at least in terms of the red numbers?

9          A.    Yeah, this -- this did inform the red

10  numbers, yes.

11         Q.    And how did it inform the red numbers?

12         A.    So, as an example, had he continued to grow

13  his advertising spend, as he did in April of '19, he

14  would have continued to grow his revenue because he had a

15  very successful advertising model and an unfair advantage

16  in the margins of that advertising.  So projecting

17  approximately $100,000 a month, which would have been

18  conservative, less the residual sales, these numbers for

19  June, July, August, September, October, November, in

20  fact, most of these numbers are as a result of just

21  reorders from his existing customers.

22               The influx of new sales following the loss

23  of the platform of new consumers was quite diminished.

24  So the ongoing sales is reorders of existing customers

25  coupled with word of mouth and incremental promotion on

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          60

```
 1   his podcast, which is a negligible amount of visibility.
 2          Q.    Now, the numbers which appear on the first
 3   page of Exhibit 42, those are gross sales numbers; is
 4   that correct?
 5              MR. GINSBERG:  Bill, can you speak up
 6          please?
 7              MR. DAVIS:  Yes.  I'm sorry.
 8   BY MR. DAVIS:
 9          Q.    Those are gross sales on Exhibit 42; is
10   that correct?
11          A.    Yes, and --
12          Q.    Well, they --
13          A.    -- I can't tell if this is Exhibit 42.  It
14   doesn't say Exhibit 42.
15          Q.    I know because we just -- yeah, that's it.
16   Well, for the record, we are looking at a document Bates
17   stamped Haney-262, 263 and 264.
18          A.    Got it.
19          Q.    Okay.  So the sales numbers, which appear
20   on this document are the resales.
21          A.    That's right.
22          Q.    Is a correct?
23          A.    Yes.
24          Q.    And how do you account for the cost of
25   goods sold?
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    61

1          A.    Well, as I mentioned initially, Haney's

2    intent was to grow the top-line revenue of this business

3    and sell the company, and that -- the sales of similar

4    types of companies in recent years have been driven by

5    top-line-revenue growth.

6               I can tell you that Mr. Haney had a per

7    unit margin of 55 percent.  So the net profit related to

8    these numbers would likely have been approximately 5

9    percent of gross sales.

10         Q.    Now, how do you translate the margin column

11   over here of "e-commerce?"

12         A.    I didn't, and certainly calculating a net

13   income to Mr. Haney would be reasonable to do so.  I

14   didn't include the deductions because, again, Haney's

15   sole goal was to drive top-line growth, not profit so

16   that he could sell the company.

17              So it's reasonable to take a deduction of

18   approximately 45 percent off of that number as a net

19   revenue number, projected net revenue number for the Pain

20   Relief Cream over that span of time given a reasonable

21   accelerated growth in the initial years followed by a

22   fairly stable year-over-year growth of 10 percent or

23   less.

24         Q.    But that was not done in your analysis as

25   you set forth in the financial damages calculation; is

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          62

 1    that correct?

 2          A.    The deduction for costs is not in this

 3    specific e-commerce calculation, that's correct.  I might

 4    mention --

 5          Q.    And did you do any kind of a calculation --

 6                MR. GINSBERG:  Wait, Bill.  He's still

 7          talking.

 8                THE WITNESS:  It would be -- as I

 9          mentioned, if that's the number that you would

10          like for purposes of calculating his projected net

11          income damages, it would be $38,170 is a

12          reasonable projected net revenue number for

13          e-commerce over the span of that timeframe.

14    BY MR. DAVIS:

15          Q.    You're doing that analysis now, sir.  You

16    did not do that analysis though in the preparation of the

17    disclosure, which was filed in court; is that correct?

18                MR. GINSBERG:  Objection.

19                THE WITNESS:  I was asked to represent what

20          the potential damages were, and as a result of the

21          loss of the platform, his ability to take

22          advantage of the incredibly unique opportunity he

23          had to run profitable advertising campaigns on

24          SiriusXM PGA TOUR Radio and any other channel he

25          chose to advertise on, by loss of the platform he

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                        63

1                    was not able to take advantage of that advantage

2                    he had, and, therefore, the ability to grow a

3                    company and sell a company disappeared.  So, using

4                    a blue sky number, there is quite reasonable given

5                    his business objective.

6     BY MR. DAVIS:

7          Q.    This is represented to be total projected

8     damages of $69,400,000 in this column.  Is it accurate to

9     say, sir, that in arriving at that $69,400,000, you did

10    not factor in the cost of goods sold for those revenue

11    sales?

12         A.    For the purpose of calculating the

13    enterprise value of the e-commerce business that Haney

14    was building, as I have been asked to do in other

15    situations with other clients and other businesses where

16    the projections are based on the business goals, in this

17    case the goal of the business was to sell the company,

18    and, therefore, the metric that mattered in the sale of

19    the company, certainly in the sale of a company assessing

20    the profit margin would have mattered, but not as much as

21    the top-line number would matter because anyone who would

22    look to acquire a company such as this has the

23    infrastructure and skill to be able to introduce

24    significant cost savings against those types of margins.

25                    So, whereas, Haney can operated this

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    64

1   business at 55 percent margin, Wyeth or Johnson and

2   Johnson or many other companies of similar nature who

3   would look to purchase a brand that had developed

4   meaningful traction and meaningful market share as

5   evidenced by a top-line number, not a net-margin number,

6   would be able to substantially increase the profitability

7   of those businesses.

8              They would not be looking -- and I would

9   implore you to discuss with any number of experts

10  regarding M and A in a similar type of situation -- they

11  would not be looking at bottom line.  They would be

12  looking a top line.

13         Q.    Where, in your disclosure, do you suggest

14  that this was modeled for the purposes of selling a

15  company?

16         A.    All you had to do was ask.  I didn't.

17         Q.    You didn't say that, did you?

18         A.    You're asking now.  I'm telling you.

19         Q.    No, I'm relying on the document that was

20  filed in court.  Where in the document, which was filed

21  in court, did you say that this was modeled based upon

22  the concept of selling a company based on top line rather

23  than bottom-line net margin?

24              MR. GINSBERG:  Objection, the document

25         speaks for itself.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                      65

1             MR. DAVIS:  You can answer.

2             THE WITNESS:  This is the document I

3        provided.

4    BY MR. DAVIS:

5        Q.   Is it fair to say that you don't say

6    anywhere in the document that you provided that the

7    "e-commerce" column was modeled on the basis of gross

8    revenues and selling a company as opposed to net losses?

9             MR. GINSBERG:  Objection, Bill.  The

10           document speaks for itself.  Somebody looking at

11           this should have been able to understand the basis

12           of getting the gross number rather than the --

13           MR. DAVIS:  I'm ask asking the author of

14           the document, which I'm entitled to do.

15           MR. GINSBERG:  And I'm suggesting you

16           are -- the document speaks for itself, and the --

17           MR. DAVIS:  The document characterizes

18           projected damages.  In the word of damages --

19           MR. GINSBERG:  The document --

20           MR. DAVIS:  -- I want to know what these

21           damages represent.  Now the witness is telling me

22           that he represents a loss of a sale opportunity,

23           and I want to know, in the actual disclosure,

24           where does it say that it's predicated upon the

25           concept of a loss of sale?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              66

1        MR. GINSBERG:  And I'm suggesting that the

2   calculation as provided should have alerted, at

3   least your expert, as to the basis of that number,

4   but given the numbers that were provided, the

5   document speaks for itself, and now you're just

6   being argumentative.

7        MR. DAVIS:  Well, I'm entitled to an

8   answer, sir.

9        MR. GINSBERG:  Well, you've gotten an

10   answer.

11        MR. DAVIS:  I have not.

12        MR. GINSBERG:  If your expert didn't

13   understand the nature of the numbers and the

14   import of those numbers, that's on him.  The

15   document speaks for itself.

16        MR. DAVIS:  The document is vague and

17   ambiguous.  I'm asking the witness --

18        MR. GINSBERG:  Well, it may have been

19   ambiguous for an academic economist who doesn't

20   know anything about the sports industry or buying

21   and selling business.  It's not vague and

22   ambiguous.

23        MR. DAVIS:  Are you telling him not to

24   answer the question?

25        MR. GINSBERG:  No, I'm telling him that he

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    67

1            has already been asked the question and answered

2            the question --

3                   MR. DAVIS:  And --

4                   MR. GINSBERG:  Excuse me -- three times,

5            but you want to ask it a fourth.  So we can move

6            along --

7                   MR. DAVIS:  I will.

8                   MR. GINSBERG:  Excuse me.  So we can move

9            along, he can do that.

10                  THE WITNESS:  There are multiple roads --

11   BY MR. DAVIS:

12           Q.    Can you tell me, sir, where --

13           A.    There are multiple roads --

14           Q.    No.  Well, let me ask a -- let me ask the

15   question, and then you can answer it.  And I want to know

16   where, in your disclosure, you've indicated that the

17   e-commerce column contained in this disclosure is modeled

18   on the basis of selling the company on the basis of a

19   top-line revenue number as opposed to a bottom line

20   margin number.  Where do you say that in your disclosure?

21           A.    I'm not sure it says that in any

22   disclosure.

23           Q.    Now, my question then to the -- you reflect

24   here a $69,400,000 as total projected damages.  So you've

25   got increments that are accruing in 2022 through 2030.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          68

1    What methodology did you employ to determine what the

2    amount and rate of increase would be year over year for

3    those revenues?

4           A.    I used a minimal incremental increase in

5    advertising, maintaining an approximately consistent

6    return on that advertising investment, and as those

7    advertising dollars increased, again, at an unfair

8    advantage in the marketplace against any competitive

9    products, the profitability -- the top-line sales and the

10   profitability have would have continued to increase, and

11   his intent was simply to continue to ramp up advertising

12   to the point where he was prepared to buy everything he

13   could get his hands on on SiriusXM.  He had --

14          Q.    Is there any recognizing --

15                MR. GINSBERG:  Wait.  Bill, please quit

16          interrupting the witness.

17                THE WITNESS:  He had an incredible

18          advantage because of the guaranteed favored

19          nations pricing, as well as the rebate back on the

20          advertising that he purchased as a partnership

21          advertising revenue share.  It -- one could argue

22          that these are ridiculously conservative because

23          he could have chosen to launch several other

24          companies based on the same business model.

25                He could have launched a pillow company or

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    69

1    any other number of directed consumer products.

2    He was incredibly thoughtful and strategic about

3    establishing the platforms so that he could create

4    these types of businesses and over the course of

5    his career had built many other similar successful

6    business enterprises at scale.

7         So this was an incredibly unique,

8    incredibly lucrative business model that was

9    unstoppable until the PGA TOUR decided to take

10   away his platform.

11        MR. GINSBERG:  Hey, Bill, let's take a

12   10-minute break, okay?

13        MR. DAVIS:  Not quite yet.  Just a minute.

14        MR. GINSBERG:  Well, there's no question

15   pending.

16        MR. DAVIS:  I've got a follow up to

17   something he just said.

18        MR. GINSBERG:  All right.  Well, you can

19   follow it up after the break.  There's no question

20   pending, and I think it would be a good idea to

21   take a 10-minute break.  I think it would benefit

22   everybody, Bill.

23        MR. DAVIS:  Okay.

24        THE VIDEOGRAPHER:  We are going off the

25   record at 12:09.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    70

```
 1                (Thereupon, the following proceedings took
 2          place at 12:17 p.m., following a short recess at
 3          12:09 p.m.)
 4                THE VIDEOGRAPHER:  We are back on the
 5          record at 12:17.
 6                MR. DAVIS:  Okay.  And, once again, I have
 7          a screen here that says Jodi Dineen.
 8                THE REMOTE VIDEO TECH:  Test 1, 2.  Does
 9          that do it?
10                MR. DAVIS:  Okay.  There we go.
11     BY MR. DAVIS:
12          Q.   Okay.  So going back to this document,
13     "Financial Damages Calculations," in the "e-commerce"
14     column, I want you to explain to me the methodology that
15     you employed in increasing the annual gross revenue in
16     2026 from 7 million to 8 million.  How did you do that?
17          A.   I took an arbitrary increase in advertising
18     dollars and projected that it would have some stable
19     million dollar a year growth model year over year.  Any
20     scientific method to be precise beyond a projection based
21     on, you know, continued growth of his marketing channels
22     would be speculative at best.
23                He was continuing to increase his
24     investment in the advertising and for the sole sake of
25     growing the top-line revenue to tract a buyer.  So he
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                  71

1    very likely could have sought to purchase substantially

2    more advertising, in which case these growth numbers

3    would have accelerated even faster.

4            Q.    Are you aware of any generally accepted

5    valuation method that you can take an arbitrary increase

6    in advertising and extrapolate that to increase in gross

7    revenue?

8            A.    Well, arbitrary is a mischar --

9    misdescription.  A relative increase in advertising

10   investment year over year -- and, sure, every single

11   direct response product, business model is based on some

12   projected amount of advertising.  It is core to the

13   principal of a media efficiency ratio that is the

14   principal in calculating the success of a direct to

15   consumer product marketing effort.

16           Q.    Do you have a document or a calculation

17   somewhere that reflects what this increase in advertising

18   would have been between 2022 and 2030 to justify an

19   increase in revenue from $3,500,000 to $11 million a

20   year?

21           A.    Yes, there are models for the VooDoo

22   business and its margins that we could provide, sure.

23           Q.    Have you provided it?

24           A.    I'm not aware if it has been provided.

25           Q.    And did you use --

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    72

```
1              A.     And I would argue that's proprietary
2     business information of Mr. Haney's, what his exact
3     business strategy is for the --
4              Q.     So are you testifying, sir, that there is a
5     model, which contemplates the increase of advertising
6     between 2022 and 2030, that results in a calculation of
7     increasing gross revenue from $3,500,000 to $11 million
8     in that period?  Is there a model out there for that?
9              A.     Yeah, absolutely.
10             Q.     Okay.  And has it been produced in this
11    case?
12             A.     I don't believe so.
13             Q.     Did you use it to formulate your opinion
14    here based on the financial damage calculation?
15             A.     I reference the trend in Hank's advertising
16    and assumed, yes, for purposes of calculating, that he
17    would continue to scale his advertising dollars, but I
18    also didn't want to be unreasonable in projecting
19    exponential growth beyond a certain point, which many
20    similar types of consumer products do experience.
21                    So it's not unusual for similar companies
22    like this to be adding zero to every year.  We didn't go
23    from millions to tens of millions until after 11 years.
24    I think it's very reasonable to argue that those are,
25    again, very conservative numbers and in --
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          73

```
1              Q.    And is the only --
2              A.    -- the cases of similar --
3              MR. GINSBERG:  Bill, you gotta stop
4         interrupting him.
5              MR. DAVIS:  He's got to answer the
6         question.
7              MR. GINSBERG:  Bill, you can't interrupt
8         him.
9              MR. DAVIS:  You can't have a witness -- I'm
10        gonna move to strike the nonresponsive nature of
11        the answer.  It's a --
12             THE WITNESS:  Well, why is it not
13        responsive?
14             MR. GINSBERG:  Wait.  Wait.  Guys.
15             Bill, let him finish.  Don't interrupt.  If
16        you want to ask for clarification, if you want to
17        move to strike, do what you want, but you cannot
18        interrupt him because you don't like the answer,
19        and you're doing it time after time.
20   BY MR. DAVIS:
21             Q.    Do you have more to your answer, sir?
22             A.    Can you repeat the question, court
23   reporter, the last question?
24             MR. DAVIS:  Sure.
25             (Thereupon, the referred to question was
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          74

1    read back by the reporter as above recorded.)

2         THE WITNESS:  Right.  So, Bill, the answer

3    here is in trying to provide a reasonable analysis

4    of the impact to Haney, I provided -- I used a

5    fairly conservative growth model.  Anyone in the

6    consumer product goods business who would look at

7    Mr. Haney's profitability with this company would

8    have said you need to increase your advertising by

9    10X or 100X right away, you have an unfair

10   advantage over competitors.

11        I didn't do that because all projections

12   are built on some kind of virtually impossible

13   model that can't -- virtually impossible to prove

14   model.  Every single -- Wall Street is built on

15   one giant house of gambling based on one person's

16   analysis versus the next.

17        So are you asking me if I have a

18   scientifically validated model that can prove that

19   these numbers are accurate?  Of course not.  And

20   if you can produce someone who says that they can,

21   they're lying.  However, this is -- based on the

22   business plan that Haney had, the strategic

23   advantage he had, his intention to continue to

24   grow this business, these are very conservative

25   and reasonable numbers, and that's it.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    75

1              And you asked for a margin.  The business

2         operates on a 55 percent net margin.  So there you

3         go. $38 million would have been the net revenue to

4         Mr. Haney.  So use that if that's the number that

5         makes you feel better.

6              The intent was to provide a top line growth

7         number.  We provided the backups that proves that

8         these are top line -- the substantiated, the sales

9         numbers were top line.  So that -- I'm sorry that

10        wasn't sufficient, in your opinion.  I'm sorry.

11   BY MR. DAVIS:

12        Q.    The --

13        A.    Perhaps you can get another economist to

14   analyze this.

15             MR. GINSBERG:  Stop it.

16             THE WITNESS:  I'm sorry.  I'm just --

17   BY MR. DAVIS:

18        Q.    Now, with regard to the increase in revenue

19   from $3.5 million a year to $11 million a year in 2030,

20   you've testified to the increase in advertising to try to

21   generate those revenues.  Is there any other variable

22   that you would include that would --

23        A.    You can -- sorry.

24        Q.    You know, I'm not cutting you off anymore.

25        A.    I'm sorry.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    76

1          Q.     So you don't cut me off.

2          A.     I'm sorry, Mr. Davis.  I'm sorry.  Keep

3    going.

4          Q.     So is there any other variable that you

5    incorporate in this model there you've developed other

6    than just an increase in advertising to generate the

7    projected increase in revenue?

8          A.     No.  It's the most reliable piece of data

9    we had to work with in order to project the growth of the

10   business.  It was the driver of the growth of the

11   business, and it was going to continue to be the driver

12   of the growth of business.

13         Q.     And how much was the advertising going to

14   be increased between 2022 and 2030 to generate that

15   difference in revenue production?

16         A.     I don't have that figure in front of me.

17   I'll have to go back and check the models and provide it.

18         Q.     But none of that information was provided

19   in your disclosure; is that correct?

20         A.     The request was for calculations of

21   damages, not a calculation of projected advertising

22   investment in his businesses.  I was certain that there

23   would be a discourse like this to understand the nature

24   of all of these numbers and was happy to be able to

25   engage in that discourse, but whether it's -- there are

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                          77

1    lots of circumstances that potentially could have

2    influenced exactly how much advertising he could or would

3    have had access to.

4              SiriusXM at the time had not acquired

5    Pandora.  Now he could have been advertising all over

6    Pandora, which opens up another huge potential audience

7    for VooDoo.  We didn't calculate that increased reach

8    into the model, but it could have been integrated.

9              We tried to provide a reasonable model that

10   was based on what we knew to be the case, which is simply

11   on SiriusXM.  If he had continued to increase advising

12   over time, he would have continued to increase top-line

13   revenue.

14        Q.    But nowhere in your disclosure do you say

15   that the model employed a concept of increased

16   advertising; is that correct?

17        A.    Yes, I believe that's correct.  Nowhere in

18   the disclosure does it says that, you know, Callaway,

19   Club Champion, Charles Schwab and Sky Golf make up the

20   value of the endorsements and the appearances column, but

21   that doesn't change --

22        Q.    Right.

23        A.    -- things.

24        Q.    Thank you.

25        A.    Okay.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              78

1          Q.    Now, this VooDoo product went on the market

2    in 2018; is that correct?

3          A.    Yes, sir.

4          Q.    So there was a track record of sales that

5    you had up to the point in time that you did your

6    disclosure; is that correct?

7          A.    Yes, sir.

8          Q.    And the analysis that you did to come up

9    with the number of $69,400,000, did that account for any

10   potential competitors in the market?

11         A.    It was a very competitive landscape when he

12   launched the business, incredibly competitive landscape,

13   but, again, relative to other competitors on the platform

14   that could advertise against him, he had the unique

15   advantage of advertising at at least half of the rate

16   that those other competitors could advertise their

17   products, so, ah --

18         Q.    And is that part of the opinion that you

19   would express if we tried this case?

20              MR. GINSBERG:  I'm sorry.  What opinion,

21         Bill?

22              MR. DAVIS:  That -- the manner in which

23         he's accounted for competitors.

24              MR. GINSBERG:  I'm sorry.  I still don't

25         understand the question.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              79

```
1    BY MR. DAVIS:
2         Q.    Let me -- I'll rephrase.  My question, Mr.
3    Aisenberg, is did you or did you not account for the
4    competitive environment with respect to this product in
5    calculating your that projection of revenue from 2022 to
6    2030?
7         A.    He was thriving in a competitive
8    marketplace.  So it is baked into the fundamental
9    assumption that was justification for being in this
10   business to begin with, was that --
11        Q.    And if you were called upon to testify --
12             MR. GINSBERG:  He wasn't done, Bill.
13   BY MR. DAVIS:
14        Q.    Are you done?
15        A.    Sure.
16        Q.    If you're called to testify in this case,
17   will you testify as to how you accounted for the
18   competitive environment?
19        A.    I'd be happy to.  There were multiple
20   advertisers in similar topical pain relief cream,
21   comparable or competitive pain relief creams of a topical
22   nature that were advertising also on SiriusXM, and Mr.
23   Haney's sales and profits were there in the face of a
24   very -- an already very competitive landscape.  He was
25   very successfully building a brand, building a large
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    80

```
 1   consumer base and, you know, easily competing with more

 2   established competitive products.

 3          Q.     Do you address the competitive environment

 4   during the period of 2022 to 2030, anywhere in your

 5   disclosure?

 6          A.     No.

 7          Q.     What was the market share in this

 8   environment that VooDoo Labs had in relation to its

 9   competitors?

10          A.     Miniscule at the -- relative to the major

11   competitors and the landscape.

12          Q.     Can you put a percentage on it?

13          A.     No, not an accurate percentage.

14          Q.     Who were the major competitors or are?

15          A.     There are dozens, if not hundreds of

16   topical pain relief cream products.  Mr. Haney's product

17   contained aspirin, a topical aspirin derivative with a

18   molecular carrier that was known to pass through the

19   epidermis and provide topical relief for inflammation.

20                 There are a handful of similar products

21   like Aspercreme, as an example, that functioned with a

22   similar mechanism.  There are -- Haney's products suite

23   also included a menthol-based-topical cream, a sport

24   cream that operated by virtue of the cooling effect of

25   menthol.  Icy Hot, among others, are the common products
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    81

1    that are based on a menthol formulation.  It's a very

2    competitive landscape.

3              Golf is a particularly attractive segment

4    of the audience to market these types of products because

5    it, you know, generally includes an older participation

6    base that suffers from aches and pains, and golf

7    exaggerates or aggregates general aches and pains,

8    arthritic conditions.  So it's a very desirable

9    marketplace to go after with a product like this, and

10   it's a competitive landscape for sure.

11        Q.    And what's reflected here as projected

12   damages of $69,400,000 is not reduced to any form of

13   present value; is that correct?

14        A.    No, sir.

15        Q.    And even if you -- your number of $38

16   million, netting out costs of goods sold, that had not

17   been reduced to present value either; is that correct?

18        A.    Yes, that's correct.

19        Q.    Okay.  Let's go back to Exhibit 40, which

20   is the Plaintiff's Amended Disclosures.

21              Were you asked to review this before it was

22   filed?

23        A.    So which document specifically?

24        Q.    Exhibit 40, Plaintiff's Amended Expert

25   Disclosures.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    82

```
1              A.    Under tab --

2              Q.    It would be tab 1.

3              A.    Okay.

4              Q.    Were you asked to review this before it was

5     filed?

6              A.    I don't recall reviewing this.  I may have.

7              Q.    Did you participate in its drafting?

8              A.    No.

9              Q.    If you go to --

10             A.    I mean, I -- this is the -- this was

11    generated over the course of a year of Mr. Ginsberg and I

12    discussing my work, so yes.

13             Q.    So let's go to page 2.

14             A.    Okay.

15             Q.    And you see there's 14 or 15 bullet points

16    on page 2 and page 3; do you see that?

17             A.    Okay.

18             Q.    It says, "Mr. Aisenberg will provide expert

19    testimony regarding, among other topics elucidated by the

20    attached curriculum vitae, and exhibits the following."

21    Let's go through this, and I want you to tell me, after

22    we go through, if there are any other topics other than

23    what's articulated in this document that you're gonna

24    testify to.

25             A.    Okay.
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              83

1          Q.     The first bullet point says, SiriusXM

2     business prior to Plaintiff's joining the outlet and the

3     impact of Mr. Haney's PGA radio show on SiriusXM's

4     financial condition, as well as his standing in the golf

5     industry."  What did you review to come to any

6     conclusions regarding that topic?

7          A.     In the course of my normal business I'm

8     intimately familiar with SiriusXM's business and their

9     place in the golf industry.  It is core element of my

10    day-to-day work.  I continue to work with high-profile

11    clients who are in business with SiriusXM.

12         Q.     Well, what documents would you have

13    reviewed or had access to that would allow you to render

14    an opinion as to the impact of Mr. Haney's PGA radio show

15    on SiriusXM's financial condition?

16         A.     Again, I've been provided with information

17    regarding the revenue of SiriusXM's PGA TOUR Channel, the

18    popularity of that channel prior to -- prior to Mr.

19    Haney's involvement.  I'm well aware of the lack of

20    advertising that existed in any of the non-live golf

21    programming, this year's XM broadcast, and directly

22    involved in creating new and lucrative business

23    opportunities for SiriusXM PGA TOUR Radio with numerous

24    major international -- national and international

25    companies through the direct efforts of myself, Mr. Haney

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    84

1    and contributing to the growth of the platform.

2         Q.    What opinion are you prepared to express

3    regarding this bullet point?

4              MR. GINSBERG:  Regarding what, Bill?  I

5         can't hear you.

6              MR. DAVIS:  Regarding the first bullet

7         point.

8              THE WITNESS:  Mr. Haney's impact was

9         substantial and very profitable for both the

10        revenue and also significant in growing the

11        audience of SiriusXM on PGA TOUR Radio.

12   BY MR. DAVIS:

13        Q.    The second bullet point is "Mr. Haney's

14   standing in the golf industry."  What opinion are you

15   prepared to an express regarding that topic?

16        A.    My Haney is widely regarded as one of the

17   most well-known and successful golf instructors in the

18   history of the sport.  He built a global brand that was

19   also widely regarded as perhaps the large and most

20   successful in the golf instruction industry.  He had been

21   ranked by his peers as one of the greatest instructors in

22   the history of the game every year that peer rankings

23   were published by major media companies.

24              He had the most successful golf

25   entertainment show in the history of The Golf Channel,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                        85

1    the show of The Haney Project.  He had built a massive

2    audience across multiple verticals and, without question,

3    had a brand with tremendous value in golf.

4           Q.     Is that Mr. Haney's current standing in the

5    golf industry?

6           A.     Some aspects of that are objective facts.

7    Some aspects of that have been significantly diminished

8    as a result of the labeling of him as a result of his

9    dismissal from SiriusXM.

10          Q.     All right.  The next bullet is "Analysis on

11   Mr. Haney's monetization as a result of his broadcasting

12   agreement with SiriusXM."  What did you mean by

13   "monetization?"

14          A.     How he was able to create incremental

15   business opportunities with the platform that SiriusXM

16   provided with the dedicated audience that consumed the

17   golf programming on SiriusXM and the fairly unique and

18   highly effective business model to integrate that

19   platform into as many of his business relationships as

20   possible, which included the contractual requirement in

21   many of his endorsement agreements that, in addition to

22   the endorsements, those companies were -- were required

23   to also advertise on SiriusXM PG Tour Radio.

24                 That model provided tremendous value to the

25   brands that worked with him and led to very many

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                86

1    successful and long-term sustainable business

2    relationships and long-term sustainable business

3    relationship for SiriusXM and for Mr. Haney.

4             Q.    The next bullet point is "An analysis of

5    the immediate and long-term financial and professional

6    damage sustained by Plaintiffs following Mr. Haney being

7    removed from SiriusXM," and we've just spent a whole

8    bunch of time going through your financial damages

9    calculation.

10            Other than what we've gone through on the

11   financial damages calculation, do you have anything to

12   add to that?

13            A.    Certainly -- well, no.  No.

14            Q.    Next bullet point is "an analysis of

15   SiriusXM's monetization as a result of Mr. Haney's

16   broadcasting agreement with SiriusXM."  What do you mean

17   by "SiriusXM's monetization?"

18            A.    We -- as also, expressed by many SiriusXM

19   executives, the dedicated efforts of Haney in association

20   with SiriusXM PGA TOUR Radio in bringing on board new

21   advertisers and promoting the platform of SiriusXM PGA

22   TOUR Radio within the industry with the other major

23   companies across the sport of golf and the industry as a

24   whole, the stature of SiriusXM PGA TOUR Radio as one of

25   the premier-media entities in the sport of golf rose

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    87

1   significantly and both my expert opinion, as well as

2   expressed by many people directly employed at SiriusXM

3   and senior leadership, that it all started with the

4   investment and time and the energy that Mr. Haney made in

5   the platform.

6         Q.    The next bullet point is 'the unique

7   position of Mr. Haney's book "The Big Hit."'  He didn't

8   write a book named "The Big Hit," did he?

9         A.    Yeah, that's a typo.  That should be "The

10  Big Miss."

11        Q.    In fact, it's directly contrary to the

12  theme of "The Big Miss," isn't it?

13        A.    Indeed.

14        Q.    It says, 'The unique position of Mr.

15  Haney's book, "The Big Hit" and its financial benefit for

16  book distribution and sellers.'  What documents have you

17  reviewed to ascertain the financial benefit of that book

18  to distributors and sellers?

19        A.    The uniqueness of a number 1 best

20  selling -- Number 1 New York Times Best Seller in the

21  golf publishing circles is significant and drove demand

22  for the book across a wide range of outlets and was

23  unavailable at many retail outlets almost immediately

24  upon release.  It sold out so quickly.  It was quite a

25  phenomenon at the time.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              88

1          Q.    How do you -- do you know though or what do
2    you plan to testify to with respect to the financial
3    benefit for book distributors and sellers?
4          A.    They sold a lot of books and made a lot of
5    money.
6          Q.    And how do you know that?
7          A.    Because I was provided with royalty reports
8    related to Mr. Haney's participation in the revenue of
9    that book that included line items for various sales
10   channels.
11         Q.    And these would have been royalty reports
12   from whom?
13         A.    From the publisher of said book, "The Big
14   Miss."
15         Q.    The next bullet point says, "The PGA TOUR's
16   unique business and marketing relationship with golfer,
17   Tiger Woods, and his agent, Mark Steinberg, including,
18   but not limited to Mr. Woods' involved, including
19   operational rights in PGA TOUR competitions."
20               What are you -- what do you understand that
21   bullet point to mean?
22         A.    The importance of Tiger Woods to the
23   historical growth of professional golf from 1997 through
24   at least 2010, 2009, 2010 and the -- that brought
25   industry-broad wide concern about the diminishing stature

1  of Tiger's role in professional golf on the backside of

2  his personal struggles is a substantial factor in the

3  analysis of the golf industry and has been a substantial

4  factoring analysis of the prospects of golf, the prospect

5  of golf audiences.

6             Tiger and his agent are two of the most

7  influential people in the sport on a global level and are

8  very involved in some of the direction of the future of

9  the game of golf.  You know, Tiger has, through the

10  years, hosted multiple events.  His foundation has been

11  the beneficiary of multiple events.

12             It's a -- I believe Tiger's foundation is,

13  at any given time, involved in as many events as any

14  other third-party foundation that the PGA TOUR does

15  business with, maybe -- I believe it's at least two at

16  the moment.  It's been as many as three or even four,

17  which -- and, you knows, Tiger's support of various

18  initiatives in the sport is crucial to or has

19  historically been crucial to the success to some of those

20  initiatives.  So it's -- you know, the influence is

21  substantial.

22        Q.    And that's the opinion that you're prepared

23  to express if we go to trial in this case?

24        A.    Most definitely, yes.

25        Q.    Anything else about that bullet point?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                90

1          A.    I think it's not a -- it's common knowledge

2    that, you know, Mr. Steinberg and Mr. Monahan have worked

3    very, very closely through the years.  There's a close

4    personal relationship there.

5                I would imagine -- no, I'm not imagining.

6    I've been told that they're very close and stay in fair

7    regular communication on a number of matters.  I would

8    certainly be able to speak to that.

9          Q.    Okay.  Anything else on that topic?

10         A.    Are you speaking?  I can't hear you.

11         Q.    Yeah, I'm sorry if you didn't hear me.  I

12   said, "Is there anything else you have to testify to on

13   that topic?"

14         A.    I said no.

15         Q.    Okay.

16         A.    Sorry.

17         Q.    All right.  The next bullet point says,

18   "The PGA --" and we're now on the page 3.  "PGA TOUR's

19   relationship with SiriusXM."  What are you prepared to

20   testify to as to that bullet point as an expert in this

21   case?

22         A.    The PGA TOUR has a significant audio

23   programming partnership with SiriusXM.  There's a channel

24   branded as such under a licensing agreement.  They're an

25   official media partner of the PGA TOUR, which gives them

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    91

1    eligibility for official media investments also

2    associated with Grace brands support of professional

3    golf, the PGA TOUR specifically, the obvious nature of

4    the TOUR's influence in this particular situation with

5    Mr. Haney, the success of the live golf initiatives for

6    SiriusXM with the TOUR's audio broadcast, the involvement

7    -- the process of involving other advertisers that -- or

8    other brands that become advertisers that are associated

9    with golf.

10         Q.    Anything else?

11         A.    Any and all of the programming that the PGA

12   TOUR has an influence on on SiriusXM, the marking

13   activation opportunities that are presented to SiriusXM

14   at PGA TOUR events, the collaboration to create

15   incremental official marketing and media deals with those

16   companies, anything related to those subjects.

17         Q.    The next bullet point says, "The industry

18   distinction between programming and content and the

19   application of those terms to the PGA TOUR, SiriusXM

20   relationship and the right of the PGA TOUR to interfere

21   with SiriusXM content."  First of all, are you prepared

22   to testify on that bullet point?

23         A.    Yes.

24         Q.    Have you reviewed the license agreement

25   between SiriusXM and the PGA TOUR?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    92

1          A.     I have.

2          Q.     Okay.  So tell me what your opinion is or

3    that you plan to express regarding that bullet point.

4          A.     That the PGA TOUR has the ability to

5    approve the programming that is added to the schedule for

6    SiriusXM PTA Tour Radio.  Once those programs are

7    determined, the data content of those programs is subject

8    to the management and production, supervision of the

9    SiriusXM PGA TOUR Radio executive team.

10         Q.     Is your opinion, as you've just expressed

11   it, predicated upon your analysis or review of the

12   license agreement?

13         A.     Yes, the license -- yes, it is, the

14   licensing agreement specifically references programming.

15   It does not reference content.

16         Q.     Do you know if the license agreement puts

17   an affirmative obligation on SiriusXM to make sure that

18   it does not incorporate into programming any material

19   that's detrimental to the tour?

20              MR. GINSBERG:  Objection, that misstates --

21         assertively misstates the content of their

22         licensing agreement, Bill.

23   BY MR. DAVIS:

24         Q.     Well, let's do this.  Let's go to the

25   License Agreement, which is probably tab -- bear with me.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    93

1    Go to tab 3 or 4 that's in the book.

2           A.    Where is it?

3           Q.    It's tab 5.

4           A.    Tab 5.

5           Q.    Tab 5, page 3.  Do you have the page in

6    front of you?

7           A.    Yes, sir.

8           Q.    Paragraph (f).

9           A.    Yup.

10          Q.    It says, "SiriusXM shall ensure that

11   SiriusXM and its representatives do not incorporate into

12   the programming any material, which is," and if you go

13   down to Romanesque (iv), "otherwise detrimental to the

14   Tour or inconsistent with TOUR standards of

15   appropriateness."  Were you aware of that?

16          A.    Yup.

17          Q.    And what do you understand that to mean?

18          A.    That programs would not be created that

19   would be a detrimental to the TOUR.  An offensive shock

20   jock, as an example, would not be the type of programming

21   that would be created on the channel by SiriusXM if it

22   were --

23          Q.    And did --

24          A.    -- detrimental to the TOUR.

25          Q.    I'm sorry.  What?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    94

```
1           A.    If it were deemed to be potentially

2     detrimental to the TOUR.

3               MR. GINSBERG:  According to guidelines that

4           the document says the PGA has to provide to

5           Sirius.

6               MR. DAVIS:  No, it's in the disjunctive.

7           It says "or."

8               MR. GINSBERG:  No.  You can interpret it

9           that way, but it --

10              MR. DAVIS:  That's what it says.

11              MR. GINSBERG:  You didn't read the entire

12          provision, Bill.

13              MR. DAVIS:  Well, I'll read the entire

14          provision just to --

15              MR. GINSBERG:  Well, let's not argue.  Just

16          go ahead.

17              MR. DAVIS:  No.  Now I'm gonna read it so

18          it's clear.  "SiriusXM shall ensure that SiriusXM

19          and its representatives do not incorporate into

20          the programming any material which is," Romanesque

21          iv, "otherwise detrimental to TOUR or, in the

22          disjunctive, inconsistent with the TOUR's

23          standards of appropriate," and it says, "may be

24          provided to SiriusXM in writing."

25    BY MR. DAVIS:
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                        95

1          Q.   Do you have an understanding, sir, as to

2     whether or not detrimental to the TOUR could be separate

3     and apart from inconsistent with standards of

4     appropriateness in terms of --

5                    MR. GINSBERG:  Objection as to form.

6                    MR. DAVIS:  -- the reasonable reading of

7               that provision?

8                    MR. GINSBERG:  It relates solely to the

9               creation of programming.  That's what the document

10              says, Bill.

11                   THE WITNESS:  Yeah, my interpretation of

12              that provision is that a program of the title and

13              nature that would be viewed as detrimental to the

14              TOUR would not be introduced to the programming

15              lineup.  Hank Haney's program was first on air in

16              2013 I believe, and at the time that it was

17              approved to be added to the programming lineup, it

18              clearly was not viewed as detrimental and,

19              therefore, it was added to the programming lineup.

20    BY MR. DAVIS:

21         Q.   And you would not view that as applying to

22    content, which is injected during the course of a

23    program, which is deemed to be detrimental; is that

24    correct?

25                   A.   That's not the way it reads.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                96

```
1            Q.    Okay.  And, so, your opinions based on this
2    bullet point are predicated upon your reading of the
3    License Agreement; is that correct?
4                  MR. GINSBERG:  Objection.  You haven't
5            asked him what the basis of his opinion is.
6                  MR. DAVIS:  You can answer the question.
7                  THE WITNESS:  My interpretation is based
8            on, yeah, industry standard practices delineating
9            the difference between programming and content,
10           and the programming executives at a network
11           determine the lineup of the programs.
12                 The producers of said network create the
13           content of each program, and it's a very distinct
14           or influence the content of each program.  It's a
15           very distinct difference in my experience.
16   BY MR. DAVIS:
17           Q.    So, now, are you saying that your review of
18   the License Agreement is not relevant to the expression
19   of your opinion in this bullet point?
20                 MR. GINSBERG:  Objection, misstates the
21           testimony.
22                 MR. DAVIS:  I'm asking.
23                 MR. GINSBERG:  Well, you didn't ask.  You
24           made a statement.
25                 MR. DAVIS:  I asked.
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    97

1              MR. GINSBERG:  Objection as to form.

2              THE WITNESS:  The -- can I -- this is

3         Exactly consistent -- this language is exactly

4         consistent with the industry standard

5         understanding of programming versus content.

6    BY MR. DAVIS:

7         Q.    Next bullet point.  "The dependency of

8    SiriusXM on the PGA TOUR."  What is your opinion in that

9    regard, and what's it based on?

10        A.    It references a number of factors related

11   to how SiriusXM could be impacted by any type of conflict

12   with the PGA TOUR, the dynamic of SiriusXM's relationship

13   with the TOUR, the widely-held belief that audio

14   streaming rights of the PGA TOUR may change hands over

15   time as the PGA TOUR takes more control over their media

16   assets, which ultimately all those factors create a very

17   -- a very interesting dynamic between the two

18   organizations.

19        Q.    If called upon to express an opinion of the

20   dependency of SiriusXM on the PGA TOUR, what specific

21   documents have you reviewed in order to articulate such

22   an opinion, if any?

23        A.    Any and every media, sorts media

24   industry-related argument referencing the PGA TOUR media

25   rights.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                      98

1           Q.    Can you name one in specific?

2           A.    It was very closely covered, as an example,

3     by Sports Business Journal.  SiriusXM --

4           Q.    Next bullet point.

5                 MR. GINSBERG:  Wait.  He's still answering

6           the question, Bill.

7                 THE WITNESS:  SiriusXM's ongoing efforts to

8           acquire additional golf rights, the dynamics of --

9           in direct conversation with SiriusXM's executives

10          regarding their decision to maintain their license

11          with the PGA TOUR or not to maintain their license

12          with the PGA TOUR and direct personal, private

13          conversations with the SiriusXM executive team.

14                MR. GINSBERG:  Hey, Bill, do you want the

15          witness, also, to go through all of the documents

16          that have been produced in this case with the

17          communications between Sirius and PGA or are you

18          asking him apart from those documents?

19                MR. DAVIS:  I'm asking him, from his best

20          recollection, what he's relying on in his opinion.

21                MR. GINSBERG:  Your question wasn't clear.

22          So do you want him to remunerate for you the

23          emails, for instance, and the other documents in

24          this case as well?

25                MR. DAVIS:  Not at this point.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    99

1              MR. GINSBERG:  Okay.

2    BY MR. DAVIS:

3         Q.    Next is "the impact of SiriusXM both

4    financially and in terms of listenership and reaction to

5    the broadcast by Mr. Haney on May 30th, 2019 and the

6    impact on SiriusXM both financially and in terms of

7    listenership, if SiriusXM had not been forced to remove

8    Mr. Haney's program from its platform."  What opinion are

9    you prepared to express in that regard?

10        A.    I have specific data related to advertisers

11   that reduced their investments in SiriusXM as a result of

12   Haney's show being terminated.  I have specific data

13   related to the lack of popularity of the shows that were

14   added in its place, specific reports from advertisers and

15   SiriusXM sales executives regarding the lack of interest

16   in advertising on the programs that replaced Hank's show,

17   and I will testify as such.

18        Q.    The next one is "PGA TOUR's reaction and

19   efforts to protect its brand in response to highly

20   publicized and controversial statements by members of the

21   PGA TOUR industry and sphere."  What opinion are you

22   prepared to express regarding that topic?

23        A.    Numerous instances of embarrassing --

24   potentially embarrassing instances of various incidents

25   with PGA TOUR members that have been proactively managed

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                          100

1    in the -- in the media landscape, very proactive efforts

2    by PGA TOUR representatives to ensure that members of the

3    media that are in association with the TOUR or are TOUR

4    media partners are not to address anything that could be

5    viewed as unfavorable to a member of the PGA TOUR or --

6    whether factual or not.

7            Q.    Do you believe PGA TOUR is active in

8    protecting its brand?

9            A.    I believe, yes, that they are -- they are

10   incredibly active in protecting their brand such that it,

11   in many cases, costs the TOUR credibility.

12           Q.    Is there any -- in any of the instances

13   where you're talking about highly publicized and

14   controversial statements, do they involve broadcasters on

15   the PGA TOUR Radio?

16           A.    Not specifically, no.

17           Q.    The next one is "the structure and business

18   operations of the PGA TOUR, including efforts with regard

19   to gender, ethnic and racial equality and hiring and

20   promotional practices."  What opinions are you prepared

21   to express in that regard?

22           A.    I have firsthand knowledge of multiple

23   instances where an opportunity was presented to the TOUR

24   to present a more diverse face to its executive team, its

25   tournament operators and institutionalized lack of

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    101

1    opportunity was ultimately the reason for certain

2    individuals of a divers background to be given

3    opportunities to work with the TOUR --

4              Q.    Can you give me some examples of that?

5              MR. GINSBERG:  He's not done, Bill.

6              MR. DAVIS:  He takes -- he hesitates, and

7         he indicates -- it seems like he's done.  I'm not

8         doing this intentionally.

9              MR. GINSBERG:  Go ahead, Jeremy.

10             THE WITNESS:  There is an example of a

11        search for a tournament director for an event that

12        was contemplated to take place in California in

13        association with one of Octagon's clients.  The

14        client is a very prominent professional basketball

15        player.

16             The client wanted to ensure that the

17        tournament director of a diverse background would

18        be identified and selected.  There were only two

19        diverse applicants for the position.  It was

20        shared with the applicant that they wanted someone

21        with experience.

22             So one of the -- one of the applicants

23        had -- an African-American gentleman had never

24        been a PGA TOUR tournament director.  The other

25        gentleman had experience as a PGA TOUR tournament

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    102

```
 1              director and was told he didn't have enough

 2              experience to be a PGA TOUR director, tournament

 3              director, and, therefore, a Caucasian individual,

 4              who was previously a tournament director, was

 5              selected.  That is an example.

 6  BY MR. DAVIS:

 7         Q.     Who was the basketball player?

 8         A.     Our client, Stephen Curry.

 9         Q.     And who were the two applicants?

10         A.     One of the applicants was Wendell Haskins.

11  The other applicant was formerly the -- formerly the

12  Director of the -- a Champion store event in Pebble

13  Beach, the -- I believe it was called the Nature Valley

14  Event at one point.

15         Q.     Okay.

16         A.     I don't know the gentleman's name off the

17  top of my head.

18         Q.     What was the tournament?

19         A.     The tournament was -- there was an effort

20  put forth to establish an event in the Bay area that

21  Stephen Curry would have become the host of the event.

22  The event ultimately fell through when talks with the

23  sponsor fell apart, but efforts were well on their way

24  with the planning and development of that event.

25         Q.     How do you know what drove the decision to
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                           103

1    select the TOUR -- a TOUR director?

2            A.    I had access to information from one of the

3    applicants, and, also, we were very involved in the

4    potential management of the event and the establishment

5    of the event, and I, through other Octagon executives,

6    had knowledge of the hiring process.

7            Q.    Did you have communications with

8    representatives of the PGA TOUR?

9            A.    No.

10           Q.    Do you know if anybody at Octagon did?

11           A.    Yeah, absolutely.  Many, many people were

12   dealing everyday with the TOUR on that.

13           Q.    And do you know who got information

14   concerning the decisionmaking process for the TOUR

15   director?

16           A.    My client, or -- excuse me -- my colleague,

17   Jeff Kleiber, who, at the time, was running Octagon's

18   golf event operations team out of our Cary, North

19   Carolina office.

20           Q.    Was he directing -- interacting with the

21   PGA TOUR?

22           A.    I believe, yes.

23           Q.    Do you know who he was interacting with?

24           A.    I believe it was a number of individuals,

25   Brian Alder.  I believe that one of our associate

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    104

1    executives of Octagon, David Schwab, was also interacting

2    with Brian as well as the Commissioner.

3          Q.    Did your colleague tell you that it was his

4    view that the PGA TOUR had discriminated with regard to

5    the selection of a TOUR director?

6          A.    The characterization was if the requirement

7    is to hire someone with experience, it was gonna be very

8    difficult to identify a minority applicant who met that

9    standard as it was -- as it was established by the TOUR.

10         Q.    Moving on to the next bullet point, it

11   says, "Efforts by the PGA TOUR to support the LPGA."

12   What do you know about that or what do you -- what

13   opinions do you plan to express in that regard?

14         A.    It's my opinion that the TOUR's support of

15   the LPGA TOUR is one of optics and public relations, not

16   a concerted, dedicated effort to help the PGA TOUR grow.

17         Q.    And what's your opinion based on?

18         A.    My 20 plus years in this industry and

19   multiple relationships with various stakeholders in

20   women's professional golf, ah --

21         Q.    Do you have any knowledge as to the --

22               MR. GINSBERG:  He's not done, Bill.

23               THE WITNESS:  Numerous observations of a

24         lack of effort to support the LPGA TOUR in any

25         prominent fashion despite the incredible resources

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              105

```
 1          and capabilities of the PGA TOUR to do so.
 2   BY MR. DAVIS:
 3          Q.    Anything else?
 4          A.    The lack of any conversation coming out of
 5   this particular incident to -- with Mr. Haney to
 6   genuinely change the discourse around professional golf,
 7   women's professional golf rather than the action being to
 8   destroy a man's career, the action here by the PGA TOUR
 9   could have been to take the advantage of Scott
10   Greenstein's offer to create programming related to
11   women's golf, to promote put personalities and athletes
12   associated with women's golf.
13              It -- there was no follow through on a
14   number of very reasonable proposals that were put forth
15   by a number of individuals, including Scott Greenstein,
16   including Jerry Tarde, including former Executive
17   Director of the United States Golf Association, David
18   Fay, all of whom had discussed and shared with Mike Whan,
19   the LPGA Commissioner, that is SiriusXM was prepared to
20   use this as an opportunity to create a significant
21   dialogue around women's golf and the need to educate
22   audiences about the women that played on the LPGA TOUR.
23   It could have been used as a tremendous opportunity to
24   help the LPGA instead of the simply just destroying a
25   human being's career.
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    106

```
1          Q.    Did you have any specific knowledge as to

2     the nature of the contractual relationship between the

3     LPGA and the PGA TOUR?

4          A.    Yes.

5          Q.    And what do you understand that to be?

6          A.    The PGA TOUR acquired the right to

7     represent the LP TOUR's media assets in their medica

8     rights and negotiations.

9          Q.    Do you know when the negotiations for that

10    were going on?

11         A.    My understanding is fairly contemporaneous

12    to the issues at hand with Mr. Haney's telecast on

13    Sirius --

14         Q.    The --

15         A.    I'm done.

16         Q.    Now, with respect to your projections here,

17    I want to ask you, very specifically, does Octagon, Inc.

18    have any interest in the outcome of this case, and by

19    that I mean in the event that Mr. Haney were to prevail

20    in some way, will Octagon receive compensation based upon

21    whatever recovery would occur in this case?

22         A.    The only conversation related to this was

23    at the time that Mr. Haney filed his lawsuit he asked if

24    Octagon was prepared to incur any of the legal fees

25    associated with the lawsuit, and the answer to that was
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              107

1   no, and it was made fairly clear at that time that unless

2   we were prepared to incur the legal costs, we would not

3   be participating in any settlement.

4                I'm here simply to provide facts and

5   perspective because I believe that Mr. Haney was treated

6   very unfairly here, not for some monetary benefit to

7   Octagon or me indirectly.

8        Q.    So you're saying that if Mr. Haney should

9   recover in this case, an increment of damage relating to

10  his loss of business opportunity with VooDoo Labs or his

11  inability to secure endorsements and what have you, that

12  Octagon would not share in any of that; is that correct?

13       A.    Octagon would have zero entitlement to any

14  of that.  Whether or not he elected to pay some fee to

15  Octagon for our time and activity in support of his case

16  has not been discussed --

17       Q.    Okay.

18       A.    -- should he prevail or at all.

19            MR. DAVIS:  Let's take a break.

20            MR. GINSBERG:  Okay.  Thank you.

21            THE VIDEOGRAPHER:  We are going off the

22            record at 13:24.

23            (Thereupon, the following proceedings took

24            place at 1:36 p.m., following a short recess at

25            1:24 p.m.)

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              108

```
 1                THE VIDEOGRAPHER:  We are back on the
 2        record at 13:36.
 3                MR. DAVIS:  I don't have any further
 4        questions.  Thank you, Mr. Aisenberg.
 5                THE WITNESS:  Thank you.
 6                MR. GINSBERG:  I have a few questions.
 7                     CROSS-EXAMINATION
 8   BY MR. GINSBERG:
 9        Q.    Mr. Aisenberg, in the early part of your
10   deposition, you testified that you had spent perhaps less
11   than 10 hours preparing your expert report.  Was that an
12   accurate estimation?
13        A.    No.  I spent hundreds of hours thinking
14   about this since the case was filed and not tracking
15   precisely, but it's been substantially more time in
16   analyzing and reviewing everything than 10 hours for
17   sure.
18        Q.    And can you give us a rough estimate in
19   terms of analyzing the data and putting together the
20   expert reports that you've put together?
21        A.    25, 30 plus hours, reasonably.
22        Q.    In terms of Mr. Haney losing his platform,
23   you've testified a few times that he had been labeled by
24   the PGA, and at one point you said that it was not worth
25   the risk to others in the golf industry.  What did you
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    109

1    mean by that?

2              A.    There's a few layers to the meaning of

3    that.  One is the perception that Haney remarks were

4    equatable to -- as derogatory and deplorable sort of

5    comments as some of the most offensive things that were

6    leading to cancellations of people in that window of

7    time.

8              The perception of his comments was far

9    worse than the realty of his comments, but perception in

10   this case became reality.  So associating in any way with

11   Hank, one is viewed as associating with someone who is

12   racist, xenophobic, sexist when the actual facts are very

13   different from that.

14             A company making an aggressive decision to

15   align themselves with Mr. Haney would subject themselves

16   to a significant amount of potential criticism, something

17   that if -- something that those businesses would really

18   have to question whether or not it's worth the risk of

19   offending some segment of their potential consumer base,

20   and, you know, fundamentally a personality like Mr. Haney

21   is a discretionary component of a brand's marketing

22   strategy for the most part.  So everything that Hank had

23   done to build his business and his brand over many, many,

24   many years created that in terms of value and demand for

25   him in the marketplace.

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                110

1           The moment that a significant reason, even

2    if it was simply perceived and not real, to not work with

3    him presented itself -- it really eliminated the ability

4    to drive his business in the marketplace.  It was --

5    again, as I said, wasn't worth the risk to companies

6    that -- no company's marketing mix needs to create a

7    potential PR crisis if they -- if it -- as evidenced by

8    this situation, one extremely irrational, over-the-top

9    press report related to the PGA TOUR's association by

10   Christine Brennan with Hank and his show on SiriusXM led

11   to -- led to this.

12           You know, any other company that associates

13   themselves with Hank opens themselves up to the similar

14   type of PR crisis as a result of how all of this was

15   handled, and that's simply not worth the risk to any

16   company that wants to protect their brand at this point.

17       Q.   You testified about a sentiment report.  Is

18   that the other -- that data available to not only

19   yourself, but to the PGA and are readily accessible?

20       A.   Yes, there are dozens of different

21   platforms that can be used to analyze the same data.  The

22   data is publicly accessible.

23       Q.   And does data such as that, is that

24   available, for instance, with regard to the popularity of

25   Jay Monahan in the wake of this crisis?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                         111

1         A.    Sure.  You could analyze that or any other

2    number of other people, stories, topics.  You could run a

3    sentiment analysis, and you could see the relative impact

4    of how loud was this negative sentiment, how many

5    instances of that negative sentiment existed.

6              As an example, we ran a similar sentiment

7    analysis and compared Justin Thomas' comments in January,

8    and there was more than 10X negative sentiment in

9    relation to Justin Thomas' remarks in comparison to Hank

10   Haney's remarks, and I have firsthand knowledge that the

11   PGA TOUR's position on Justin Thomas was that he was

12   being treated unfairly by the media for his remark.

13        Q.    Did the PGA take any disciplinary action

14   with regard to Mr. Thomas after he used the word "faggot"

15   on live television?

16        A.    The PGA TOUR doesn't disclose their

17   disciplinary actions.

18        Q.    Are you aware of Mr. Thomas missing any

19   tournaments or being fined in any way?

20        A.    Mr. Thomas was absent from several

21   tournaments following his comments.

22        Q.    Was that as a result of any PGA discipline?

23             MR. DAVIS:  Objection, absence of

24        foundation.

25             THE WITNESS:  It would be reasonable to

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              112

```
 1              concluded that there was some disciplinary action
 2              taken.
 3   BY MR. GINSBERG:
 4         Q.    And a media member talked about a lynching
 5   in the context of talking about Tiger Woods.  Are you
 6   aware of the PGA taking any action to keep that member of
 7   the media off the air?
 8         A.    I'm not aware that there was any long
 9   term -- there was no long-term consequence for Kelly
10   Tilghman in relation to that comment.  She was -- which
11   happened live during a PGA TOUR telecast on another -- on
12   the Golf Channel on another PGA TOUR media partner
13   platform during the live airing of their event.  I
14   believe she may have been suspended for a short period of
15   time and returned to the air without any long-term
16   impact.
17         Q.    Is there sentiment data available with
18   regard to her and her comments?
19         A.    Those comments took place before the
20   incredible rise of social media over the last ten years
21   or so.  So I'm sure a comparable analysis of media could
22   be conducted through a LexisNexis search, but it would be
23   more manual.  It wouldn't be possible on one of these
24   social media analytics tools.
25         Q.    Do you know who Kevin Kisner is?
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                113

```
1              A.    I do.

2              Q.    Who is he?

3              A.    He is a member of -- a player on the PGA

4    TOUR, I believe also on the Player Advisory Council,

5    which is the committee of players who oversee the TOUR's

6    operation or oversee the TOUR.

7              Q.    Are you aware of Mr. Kisner saying

8    something with regard to deaths related to COVID, that

9    the people who died got what they deserved?

10             A.    I'm aware of some --

11             MR. DAVIS:  Objection, mischaracterizes.

12             THE WITNESS:  I'm aware that there were

13        very insensitive remarks related to COVID-19 and

14        its impact on some people that I believe Mr.

15        Kisner has to address publicly on social media.

16   BY MR. GINSBERG:

17             Q.    Has Mr. Kisner been allowed to remain part

18   of the Player's Committee you mentioned?

19             A.    I believe he has, yes.

20             Q.    You said something earlier about whether

21   financial forecasts could ever be -- I think you said

22   that they could never be scientific.  Can you explain

23   what you meant by that?

24             A.    My point is that there are a number of

25   permutations of financial models that can be created to
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                              114

1    project any number of business opportunities, revenue

2    projections of that any kind, any nature, and there's no

3    absolutely perfect and precise projections that will

4    match what actually happens perfectly.

5          Q.    Were your projections based on data and

6    experience and provided -- are they based upon -- let me

7    strike that.  Let me try again.

8          Are your projections based with reasonable

9    certainty on facts and data that you have reviewed?

10         A.    They are, yes.

11         MR. DAVIS:  Object to the form.

12   BY MR. GINSBERG:

13         Q.    And is the data not only --

14         A.    Did you hear him?  He said, "Objection to

15   form."  I just want to make sure --

16         Q.    Is the data not only based upon historical

17   revenue, but trends and experience the marketplace and in

18   the media world with which you are familiar as a fact

19   witness and as an expert?

20         MR. DAVIS:  Objection to form.

21         THE WITNESS:  Yes.  Yes, there's a

22         significant shift in advertising dollars to

23         talent-driven media enterprises.  It is the direct

24         result of the incredibly competitive nature of

25         major media companies and their need to provide

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    115

```
 1              more efficient models.
 2                   They have struggled to do so, and they,
 3              with the rise of social media and the rise of
 4              virtually infinite number of digital platforms
 5              with which to reach audiences, the -- the
 6              potential business opportunity for people like
 7              Hank Haney and other talent with a high degree of
 8              affinity audiences who have a high degree of
 9              affinity for those people, there's an unlimited
10              amount of growth happening for those types of
11              platforms and the talent associated with those
12              types of platforms.
13                   It's given rise to things like Barstool
14              Sports and The Ringer and the acquisition of a
15              newly platforms on a daily basis because of the
16              power of these new channels that are being
17              developed, and our clients have truly thrived in
18              being able to leverage those types of
19              opportunities.
20      BY MR. GINSBERG:
21           Q.    And in rendering your expert report, did
22      you apply data based upon Mr. Haney's revenue and
23      development to the trends that you have studied in the
24      media and golf industries?
25           A.    I did.
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    116

```
1                    MR. DAVIS:  Form.
2                    THE WITNESS:  Though, as I've stated, I was
3           quite conservative in applying the overall growth
4           metrics of those trends so as to, you know, be
5           reasonable in assessing the potential damages to
6           him.  I think it's very -- it would be very
7           reasonable to apply those same growth metrics to
8           all of these categories of revenue and produce
9           much larger potential damages.
10    BY MR. GINSBERG:
11          Q.    At one point I think you used the word
12    "arbitrary" in response to one of Mr. Davis' questions.
13    Was there anything arbitrary about your analysis?
14          A.    No.
15                    MR. DAVIS:  Objection to form.
16                    THE WITNESS:  No.  The point I was
17           attempting to make is that at that point the --
18           the exact nature of a model that could be used to
19           provide this type of a pro forma analysis could
20           take almost infinite number of forms that would be
21           reasonable, none of which are going to be
22           scientifically precise when measured against the
23           real-world outcome over time, all of which are
24           based on some assumptions.
25                    You do the best you can to base those
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    117

1              assumptions in the data experience, expertise,

2              history of those businesses that you can -- that

3              you can refer to, but to suggest that one model is

4              going to be the perfect and precise model is

5              simply a fallacy.

6    BY MR. GINSBERG:

7         Q.    You said that you based your projections in

8    this report not only on your experience, but also on

9    historical revenue and particular data.  Was the data

10   that you reviewed for the purpose of your report found on

11   documents and records that were created in the normal

12   course of Siris or Octagon's business?

13        A.    They were.

14        Q.    And are they -- the spreadsheets and data

15   produced, are those documents that you have regularly

16   used and that Octagon regularly uses in your businesses?

17        A.    Yes.

18        Q.    Did you rely upon regularity and accuracy

19   of those documents that have been produced in this case?

20        A.    Yes.  And Octagon is a public company held

21   to a very high standard in -- in its accounting practices

22   and is audited regularly, and any potential discrepancy

23   is researched exhaustively; and I've been with the

24   company now since 2006 and have never seen any error in

25   any of the data that is produced through our accounting

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    118

1    department.

2              Q.    Mr. Davis asked you questions about

3    advertising and your projections of the advertising for

4    Mr. Haney's product VooDoo would increase.  Do you recall

5    that testimony?

6              A.    I do.

7              Q.    What was the basis for your projections

8    that the advertising would increase?

9              A.    The basis was a -- an anticipated increase

10   month over month in advertising that Haney would be

11   purchasing from SiriusXM because of the very successful

12   return on that investment, and he had refined his

13   advertising over the course of many months such that

14   he -- the more he spent, the more he made; and, again,

15   because his goal was to drive top-line sales, the only --

16   the key element in driving top line was gonna be driving

17   the advertising funnel.

18             Q.    And upon what did you base the actual

19   projection you used for your analysis?

20             A.    I believe I created a monthly model that

21   projected out a year-over-year incremental increase, you

22   know, more in the initial years and flattening as he got

23   further out into the timeline.

24             Q.    And why was that the model that you decided

25   to use to support your expert opinion?

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              119

1          A.    It was reasonable based upon on the

2     financial resources, the sales, the enthusiasm for the

3     brand, the growing databases.  You know, it -- I did not

4     want to provide some unreasonably high growth metric that

5     would add zeros, that there are many instances where

6     companies scale from hundreds of thousands to millions to

7     tens of millions to hundreds of millions of dollars that

8     would have been to provide a projected damage that

9     suggested that Hank could generate $100 million in sales

10    in 2026of VooDoo.

11               Is it possible?  Actually, it could have

12    been possible if he had maintained the type of growth

13    that he was seeing and had he elected, as an example, to

14    take on some growth capital if investors had identified

15    the opportunity he had to continue to grow that business.

16               Very -- there are a number scenarios that

17    we could have taken into consideration when we created

18    the projection here, the most conservative of which

19    seemed to be a steady and consistent increase in sales

20    almost exclusively driven by the success of his SiriusXM

21    platform.

22          Q.    Mr. Davis also went through the bullet

23    points on pages 2 and 3 of our expert report, and you

24    provided an answer, and you said that there were other

25    aspects of each bullet point.  I think Mr. Davis finally

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    120

1   went on to the next bullet point.

2                I just want to ask you whether -- well, we

3   can go through them one by one.  "SiriusXM's business

4   prior to Mr. Haney joining the outlet and then the impact

5   on Sirius' financial position that Mr. Haney's program

6   had on Sirius."  What are the bases upon which you have

7   knowledge regarding that topic?

8        A.   At the time, prior to Haney joining

9   SiriusXM's golf network, there was -- there were very few

10  companies specifically advertising on that network.  The

11  majority of the advertising that ran on that channel was

12  broad audience-wide ad units being placed by advertisers

13  who didn't care who was listening.  They were just buying

14  ears.

15               When Mr. Haney joined SiriusXM, the

16  credibility that was instantly brought to the non-live

17  golf programming on the channel increased substantially.

18  The -- for the first time endemic advertisers, like major

19  golf retailers, like major golf equipment brands were

20  making SiriusXM a meaningful element of their advertising

21  mix, and from 2013 through 2019, in fact, continuing to

22  this day, SiriusXM is now, without question, objectively

23  one of the premier golf-specific media platforms in the

24  sport.  They were not even relevant or in the

25  consideration set prior to Hank Haney joining the

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    121

1    network.

2              Q.    And has anyone from Sirius ever confirmed

3    to you your conclusion that Mr. Haney was significantly

4    responsible for that growth and legitimacy of Sirius?

5              A.    Yes, Scott Greenstein and many other

6    executives of Sirius had shared that, voiced that same

7    opinion.  Not until Hank Haney made it an essential

8    element of his business model, integrated all of his

9    endorsement relationships into incremental advertising

10   relationships with Sirius, attracted other high-profile

11   talent based on the significant commitment that he had

12   already made, all of those things were -- Haney's joining

13   the network was a catalyst to all of those -- all of

14   those attributes of the success of Sirius.

15             Q.    A number of the bullet points relates to

16   "The Big Miss" and the financial benefit it was having

17   for book distributors and sellers.  What is the basis for

18   your opinion as to -- what is the basis for your ability

19   to provide expert opinion regarding the positions of Mr.

20   Haney's book in that regard?

21             A.    I had a very direct role in launching that

22   book.  I was directly involved in the marketing plan,

23   worked closely, as an example, with Golf Digest to plan

24   and execute the serial rights for the excerpt of the

25   book, which ran in Golf Digest and on Golf Digest's

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    122

1    website, which, to this day, remains the most read

2    article in the history of Golf Digest, both on line and

3    in print.  The significance of that, of Hank's book in

4    the pantheon of golf publications and books is pretty

5    significant.

6          Q.    What was the significance of that book, in

7    your expert opinion, becoming a New York Times best

8    seller, specifically with regard to the golf industry?

9          A.    It was the very first inside account of the

10   world of Tiger Woods with a favorable and unfavorable, at

11   times, insight into what made Tiger great, and some of

12   those same elements that impacted his ability to continue

13   to be great.  It was -- to that point there had never

14   been anything that came close to revealing what the man

15   was really like, and even that book was fairly unfairly

16   characterized as a takedown book.

17               It most definitely was not a takedown book.

18   Any personal anecdotes that were related to Tiger's

19   private life in that book were very specifically relevant

20   to his mindset as a competitor, not in an effort to

21   reveal something personal about Tiger Woods.

22               As an example, there was an anecdotal in

23   that book about Tiger's conversation with his wife, Elin,

24   at the time flying home from a PGA TOUR victory where it

25   was early in their relationship, and Elin said something

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    123

1      to the effect, let's celebrate, and it was not a major,

2      and it wasn't a world golf championship.  It was, you

3      know, kind of a regular PGA TOUR event, and Tiger said,

4      "We don't celebrate these victories.  We're supposed to

5      win these events."

6                  And, so, that may have been perceived as a

7      personal -- a personal story that violated some level of

8      confidence that a coach and a student should have, but

9      that showed you more about the mindset of Tiger Woods'

10     approach to tournament golf, which, you know, for people

11     who just read the headlines about the -- written by

12     people who didn't think the book should be written, would

13     be lost if they didn't dig a little deeper.

14          Q.    Incidentally, I think my connection just

15     went out.  Are you all hearing okay?

16                MR. DAVIS:  Yeah, I'm fine.

17                MR. GINSBERG:  I'm not sure why that

18            happened, but I'm just going to keep going, if you

19            don't mind because it's only --

20                MR. DAVIS:  No.  Go ahead.

21     BY MR. GINSBERG:

22          Q.    Did "The Big Miss" have -- based on your

23     expertise, as well as your experience, have a benefit to

24     PGA book outlets and PGA Superstores, for instance?

25          A.    It drove -- it sold out at everywhere it

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                    124

1    was available initially.  So anyone, including those

2    outlets who carried it, sold them instantly, as we

3    discussed in previous testimony, in my previous

4    deposition, the PGA TOUR shops, as an example, were

5    instructed to cancel.

6              MR. DAVIS:  I'm gonna object to this and

7         move to strike.

8              MR. GINSBERG:  Please let --

9              MR. DAVIS:  It's beyond the scope.

10             MR. GINSBERG:  Please let the witness

11        finish.  You can --

12             MR. DAVIS:  No.  It's beyond the scope of

13        expert testimony.

14             MR. GINSBERG:  All right.  Then make an

15        objection at the proper time and the proper way

16        instead of being rude.

17             THE WITNESS:  The book sold quite well

18        everywhere it was available.  That included PGA

19        TOUR licensed sales outlets.

20   BY MR. GINSBERG:

21        Q.   And, in your expert opinion, was there --

22   well, let me ask you.  Do you have factual knowledge as

23   to whether those superstores reordered supplies of the

24   book?

25             MR. DAVIS:  Objection, beyond the scope,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              125

```
 1              move to -- well --
 2                   THE WITNESS:  Yeah.  My understanding is
 3              they immediately reordered until the direction was
 4              received to cancel their reorder.
 5    BY MR. GINSBERG:
 6         Q.    And, based on your experience in the media
 7    industry and your expertise, was there any bona fide
 8    business reason why those orders should have been
 9    cancelled?
10                   MR. DAVIS:  Objection to form, absence of a
11              foundation, hearsay.
12                   THE WITNESS:  No.
13                   MR. GINSBERG:  You can answer.
14                   THE WITNESS:  No.
15    BY MR. GINSBERG:
16         Q.    I'm sorry?
17         A.    No, there would be no business rationale to
18    cancel the reorder of inventory that was selling very
19    well up until that point.
20         Q.    You testified -- Mr. Davis asked you about
21    your expertise with regard to the PGA's unique business
22    and marketing relationship with Tiger Woods and his
23    agent, Mark Steinberg, and during that testimony you said
24    that Mr. Woods was provided sponsorship opportunity at
25    certain tournaments; is that right?
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                      126

1          A.     His foundation was provided management

2     rights or involvement with events.

3          Q.     How many such events?

4          A.     It's ebb and flowed through the years.  I

5     believe his -- his foundation now currently is involved

6     with events in Los Angeles, the Riviera.  I believe he's

7     involved in the events, the -- I believe it was called

8     "The Hero World Challenge" most recently in the Bahamas.

9               He's been involved with the event in

10    Boston, which has now changed into a FedEx Cup event that

11    rotates -- a playoff event that rotates locations, I

12    believe sponsored now by Northern Trust.  I don't believe

13    his foundation is involved at the present time.

14         Q.     Has any other PGA player ever been given

15    similar opportunities?

16         A.     Not that I'm aware of.

17         Q.     Based on your experience and expertise,

18    what would a consequence to Sirius be if the PGA severed

19    its relationship with SiriusXM?

20               MR. DAVIS:  Objection, beyond the scope of

21         his expertise.

22               THE WITNESS:  I would -- it would depend

23         upon the nature of that severing or the

24         relationship.  If --

25    BY MR. GINSBERG:

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                              127

1          Q.    What do you mean by that?

2          A.    If it was in the midst of some type of

3     conflict, it could have impact on Sirius.  If it were

4     simply a business decision based on not renewing the

5     media rights partnership, it may have little or no

6     potential impact.

7          Q.    Well, one of the areas of your -- yeah, one

8     of the areas of which your report says that you were

9     gonna be testifying is the dependency of Sirius on the

10    PGA TOUR.  What do you mean by that?

11         A.    Well, the PGA TOUR is incredibly

12    influential in the business landscape with major

13    corporate global corporations at the Board level.  So

14    it's -- it is reasonable to conclude that a hostile or

15    damaged business relationship between SiriusXM and PGA

16    TOUR could have a negative impact on SiriusXM's business.

17              In particular, the automobile manufacturers

18    are the most crucial business relationship that SiriusXM

19    has, without the integration of their technology in new

20    automobiles, it could significantly impact Sirius'

21    ability to continue to add new subscribers, and anyone

22    with a high degree of influence among auto manufacturers

23    is someone that SiriusXM needs to do their best to stay

24    in a harmonious relationship with.

25         Q.    The last two bullet points Mr. Davis asked

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    128

1    you about, one was the structure and business operations

2    of the PGA TOUR, including efforts with regard to gender,

3    ethnic and racial equality and hiring promotional

4    practices.  Based on your experience and what you've

5    reviewed as an expert, will you be prepared to opine at

6    trial as to the hiring practices of the PGA TOUR and any

7    efforts the PGA TOUR has made, for instance, to provide

8    leadership positions at the PGA TOUR to minority, gender,

9    ethnic and racial equality members?

10            A.    Yes.

11            Q.    And based upon your experience with PGA

12   TOUR, will you be prepared to opine as to hiring and

13   promotional practices in the PGA TOUR in that regard?

14            A.    Yes.

15            Q.    And with regard to efforts by the PGA TOUR

16   to support the LPGA, will you be prepared, in your expert

17   capacity, to testify about effort or lack of effort by

18   the PGA TOUR to support the LPGA TOUR?

19            A.    Yes.

20            Q.    And what is the basis of the expert

21   opinions that you will be able to render with regard to

22   that topic?

23            A.    Firsthand involvement with senior

24   executives across all aspects of the stakeholders in

25   professional golf, from the networks to the advertisers

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    129

1    to the tournament directors, the tournament owners, title

2    sponsors, executive teams across the landscape.

3              MR. GINSBERG:  I have no further questions.

4        Thank you.

5              MR. DAVIS:  One question directed at that.

6                    REDIRECT EXAMINATION

7    BY MR. DAVIS:

8        Q.    On May 29th, 2019, did, to your knowledge,

9    the PGA TOUR have a business relationship with the LPGA?

10       A.    Yes.

11             MR. DAVIS:  Thank you.

12                   RECROSS EXAMINATION

13   BY MR. GINSBERG:

14       Q.    After that time period, are you aware of

15   the PGA doing anything to support the LPGA in terms of

16   getting programming on Sirius or providing fair treatment

17   in their media rights agreement or anything of that sort?

18       A.    Other than any potential incremental

19   benefit to the LPGA from the media rights aspect of their

20   business relationship, you know, no substantive platform

21   growth has materialized since then.  They still have very

22   few events on network.  All of their events are on cable.

23             The investment and production resources for

24   LPGA events is a fraction of the production investment in

25   men's events.  There's no more than seven cameras on

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

```
 1    average at an LPGA event versus many times that at a PGA
 2    TOUR event on a weekly basis.  The broadcast windows are
 3    generally shorter.
 4             Mike Whan noted that it was one of his big
 5    disappointments in his tenure as the LPGA TOUR
 6    Commissioner, which he announced his resignation to
 7    ultimately become the CEO or Executive Director of the
 8    United States Golf Association later this summer, Mike
 9    specifically referenced the fact that they haven't been
10    able to add more tournaments to national network
11    broadcasts has been one of his great disappointments as
12    Commissioner of the LPGA.
13        Q.   And, in your expert opinion based upon your
14    knowledge of the media and the sports industry, do you
15    think it showed support or the lack of a support that the
16    Commissioner of the PGA was not able to name the winner
17    of the U.S. Ladies' Open Tournament in 2019 or any of the
18    top ten-ranged players in the LPGA TOUR other than one
19    person?
20             MR. DAVIS:  Objection to form, absence of
21         predicate.
22             THE WITNESS:  It's certainly disappointing
23         to learn that that was the case in -- certainly in
24         the context of this situation with Mr. Haney, I
25         would have expected a higher degree of knowledge
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                131

```
 1    of that particular issue.
 2          MR. GINSBERG:  I have no further questions.
 3          MR. DAVIS:  Okay.  Then I guess we're
 4    concluded.  Obviously you have the right to read a
 5    copy.  We are going to order it expedited.
 6          THE STENOGRAPHER:  For when, expedited?
 7          MR. DAVIS:  Yes.
 8          THE STENOGRAPHER:  What expedited?  How
 9    many days, one?
10          MR. DAVIS:  What does expedited mean to
11    you?
12          THE STENOGRAPHER:  Well, they have expedite
13    one day, two day, same day.
14          MR. DAVIS:  No, I'd say two to three days
15    would be fine.
16          THE STENOGRAPHER:  Okay.
17          And, Peter -- are you a pdf or do you like
18    ETran, Mr. Davis?
19          MR. DAVIS:  Pdf is fine.
20          THE STENOGRAPHER:  Okay.
21          THE VIDEOGRAPHER:  Mr. Davis, would you
22    like a copy of the sync'd video?
23          MR. DAVIS:  Yes, I think we will.
24          THE STENOGRAPHER:  Did other counsel leave?
25          MR. GINSBERG:  I'm here.
```

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                      132

1          THE STENOGRAPHER:  Oh, do you want a copy?

2     Is he gonna read?

3          MR. GINSBERG:  Yes, Mr. Davis said we're

4     gonna read, and I'll have my office contact you

5     but how -- whether we want it expedited or not.

6          THE STENOGRAPHER:  Okay.

7          THE VIDEOGRAPHER:  And, Mr. Ginsberg, would

8     you like a copy of the sync'd video?

9          MR. GINSBERG:  No thanks.

10         THE VIDEOGRAPHER:  If there are no further

11    questions, we are going off the record at 14:20.

12         MR. GINSBERG:  Thank you.

13         MR. DAVIS:  Thank you.

14         (Thereupon, the proceedings concluded at

15    2:20 p.m.)

16

17

18

19

20

21

22

23

24

25

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    133

1                    ACKNOWLEDGEMENT OF DEPONENT

2

3           I, JEREMY AISENBERG, do hereby acknowledge

4    that I have read and examined the foregoing testimony,

5    and the same is a true, correct and complete

6    transcription of the testimony given by me and any

7    corrections appear on the attached Errata sheet signed by

8    me.

9

10

11

12

13     (Date)                                   JEREMY AISENBERG

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021                                    134

```
1

2                          CERTIFICATE OF OATH

3      THE STATE OF FLORIDA )

4      COUNTY OF DUVAL       )

5              I, the undersigned authority, certify that

6      JEREMY AISENBERG appeared before me remotely via

7      videoconference, and was duly sworn on the 31st day of

8      March, 2021.

9              Signed this 5th day of April, 2021.

10

11

12

13      _____

14      LORA LEE KNORR-FIERRO, RPR/FPR

15      Notary Public - State of Florida

16      My Commission No. GG303687

17      My Commission Expires: 04/30/23

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF REPORTER

2    THE STATE OF FLORIDA )

3    COUNTY OF DUVAL      )

4              I, LORA LEE KNORR-FIERRO, Registered

5    Professional Reporter and Florida Professional Reporter,

6    certify that I was authorized to and did stenographically

7    report the videotaped deposition of JEREMY AISENBERG,

8    pages 1 through 132; that a review of the transcript was

9    requested; and that the transcript is a true and complete

10   record of my stenographic notes.

11             I further certify that I am not a

12   relative, employee, attorney, or counsel of any of the

13   parties, nor am I a relative or employee of any of the

14   parties' attorney or counsel connected with the action,

15   nor am I financially interested in the action.

16             DATED this 5th day of April, 2021.

17

18

19

20

21   _____

22        LORA LEE KNORR-FIERRO, RPR/FPR

23

24

25

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

136

| A |
| --- |

**abilities**
9:21
**ability**
11:9, 11:14,
46:9, 62:21,
63:2, 92:4,
110:3, 121:18,
122:12, 127:21
**able**
11:18, 32:9,
42:12, 46:6,
46:13, 48:5,
55:14, 57:25,
63:1, 63:23,
64:6, 65:11,
76:24, 85:14,
90:8, 115:18,
128:21, 130:10,
130:16
**about**
6:22, 17:17,
20:25, 27:20,
28:22, 41:25,
47:3, 66:20,
69:2, 88:25,
89:25, 100:13,
104:12, 105:22,
108:14, 110:17,
112:4, 112:5,
113:20, 116:13,
118:2, 122:21,
122:23, 123:9,
123:11, 125:20,
128:1, 128:17
**above**
36:2, 74:1
**absence**
11:8, 111:23,
125:10, 130:20
**absent**
111:20
**absolutely**
72:9, 103:11,
114:3
**academic**
66:19

**academy**
13:6
**accelerated**
61:21, 71:3
**accepted**
71:4
**access**
33:20, 34:2,
49:15, 77:3,
83:13, 103:2
**accessible**
110:19, 110:22
**according**
94:3
**account**
53:12, 60:24,
78:9, 79:3,
122:9
**accounted**
78:23, 79:17
**accounting**
12:19, 12:25,
13:25, 14:5,
14:14, 14:21,
15:19, 53:18,
54:10, 117:21,
117:25
**accruing**
67:25
**accuracy**
37:9, 117:18
**accurate**
21:12, 43:6,
63:8, 74:19,
80:13, 108:12
**aches**
81:6, 81:7
**acknowledge**
6:3, 6:6, 133:3
**acknowledgement**
4:21, 133:1
**acquire**
63:22, 98:8
**acquired**
77:4, 106:6
**acquisition**
115:14
**across**
30:3, 55:6,

**academy** 85:2, 86:23,
87:22, 128:24,
129:2
**action**
1:3, 30:13,
105:7, 105:8,
111:13, 112:1,
112:6, 135:14,
135:15
**actions**
26:18, 29:19,
39:24, 111:17
**activation**
91:13
**active**
100:7, 100:10
**activities**
40:12, 40:13,
49:5
**activity**
36:1, 49:7,
107:15
**actual**
18:15, 21:1,
24:22, 28:18,
40:14, 40:16,
40:21, 65:23,
109:12, 118:18
**actually**
28:4, 36:2,
46:21, 49:2,
114:4, 119:11
**ad**
120:12
**add**
86:12, 119:5,
127:21, 130:10
**added**
15:15, 92:5,
95:17, 95:19,
99:14
**adding**
72:22
**addition**
29:5, 85:21
**additional**
36:3, 98:8
**address**
17:10, 80:3,

**academy** 100:4, 113:15
**addressing**
17:21
**administer**
6:8
**administered**
6:7
**administrative**
6:10
**advantage**
57:19, 58:6,
59:15, 62:22,
63:1, 68:8,
68:18, 74:10,
74:23, 78:15,
105:9
**advertise**
62:25, 78:14,
78:16, 85:23
**advertiser**
57:25
**advertisers**
24:17, 24:20,
24:21, 26:6,
27:17, 28:12,
37:20, 37:23,
40:7, 79:20,
86:21, 91:7,
91:8, 99:10,
99:14, 120:12,
120:18, 128:25
**advertising**
23:17, 24:1,
26:5, 27:15,
43:18, 43:19,
46:3, 57:17,
57:18, 57:21,
57:23, 58:1,
58:4, 58:5,
59:13, 59:15,
59:16, 62:23,
68:5, 68:6,
68:7, 68:11,
68:20, 68:21,
70:17, 70:24,
71:2, 71:6,
71:9, 71:12,
71:17, 72:5,

72:15, 72:17,
74:8, 75:20,
76:6, 76:13,
76:21, 77:2,
77:5, 77:16,
78:15, 79:22,
83:20, 99:16,
114:22, 118:3,
118:8, 118:10,
118:13, 118:17,
120:10, 120:11,
120:20, 121:9
**advising**
77:11
**advisory**
113:4
**affecting**
28:19
**affinity**
115:8, 115:9
**affirmative**
92:17
**african-american**
101:23
**after**
26:21, 34:5,
36:1, 42:20,
69:19, 72:23,
73:19, 81:9,
82:21, 111:14,
129:14
**again**
26:2, 26:3,
40:21, 46:21,
47:7, 48:13,
51:1, 54:12,
54:23, 61:14,
68:7, 70:6,
72:25, 78:13,
83:16, 110:5,
114:7, 118:14
**against**
63:24, 68:8,
78:14, 116:22
**age**
22:18
**agent**
88:17, 89:6,

125:23
**aggregate**
45:9
**aggregates**
81:7
**aggressive**
109:14
**aggressively**
23:15, 42:18
**ago**
9:22
**agree**
6:17, 6:18
**agreement**
2:20, 6:14,
7:23, 25:21,
42:1, 42:12,
43:10, 43:23,
44:12, 44:24,
45:16, 45:19,
85:12, 86:16,
90:24, 91:24,
92:12, 92:14,
92:16, 92:22,
92:25, 96:3,
96:18, 129:17
**agreements**
85:21
**ah**
23:21, 78:17,
104:20
**ahead**
58:10, 94:16,
101:9, 123:20
**air**
25:8, 95:15,
112:7, 112:15
**airing**
112:13
**aisenberg**
1:15, 2:1, 4:6,
5:4, 6:19, 7:6,
7:12, 32:9,
79:3, 82:18,
108:4, 108:9,
133:3, 133:13,
134:6, 135:7
**al**
5:5

**alder**
103:25
**alerted**
66:2
**algorithmic**
17:12
**algorithms**
15:25, 16:4
**align**
109:15
**all**
9:14, 10:13,
12:8, 13:8,
23:12, 24:8,
24:12, 28:3,
29:5, 30:3,
30:11, 31:2,
31:18, 33:16,
40:16, 41:6,
41:7, 41:8,
45:4, 46:14,
47:23, 51:25,
52:8, 54:9,
55:8, 56:8,
64:16, 69:18,
74:11, 76:24,
77:5, 85:10,
87:3, 90:17,
91:11, 91:21,
97:16, 98:15,
105:18, 107:18,
110:14, 116:8,
116:23, 121:8,
121:12, 121:13,
123:15, 124:14,
128:24, 129:22
**allow**
83:13
**allowance**
45:20
**allowed**
45:17, 113:17
**almost**
38:5, 56:13,
87:23, 116:20,
119:20
**along**
67:6, 67:9

**already**
26:2, 67:1,
79:24, 121:12
**also**
4:1, 11:10,
39:24, 46:3,
57:6, 57:20,
72:18, 79:22,
80:23, 84:10,
84:19, 85:23,
86:18, 91:1,
98:15, 103:3,
104:1, 113:4,
117:8, 119:22
**ambiguous**
66:17, 66:19,
66:22
**amended**
4:15, 10:23,
13:16, 19:5,
19:7, 19:12,
81:20, 81:24
**among**
29:1, 80:25,
82:19, 127:22
**amount**
11:3, 11:5,
12:7, 30:2,
40:24, 41:3,
52:1, 55:13,
60:1, 68:2,
71:12, 109:16,
115:10
**analyses**
33:4
**analysis**
4:17, 21:14,
23:2, 23:12,
24:1, 24:6,
28:24, 29:25,
30:17, 33:1,
33:9, 33:11,
33:22, 34:23,
39:9, 39:11,
52:11, 52:12,
61:24, 62:15,
62:16, 74:3,
74:16, 78:8,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

138

85:10, 86:4,
86:14, 89:3,
89:4, 92:11,
111:3, 111:7,
112:21, 116:13,
116:19, 118:19
**analytics**
112:24
**analyze**
14:9, 18:20,
23:9, 75:14,
110:21, 111:1
**analyzed**
24:25, 29:25
**analyzing**
36:12, 108:16,
108:19
**anecdotal**
122:22
**anecdotes**
122:18
**angeles**
126:6
**announced**
130:6
**annual**
70:15
**another**
13:13, 22:9,
44:17, 75:13,
77:6, 112:11,
112:12
**answer**
9:10, 22:24,
39:10, 50:12,
65:1, 66:8,
66:10, 66:24,
67:15, 73:5,
73:11, 73:18,
73:21, 74:2,
96:6, 106:25,
119:24, 125:13
**answered**
67:1
**answering**
9:13, 98:5
**anticipate**
39:12

**anticipated**
17:2, 118:9
**any**
6:12, 8:10,
8:14, 8:15, 9:4,
10:22, 12:25,
13:25, 14:2,
14:4, 15:3,
15:17, 21:9,
21:12, 22:20,
27:15, 28:5,
33:16, 36:16,
36:20, 36:23,
38:17, 39:7,
40:6, 47:9,
51:18, 54:24,
55:3, 55:16,
57:25, 62:5,
62:24, 64:9,
67:21, 68:8,
68:14, 69:1,
70:19, 71:4,
75:21, 76:4,
78:9, 81:12,
82:22, 83:5,
83:20, 89:13,
91:11, 92:18,
93:12, 94:20,
97:11, 97:22,
97:23, 100:12,
104:21, 104:24,
105:4, 106:1,
106:18, 106:24,
107:3, 107:12,
107:13, 108:3,
109:10, 110:12,
110:15, 111:1,
111:13, 111:18,
111:19, 111:22,
112:6, 112:8,
112:15, 114:1,
114:2, 117:22,
117:24, 117:25,
122:18, 125:7,
126:14, 128:6,
129:18, 130:17,
133:6, 135:12,
135:13

**anybody**
103:10
**anyhow**
31:17
**anymore**
75:24
**anyone**
18:7, 63:21,
74:5, 121:2,
124:1, 127:21
**anything**
14:13, 17:9,
21:9, 45:15,
50:21, 52:24,
66:20, 86:11,
89:25, 90:9,
90:12, 91:10,
91:16, 100:4,
105:3, 116:13,
122:14, 129:15,
129:17
**anywhere**
65:6, 80:4
**aosc**
6:10
**apart**
95:3, 98:18,
102:23
**appear**
13:18, 60:2,
60:19, 133:7
**appearance**
46:17, 47:10,
47:17, 48:6
**appearances**
3:1, 40:10,
41:20, 41:21,
43:18, 44:8,
45:7, 46:4,
46:24, 47:12,
77:20
**appeared**
134:6
**appearing**
3:9, 3:20
**applicant**
101:20, 102:11,
104:8

**applicants**
101:19, 101:22,
102:9, 102:10,
103:3
**application**
91:19
**apply**
115:22, 116:7
**applying**
95:21, 116:3
**approach**
123:10
**approaching**
22:19
**appropriate**
38:23, 39:22,
94:23
**appropriateness**
93:15, 95:4
**approve**
92:5
**approved**
95:17
**approximate**
45:6
**approximately**
25:1, 25:3,
25:4, 25:7,
34:14, 35:17,
36:24, 44:6,
45:25, 49:22,
57:24, 59:17,
61:8, 61:18,
68:5
**april**
59:1, 59:13,
134:9, 135:16
**arbitrary**
25:17, 70:17,
71:5, 71:8,
116:12, 116:13
**area**
24:21, 102:20
**areas**
15:18, 127:7,
127:8
**arguably**
38:7

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

139

argue
68:21, 72:1,
72:24, 94:15
argument
97:24
argumentative
66:6
around
24:18, 105:6,
105:21
arrangement
6:9, 6:12,
57:10
arrive
26:1, 38:14,
41:21, 51:16
arriving
63:9
arthritic
81:8
article
122:2
articles
15:17, 15:18,
33:12, 33:15
articulate
97:21
articulated
82:23
ascertain
23:9, 87:17
asked
20:9, 27:22,
39:4, 39:10,
40:8, 62:19,
63:14, 67:1,
75:1, 81:21,
82:4, 96:5,
96:25, 106:23,
118:2, 125:20,
127:25
asking
12:12, 12:14,
64:18, 65:13,
66:17, 74:17,
96:22, 98:18,
98:19
aspect
17:4, 18:10,

49:4, 56:6,
56:7, 56:8,
129:19
aspects
42:11, 85:6,
85:7, 119:25,
128:24
aspercreme
80:21
aspirin
80:17
assertively
92:21
assess
28:25
assessing
52:7, 63:19,
116:5
assets
97:16, 106:7
assistant
5:21
assisted
14:21
associate
103:25
associated
17:3, 40:17,
51:25, 53:20,
91:2, 91:8,
105:12, 106:25,
115:11
associates
110:12
associating
109:10, 109:11
association
28:16, 45:17,
50:24, 86:19,
100:3, 101:13,
105:17, 110:9,
130:8
assumed
72:16
assumption
27:6, 79:9
assumptions
116:24, 117:1

athletes
105:11
atlas
33:9
attached
19:1, 32:23,
58:13, 82:20,
133:7
attempted
21:13
attempting
116:17
attention
15:6, 19:4,
19:9, 30:2,
30:9, 58:9
attorney
9:20, 135:12,
135:14
attorneys
6:2, 39:1,
39:14
attract
20:22
attracted
121:10
attractive
81:3
attributable
43:22, 44:5
attribute
42:23
attributes
121:14
audience
29:23, 77:6,
81:4, 84:11,
85:2, 85:16
audience-wide
120:12
audiences
29:1, 46:9,
89:5, 105:22,
115:5, 115:8
audio
90:22, 91:6,
97:13
audited
117:22

august
59:19
author
65:13
authoritative
38:7
authority
134:5
authorized
135:6
auto
127:22
automatic
43:9
automatically
33:24
automobile
127:17
automobiles
13:4, 127:20
available
110:18, 110:24,
112:17, 124:1,
124:18
avenue
3:4
average
130:1
aware
39:7, 71:4,
71:24, 83:19,
93:15, 111:18,
112:6, 112:8,
113:7, 113:10,
113:12, 126:16,
129:14
away
69:10, 74:9
axis
34:8, 34:12,
35:7

B

back
21:2, 31:19,
31:25, 32:7,
34:16, 35:19,
36:18, 42:24,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

50:23, 68:19,
70:4, 70:12,
74:1, 76:17,
81:19, 108:1
**background**
101:2, 101:17
**backside**
89:1
**backups**
75:7
**bahamas**
126:8
**baked**
79:8
**balance**
14:5
**bank**
53:20
**banking**
53:24
**barstool**
115:13
**base**
23:11, 80:1,
81:6, 109:19,
116:25, 118:18
**based**
9:25, 22:1,
23:1, 23:6,
26:5, 36:19,
40:14, 40:16,
48:8, 57:15,
63:16, 64:21,
64:22, 68:24,
70:20, 71:11,
72:14, 74:15,
74:21, 77:10,
81:1, 96:1,
96:7, 97:9,
104:17, 106:20,
114:5, 114:6,
114:8, 114:16,
115:22, 116:24,
117:7, 119:1,
121:11, 123:22,
125:6, 126:17,
127:4, 128:4,
128:11, 130:13

**bases**
120:6
**basically**
20:17
**basis**
26:17, 28:20,
65:7, 65:11,
66:3, 67:18,
96:5, 115:15,
118:7, 118:9,
121:17, 121:18,
128:20, 130:2
**basketball**
101:14, 102:7
**bates**
60:16
**bay**
102:20
**beach**
102:13
**bear**
31:8, 92:25
**became**
34:19, 37:8,
47:5, 109:10
**because**
10:17, 11:5,
23:11, 29:11,
29:20, 35:15,
35:22, 37:7,
38:5, 38:12,
43:3, 45:3,
46:17, 59:14,
60:15, 61:14,
63:21, 68:18,
68:22, 73:18,
74:11, 81:4,
88:7, 107:5,
115:15, 118:11,
118:15, 123:19
**become**
91:8, 102:21,
130:7
**becoming**
122:7
**before**
2:20, 8:21,
8:25, 81:21,

82:4, 112:19,
134:6
**began**
5:2, 56:15
**begin**
79:10
**beginning**
58:5
**begins**
5:3
**behalf**
3:2, 3:12,
5:16, 5:18,
8:21, 18:3,
52:8, 53:22
**being**
8:3, 8:6,
25:12, 29:14,
38:8, 38:10,
51:6, 51:23,
66:6, 79:9,
86:6, 99:12,
105:7, 111:12,
111:19, 115:16,
115:18, 120:12,
124:16
**being's**
105:25
**belief**
97:13
**believe**
13:17, 13:22,
19:6, 24:14,
31:4, 31:8,
33:13, 34:17,
39:23, 42:4,
42:5, 43:10,
44:6, 46:19,
47:17, 50:8,
53:17, 54:9,
56:22, 57:6,
57:8, 57:10,
72:12, 77:17,
89:12, 89:15,
95:16, 100:7,
100:9, 102:13,
103:22, 103:24,
103:25, 107:5,

112:14, 113:4,
113:14, 113:19,
118:20, 126:5,
126:6, 126:7,
126:12
**beneficiary**
54:24, 89:11
**benefit**
69:21, 87:15,
87:17, 88:3,
107:6, 121:16,
123:23, 129:19
**best**
12:14, 21:10,
41:10, 70:22,
87:19, 87:20,
98:19, 116:25,
122:7, 127:23
**better**
75:5
**between**
8:14, 25:1,
71:18, 72:6,
76:14, 91:18,
91:25, 96:9,
97:17, 98:17,
106:2, 127:15
**beyond**
40:12, 70:20,
72:19, 124:9,
124:12, 124:25,
126:20
**big**
55:22, 87:7,
87:8, 87:10,
87:12, 87:15,
88:13, 121:16,
123:22, 130:4
**bill**
9:12, 23:24,
47:21, 54:17,
58:15, 60:5,
62:6, 65:9,
68:15, 69:11,
69:22, 73:3,
73:7, 73:15,
74:2, 78:21,
79:12, 84:4,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

141

92:22, 94:12,
95:10, 98:6,
98:14, 101:5,
104:22
**binder**
13:18, 31:10,
50:9, 50:12,
50:13
**biscayne**
3:14
**bit**
37:15
**blackballing**
30:14
**blue**
63:4
**blueprint**
48:23
**board**
55:6, 86:20,
127:13
**bona**
125:7
**book**
19:10, 87:7,
87:8, 87:15,
87:16, 87:17,
87:22, 88:3,
88:9, 88:13,
93:1, 121:17,
121:20, 121:22,
121:25, 122:3,
122:6, 122:15,
122:16, 122:17,
122:19, 122:23,
123:12, 123:24,
124:17, 124:24
**books**
47:25, 88:4,
122:4
**boston**
126:10
**both**
10:10, 35:13,
37:6, 84:9,
87:1, 99:3,
99:6, 122:2
**bottom**
20:6, 64:11,

67:19
**bottom-line**
64:23
**boulevard**
3:14
**box**
55:22
**brand**
64:3, 79:25,
84:18, 85:3,
99:19, 100:8,
100:10, 109:23,
110:16, 119:3
**brand's**
109:21
**branded**
90:24
**brands**
46:6, 46:7,
85:25, 91:2,
91:8, 120:19
**break**
69:12, 69:19,
69:21, 107:19
**brennan**
110:10
**brian**
103:25, 104:2
**bridge**
39:16
**bringing**
86:20
**broad**
120:12
**broadcast**
83:21, 91:6,
99:5, 130:2
**broadcasters**
100:14
**broadcasting**
43:4, 85:11,
86:16
**broadcasts**
130:11
**brought**
41:5, 88:24,
120:16
**budgets**
18:14

**build**
11:19, 109:23
**building**
49:12, 63:14,
79:25
**built**
24:18, 69:5,
74:12, 74:14,
84:18, 85:1
**bullet**
17:10, 17:13,
17:16, 17:21,
17:25, 82:15,
83:1, 84:3,
84:6, 84:13,
85:10, 86:4,
86:14, 87:6,
88:15, 88:21,
89:25, 90:17,
90:20, 91:17,
91:22, 92:3,
96:2, 96:19,
97:7, 98:4,
104:10, 119:22,
119:25, 120:1,
121:15, 127:25
**bunch**
86:8
**business**
10:9, 10:10,
10:12, 10:17,
11:6, 11:13,
11:18, 12:17,
13:4, 13:5,
15:2, 15:5,
16:19, 16:25,
17:2, 17:5,
18:12, 18:23,
20:10, 20:17,
20:18, 20:20,
21:15, 22:3,
23:2, 23:6,
23:7, 23:13,
23:14, 30:16,
38:4, 40:17,
41:9, 46:15,
49:12, 53:1,
56:3, 56:7,

58:7, 59:1,
61:2, 63:5,
63:13, 63:16,
63:17, 64:1,
66:21, 68:24,
69:6, 69:8,
71:11, 71:22,
72:2, 72:3,
74:6, 74:22,
74:24, 75:1,
76:10, 76:11,
76:12, 78:12,
79:10, 83:2,
83:7, 83:8,
83:11, 83:22,
85:15, 85:18,
85:19, 86:1,
86:2, 88:16,
89:15, 98:3,
100:17, 107:10,
109:23, 110:4,
114:1, 115:6,
117:12, 119:15,
120:3, 121:8,
125:8, 125:17,
125:21, 127:4,
127:12, 127:15,
127:16, 127:18,
128:1, 129:9,
129:20
**businesses**
10:15, 14:22,
16:1, 16:20,
23:13, 46:10,
49:25, 50:1,
55:5, 56:9,
63:15, 64:7,
69:4, 76:22,
109:17, 117:2,
117:16
**butch**
22:8
**buy**
68:12
**buyer**
20:22, 70:25
**buying**
57:19, 66:20,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

142

120:13

**C**

**cable**
129:22
**calculate**
49:17, 77:7
**calculated**
20:10, 25:9,
45:11, 51:20
**calculating**
24:12, 61:12,
62:10, 63:12,
71:14, 72:16,
79:5
**calculation**
15:18, 18:22,
19:22, 20:8,
20:16, 20:24,
51:24, 53:14,
61:25, 62:3,
62:5, 66:2,
71:16, 72:6,
72:14, 76:21,
86:9, 86:11
**calculations**
21:7, 52:10,
59:7, 70:13,
76:20
**california**
101:12
**callaway**
41:23, 41:25,
42:1, 42:8,
42:12, 42:17,
43:6, 47:4,
47:5, 77:18
**called**
17:7, 32:12,
42:17, 48:22,
79:11, 79:16,
97:19, 102:13,
126:7
**came**
49:6, 49:15,
122:14
**cameras**
129:25

**campaign**
57:18
**campaigns**
62:23
**can't**
9:22, 12:4,
18:20, 50:12,
57:6, 60:13,
73:7, 73:9,
74:13, 84:5,
90:10
**cancel**
124:5, 125:4,
125:18
**cancellations**
109:6
**cancelled**
125:9
**candidly**
10:18
**cannot**
73:17
**capabilities**
105:1
**capability**
23:9
**capacity**
7:21, 11:21,
11:24, 23:4,
28:7, 128:17
**capital**
16:17, 119:14
**care**
120:13
**career**
16:23, 21:8,
48:21, 55:21,
69:5, 105:8,
105:25
**carolina**
103:19
**carried**
43:3, 124:2
**carrier**
80:18
**cary**
103:18
**case**
5:7, 7:15,

7:25, 8:4, 8:7,
8:9, 8:11, 8:16,
9:5, 9:19, 10:2,
10:13, 29:13,
33:8, 33:13,
39:20, 55:4,
63:17, 71:2,
72:11, 77:10,
78:19, 79:16,
89:23, 90:21,
98:16, 98:24,
106:18, 106:21,
107:9, 107:15,
108:14, 109:10,
117:19, 130:23
**cases**
73:2, 100:11
**catalyst**
121:13
**categories**
116:8
**category**
15:7, 17:7,
49:20
**caucasian**
102:3
**cbs**
17:19
**celebrate**
123:1, 123:4
**ceo**
130:7
**certain**
39:15, 72:19,
76:22, 101:1,
125:25
**certainly**
39:23, 61:12,
63:19, 86:13,
90:8, 130:22,
130:23
**certainty**
114:9
**certificate**
4:22, 4:23,
134:2, 135:1
**certify**
134:5, 135:6,

135:11
**challenge**
126:8
**champion**
41:23, 43:13,
43:14, 47:6,
77:19, 102:12
**championship**
123:2
**chance**
50:11
**change**
77:21, 97:14,
105:6
**changed**
126:10
**channel**
43:5, 62:24,
83:17, 83:18,
84:25, 90:23,
93:21, 112:12,
120:11, 120:17
**channels**
58:25, 70:21,
88:10, 115:16
**characterization**
104:6
**characterize**
20:8
**characterized**
122:16
**characterizes**
65:17
**charged**
37:16
**charles**
41:23, 44:19,
44:20, 77:19
**chart**
35:18
**check**
42:24, 76:17
**child**
22:6
**choose**
33:11, 36:20,
39:14
**chose**
23:25, 26:19,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

143

62:25
**chosen**
68:23
**christine**
110:10
**circles**
87:21
**circumstance**
9:16
**circumstances**
77:1
**civil**
1:3
**clarification**
27:25, 52:20,
73:16
**clear**
11:6, 11:7,
11:8, 29:8,
34:19, 34:21,
37:19, 43:7,
47:5, 94:18,
98:21, 107:1
**clearly**
11:10, 18:20,
95:18
**client**
16:24, 18:4,
18:23, 53:12,
53:25, 101:14,
101:16, 102:8,
103:16
**clients**
8:21, 14:9,
18:11, 18:19,
41:2, 47:13,
52:9, 53:23,
56:8, 63:15,
83:11, 101:13,
115:17
**close**
90:3, 90:6,
122:14
**closely**
90:3, 98:2,
121:23
**club**
41:23, 42:17,

43:14, 47:6,
77:19
**coach**
123:8
**coincides**
34:12
**collaboration**
30:8, 49:11,
91:14
**collaborator**
57:4
**colleague**
5:18, 103:16,
104:3
**collected**
25:11
**column**
24:16, 27:17,
28:12, 37:20,
38:15, 40:7,
48:18, 49:18,
50:25, 51:13,
52:13, 54:21,
56:12, 59:7,
61:10, 63:8,
65:7, 67:17,
70:14, 77:20
**columns**
54:23
**com**
3:10, 3:21,
3:22
**come**
20:25, 21:19,
31:19, 42:20,
49:3, 78:8, 83:5
**comes**
33:17, 52:24,
53:22
**coming**
105:4
**comment**
35:5, 37:1,
112:10
**commentary**
34:5
**comments**
34:10, 34:23,

35:1, 35:4,
37:1, 37:3,
37:9, 37:10,
37:11, 109:5,
109:8, 109:9,
111:7, 111:21,
112:18, 112:19
**commercial**
13:7
**commission**
8:12, 51:18,
134:16, 134:17
**commissioner**
104:2, 105:19,
130:6, 130:12,
130:16
**commitment**
121:11
**committee**
113:5, 113:18
**common**
33:23, 80:25,
90:1
**communication**
90:7
**communications**
98:17, 103:7
**companies**
12:20, 16:17,
17:19, 47:2,
47:7, 61:4,
64:2, 68:24,
72:21, 83:25,
84:23, 85:22,
86:23, 91:16,
110:5, 114:25,
119:6, 120:10
**company**
12:22, 16:15,
17:1, 20:19,
43:17, 45:18,
56:14, 57:1,
57:2, 57:22,
58:8, 61:3,
61:16, 63:3,
63:17, 63:19,
63:22, 64:15,
64:22, 65:8,

67:18, 68:25,
74:7, 109:14,
110:12, 110:16,
117:20, 117:24
**company's**
110:6
**comparable**
79:21, 112:21
**compared**
111:7
**comparison**
111:9
**compel**
20:19
**compensated**
8:3, 8:6
**compensation**
8:16, 25:23,
106:20
**competing**
80:1
**competitions**
88:19
**competitive**
68:8, 78:11,
78:12, 79:4,
79:7, 79:18,
79:21, 79:24,
80:2, 80:3,
81:2, 81:10,
114:24
**competitor**
122:20
**competitors**
74:10, 78:10,
78:13, 78:16,
78:23, 80:9,
80:11, 80:14
**compilation**
54:3, 54:4
**compiling**
14:22
**complete**
133:5, 135:9
**completely**
38:5
**complex**
11:12

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

144

component
18:18, 109:21
concept
64:22, 65:25,
77:15
concern
88:25
concerning
103:14
concerted
26:3, 104:16
conclude
35:21, 127:14
concluded
112:1, 131:4,
132:14
conclusion
121:3
conclusions
83:6
condition
83:4, 83:15
conditions
81:8
conduct
28:5, 33:4,
33:11
conducted
28:24, 33:1,
112:22
conducts
33:9
conference
2:2
conferences
15:14
confidence
123:8
confirm
26:20, 34:16
confirmed
121:2
conflict
97:11, 127:3
confused
29:11
confusing
11:11

connected
135:14
connection
123:14
consent
6:11
consequence
36:13, 36:23,
112:9, 126:18
conservative
21:14, 23:12,
23:25, 45:8,
45:12, 45:25,
46:11, 46:22,
56:9, 59:18,
68:22, 72:25,
74:5, 74:24,
116:3, 119:18
conservatively
25:24, 26:4
consider
18:24, 39:21
consideration
28:10, 40:6,
45:7, 51:13,
119:17, 120:25
considered
34:22, 35:3
consistent
68:5, 97:3,
97:4, 119:19
consumed
85:16
consumer
49:5, 69:1,
71:15, 72:20,
74:6, 80:1,
109:19
consumers
59:23
consumption
55:7
contact
132:4
contained
49:17, 59:7,
67:17, 80:17
contemplated
8:18, 101:12

contemplates
72:5
contemporaneous
106:11
contemporaneously
33:5, 34:6
content
17:18, 18:4,
18:6, 33:16,
38:3, 44:23,
46:5, 48:20,
49:14, 91:18,
91:21, 92:7,
92:15, 92:21,
95:22, 96:9,
96:13, 96:14,
97:5
content-driven
18:11
content-related
49:25
context
112:5, 130:24
continue
22:2, 23:3,
23:20, 35:11,
46:13, 56:5,
68:11, 72:17,
74:23, 76:11,
83:10, 119:15,
122:12, 127:21
continued
11:10, 22:13,
22:15, 26:18,
30:11, 37:4,
56:10, 59:12,
59:14, 68:10,
70:21, 77:11,
77:12
continuing
49:10, 70:23,
120:21
continuously
11:24, 16:23
contract
24:23, 26:7,
26:11, 26:21,
27:6, 27:13,

27:15, 42:4,
42:5, 42:9,
44:15, 44:16
contracts
40:11
contractual
85:20, 106:2
contractually
40:23
contrary
87:11
contributing
84:1
control
97:15
controversial
99:20, 100:14
conversation
37:8, 37:17,
98:9, 105:4,
106:22, 122:23
conversations
98:13
convince
18:23
cooling
80:24
copy
30:23, 131:5,
131:22, 132:1,
132:8
core
17:4, 18:18,
23:13, 71:12,
83:9
corporate
127:13
corporations
127:13
correct
7:12, 7:16,
9:1, 20:8,
22:24, 26:12,
27:11, 34:24,
34:25, 35:2,
35:4, 35:5,
35:8, 35:12,
37:24, 38:15,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

145

40:19, 40:20,
41:18, 45:5,
48:15, 48:16,
50:19, 51:1,
51:4, 51:7,
51:8, 52:14,
53:5, 53:9,
53:11, 53:15,
54:5, 55:1,
56:18, 60:4,
60:10, 60:22,
62:1, 62:3,
62:17, 76:19,
77:16, 77:17,
78:2, 78:6,
81:13, 81:17,
81:18, 95:24,
96:3, 107:12,
133:5
**corrections**
133:7
**corresponding**
51:19, 53:19
**cost**
17:3, 57:23,
57:25, 60:24,
63:10, 63:24
**costs**
51:9, 51:13,
51:15, 51:22,
57:11, 62:2,
81:16, 100:11,
107:2
**could**
10:21, 13:21,
21:11, 22:12,
22:13, 23:15,
24:2, 25:14,
28:6, 30:24,
37:25, 40:24,
46:20, 55:19,
55:20, 61:16,
68:13, 68:21,
68:23, 68:25,
69:3, 71:1,
71:22, 77:1,
77:2, 77:5,
77:8, 78:14,

78:16, 95:2,
97:11, 100:4,
105:9, 105:23,
111:1, 111:2,
111:3, 112:21,
113:21, 113:22,
116:18, 116:19,
119:9, 119:11,
119:17, 127:3,
127:16, 127:20
**couldn't**
11:16
**council**
113:4
**counsel**
4:2, 5:13,
5:21, 5:22,
6:11, 7:2,
131:24, 135:12,
135:14
**count**
9:2
**county**
134:4, 135:3
**coupled**
59:25
**course**
10:11, 11:13,
14:8, 14:9,
14:10, 21:8,
21:16, 39:1,
39:12, 39:13,
49:19, 55:21,
58:1, 69:4,
74:19, 82:11,
83:7, 95:22,
117:12, 118:13
**courses**
13:25, 14:2,
14:4
**coursework**
14:11
**court**
1:1, 5:6, 5:23,
6:10, 9:4, 9:9,
14:12, 62:17,
64:20, 64:21,
73:22

**courtroom**
8:25
**cover**
40:10
**covered**
98:2
**covid**
41:6, 46:17,
113:8, 113:13
**cpa**
14:21, 14:22,
14:25
**cream**
20:17, 56:14,
57:9, 59:1,
59:5, 61:20,
79:20, 80:16,
80:23, 80:24
**creams**
79:21
**create**
27:16, 36:11,
69:3, 85:14,
91:14, 96:12,
97:16, 105:10,
105:20, 110:6
**created**
12:23, 42:16,
51:3, 53:9,
93:18, 93:21,
109:24, 113:25,
117:11, 118:20,
119:17
**creating**
20:20, 83:22
**creation**
15:25, 16:3,
95:9
**creators**
18:4
**credibility**
100:11, 120:16
**crisis**
110:7, 110:14,
110:25
**criticism**
109:16
**crocs**
12:22

**cross**
39:16
**cross-examination**
4:8, 108:7
**crucial**
89:18, 89:19,
127:18
**cultivation**
18:16
**cup**
126:10
**current**
85:4
**currently**
47:9, 126:5
**curriculum**
82:20
**curry**
102:8, 102:21
**custom-club-fitt-
ing**
43:17
**customers**
59:21, 59:24
**cut**
76:1
**cutting**
75:24
**cv**
13:22, 15:7,
17:7
**cv--rar**
1:3, 5:8

---
**D**
---
**daily**
115:15
**damage**
15:18, 20:8,
38:21, 38:24,
39:2, 72:14,
86:6, 107:9,
119:8
**damaged**
127:15
**damages**
8:11, 10:1,
19:21, 20:7,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

146

20:23, 21:1,
24:12, 39:8,
40:4, 61:25,
62:11, 62:20,
63:8, 65:18,
65:21, 67:24,
70:13, 76:21,
81:12, 86:8,
86:11, 116:5,
116:9
**data**
24:5, 24:11,
24:15, 34:16,
35:14, 35:19,
36:6, 36:9,
52:10, 52:12,
76:8, 92:7,
99:10, 99:12,
108:19, 110:18,
110:21, 110:22,
110:23, 112:17,
114:5, 114:9,
114:13, 114:16,
115:22, 117:1,
117:9, 117:14,
117:25
**databases**
119:3
**date**
5:9, 11:25,
34:18, 36:3,
59:2, 133:13
**dated**
13:17, 135:16
**david**
104:1, 105:17
**day**
16:23, 34:14,
34:17, 36:16,
36:25, 120:22,
122:1, 131:13,
134:7, 134:9,
135:16
**day-to-day**
83:10
**days**
29:3, 36:3,
37:17, 131:9,

131:14
**de**
11:6
**dealing**
103:12
**deals**
91:15
**deaths**
113:8
**december**
42:6
**decided**
69:9, 118:24
**decision**
98:10, 102:25,
109:14, 127:4
**decisionmaking**
103:14
**decisive**
30:13
**dedicated**
18:7, 85:16,
86:19, 104:16
**deduction**
61:17, 62:2
**deductions**
51:25, 61:14
**deemed**
94:1, 95:23
**deeper**
123:13
**defendant**
1:11, 3:12,
4:13
**defendant's**
18:25, 32:22,
58:12
**define**
18:21
**defined**
11:7, 11:8,
11:10
**definitely**
89:24, 122:17
**degree**
115:7, 115:8,
127:22, 130:25
**degrees**
16:21

**delineating**
96:8
**demand**
46:18, 46:20,
87:21, 109:24
**department**
53:18, 54:10,
118:1
**depend**
126:22
**dependency**
97:7, 97:20,
127:9
**depicted**
34:22
**depiction**
35:12
**deplorable**
38:10, 109:4
**deponent**
4:21, 133:1
**depos**
5:11, 5:25
**deposition**
1:14, 2:1, 5:4,
5:12, 6:3, 6:4,
6:5, 28:1,
108:10, 124:4,
135:7
**deputy**
5:21
**derivative**
80:17
**derived**
24:22
**derogatory**
109:4
**describe**
16:13
**described**
17:6, 22:22,
45:23
**description**
4:14, 26:25
**deserved**
38:10, 113:9
**desirable**
81:8

**desire**
23:3, 46:4
**despite**
104:25
**destroy**
105:8
**destroying**
105:24
**determination**
11:17, 21:24
**determine**
23:1, 68:1,
96:11
**determined**
92:7
**determining**
52:6
**detrimental**
92:19, 93:13,
93:19, 93:24,
94:2, 94:21,
95:2, 95:13,
95:18, 95:23
**develop**
18:11
**developed**
17:18, 46:8,
49:10, 49:14,
58:4, 64:3,
76:5, 115:17
**developing**
10:8
**development**
16:18, 48:23,
57:5, 102:24,
115:23
**developments**
42:15
**devices**
44:14
**dialogue**
105:21
**dick's**
55:24
**died**
113:9
**difference**
76:15, 96:9,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

147

**different**
33:3, 55:20, 109:13, 110:20
**difficult**
18:22, 21:10, 30:15, 35:21, 104:8
**difficulty**
29:13
**dig**
123:13
**digest**
121:23, 121:25, 122:2
**digest's**
121:25
**digital**
55:7, 115:4
**diminished**
38:5, 59:23, 85:7
**diminishing**
88:25
**dineen**
3:24, 5:11, 32:3, 70:7
**direct**
4:7, 7:9, 15:6, 19:4, 29:9, 49:4, 51:9, 58:9, 71:11, 71:14, 83:25, 98:9, 98:12, 114:23, 121:21
**direct-consumer**
48:20, 49:7
**directed**
69:1, 129:5
**directing**
19:8, 103:20
**direction**
36:17, 89:8, 125:3
**directly**
8:8, 9:15, 10:10, 12:18, 83:21, 87:2,

87:11, 121:22
**director**
101:11, 101:17, 101:24, 102:1, 102:2, 102:3, 102:4, 102:12, 103:1, 103:15, 104:5, 105:17, 130:7
**directors**
129:1
**dis-favorable**
28:17
**disappeared**
63:3
**disappears**
37:18
**disappointing**
130:22
**disappointments**
130:5, 130:11
**disciplinary**
111:13, 111:17, 112:1
**discipline**
111:22
**disclose**
111:16
**disclosure**
10:24, 62:17, 64:13, 65:23, 67:16, 67:17, 67:20, 67:22, 76:19, 77:14, 77:18, 78:6, 80:5
**disclosures**
4:16, 13:16, 19:5, 19:7, 19:12, 81:20, 81:25
**discount**
39:3, 39:15, 41:16
**discourse**
36:13, 36:18, 37:13, 76:23, 76:25, 105:6

**discovery**
17:20
**discrepancy**
117:22
**discretionary**
109:21
**discriminated**
104:4
**discuss**
64:9
**discussed**
8:13, 8:17, 9:23, 105:18, 107:16, 124:3
**discussing**
37:9, 82:12
**discussion**
21:21, 37:15
**discussions**
55:23
**disjunctive**
94:6, 94:22
**disk**
5:3
**dismissal**
10:2, 28:16, 29:4, 29:21, 41:10, 49:5, 85:9
**dismissed**
38:11
**displayed**
37:22
**distance**
44:14
**distinct**
96:13, 96:15
**distinction**
91:18
**distribution**
87:16
**distributors**
87:18, 88:3, 121:17
**district**
1:1, 1:2, 5:6, 5:7
**divers**
101:2

**diverse**
100:24, 101:17, 101:19
**document**
7:24, 19:21, 20:23, 30:19, 31:2, 31:19, 32:10, 32:13, 50:15, 53:3, 53:7, 53:8, 58:20, 58:23, 59:6, 60:16, 60:20, 64:19, 64:20, 64:24, 65:2, 65:6, 65:10, 65:14, 65:16, 65:17, 65:19, 66:5, 66:15, 66:16, 70:12, 71:16, 81:23, 82:23, 94:4, 95:9
**documentation**
33:8
**documents**
15:3, 27:14, 27:16, 49:16, 50:5, 53:14, 54:3, 83:12, 87:16, 97:21, 98:15, 98:18, 98:23, 117:11, 117:15, 117:19
**doing**
10:13, 15:5, 17:11, 62:15, 73:19, 101:8, 129:15
**dollar**
70:19
**dollars**
51:21, 51:22, 57:22, 68:7, 70:18, 72:17, 114:22, 119:7
**done**
16:13, 23:23, 33:5, 33:6,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

148

61:24, 79:12,
79:14, 101:5,
101:7, 104:22,
106:15, 109:23
**double-check**
25:10
**down**
22:7, 93:13
**dozens**
80:15, 110:20
**drafting**
82:7
**drive**
20:18, 46:9,
61:15, 110:4,
118:15
**driven**
61:4, 119:20
**driver**
76:10, 76:11
**driving**
118:16
**drove**
87:21, 102:25,
123:25
**duly**
7:7, 134:7
**during**
46:17, 54:25,
55:9, 80:4,
95:22, 112:11,
112:13, 125:23
**duval**
134:4, 135:3
**dynamic**
97:12, 97:17
**dynamics**
29:20, 98:8

**E**

**e-commerce**
20:15, 20:16,
56:11, 56:12,
58:25, 59:7,
61:11, 62:3,
62:13, 63:13,
65:7, 67:17,
70:13

**each**
53:20, 96:13,
96:14, 119:25
**earlier**
113:20
**early**
21:4, 25:13,
108:9, 122:25
**earn**
25:8
**earned**
25:22, 40:1
**earning**
28:6
**ears**
120:14
**easily**
23:15, 24:2,
24:5, 24:6, 80:1
**ebb**
126:4
**econometrics**
14:2, 14:16,
15:22
**economist**
66:19, 75:13
**eddie**
22:14
**educate**
105:21
**education**
13:24
**effect**
80:24, 123:1
**effective**
57:23, 58:4,
85:18
**efficiency**
71:13
**efficient**
115:1
**effort**
71:15, 102:19,
104:16, 104:24,
122:20, 128:17
**efforts**
48:20, 83:25,
86:19, 98:7,

99:19, 100:1,
100:18, 102:23,
104:11, 128:2,
128:7, 128:15
**eighth**
13:21
**either**
29:12, 81:17
**elected**
25:17, 107:14,
119:13
**element**
83:9, 118:16,
120:20, 121:8
**elements**
122:12
**eligibility**
91:1
**eliminated**
110:3
**elin**
122:23, 122:25
**else**
52:24, 89:25,
90:9, 90:12,
91:10, 105:3
**elucidated**
82:19
**emails**
98:23
**embarrassing**
99:23, 99:24
**emotion**
37:17
**empirically**
34:4
**employ**
68:1
**employability**
28:20
**employable**
37:23, 38:1
**employed**
21:24, 22:21,
22:25, 29:14,
45:22, 70:15,
77:15, 87:2
**employee**
7:21, 21:19,

135:12, 135:13
**encompass**
48:18
**encompasses**
48:3
**end**
35:11, 36:7
**endemic**
120:18
**ending**
29:7
**endorse**
45:15
**endorsement**
40:9, 41:20,
42:1, 43:3,
43:12, 43:16,
44:12, 44:17,
44:22, 46:12,
47:9, 48:6,
48:23, 85:21,
121:9
**endorsement-rela-
ted**
46:2
**endorsements**
44:7, 45:13,
46:1, 46:24,
48:10, 77:20,
85:22, 107:11
**ends**
36:6
**energy**
87:4
**engage**
23:22, 38:17,
76:25
**engaged**
7:15, 9:18
**engagement**
7:18, 7:19,
7:23, 9:24,
14:18
**engages**
7:24
**enough**
102:1
**ensure**
93:10, 94:18,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

149

**entered**
100:2, 101:16
**entered**
34:3
**enterprise**
10:9, 10:11,
12:18, 63:13
**enterprises**
10:12, 69:6,
114:23
**entertainment**
84:25
**enthusiasm**
119:2
**entire**
18:1, 19:7,
49:4, 50:24,
94:11, 94:13
**entirely**
57:2
**entities**
52:21, 86:25
**entitled**
65:14, 66:7
**entitlement**
107:13
**entity**
52:17, 56:18
**environment**
79:4, 79:18,
80:3, 80:8
**epidermis**
80:19
**equality**
100:19, 128:3,
128:9
**equatable**
109:4
**equipment**
41:6, 120:19
**errata**
133:7
**error**
117:24
**escrow**
53:12
**esquire**
3:8, 3:18, 3:19
**essential**
27:9, 121:7

**essentially**
23:12, 35:25,
36:13, 45:19,
49:6, 49:22,
57:21
**establish**
22:21, 102:20
**established**
80:2, 104:9
**establishing**
14:5, 20:25,
24:16, 69:3
**establishment**
103:4
**estate**
13:3
**estimate**
12:13, 41:13,
43:1, 45:13,
46:11, 108:18
**estimates**
21:10, 46:22,
55:2
**estimation**
108:12
**et**
5:5
**ethnic**
100:19, 128:3,
128:9
**etran**
131:18
**evaluation**
28:5
**even**
36:9, 71:3,
81:15, 89:16,
110:1, 120:24,
122:15
**event**
33:6, 34:13,
45:14, 101:11,
102:12, 102:14,
102:20, 102:21,
102:22, 102:24,
103:4, 103:5,
103:18, 106:19,
112:13, 123:3,

126:9, 126:10,
126:11, 130:1,
130:2
**events**
46:18, 89:10,
89:11, 89:13,
91:14, 123:5,
126:2, 126:3,
126:6, 126:7,
129:22, 129:24,
129:25
**ever**
8:20, 14:12,
113:21, 121:2,
126:14
**every**
16:22, 16:24,
17:13, 18:10,
20:14, 23:18,
49:4, 71:10,
72:22, 74:14,
84:22, 97:23
**everybody**
69:22
**everyday**
103:12
**everything**
18:19, 68:12,
108:16, 109:22
**everywhere**
123:25, 124:18
**evidenced**
38:1, 64:5,
110:7
**exact**
12:9, 33:7,
72:2, 116:18
**exactly**
9:22, 12:4,
40:24, 55:2,
59:2, 77:2, 97:3
**exaggerates**
81:7
**examination**
4:7, 4:9, 4:10,
7:9, 129:6,
129:12
**examined**
7:7, 133:4

**example**
12:19, 12:22,
22:9, 47:4,
51:18, 52:23,
54:19, 59:12,
80:21, 93:20,
98:2, 101:10,
102:5, 111:6,
119:13, 121:23,
122:22, 124:4
**examples**
13:2, 22:16,
101:4
**exceed**
12:3
**except**
20:14
**excerpt**
121:24
**exclusively**
56:13, 119:20
**excuse**
5:22, 67:4,
67:8, 103:16
**execute**
46:4, 121:24
**execution**
18:13
**executive**
92:9, 98:13,
100:24, 105:16,
129:2, 130:7
**executives**
86:19, 96:10,
98:9, 99:15,
103:5, 104:1,
121:6, 128:24
**exercise**
38:17, 43:9
**exhaustive**
15:10
**exhaustively**
117:23
**exhibit**
4:14, 18:25,
19:6, 19:8,
19:12, 30:21,
32:21, 32:22,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

150

37:22, 53:5,
58:11, 58:12,
60:3, 60:9,
60:13, 60:14,
81:19, 81:24
**exhibits**
4:13, 44:16,
82:20
**existed**
83:20, 111:5
**existing**
26:5, 59:21,
59:24
**expect**
11:14
**expected**
25:7, 130:25
**expedite**
131:12
**expedited**
131:5, 131:6,
131:8, 131:10,
132:5
**experience**
10:1, 17:6,
17:7, 17:10,
23:7, 27:21,
28:14, 40:15,
72:20, 96:15,
101:21, 101:25,
102:2, 104:7,
114:6, 114:17,
117:1, 117:8,
123:23, 125:6,
126:17, 128:4,
128:11
**experienced**
41:3, 46:20
**expert**
4:15, 7:15,
7:25, 8:2, 8:4,
8:7, 8:9, 8:20,
9:1, 9:3, 9:5,
9:7, 9:18, 9:21,
10:5, 13:16,
19:5, 19:7,
19:12, 21:11,
24:24, 37:21,

39:19, 48:9,
66:3, 66:12,
81:24, 82:18,
87:1, 90:20,
108:11, 108:20,
114:19, 115:21,
118:25, 119:23,
121:19, 122:7,
124:13, 124:21,
128:5, 128:16,
128:20, 130:13
**expertise**
9:8, 10:9,
10:14, 10:18,
38:3, 117:1,
123:23, 125:7,
125:21, 126:17,
126:21
**experts**
64:9
**expiration**
42:10
**expire**
42:1, 45:17
**expired**
42:5, 43:23,
44:25
**expires**
134:17
**explain**
17:25, 70:14,
113:22
**exponential**
72:19
**express**
78:19, 84:2,
84:15, 89:23,
92:3, 97:19,
99:9, 99:22,
100:21, 104:13
**expressed**
28:11, 86:18,
87:2, 92:10
**expression**
96:18
**extensions**
18:17
**extensive**
49:13

**extrapolate**
71:6
**extremely**
110:8

**F**

**f**
93:8
**face**
10:20, 79:23,
100:24
**facebook**
17:20, 33:15
**facilitate**
22:3
**fact**
18:19, 25:20,
28:3, 34:5,
38:1, 52:8,
59:20, 87:11,
114:18, 120:21,
130:9
**factor**
28:18, 63:10,
89:2
**factored**
57:11
**factoring**
89:4
**factors**
97:10, 97:16
**facts**
85:6, 107:4,
109:12, 114:9
**factual**
26:16, 100:6,
124:22
**factually**
37:10
**faggot**
111:14
**fair**
24:8, 27:4,
65:5, 90:6,
129:16
**fairly**
45:8, 61:22,
74:5, 85:17,

**106:11, 107:1,**
122:15
**fallacy**
117:5
**familiar**
52:9, 83:8,
114:18
**far**
50:2, 109:8
**fashion**
104:25
**faster**
71:3
**favorable**
122:10
**favored**
57:20, 68:18
**fay**
105:18
**february**
26:8, 26:21,
59:3
**fedex**
126:10
**fee**
8:12, 107:14
**feedback**
29:5
**feel**
75:5
**fees**
51:22, 106:24
**fell**
102:22, 102:23
**felt**
21:6
**few**
36:3, 108:6,
108:23, 109:2,
120:9, 129:22
**fide**
125:7
**field**
15:22
**fierro**
2:21
**figure**
12:9, 45:23,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

151

76:16
**figures**
20:21, 21:2,
23:11, 51:18
**filed**
10:24, 13:16,
62:17, 64:20,
81:22, 82:5,
106:23, 108:14
**filming**
51:22
**filter**
33:10
**final**
34:18
**finally**
119:25
**financial**
14:5, 15:3,
16:19, 17:14,
19:21, 20:23,
61:25, 70:13,
72:14, 83:4,
83:15, 86:5,
86:8, 86:11,
87:15, 87:17,
88:2, 113:21,
113:25, 119:2,
120:5, 121:16
**financially**
99:4, 99:6,
135:15
**find**
12:9, 31:4,
31:7, 31:14,
31:19
**fine**
123:16, 131:15,
131:19
**fined**
111:19
**finish**
16:8, 16:10,
73:15, 124:11
**firms**
47:13
**first**
7:7, 11:20,

16:15, 36:23,
60:2, 83:1,
84:6, 91:21,
95:15, 120:18,
122:9
**firsthand**
100:22, 111:10,
128:23
**flattening**
118:22
**floor**
3:5
**florida**
1:2, 2:22,
3:16, 5:7, 6:9,
134:3, 134:15,
135:2, 135:5
**flow**
13:8, 56:2
**flowed**
53:2, 126:4
**flying**
122:24
**focus**
10:21, 20:20,
41:14, 41:17,
46:1
**focused**
23:14
**foley**
3:13
**follow**
8:24, 69:16,
69:19, 105:13
**followed**
61:21
**following**
5:2, 31:22,
31:23, 42:18,
49:5, 59:22,
70:1, 70:2,
82:20, 86:6,
107:23, 107:24,
111:21
**follows**
7:8
**followup**
53:19

**forced**
99:7
**forecast**
11:9, 41:11
**forecasted**
57:16
**forecasts**
113:21
**foregoing**
133:4
**forensic**
13:25, 14:13,
15:19
**forgets**
29:23
**forgives**
29:23
**form**
17:22, 53:16,
81:12, 95:5,
97:1, 114:11,
114:15, 114:20,
116:1, 116:15,
125:10, 130:20
**forma**
116:19
**former**
105:16
**formerly**
102:11
**forms**
30:3, 116:20
**formulate**
59:6, 72:13
**formulating**
10:4, 10:23,
11:2, 28:11
**formulation**
56:21, 57:5,
81:1
**forth**
25:16, 52:13,
61:25, 102:20,
105:14
**forward**
43:9, 48:12,
55:11
**found**
117:10

**foundation**
89:10, 89:12,
89:14, 111:24,
125:11, 126:1,
126:5, 126:13
**founded**
56:14, 57:1
**four**
9:22, 49:23,
89:16
**fourth**
67:5
**fpr**
1:24, 2:21,
134:14, 135:22
**fraction**
55:12, 55:15,
129:24
**frankly**
21:14, 30:13,
34:3
**front**
13:19, 30:20,
32:18, 50:9,
58:18, 76:16,
93:6
**functioned**
80:21
**fund**
16:17
**fundamental**
79:8
**fundamentally**
109:20
**funded**
57:2
**funnel**
118:17
**further**
6:6, 108:3,
118:23, 129:3,
131:2, 132:10,
135:11
**future**
29:14, 39:8,
89:8

**G**

**galaxy**
55:24

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

152

gambling
74:15
game
84:22, 89:9
gary
22:11
gender
100:19, 128:2,
128:8
general
5:21, 5:22,
10:6, 10:25,
27:20, 28:14,
81:7
generally
37:1, 52:16,
71:4, 81:5,
130:3
generate
11:15, 40:1,
40:3, 45:9,
46:13, 52:21,
55:14, 75:21,
76:6, 76:14,
119:9
generated
27:14, 45:8,
53:8, 57:16,
59:4, 82:11
generating
39:12, 47:14,
50:2, 50:3
gentleman
101:23, 101:25
gentleman's
102:16
genuinely
105:6
getting
47:4, 65:12,
129:16
gg
134:16
giant
74:15
ginsberg
3:8, 4:8, 4:10,
5:15, 6:16,

9:12, 9:20,
12:12, 16:8,
16:10, 17:22,
19:15, 21:6,
23:23, 27:19,
27:24, 30:24,
31:11, 31:15,
32:5, 47:19,
47:21, 53:16,
54:11, 54:17,
58:15, 60:5,
62:6, 62:18,
64:24, 65:9,
65:15, 65:19,
66:1, 66:9,
66:12, 66:18,
66:25, 67:4,
67:8, 68:15,
69:11, 69:14,
69:18, 73:3,
73:7, 73:14,
75:15, 78:20,
78:24, 79:12,
82:11, 84:4,
92:20, 94:3,
94:8, 94:11,
94:15, 95:5,
95:8, 96:4,
96:20, 96:23,
97:1, 98:5,
98:14, 98:21,
99:1, 101:5,
101:9, 104:22,
107:20, 108:6,
108:8, 112:3,
113:16, 114:12,
115:20, 116:10,
117:6, 123:17,
123:21, 124:8,
124:10, 124:14,
124:20, 125:5,
125:13, 125:15,
126:25, 129:3,
129:13, 131:2,
131:25, 132:3,
132:7, 132:9,
132:12
give
6:22, 28:10,

40:6, 52:21,
101:4, 108:18
given
28:17, 29:22,
30:6, 36:20,
44:1, 54:18,
61:20, 63:4,
66:4, 89:13,
101:2, 115:13,
126:14, 133:6
gives
90:25
global
17:19, 84:18,
89:7, 127:13
globally
38:13
go
13:21, 17:16,
28:22, 31:13,
31:18, 32:6,
34:16, 35:19,
40:9, 42:24,
46:4, 48:17,
54:17, 58:10,
70:10, 72:22,
75:3, 76:17,
81:9, 81:19,
82:9, 82:13,
82:21, 82:22,
89:23, 92:24,
93:1, 93:12,
94:16, 98:15,
101:9, 120:3,
123:20
go-forward
28:20
goal
61:15, 63:17,
118:15
goals
63:16
god
6:24
going
21:2, 26:11,
31:20, 43:8,
47:6, 48:5,

48:12, 50:23,
54:24, 55:11,
69:24, 70:12,
76:3, 76:11,
76:13, 86:8,
106:10, 107:21,
116:21, 117:4,
123:18, 131:5,
132:11
golf
13:6, 18:4,
18:7, 22:14,
22:17, 29:1,
30:9, 30:15,
38:3, 38:8,
41:4, 41:6,
41:8, 41:24,
43:20, 44:9,
44:13, 46:9,
50:17, 51:19,
52:23, 55:6,
55:8, 55:24,
77:19, 81:3,
81:6, 83:4,
83:9, 83:20,
84:14, 84:17,
84:20, 84:24,
84:25, 85:3,
85:5, 85:17,
86:23, 86:25,
87:21, 88:23,
89:1, 89:3,
89:4, 89:5,
89:9, 91:3,
91:5, 91:9,
98:8, 103:18,
104:20, 105:6,
105:7, 105:11,
105:12, 105:17,
105:21, 108:25,
112:12, 115:24,
120:9, 120:17,
120:19, 121:23,
121:25, 122:2,
122:4, 122:8,
123:2, 123:10,
128:25, 130:8
golf-specific
120:23

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

153

golfer
88:16
gone
16:20, 86:10
gonna
7:2, 13:13,
19:8, 21:12,
73:10, 82:23,
94:17, 104:7,
118:16, 124:6,
127:9, 132:2,
132:4
good
7:11, 69:20
goods
55:24, 60:25,
63:10, 74:6,
81:16
gospel
38:11
gotta
73:3
gotten
57:17, 66:9
grace
91:2
graduate
16:16
graft
34:22
granted
13:3
graph
35:7, 35:11,
36:5, 36:7,
36:15
gray
35:1
great
52:23, 122:11,
122:13, 130:11
greater
40:22, 41:12
greatest
84:21
green
34:22, 35:13
greenstein
26:14, 26:20,

105:15, 121:5
greenstein's
105:10
gross
12:3, 20:13,
48:14, 51:21,
58:24, 60:3,
60:9, 61:9,
65:7, 65:12,
70:15, 71:6,
72:7
group
38:7, 45:18,
56:23
grow
23:21, 24:3,
56:5, 59:12,
59:14, 61:2,
63:2, 74:24,
104:16, 119:15
growing
23:15, 46:2,
56:16, 70:25,
84:10, 119:3
grown
23:18
growth
23:14, 23:16,
25:17, 26:6,
41:4, 55:3,
55:6, 61:5,
61:15, 61:21,
61:22, 70:19,
70:21, 71:2,
72:19, 74:5,
75:6, 76:9,
76:10, 76:12,
84:1, 88:23,
115:10, 116:3,
116:7, 119:4,
119:12, 119:14,
121:4, 129:21
guaranteed
68:18
guaranties
25:5
guess
131:3

guest
15:8
guidelines
94:3
guys
39:16, 73:14

**H**
half
78:15
halfway
35:17
halt
49:6
hand
6:20, 106:12
handful
47:11, 80:20
handled
110:15
hands
68:13, 97:14
haney
1:5, 5:5, 8:10,
8:15, 11:1,
11:21, 11:23,
12:7, 14:18,
15:5, 19:21,
20:15, 21:4,
21:5, 22:4,
22:18, 23:13,
24:23, 25:2,
26:14, 28:6,
28:14, 28:17,
29:1, 29:13,
30:6, 30:15,
33:17, 34:3,
34:13, 36:17,
37:22, 38:9,
39:11, 39:14,
39:25, 41:21,
43:4, 44:22,
45:15, 45:17,
46:1, 48:9,
48:10, 48:21,
48:22, 48:23,
49:1, 49:9,
50:3, 50:15,

51:10, 51:12,
52:1, 52:8,
53:5, 54:8,
54:24, 55:25,
56:4, 56:14,
57:8, 60:17,
61:6, 61:13,
63:13, 63:25,
74:4, 74:22,
75:4, 83:25,
84:16, 85:1,
86:3, 86:6,
86:19, 87:4,
91:5, 99:5,
105:5, 106:19,
106:23, 107:5,
107:8, 108:22,
109:3, 109:15,
109:20, 115:7,
118:10, 120:4,
120:8, 120:15,
120:25, 121:3,
121:7, 130:24
haney's
9:20, 10:9,
12:3, 12:17,
20:10, 20:18,
21:15, 22:1,
23:2, 25:21,
30:3, 37:9,
39:1, 41:9,
43:17, 43:20,
45:3, 46:16,
50:23, 55:5,
55:21, 56:6,
56:7, 56:24,
58:25, 61:1,
61:14, 72:2,
74:7, 79:23,
80:16, 80:22,
83:3, 83:14,
83:19, 84:8,
84:13, 85:4,
85:11, 86:15,
87:7, 87:15,
88:8, 95:15,
99:8, 99:12,
106:12, 111:10,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

154

115:22, 118:4,
120:5, 121:12,
121:20
**hang**
31:12
**hank**
1:5, 9:20,
10:9, 12:17,
15:5, 19:21,
21:15, 22:1,
22:18, 23:2,
25:1, 29:7,
30:15, 33:17,
34:3, 36:17,
41:9, 43:20,
43:22, 48:10,
56:14, 95:15,
109:11, 109:22,
110:10, 110:13,
111:9, 115:7,
119:9, 120:25,
121:7
**hank's**
10:1, 10:2,
10:10, 10:16,
27:1, 37:3,
42:21, 72:15,
99:16, 122:3
**happen**
33:25, 34:1
**happened**
34:13, 55:8,
112:11, 123:18
**happening**
115:10
**happens**
114:4
**happy**
47:7, 76:24,
79:19
**harmon**
22:9
**harmonious**
127:24
**harvey**
22:15
**haskins**
102:10

**he'll**
55:14
**head**
42:3, 48:1,
57:7, 102:17
**headlines**
123:11
**healthy**
22:5
**hear**
84:5, 90:10,
90:11, 114:14
**hearing**
123:15
**hearsay**
125:11
**heavily**
37:16
**held**
2:1, 117:20
**help**
6:23, 46:9,
104:16, 105:24
**helped**
57:4
**helping**
18:11
**here**
5:3, 10:19,
17:6, 17:13,
18:2, 30:22,
34:21, 37:22,
39:24, 41:13,
47:20, 48:3,
48:13, 49:17,
50:17, 52:13,
54:7, 54:8,
57:12, 61:11,
67:24, 70:7,
72:14, 74:3,
81:11, 105:8,
106:16, 107:4,
107:6, 119:18,
131:25
**hereby**
133:3
**hereof**
19:2, 32:24,

58:14
**hereto**
19:2, 32:24,
58:14
**hero**
126:8
**hesitates**
101:6
**hey**
69:11, 98:14
**high**
34:17, 115:7,
115:8, 117:21,
119:4, 127:22
**high-profile**
18:3, 22:9,
22:14, 22:17,
83:10, 121:10
**higher**
130:25
**highest**
12:7
**highlighted**
21:1
**highly**
17:18, 85:18,
99:19, 100:13
**highs**
41:7, 41:8
**himself**
49:13
**hire**
104:7
**hiring**
100:19, 103:6,
128:3, 128:6,
128:12
**historic**
11:7, 24:5,
24:11, 24:15
**historical**
40:15, 40:16,
49:19, 50:6,
50:16, 88:23,
114:16, 117:9
**historically**
89:19
**history**
84:18, 84:22,

84:25, 117:2,
122:2
**hit**
87:7, 87:8,
87:15
**hm**
32:5
**hold**
31:1
**holdings**
12:21
**home**
122:24
**horizon**
21:5
**horizontal**
35:7
**host**
102:21
**hosted**
89:10
**hostile**
127:14
**hot**
80:25
**hour**
31:17
**hours**
11:4, 20:5,
37:4, 108:11,
108:13, 108:16,
108:21
**house**
4:2, 74:15
**however**
74:21
**huge**
77:6
**human**
105:25
**hundreds**
16:20, 80:15,
108:13, 119:6,
119:7

**I**

**icy**
80:25

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

155

idea
18:13, 55:16,
69:20
identification
19:1, 32:23,
58:13
identified
101:18, 119:14
identify
5:13, 104:8
iheart
17:19, 38:2
ii
1:13
illustrated
29:24
imagine
90:5
imagining
90:5
immediate
86:5
immediately
87:23, 125:3
impact
10:15, 28:15,
28:18, 28:23,
29:9, 30:11,
38:5, 74:4,
83:3, 83:14,
84:8, 99:3,
99:6, 111:3,
112:16, 113:14,
120:4, 127:3,
127:6, 127:16,
127:20
impacted
97:11, 122:12
implore
64:9
import
66:14
importance
88:22
important
11:16
impossible
18:23, 74:12,

74:13
inability
107:11
inc
1:10, 4:2, 5:5,
7:20, 106:17
incident
105:5
incidentally
123:14
incidents
99:24
include
33:12, 33:13,
39:9, 61:14,
75:22
included
28:3, 33:14,
34:11, 43:17,
43:19, 43:21,
80:23, 85:20,
88:9, 124:18
includes
18:13, 42:15,
81:5
including
17:19, 29:25,
33:14, 51:3,
55:5, 88:17,
88:18, 100:18,
105:15, 105:16,
124:1, 128:2
income
24:22, 25:7,
26:4, 39:11,
40:1, 40:2,
40:3, 42:25,
47:18, 48:6,
50:3, 52:22,
61:13, 62:11
income-producing
23:9
incoming
53:10
inconsistent
93:14, 94:22,
95:3
incorporate
76:5, 92:18,

93:11, 94:19
increase
25:15, 41:5,
46:16, 55:7,
64:6, 68:2,
68:4, 68:10,
70:17, 70:23,
71:5, 71:6,
71:9, 71:17,
71:19, 72:5,
74:8, 75:18,
75:20, 76:6,
76:7, 77:11,
77:12, 118:4,
118:8, 118:9,
118:21, 119:19
increased
46:21, 68:7,
76:14, 77:7,
77:15, 120:17
increasing
57:17, 70:15,
72:7
incredible
57:19, 68:17,
104:25, 112:20
incredibly
62:22, 69:2,
69:7, 69:8,
78:12, 100:10,
114:24, 127:11
increment
38:20, 107:9
incremental
26:6, 40:25,
41:3, 43:22,
46:16, 57:16,
59:25, 68:4,
85:14, 91:15,
118:21, 121:9,
129:18
increments
67:25
incur
39:5, 51:11,
106:24, 107:2
indeed
87:13

independent
9:7
index
4:5
indicate
6:13
indicated
67:16
indicates
101:7
indirectly
26:23, 107:7
individual
102:3
individuals
101:2, 103:24,
105:15
industries
115:24
industry
66:20, 83:5,
83:9, 84:14,
84:20, 85:5,
86:22, 86:23,
89:3, 91:17,
96:8, 97:4,
99:21, 104:18,
108:25, 122:8,
125:7, 130:14
industry-broad
88:25
industry-related
97:24
infegy
33:8
infinite
115:4, 116:20
inflammation
80:19
influence
46:8, 89:20,
91:4, 91:12,
96:14, 127:22
influenced
77:2
influential
18:6, 38:7,
38:12, 89:7,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

156

127:12
**influx**
59:22
**inform**
59:9, 59:11
**information**
14:24, 72:2,
76:18, 83:16,
103:2, 103:13
**informed**
52:10, 52:12
**infrastructure**
63:23
**initial**
36:14, 61:21,
118:22
**initially**
61:1, 124:1
**initiatives**
15:2, 16:25,
18:16, 18:17,
89:18, 89:20,
91:5
**injected**
95:22
**inquired**
9:21
**insensitive**
113:13
**inside**
122:9
**insight**
122:11
**instagram**
33:14
**instance**
35:22, 36:24,
98:23, 110:24,
123:24, 128:7
**instances**
15:12, 34:10,
49:11, 49:12,
49:24, 55:4,
99:23, 99:24,
100:12, 100:23,
111:5, 119:5
**instantly**
120:16, 124:2

**instead**
105:24, 124:16
**institutionalized**
100:25
**instructed**
124:5
**instruction**
84:20
**instructor**
22:15
**instructors**
50:2, 84:17,
84:21
**integrate**
85:18
**integrated**
77:8, 121:8
**integration**
127:19
**intended**
42:19
**intent**
61:2, 68:11,
75:6
**intention**
22:6, 29:7,
74:23
**intentionally**
101:8
**interacting**
103:20, 103:23,
104:1
**interest**
56:24, 99:15,
106:18
**interested**
135:15
**interesting**
97:17
**interests**
24:7
**interfere**
91:20
**interference**
39:6
**internal**
53:25
**international**
15:13, 83:24

**interpret**
94:8
**interpretation**
95:11, 96:7
**interrupt**
73:7, 73:15,
73:18
**interrupting**
68:16, 73:4
**intimately**
83:8
**introduce**
25:17, 63:23
**introduced**
95:14
**inventory**
125:18
**investing**
56:16
**investment**
68:6, 70:24,
71:10, 76:22,
87:4, 118:12,
129:23, 129:24
**investments**
91:1, 99:11
**investors**
119:14
**involve**
14:19, 17:11,
100:14
**involved**
15:24, 16:3,
16:4, 16:18,
48:21, 51:9,
83:22, 88:18,
89:8, 89:13,
103:3, 121:22,
126:5, 126:7,
126:9, 126:13
**involvement**
83:19, 91:6,
126:2, 128:23
**involving**
14:13, 91:7
**irrational**
110:8
**issue**
17:11, 37:12,

131:1
**issued**
52:17
**issues**
106:12
**item**
20:14, 53:21
**items**
88:9
**itself**
64:25, 65:10,
65:16, 66:5,
66:15, 110:3
**iv**
93:13, 94:21

**J**

**january**
30:5, 111:7
**jay**
110:25
**jeff**
103:17
**jeremy**
1:15, 2:1, 4:6,
5:4, 7:6, 47:22,
101:9, 133:3,
133:13, 134:6,
135:7
**jerry**
105:16
**job**
1:22, 17:6,
26:15
**jock**
93:20
**jodi**
5:11, 32:3,
32:5, 70:7
**jodie**
3:24
**johnson**
64:1, 64:2
**joined**
120:15
**joining**
83:2, 120:4,
120:8, 120:25,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

121:12
**journal**
98:3
**july**
32:15, 35:8,
59:19
**june**
34:15, 34:17,
59:19
**jury**
39:20, 39:23
**justification**
79:9
**justify**
71:18
**justin**
29:25, 111:7,
111:9, 111:11

**K**

**keep**
76:2, 112:6,
123:18
**kelly**
3:19, 5:18,
112:9
**kevin**
112:25
**key**
118:16
**kind**
14:24, 23:8,
24:15, 28:5,
47:14, 62:5,
74:12, 114:2,
123:3
**kisner**
112:25, 113:7,
113:15, 113:17
**kleiber**
103:17
**kmilliron@foley**
3:22
**knew**
77:10
**knorr**
2:20
**knorr-fierro**
1:24, 5:24,

134:14, 135:4,
135:22
**know**
9:9, 12:9,
21:7, 23:6,
30:4, 33:10,
34:6, 36:3,
36:8, 37:1,
37:8, 37:14,
45:14, 46:1,
52:3, 54:18,
60:15, 65:20,
65:23, 66:20,
67:15, 70:21,
75:24, 77:18,
80:1, 81:5,
88:1, 88:6,
89:9, 89:20,
90:2, 92:16,
102:16, 102:25,
103:10, 103:13,
103:23, 104:12,
106:9, 109:20,
110:12, 112:25,
116:4, 118:22,
119:3, 123:3,
123:10, 129:20
**knowledge**
24:13, 58:23,
90:1, 100:22,
103:6, 104:21,
106:1, 111:10,
120:7, 124:22,
129:8, 130:14,
130:25
**known**
56:18, 80:18
**knows**
89:17

**L**

**lab**
4:18, 57:10,
58:21
**labeled**
29:18, 48:11,
108:23
**labeling**
38:6, 38:9,

48:11, 85:8
**laboratory**
56:22
**labs**
56:18, 56:20,
56:25, 80:8,
107:10
**lack**
37:11, 83:19,
99:13, 99:15,
100:25, 104:24,
105:4, 128:17,
130:15
**ladies**
130:17
**landscape**
15:13, 38:4,
78:11, 78:12,
79:24, 80:11,
81:2, 81:10,
100:1, 127:12,
129:2
**lane**
53:21
**language**
97:3
**lardner**
3:13
**large**
79:25, 84:19
**larger**
20:19, 30:2,
49:21, 116:9
**largest**
20:21
**last**
19:4, 19:9,
19:10, 19:11,
19:18, 19:20,
41:4, 47:12,
55:8, 73:23,
112:20, 127:25
**late**
31:10
**later**
130:3
**launch**
59:1, 68:23

**launched**
42:19, 49:13,
58:2, 68:25,
78:12
**launching**
121:21
**law**
9:4, 14:12
**lawsuit**
106:23, 106:25
**lawyers**
20:10
**layers**
109:2
**leadership**
87:3, 128:8
**leading**
109:6
**learn**
130:23
**learning**
14:8
**lease**
43:19
**leaseholds**
13:6
**least**
22:10, 25:22,
27:9, 35:11,
40:23, 42:25,
50:24, 59:8,
66:3, 78:15,
88:24, 89:15
**leave**
40:5, 131:24
**lectures**
15:8
**led**
30:14, 85:25,
110:10, 110:11
**ledger**
50:14, 53:10,
53:11, 53:13,
53:21, 58:24
**lee**
1:24, 2:20,
5:24, 34:19,
134:14, 135:4,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

158

135:22
**lee6**
34:19, 37:6
**lees**
37:12
**left**
20:6, 25:6,
34:8
**legal**
106:24, 107:2
**legitimacy**
121:4
**less**
11:4, 50:2,
59:18, 61:23,
108:10
**let's**
17:17, 31:18,
31:19, 32:20,
40:9, 41:14,
41:17, 41:25,
48:17, 56:11,
58:10, 69:11,
81:19, 82:13,
82:21, 92:24,
94:15, 107:19,
123:1
**letter**
43:11
**level**
11:14, 36:9,
89:7, 123:7,
127:13
**levelled**
37:5
**levels**
16:21
**leverage**
115:18
**lexisnexis**
112:22
**library**
49:13
**license**
52:18, 91:24,
92:12, 92:13,
92:16, 92:25,
96:3, 96:18,

98:10, 98:11
**licensed**
50:1, 55:22,
124:19
**licensing**
48:17, 49:18,
50:25, 51:10,
51:14, 52:13,
52:22, 54:21,
54:25, 90:24,
92:14, 92:22
**licensing-related**
55:14
**licensors**
55:17
**lieu**
6:6
**life**
122:19
**likelihood**
22:1
**likely**
17:3, 35:14,
35:19, 46:14,
49:23, 55:13,
55:19, 61:8,
71:1
**likeness**
43:18
**limited**
88:18
**line**
20:14, 64:11,
64:12, 64:22,
67:19, 75:6,
75:8, 75:9,
88:9, 118:16,
122:2
**lines**
55:22
**lineup**
95:15, 95:17,
95:19, 96:11
**liquidated**
12:23
**list**
18:5
**listed**
47:19, 50:17,

51:15
**listenership**
99:4, 99:7
**listening**
120:13
**little**
123:13, 127:5
**live**
91:5, 111:15,
112:11, 112:13
**living**
18:9
**llc**
1:6, 4:18,
56:18, 56:20,
56:25, 58:21
**llp**
3:13
**locate**
32:9
**location**
43:21
**locations**
126:11
**logged**
34:2
**long**
20:4, 26:15,
26:19, 27:2,
27:3, 112:8
**long-term**
18:16, 49:20,
86:1, 86:2,
86:5, 112:9,
112:15
**longer**
22:12, 36:10
**look**
21:15, 43:8,
63:22, 64:3,
74:6
**looking**
9:7, 31:11,
36:5, 48:4,
56:3, 57:12,
60:16, 64:8,
64:11, 64:12,
65:10

**looks**
35:10, 36:6,
54:6
**lora**
1:24, 2:20,
5:24, 134:14,
135:4, 135:22
**los**
126:6
**lose**
41:21, 49:2
**losing**
108:22
**loss**
14:19, 14:23,
25:6, 25:12,
29:9, 41:18,
42:13, 42:20,
45:3, 57:14,
59:22, 62:21,
62:25, 65:22,
65:25, 107:10
**losses**
10:16, 45:6,
65:8
**lost**
20:10, 21:2,
29:8, 29:15,
38:15, 44:3,
44:8, 55:12,
56:1, 58:3,
123:13
**lot**
88:4
**lots**
46:4, 77:1
**loud**
111:4
**low**
35:22
**lowest**
57:24
**lp**
106:7
**lpga**
30:8, 104:11,
104:15, 104:24,
105:19, 105:22,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

159

105:24, 106:3,
128:16, 128:18,
129:9, 129:15,
129:19, 129:24,
130:1, 130:5,
130:12, 130:18
**lucrative**
69:8, 83:22
**lying**
74:21
**lynching**
112:4

**M**

**made**
19:2, 27:1,
28:19, 32:24,
47:5, 47:8,
58:14, 87:4,
88:4, 96:24,
107:1, 118:14,
121:7, 121:12,
122:11, 128:7
**maintain**
98:10, 98:11
**maintained**
119:12
**maintaining**
23:12, 68:5
**major**
29:6, 38:2,
41:6, 55:20,
55:22, 80:10,
80:14, 83:24,
84:23, 86:22,
114:25, 120:18,
120:19, 123:1,
127:12
**majority**
120:11
**make**
11:16, 21:24,
32:20, 33:25,
46:23, 58:10,
77:19, 92:17,
114:15, 116:17,
124:14
**makes**
56:11, 75:5

**making**
109:14, 120:20
**man**
122:14
**man's**
105:8
**managed**
99:25
**management**
92:8, 103:4,
126:1
**manner**
6:13, 78:22
**manual**
112:23
**manufactured**
56:20, 56:21
**manufacturers**
41:7, 127:17,
127:22
**many**
11:4, 12:2,
12:4, 12:5,
22:16, 33:21,
40:24, 41:9,
45:13, 47:2,
47:7, 49:24,
52:9, 55:4,
64:2, 69:5,
72:19, 85:19,
85:21, 85:25,
86:18, 87:2,
87:23, 89:13,
89:16, 100:11,
103:11, 109:23,
109:24, 111:4,
118:13, 119:5,
121:5, 126:3,
130:1, 131:9
**march**
1:17, 5:9,
13:17, 134:8
**margin**
61:7, 61:10,
63:20, 64:1,
64:23, 67:20,
75:1, 75:2
**margins**
59:16, 63:24,

71:22
**mark**
19:8, 30:21,
58:10, 88:17,
125:23
**marked**
19:1, 32:23,
53:4, 58:13
**market**
42:18, 42:20,
58:7, 64:4,
78:1, 78:10,
80:7, 81:4
**marketed**
56:17
**marketing**
15:12, 18:15,
33:23, 42:16,
44:23, 48:20,
49:5, 49:7,
56:15, 70:21,
71:15, 88:16,
91:15, 109:21,
110:6, 121:22,
125:22
**marketing-related**
40:12
**marketplace**
28:15, 38:12,
48:10, 56:5,
68:8, 79:8,
81:9, 109:25,
110:4, 114:17
**marketplace's**
48:8
**marking**
91:12
**massive**
85:1
**match**
114:4
**material**
92:18, 93:12,
94:20
**materialized**
42:12, 129:21
**materials**
14:23, 43:11

**mathematical**
15:25, 16:4,
17:11
**matter**
5:5, 6:22,
10:6, 10:18,
26:18, 37:15,
63:21
**mattered**
63:18, 63:20
**matters**
9:8, 90:7
**maybe**
89:15
**mean**
11:21, 17:24,
19:7, 20:12,
54:14, 82:10,
85:12, 86:16,
88:21, 93:17,
106:19, 109:1,
127:1, 127:10,
131:10
**meaning**
109:2
**meaningful**
48:25, 64:4,
120:20
**meant**
113:23
**measured**
34:9, 116:22
**measuring**
44:14
**mechanism**
80:22
**media**
1:5, 15:12,
17:19, 23:16,
24:1, 24:16,
24:21, 24:23,
27:17, 28:8,
28:11, 30:3,
33:13, 33:14,
34:5, 36:21,
37:19, 37:23,
38:2, 40:7,
40:13, 46:3,

55:7, 71:13,
84:23, 90:25,
91:1, 91:15,
97:15, 97:23,
97:24, 100:1,
100:3, 100:4,
106:7, 111:12,
112:4, 112:7,
112:12, 112:20,
112:21, 112:24,
113:15, 114:18,
114:23, 114:25,
115:3, 115:24,
120:23, 125:6,
127:5, 129:17,
129:19, 130:14
**medica**
106:7
**member**
100:5, 112:4,
112:6, 113:3
**members**
99:20, 99:25,
100:2, 128:9
**men's**
129:25
**menthol**
80:25, 81:1
**menthol-based-to-pical**
80:23
**mention**
62:4
**mentioned**
24:25, 30:17,
43:13, 44:18,
61:1, 62:9,
113:18
**merrins**
22:14
**met**
104:8
**method**
70:20, 71:5
**methodologies**
23:1
**methodology**
21:19, 21:23,

22:20, 22:22,
23:6, 24:9,
33:7, 39:8,
45:22, 68:1,
70:14
**metric**
23:16, 24:3,
25:17, 63:18,
119:4
**metrics**
116:4, 116:7
**miami**
3:16
**michelman**
3:3
**midst**
41:4, 127:2
**might**
62:3
**mike**
105:18, 130:4,
130:8
**million**
12:3, 25:3,
25:22, 38:21,
70:16, 70:19,
71:19, 72:7,
75:3, 75:19,
81:16, 119:9
**millions**
72:23, 119:6,
119:7
**milliron**
3:19, 5:18
**mind**
52:24, 123:19
**mindset**
122:20, 123:9
**minimal**
47:16, 68:4
**miniscule**
80:10
**minority**
104:8, 128:8
**minute**
41:25, 69:12,
69:13, 69:21
**minutes**
31:16

**mischar**
71:8
**mischaracterizes**
113:11
**misdescription**
71:9
**miss**
34:19, 87:10,
87:12, 88:14,
121:16, 123:22
**missing**
111:18
**misstates**
92:20, 92:21,
96:20
**mix**
110:6, 120:21
**model**
38:24, 46:3,
58:4, 59:15,
68:24, 69:8,
70:19, 71:11,
72:5, 72:8,
74:5, 74:13,
74:14, 74:18,
76:5, 77:8,
77:9, 77:15,
85:18, 85:24,
116:18, 117:3,
117:4, 118:20,
118:24, 121:8
**modeled**
64:14, 64:21,
65:7, 67:17
**models**
15:25, 16:4,
17:1, 18:12,
46:15, 71:21,
76:17, 113:25,
115:1
**molecular**
80:18
**moment**
35:22, 36:14,
89:16, 110:1
**monahan**
90:2, 110:25
**monetary**
107:6

**monetization**
85:11, 85:13,
86:15, 86:17
**money**
41:16, 88:5
**monitor**
5:10
**month**
59:17, 118:10
**month-over-month**
57:15
**monthly**
58:24, 118:20
**months**
41:4, 42:19,
47:12, 55:9,
58:2, 118:13
**more**
10:19, 17:20,
21:9, 21:24,
23:4, 30:9,
37:16, 46:14,
50:3, 71:2,
73:21, 80:1,
97:15, 100:24,
108:15, 111:8,
112:23, 115:1,
118:14, 118:22,
123:9, 129:25,
130:10
**morning**
7:11, 10:20
**morrison**
3:25
**most**
18:3, 18:6,
28:13, 38:7,
38:12, 59:20,
76:8, 84:17,
84:19, 84:24,
89:6, 89:24,
109:5, 109:22,
119:18, 122:1,
122:17, 126:8,
127:18
**motion**
33:25
**mouth**
59:25

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

161

**move**
56:11, 67:5,
67:8, 73:10,
73:17, 124:7,
125:1
**moving**
104:10
**much**
10:3, 10:19,
11:1, 11:18,
42:22, 44:4,
63:20, 76:13,
77:2, 116:9
**multiple**
67:10, 67:13,
79:19, 85:2,
89:10, 89:11,
100:22, 104:19
**mute**
7:2
**myself**
7:2, 46:25,
83:25

**N**

**name**
6:14, 7:11,
43:17, 47:3,
56:23, 57:6,
98:1, 102:16,
130:16
**named**
87:8
**namely**
42:17
**names**
52:21
**national**
15:13, 83:24,
130:10
**nations**
57:20, 68:19
**nature**
10:17, 37:11,
44:10, 44:20,
64:2, 66:13,
73:10, 76:23,
79:22, 91:3,

95:13, 102:13,
106:2, 114:2,
114:24, 116:18,
126:23
**nbc**
17:19
**near**
41:7
**necessary**
14:23
**need**
25:10, 29:17,
31:14, 37:12,
42:24, 74:8,
105:21, 114:25
**needed**
29:16
**needs**
110:6, 127:23
**neena**
4:2
**neera**
5:20
**negative**
35:4, 35:5,
35:6, 35:10,
35:21, 36:25,
37:2, 37:7,
111:4, 111:5,
111:8, 127:16
**negativity**
37:4
**negligible**
60:1
**negotiate**
39:1, 39:15
**negotiating**
39:13, 39:18
**negotiations**
106:8, 106:9
**neighborhood**
25:11
**net**
17:3, 20:15,
27:14, 29:2,
30:4, 45:6,
51:12, 51:23,
52:6, 61:7,

61:12, 61:18,
61:19, 62:10,
62:12, 64:23,
65:8, 75:2, 75:3
**net-margin**
64:5
**netted**
51:16
**netting**
81:16
**network**
27:2, 96:10,
96:12, 120:9,
120:10, 121:1,
121:13, 129:22,
130:10
**networks**
128:25
**neutral**
29:12, 35:1,
37:15
**never**
8:25, 9:10,
9:15, 101:23,
113:22, 117:24,
122:13
**new**
3:6, 59:22,
59:23, 83:22,
86:20, 87:20,
115:16, 122:7,
127:19, 127:21
**newly**
115:15
**news**
33:12, 33:15
**next**
19:19, 37:4,
38:21, 74:16,
85:10, 86:4,
86:14, 87:6,
88:15, 90:17,
91:17, 97:7,
98:4, 99:3,
99:18, 100:17,
104:10, 120:1
**night**
31:3

**noise**
35:25, 36:2,
36:9, 36:19
**non-live**
83:20, 120:16
**none**
8:13, 8:17,
76:18, 116:21
**nonexistent**
48:12
**nonresponsive**
73:10
**nope**
14:17, 15:20
**normal**
11:13, 83:7,
117:11
**north**
103:18
**northern**
126:12
**notary**
2:21, 134:15
**noted**
130:4
**notes**
135:10
**nothing**
6:23
**november**
59:19
**nowhere**
77:14, 77:17
**number**
5:3, 5:7,
13:19, 15:13,
15:14, 18:25,
19:6, 19:13,
25:9, 25:15,
25:18, 29:15,
32:22, 33:3,
45:8, 46:20,
47:12, 48:14,
51:20, 53:4,
53:5, 55:19,
57:13, 58:9,
58:11, 58:12,
58:18, 61:18,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

162

61:19, 62:9,
62:12, 63:4,
63:21, 64:5,
64:9, 65:12,
66:3, 67:19,
67:20, 69:1,
75:4, 75:7,
78:9, 81:15,
87:19, 87:20,
90:7, 97:10,
103:24, 105:14,
105:15, 111:2,
113:24, 114:1,
115:4, 116:20,
119:16, 121:15
**numbered**
37:12
**numbers**
23:18, 23:20,
40:14, 40:19,
40:20, 40:21,
40:22, 41:11,
49:17, 49:21,
51:12, 51:16,
57:12, 59:8,
59:10, 59:11,
59:18, 59:20,
60:2, 60:3,
60:19, 61:8,
66:4, 66:13,
66:14, 71:2,
72:25, 74:19,
74:25, 75:9,
76:24
**numerous**
9:6, 10:11,
12:17, 15:11,
48:24, 83:23,
99:23, 104:23
**nurse**
57:5

---
O
---

**oath**
4:22, 6:7, 6:8,
9:15, 134:2
**object**
53:16, 114:11,

124:6
**objection**
17:22, 62:18,
64:24, 65:9,
92:20, 95:5,
96:4, 96:20,
97:1, 111:23,
113:11, 114:14,
114:20, 116:15,
124:15, 124:25,
125:10, 126:20,
130:20
**objections**
6:12
**objective**
20:18, 63:5,
85:6
**objectively**
120:22
**obligation**
92:17
**obligations**
42:9
**observations**
104:23
**observed**
34:4, 34:7
**obvious**
91:3
**obviously**
15:2, 131:4
**occasions**
9:6
**occur**
106:21
**occurred**
37:6
**occurrences**
35:14, 35:20
**occurring**
36:14
**octagon**
7:20, 7:22,
8:6, 8:12, 8:14,
8:15, 8:22,
11:21, 11:24,
12:8, 13:9,
14:8, 14:11,

15:3, 15:4,
16:25, 33:2,
46:25, 50:24,
53:2, 53:9,
53:14, 103:5,
103:10, 104:1,
106:17, 106:20,
106:24, 107:7,
107:12, 107:13,
107:15, 117:16,
117:20
**octagon's**
12:19, 12:25,
53:12, 53:18,
53:23, 54:10,
101:13, 103:17,
117:12
**october**
59:19
**offending**
109:19
**offensive**
93:19, 109:5
**offer**
105:10
**office**
103:19, 132:4
**official**
90:25, 91:1,
91:15
**oh**
132:1
**okay**
6:19, 7:4,
7:14, 8:24,
13:14, 13:23,
15:24, 17:15,
19:14, 19:23,
20:6, 27:4,
28:22, 32:2,
32:17, 32:20,
35:6, 35:24,
40:5, 42:7,
48:13, 53:13,
54:14, 54:21,
60:19, 69:12,
69:23, 70:6,
70:10, 70:12,

72:10, 77:25,
81:19, 82:3,
82:14, 82:17,
82:25, 90:9,
90:15, 92:2,
96:1, 99:1,
102:15, 107:17,
107:20, 123:15,
131:3, 131:16,
131:20, 132:6
**oklahoma**
56:22, 57:6
**old**
22:10, 22:11
**older**
81:5
**omega**
45:18
**once**
70:6, 92:6
**one**
8:21, 17:17,
23:14, 26:16,
31:5, 31:12,
32:16, 35:19,
36:11, 41:15,
47:19, 47:24,
50:14, 50:18,
53:22, 68:21,
74:15, 84:16,
84:21, 86:24,
98:1, 99:18,
100:17, 101:13,
101:22, 102:10,
102:14, 103:2,
103:25, 104:15,
108:24, 109:3,
109:11, 110:8,
112:23, 116:11,
116:12, 117:3,
120:3, 120:23,
127:7, 128:1,
129:5, 130:4,
130:11, 130:18,
131:9, 131:13
**ongoing**
22:3, 24:19,
27:2, 35:25,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

163

| | | | |
|---|---|---|---|
| 37:15, 42:15,<br>46:12, 59:24,<br>98:7<br>**only**<br>31:9, 45:16,<br>73:1, 101:18,<br>106:22, 110:18,<br>114:13, 114:16,<br>117:8, 118:15,<br>123:19<br>**open**<br>34:18, 130:17<br>**opening**<br>34:20<br>**opens**<br>77:6, 110:13<br>**operated**<br>63:25, 80:24<br>**operates**<br>75:2<br>**operation**<br>113:6<br>**operational**<br>88:19<br>**operations**<br>100:18, 103:18,<br>128:1<br>**operators**<br>100:25<br>**opine**<br>128:5, 128:12<br>**opinion**<br>9:5, 36:20,<br>39:19, 48:9,<br>72:13, 75:10,<br>78:18, 78:20,<br>83:14, 84:2,<br>84:14, 87:1,<br>89:22, 92:2,<br>92:10, 96:5,<br>96:19, 97:8,<br>97:19, 97:22,<br>98:20, 99:8,<br>99:21, 104:14,<br>104:17, 118:25,<br>121:7, 121:18,<br>121:19, 122:7,<br>124:21, 130:13 | **opinions**<br>10:4, 28:11,<br>96:1, 100:20,<br>104:13, 128:21<br>**opportunities**<br>17:2, 17:4,<br>22:3, 38:4,<br>40:18, 40:25,<br>43:13, 55:3,<br>55:11, 56:6,<br>83:23, 85:15,<br>91:13, 101:3,<br>114:1, 115:19,<br>126:15<br>**opportunity**<br>20:11, 29:22,<br>30:6, 55:25,<br>62:22, 65:22,<br>100:23, 101:1,<br>105:20, 105:23,<br>107:10, 115:6,<br>119:15, 125:24<br>**opposed**<br>10:25, 32:3,<br>65:8, 67:19<br>**optics**<br>104:15<br>**order**<br>6:10, 20:21,<br>27:16, 33:19,<br>76:9, 97:21,<br>131:5<br>**orders**<br>125:8<br>**organization**<br>38:13<br>**organizations**<br>55:20, 97:18<br>**other**<br>8:1, 10:12,<br>13:2, 15:3,<br>15:11, 22:19,<br>22:20, 23:13,<br>27:13, 27:16,<br>28:7, 29:24,<br>31:2, 37:23,<br>41:2, 42:11,<br>43:12, 44:7, | 47:13, 50:1,<br>52:8, 53:14,<br>54:23, 55:4,<br>56:8, 57:25,<br>62:24, 63:14,<br>63:15, 64:2,<br>68:23, 69:1,<br>69:5, 75:21,<br>76:4, 76:5,<br>78:13, 78:16,<br>82:19, 82:22,<br>86:10, 86:22,<br>89:14, 91:7,<br>91:8, 98:23,<br>101:24, 102:11,<br>103:5, 110:12,<br>110:18, 111:1,<br>111:2, 115:7,<br>119:24, 121:5,<br>121:10, 126:14,<br>129:18, 130:18,<br>131:24<br>**others**<br>46:25, 80:25,<br>108:25<br>**otherwise**<br>93:13, 94:21<br>**out**<br>17:9, 20:11,<br>21:3, 21:21,<br>22:12, 22:18,<br>24:7, 35:11,<br>39:22, 42:17,<br>46:4, 51:16,<br>72:8, 81:16,<br>87:24, 103:18,<br>105:4, 118:21,<br>118:23, 123:15,<br>123:25<br>**outcome**<br>8:16, 106:18,<br>116:23<br>**outer**<br>55:18<br>**outfits**<br>9:7<br>**outlet**<br>83:2, 120:4 | **outlets**<br>87:22, 87:23,<br>123:24, 124:2,<br>124:19<br>**outlined**<br>50:4<br>**outside**<br>18:7<br>**over**<br>21:16, 22:4,<br>24:3, 38:21,<br>39:12, 40:2,<br>40:9, 41:4,<br>42:19, 46:9,<br>48:6, 49:19,<br>50:23, 58:1,<br>61:11, 61:20,<br>62:13, 68:2,<br>69:4, 70:19,<br>71:10, 74:10,<br>77:5, 77:12,<br>82:11, 97:14,<br>97:15, 109:23,<br>112:20, 116:23,<br>118:10, 118:13<br>**over-the-top**<br>110:8<br>**overall**<br>36:25, 37:17,<br>116:3<br>**overcome**<br>30:15<br>**oversee**<br>113:5, 113:6<br>**own**<br>42:2, 42:5,<br>43:24, 44:25,<br>57:22<br>**owned**<br>57:1, 57:2<br>**owners**<br>129:1<br><br>**P**<br><br>**pace**<br>23:3<br>**page**<br>4:6, 4:14, |

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

164

13:21, 19:5,
19:9, 19:10,
19:11, 19:18,
19:20, 60:3,
82:13, 82:16,
90:18, 93:5
**pages**
1:23, 119:23,
135:8
**paid**
25:4, 52:1
**pain**
20:17, 56:13,
58:25, 59:5,
61:19, 79:20,
79:21, 80:16
**pains**
81:6, 81:7
**pandemic**
55:9
**pandora**
77:5, 77:6
**pantheon**
122:4
**paragraph**
93:8
**parallel**
29:17
**part**
10:23, 11:16,
13:3, 13:5,
13:7, 14:10,
19:2, 32:24,
37:12, 46:3,
58:14, 78:18,
108:9, 109:22,
113:17
**participate**
8:2, 82:7
**participating**
6:3, 107:3
**participation**
43:19, 81:5,
88:8
**particular**
34:11, 91:4,
105:5, 117:9,
127:17, 131:1

**particularly**
81:3
**parties**
6:11, 15:4,
24:8, 40:11,
49:11, 135:13,
135:14
**partner**
90:25, 112:12
**partners**
18:24, 41:9,
57:3, 100:4
**partnership**
24:19, 68:20,
90:23, 127:5
**partnerships**
17:18
**pass**
12:18, 12:24,
80:18
**passed**
53:12
**past**
22:17, 36:14
**pay**
42:8, 107:14
**paying**
52:18
**payment**
25:2, 53:22
**payments**
50:14, 54:5
**payor**
53:8, 54:4
**payors**
55:17
**pdf**
131:17, 131:19
**peak**
34:11, 36:4,
36:23, 36:24
**peaks**
35:18, 36:22
**pebble**
102:12
**peer**
84:22
**peer-review**
15:18

**peers**
22:8, 84:21
**pending**
69:15, 69:20
**penick**
22:16
**people**
10:12, 37:9,
56:4, 87:2,
89:7, 103:11,
109:6, 111:2,
113:9, 113:14,
115:6, 115:9,
123:10, 123:12
**people's**
36:19
**perceived**
110:2, 123:6
**percent**
21:12, 36:24,
43:6, 57:24,
61:7, 61:9,
61:18, 61:22,
64:1, 75:2
**percentage**
80:12, 80:13
**perception**
109:3, 109:8,
109:9
**perfect**
114:3, 117:4
**perfectly**
114:4
**perhaps**
9:21, 11:4,
30:7, 75:13,
84:19, 108:10
**period**
20:24, 20:25,
21:25, 22:4,
48:7, 72:8,
80:4, 112:14,
129:14
**permutations**
113:25
**person**
6:7, 36:11,
130:19

**person's**
74:15
**personal**
14:22, 89:2,
90:4, 98:12,
122:18, 122:21,
123:7
**personalities**
22:17, 48:25,
105:11
**personality**
109:20
**personally**
7:19, 8:23
**perspective**
107:5
**peter**
3:8, 5:15,
6:16, 9:20,
131:17
**pg**
85:23
**pga's**
26:15, 125:21
**pginsberg@mrllp**
3:10
**phenomenon**
87:25
**physically**
6:4
**picked**
34:23
**piece**
33:20, 76:8
**pieces**
45:20
**pillar**
48:25
**pillow**
68:25
**pitches**
46:23, 47:8
**place**
5:12, 31:23,
39:2, 70:2,
83:9, 99:14,
101:12, 107:24,
112:19

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

165

placed
120:12
plaintiff's
4:15, 13:15,
19:5, 19:7,
19:11, 81:20,
81:24, 83:2
plaintiffs
1:7, 3:2, 5:16,
86:6
plan
11:6, 18:13,
18:14, 18:15,
74:22, 88:2,
92:3, 104:13,
121:22, 121:23
planet
5:11, 5:24
planning
102:24
plans
16:19
plat
29:16
platform
10:16, 29:8,
29:10, 29:15,
29:17, 29:18,
30:7, 30:10,
33:2, 33:9,
38:2, 42:13,
42:21, 43:7,
43:8, 44:3,
45:3, 53:24,
55:13, 56:1,
58:3, 59:23,
62:21, 62:25,
69:10, 78:13,
84:1, 85:15,
85:19, 86:21,
87:5, 99:8,
108:22, 112:13,
119:21, 129:20
platforms
15:1, 33:3,
33:10, 33:21,
46:7, 59:5,
69:3, 110:21,

115:4, 115:11,
115:12, 115:15,
120:23
played
105:22
player
22:11, 101:15,
102:7, 113:3,
113:4, 126:14
player's
113:18
players
113:5, 130:18
playoff
126:11
plays
18:7
please
5:13, 5:25,
6:13, 6:20,
60:6, 68:15,
124:8, 124:10
plenty
22:8, 22:25
plus
10:8, 104:18,
108:21
podcast
28:14, 38:2,
60:1
point
10:4, 17:9,
17:21, 25:5,
34:17, 37:8,
48:9, 57:17,
59:3, 68:12,
72:19, 78:5,
83:1, 84:3,
84:7, 84:13,
86:4, 86:14,
87:6, 88:15,
88:21, 89:25,
90:17, 90:20,
91:17, 91:22,
92:3, 96:2,
96:19, 97:7,
98:4, 98:25,
102:14, 104:10,

108:24, 110:16,
113:24, 116:11,
116:16, 116:17,
119:25, 120:1,
122:13, 125:19
points
17:10, 35:14,
36:7, 82:15,
119:23, 121:15,
127:25
pop
35:13
popularity
41:5, 83:18,
99:13, 110:24
portfolio
44:13, 45:25,
46:5
position
28:17, 39:7,
39:25, 40:2,
46:13, 87:7,
87:14, 101:19,
111:11, 120:5
positions
121:19, 128:8
positive
29:2, 29:12,
30:4, 34:12,
34:22, 36:1,
36:4, 36:6,
37:2, 37:7
possible
20:21, 57:25,
85:20, 112:23,
119:11, 119:12
potential
11:17, 18:21,
20:22, 62:20,
77:6, 78:10,
103:4, 109:16,
109:19, 110:7,
115:6, 116:5,
116:9, 117:22,
127:6, 129:18
potentially
37:25, 77:1,
94:1, 99:24

power
115:16
pr
110:7, 110:14
practical
23:6
practice
16:22, 33:23,
48:24
practice-related
56:2
practices
14:8, 96:8,
100:20, 117:21,
128:4, 128:6,
128:13
practitioner
57:5
precise
70:20, 114:3,
116:22, 117:4
precisely
108:15
predicate
130:21
predicated
25:19, 27:5,
65:24, 92:11,
96:2
predict
30:10
premier
120:23
premier-media
86:25
preparation
62:16
prepare
10:19, 20:2,
20:4
prepared
68:12, 84:2,
84:15, 89:22,
90:19, 91:21,
99:9, 99:22,
100:20, 105:19,
106:24, 107:2,
128:5, 128:12,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

166

128:16
**preparing**
14:19, 17:1,
21:7, 108:11
**present**
4:1, 6:4,
38:17, 38:23,
39:3, 39:9,
39:15, 39:21,
40:6, 48:15,
51:6, 81:13,
81:17, 100:24,
126:13
**presentations**
15:7
**presented**
9:4, 39:19,
40:25, 91:13,
100:23, 110:3
**president**
5:20, 26:14
**press**
110:9
**presumably**
39:19
**presume**
52:3
**presuppose**
54:23
**presupposes**
26:11
**presupposing**
48:5
**pretty**
22:23, 56:9,
122:4
**prevail**
106:19, 107:18
**previous**
39:10, 124:3
**previously**
102:4
**price**
57:20
**pricing**
68:19
**principal**
71:13, 71:14

**print**
122:3
**prior**
45:14, 50:21,
83:2, 83:18,
120:4, 120:8,
120:25
**private**
98:12, 122:19
**pro**
116:19
**proactive**
100:1
**proactively**
99:25
**probably**
13:18, 36:19,
47:17, 92:25
**proceed**
7:3
**proceeding**
10:24, 13:17,
21:16, 50:7,
58:2
**proceedings**
4:5, 5:2,
31:22, 70:1,
107:23, 132:14
**process**
51:10, 54:1,
55:23, 91:7,
103:6, 103:14
**processes**
13:1
**processing**
51:22
**produce**
18:6, 21:11,
74:20, 116:8
**produced**
24:12, 30:19,
31:2, 50:7,
52:2, 53:18,
72:10, 98:16,
117:15, 117:19,
117:25
**producers**
96:12

**product**
45:19, 45:20,
48:20, 48:22,
52:25, 53:13,
55:6, 55:22,
56:17, 57:11,
58:7, 71:11,
71:15, 74:6,
78:1, 79:4,
80:16, 81:9,
118:4
**product-related**
50:1
**production**
76:15, 92:8,
129:23, 129:24
**products**
42:16, 48:24,
49:9, 53:1,
56:3, 68:9,
69:1, 72:20,
78:17, 80:2,
80:16, 80:20,
80:22, 80:25,
81:4
**professional**
7:21, 9:25,
18:8, 86:5,
88:23, 89:1,
91:2, 101:14,
104:20, 105:6,
105:7, 128:25,
135:5
**professionally**
18:8
**profit**
14:19, 14:23,
18:21, 61:7,
61:15, 63:20
**profitability**
64:6, 68:9,
68:10, 74:7
**profitable**
17:18, 18:12,
62:23, 84:9
**profits**
16:7, 17:12,
20:13, 79:23

**program**
95:12, 95:15,
95:23, 96:13,
96:14, 99:8,
120:5
**programming**
29:6, 83:21,
85:17, 90:23,
91:11, 91:18,
92:5, 92:14,
92:18, 93:12,
93:20, 94:20,
95:9, 95:14,
95:17, 95:19,
96:9, 96:10,
97:5, 105:10,
120:17, 129:16
**programs**
92:6, 92:7,
93:18, 96:11,
99:16
**project**
11:14, 16:1,
21:21, 23:20,
39:2, 39:8,
47:20, 56:9,
76:9, 85:1,
114:1
**projected**
10:1, 20:7,
22:12, 23:3,
24:12, 25:15,
26:10, 40:24,
57:14, 61:19,
62:10, 62:12,
63:7, 65:18,
67:24, 70:18,
71:12, 76:7,
76:21, 81:11,
118:21, 119:8
**projecting**
16:5, 21:3,
24:7, 25:3,
26:5, 38:20,
39:22, 59:16,
72:18
**projection**
17:12, 18:14,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

167

20:16, 26:3,
39:4, 48:3,
51:4, 54:12,
54:22, 70:20,
79:5, 118:19,
119:18
**projections**
10:15, 10:23,
11:2, 16:19,
17:2, 17:14,
20:9, 21:8,
21:12, 27:5,
27:17, 63:16,
74:11, 106:16,
114:2, 114:3,
114:5, 114:8,
117:7, 118:3,
118:7
**projects**
22:18
**prominence**
50:2
**prominent**
101:14, 104:25
**promote**
105:11
**promoting**
86:21
**promotion**
59:25
**promotional**
100:20, 128:3,
128:13
**pronounce**
7:11
**proper**
124:15
**properties**
13:6
**property**
43:20
**proposals**
105:14
**proprietary**
72:1
**prospect**
89:4
**prospects**
89:4

**protect**
99:19, 110:16
**protecting**
100:8, 100:10
**prove**
74:13, 74:18
**proves**
75:7
**provide**
20:9, 21:3,
21:13, 30:9,
36:2, 39:4,
39:11, 47:7,
71:22, 74:3,
75:6, 76:17,
77:9, 80:19,
82:18, 94:4,
107:4, 114:25,
116:19, 119:4,
119:8, 121:19,
128:7
**provided**
13:5, 13:7,
15:4, 23:16,
24:2, 41:13,
41:15, 42:4,
43:11, 44:15,
47:18, 52:11,
53:24, 54:10,
54:16, 57:8,
65:3, 65:6,
66:2, 66:4,
71:23, 71:24,
74:4, 75:7,
76:18, 83:16,
85:16, 85:24,
88:7, 94:24,
114:6, 119:24,
125:24, 126:1
**providing**
10:14, 14:25,
49:14, 129:16
**provision**
43:10, 94:12,
94:14, 95:7,
95:12
**pta**
92:6

**public**
2:21, 30:1,
36:18, 104:15,
117:20, 134:15
**publications**
15:7, 122:4
**publicized**
99:20, 100:13
**publicly**
110:22, 113:15
**publicly-traded**
12:20, 17:1
**published**
15:17, 84:23
**publisher**
88:13
**publishing**
54:8, 87:21
**pull**
36:18
**pulled**
36:9
**purchase**
20:19, 58:1,
64:3, 71:1
**purchased**
57:9, 68:20
**purchasing**
118:11
**purports**
58:20
**purpose**
63:12, 117:10
**purposes**
25:16, 27:20,
36:12, 38:23,
62:10, 64:14,
72:16
**pursuant**
2:20, 6:9
**put**
19:15, 21:4,
30:24, 33:25,
40:2, 80:12,
102:20, 105:11,
105:14, 108:20
**puts**
92:16

**putting**
108:19

**Q**

**qualification**
9:3
**qualified**
8:25
**quantifying**
28:22
**query**
33:17, 33:18,
34:11
**question**
9:11, 9:13,
13:13, 15:21,
16:2, 16:8,
16:10, 17:23,
17:24, 18:5,
27:22, 33:24,
39:20, 50:12,
66:24, 67:1,
67:2, 67:15,
67:23, 69:14,
69:19, 73:6,
73:22, 73:23,
73:25, 78:25,
79:2, 85:2,
96:6, 98:6,
98:21, 109:18,
120:22, 129:5
**questions**
108:4, 108:6,
116:12, 118:2,
129:3, 131:2,
132:11
**quickly**
29:24, 37:4,
87:24
**quit**
68:15
**quite**
29:23, 37:14,
41:11, 52:9,
59:23, 63:4,
69:13, 87:24,
116:3, 124:17

**R**

**racial**
100:19, 128:3,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

168

128:9
**racist**
38:6, 109:12
**radio**
24:19, 26:15,
43:4, 62:24,
83:3, 83:14,
83:23, 84:11,
85:23, 86:20,
86:22, 86:24,
92:6, 92:9,
100:15
**raise**
6:20
**raising**
16:16
**ramp**
68:11
**ran**
26:8, 111:6,
120:11, 121:25
**random**
36:10
**range**
87:22
**ranked**
84:21
**rankings**
84:22
**rate**
22:2, 68:2,
78:15
**rather**
21:20, 40:1,
64:22, 65:12,
105:7
**ratio**
71:13
**rationale**
125:17
**raw**
34:16, 35:19
**reach**
46:8, 77:7,
115:5
**reaction**
48:8, 99:4,
99:18

**read**
74:1, 94:11,
94:13, 94:17,
122:1, 123:11,
131:4, 132:2,
132:4, 133:4
**readily**
110:19
**reading**
95:6, 96:2
**reads**
95:25
**real**
13:3, 110:2
**real-world**
16:22, 116:23
**reality**
109:10
**realized**
16:20
**really**
11:12, 37:8,
109:17, 110:3,
122:15
**realty**
109:9
**reason**
31:9, 32:2,
44:1, 101:1,
110:1, 125:8
**reasonable**
10:15, 11:14,
11:17, 20:10,
21:3, 21:6,
21:14, 22:4,
22:12, 23:2,
23:5, 23:20,
24:4, 24:8,
24:9, 30:10,
39:4, 41:11,
46:19, 61:13,
61:17, 61:20,
62:12, 63:4,
72:24, 74:3,
74:25, 77:9,
95:6, 105:14,
111:25, 114:8,
116:5, 116:7,

116:21, 119:1,
127:14
**reasonably**
11:9, 23:16,
25:14, 26:3,
108:21
**rebate**
57:21, 68:19
**rebuild**
29:16, 29:17,
29:18
**recall**
9:22, 12:4,
42:3, 47:25,
56:22, 82:6,
118:4
**receive**
8:12, 8:15,
106:20
**received**
12:7, 30:1,
53:14, 54:4,
57:20, 125:4
**recent**
61:4
**recently**
126:8
**recess**
31:23, 70:2,
107:24
**recognizing**
68:14
**recollection**
12:15, 98:20
**reconciliation**
53:25
**record**
6:15, 31:13,
31:19, 31:21,
32:1, 32:7,
32:21, 34:21,
53:3, 60:16,
69:25, 70:5,
78:4, 107:22,
108:2, 132:11,
135:10
**recorded**
74:1

**recording**
13:1
**records**
25:10, 42:24,
54:16, 117:11
**recover**
8:10, 107:9
**recovery**
106:21
**recross**
4:10, 129:12
**red**
21:2, 24:22,
35:3, 35:12,
35:13, 35:18,
40:14, 40:19,
40:20, 59:8,
59:9, 59:11
**redirect**
4:9, 129:6
**reduced**
45:19, 48:14,
81:12, 81:17,
99:11
**refer**
13:15, 33:7,
39:10, 117:3
**reference**
72:15, 92:15
**referenced**
130:9
**references**
92:14, 97:10
**referencing**
97:24
**referrals**
43:21
**referred**
73:25
**referring**
53:4, 54:19
**refined**
58:4, 118:12
**reflect**
24:22, 50:5,
57:13, 67:23
**reflected**
81:11

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

169

reflects
71:17
regard
15:12, 15:22,
16:14, 45:4,
50:6, 75:18,
97:9, 99:9,
100:18, 100:21,
104:4, 104:13,
110:24, 111:14,
112:18, 113:8,
121:20, 122:8,
125:21, 128:2,
128:13, 128:15,
128:21
regarded
84:16, 84:19
regarding
10:14, 27:1,
29:1, 34:13,
64:10, 82:19,
83:6, 83:17,
84:3, 84:4,
84:6, 84:15,
92:3, 98:10,
99:15, 99:22,
120:7, 121:19
registered
135:4
regular
14:10, 90:7,
123:3
regularity
117:18
regularly
117:15, 117:16,
117:22
relate
17:13
related
10:1, 10:2,
10:6, 10:9,
10:10, 15:1,
16:19, 18:10,
18:14, 25:7,
30:12, 33:16,
36:17, 43:21,
44:13, 48:19,

50:23, 55:8,
61:7, 88:8,
91:16, 97:10,
99:10, 99:13,
105:10, 106:22,
110:9, 113:8,
113:13, 122:18
relates
95:8, 121:15
relating
107:9
relation
8:8, 16:24,
27:14, 47:13,
55:24, 80:8,
111:9, 112:10
relations
104:15
relationship
8:14, 10:25,
28:8, 29:7,
43:3, 43:16,
44:11, 44:15,
44:18, 44:21,
53:1, 58:8,
86:3, 88:16,
90:4, 90:19,
91:20, 97:12,
106:2, 122:25,
125:22, 126:19,
126:24, 127:15,
127:18, 127:24,
129:9, 129:20
relationships
46:2, 47:10,
56:4, 85:19,
86:2, 104:19,
121:9, 121:10
relative
30:2, 38:4,
71:9, 78:13,
80:10, 111:3,
135:12, 135:13
release
87:24
relevant
15:3, 96:18,
120:24, 122:19

relevantly
28:13
reliable
21:25, 76:8
reliably
35:21, 40:24
relied
24:11
relief
20:17, 56:14,
59:1, 59:5,
61:20, 79:20,
79:21, 80:16,
80:19
rely
24:15, 49:16,
52:5, 117:18
relying
64:19, 98:20
remain
29:22, 30:7,
113:17
remained
25:8, 25:20,
39:25
remains
122:1
remark
111:12
remarks
28:19, 29:3,
30:1, 30:5,
30:12, 38:10,
109:3, 111:9,
111:10, 113:13
remember
57:6
remote
1:14, 3:25,
70:8
remotely
5:12, 6:6, 6:8,
134:6
remove
99:7
removed
86:7
remunerate
98:22

render
9:5, 83:13,
128:21
rendering
115:21
renew
26:21, 47:5,
47:6
renewal
43:10
renewed
26:12, 27:7
renewing
127:4
reorder
125:4, 125:18
reordered
124:23, 125:3
reorders
59:21, 59:24
repeat
73:22
repeatedly
16:23, 26:13
rephrase
79:2
replace
48:6
replaced
28:6, 99:16
report
14:9, 24:25,
27:20, 47:8,
47:18, 59:4,
108:11, 110:9,
110:17, 115:21,
117:8, 117:10,
119:23, 127:8,
135:7
reported
1:24, 53:23,
59:3
reporter
4:23, 5:23,
5:25, 73:23,
74:1, 135:1,
135:5
reporting
6:5, 6:13,

53:25
**reports**
15:1, 15:2,
88:7, 88:11,
99:14, 108:20
**represent**
5:14, 11:15,
22:10, 62:19,
65:21, 106:7
**representation**
11:13, 49:20
**representations**
27:1
**representative**
5:19
**representatives**
93:11, 94:19,
100:2, 103:8
**represented**
11:23, 63:7
**representing**
5:11, 5:24,
11:20
**represents**
65:22
**request**
8:1, 76:20
**requested**
52:4, 135:9
**require**
11:3, 11:5,
17:14
**required**
85:22
**requirement**
85:20, 104:6
**resales**
60:20
**research**
9:7
**researched**
117:23
**residual**
59:18
**resignation**
130:6
**resources**
104:25, 119:2,

129:23
**respect**
14:4, 14:13,
24:16, 43:12,
79:4, 88:2,
106:16
**response**
71:11, 99:19,
116:12
**responsible**
121:4
**responsive**
73:13
**rest**
25:8, 45:9
**restate**
16:2
**result**
8:16, 25:12,
25:13, 28:15,
29:9, 29:18,
42:13, 48:10,
59:20, 62:20,
85:8, 85:11,
86:15, 99:11,
110:14, 111:22,
114:24
**results**
72:6
**retail**
41:8, 55:23,
87:23
**retailers**
55:21, 120:19
**retained**
9:6
**return**
68:6, 118:12
**returned**
29:2, 30:4,
112:15
**returns**
29:12
**reveal**
122:21
**revealing**
122:14
**revenue**
11:15, 11:17,

12:3, 12:7,
12:17, 17:3,
20:11, 20:12,
20:13, 20:15,
20:19, 24:20,
25:23, 27:15,
38:15, 39:5,
39:21, 43:21,
46:12, 46:17,
47:14, 48:19,
48:25, 50:18,
51:23, 55:14,
57:9, 59:14,
61:2, 61:19,
62:12, 63:10,
67:19, 68:21,
70:15, 70:25,
71:7, 71:19,
72:7, 75:3,
75:18, 76:7,
76:15, 77:13,
79:5, 83:17,
84:10, 88:8,
114:1, 114:17,
115:22, 116:8,
117:9
**revenues**
11:7, 11:8,
11:9, 14:10,
16:1, 23:17,
24:2, 24:3,
25:3, 40:17,
41:6, 49:19,
50:6, 50:22,
65:8, 68:3,
75:21
**review**
50:11, 81:21,
82:4, 83:5,
92:11, 96:17,
135:8
**reviewed**
27:16, 83:13,
87:17, 91:24,
97:21, 114:9,
117:10, 128:5
**reviewing**
82:6, 108:16

**ridiculously**
68:22
**right**
6:20, 9:14,
31:18, 40:7,
47:23, 60:21,
69:18, 74:2,
74:9, 77:22,
85:10, 90:17,
91:20, 106:6,
124:14, 125:25,
131:4
**rights**
88:19, 97:14,
97:25, 98:8,
106:8, 121:24,
126:2, 127:5,
129:17, 129:19
**ringer**
115:14
**rise**
36:2, 112:20,
115:3, 115:13
**risk**
29:20, 108:25,
109:18, 110:5,
110:15
**riviera**
126:6
**roads**
67:10, 67:13
**robinson**
3:3
**role**
26:19, 27:2,
89:1, 121:21
**romanesque**
93:13, 94:20
**room**
6:4
**rose**
86:25
**rotates**
126:11
**rough**
108:18
**round**
34:18

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

171

routine
14:7
royal
54:7
royalties
48:17, 49:18,
50:25, 51:10,
51:14, 52:14,
54:22, 54:25,
55:17
royalty
51:17, 51:23,
52:18, 52:22,
53:8, 54:6,
54:9, 54:13,
54:16, 57:21,
88:7, 88:11
rpr
1:24, 2:21,
134:14, 135:22
rude
124:16
run
7:19, 62:23,
111:2
running
103:17
runs
35:7

**S**

s
21:5, 22:15,
22:16
said
58:15, 69:17,
74:8, 88:13,
90:12, 90:14,
96:12, 108:24,
110:5, 113:20,
113:21, 114:14,
117:7, 119:24,
122:25, 123:3,
125:23, 132:3
sake
52:20, 70:24
sale
63:18, 63:19,

65:22, 65:25
sales
4:18, 18:14,
18:15, 41:7,
41:8, 42:16,
43:22, 51:18,
51:22, 55:6,
57:14, 57:15,
58:21, 58:25,
59:4, 59:18,
59:22, 59:24,
60:3, 60:9,
60:19, 61:3,
61:9, 63:11,
68:9, 75:8,
78:4, 79:23,
88:9, 99:15,
118:15, 119:2,
119:9, 119:19,
124:19
same
15:21, 26:12,
26:22, 45:23,
68:24, 110:21,
116:7, 121:6,
122:12, 131:13,
133:5
sampling
35:15
savings
63:24
saw
46:16
say
21:11, 27:4,
41:2, 41:15,
60:14, 63:9,
64:17, 64:21,
65:5, 65:24,
67:20, 77:14,
131:14
saying
42:8, 96:17,
107:8, 113:7
says
20:6, 58:20,
67:21, 70:7,
74:20, 77:18,

82:18, 83:1,
87:14, 88:15,
90:17, 91:17,
93:10, 94:4,
94:7, 94:10,
94:23, 95:10,
104:11, 127:8
scale
55:10, 58:5,
69:6, 72:17,
119:6
scenarios
119:16
schedule
92:5
scheduled
18:2
school
16:16
schwab
41:23, 44:19,
44:20, 77:19,
104:1
scientific
70:20, 113:22
scientifically
74:18, 116:22
scope
9:24, 40:12,
55:10, 124:9,
124:12, 124:25,
126:20
scott
26:13, 105:9,
105:15, 121:5
screen
19:16, 30:25,
32:3, 70:7
search
101:11, 112:22
second
17:17, 31:12,
84:13
secure
107:11
secured
47:11
securing
51:10

see
10:20, 19:25,
32:5, 36:7,
36:8, 36:10,
36:15, 36:19,
36:22, 37:14,
58:21, 82:15,
82:16, 111:3
seeing
119:13
seem
11:11
seemed
22:11, 23:4,
119:19
seems
24:8, 101:7
seen
117:24
segment
81:3, 109:19
select
103:1
selected
101:18, 102:5
selection
104:5
sell
61:3, 61:16,
63:3, 63:17
seller
87:20, 122:8
sellers
87:16, 87:18,
88:3, 121:17
selling
64:14, 64:22,
65:8, 66:21,
67:18, 87:20,
125:18
senior
5:20, 87:3,
128:23
sensitivity
32:12, 37:10
sentiment
4:17, 28:15,
28:24, 29:1,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

172

29:2, 29:12,
29:24, 30:4,
30:17, 32:13,
33:1, 33:16,
33:22, 34:12,
35:5, 35:6,
35:22, 36:1,
36:4, 36:6,
36:12, 36:16,
36:25, 37:2,
37:21, 110:17,
111:3, 111:4,
111:5, 111:6,
111:8, 112:17
**sentiments**
35:10, 37:7
**separate**
95:2
**september**
59:19
**serial**
121:24
**serve**
9:21, 26:19
**services**
49:9, 56:3
**serving**
8:8
**set**
52:13, 61:25,
120:25
**settlement**
25:1, 25:2,
25:6, 39:2,
39:13, 39:18,
107:3
**seven**
29:3, 129:25
**several**
20:5, 33:10,
68:23, 111:20
**severed**
126:18
**severing**
126:23
**sexist**
38:6, 109:12
**shall**
93:10, 94:18

**share**
36:20, 43:21,
57:9, 64:4,
68:21, 80:7,
107:12
**shared**
101:20, 105:18,
121:6
**shares**
12:23, 24:20,
25:23, 48:19
**sheet**
133:7
**sheets**
14:5
**shetty**
4:2, 5:20
**shift**
114:22
**shock**
93:19
**shoe**
12:22
**shops**
124:4
**short**
31:23, 70:2,
107:24, 112:14
**shorter**
130:3
**should**
15:15, 19:20,
39:3, 39:13,
39:14, 65:11,
66:2, 87:9,
107:8, 107:18,
123:8, 123:12,
125:8
**show**
10:19, 51:20,
51:21, 83:3,
83:14, 84:25,
85:1, 99:12,
99:16, 110:10
**showed**
123:9, 130:15
**shows**
99:13

**signature-kzx**
135:20
**signature-usnmn**
134:12
**signed**
23:19, 133:7,
134:9
**significance**
122:3, 122:6
**significant**
11:3, 12:21,
12:24, 35:15,
41:3, 46:16,
55:7, 56:4,
56:6, 56:7,
56:8, 63:24,
84:10, 87:21,
90:22, 105:20,
109:16, 110:1,
114:22, 121:11,
122:5
**significantly**
30:2, 58:6,
85:7, 87:1,
121:3, 127:20
**similar**
9:16, 10:12,
33:21, 36:8,
36:19, 44:12,
44:22, 46:15,
46:20, 49:24,
55:4, 55:25,
61:3, 64:2,
64:10, 69:5,
72:20, 72:21,
73:2, 79:20,
80:20, 80:22,
110:13, 111:6,
126:15
**simply**
10:13, 30:12,
39:4, 40:20,
53:10, 53:11,
58:24, 68:11,
77:10, 105:24,
107:4, 110:2,
110:15, 117:5,
127:4

**simulators**
44:14
**since**
11:24, 30:4,
41:10, 56:16,
58:2, 108:14,
117:24, 129:21
**single**
71:10, 74:14
**sir**
13:12, 13:14,
13:20, 27:4,
32:19, 34:25,
37:20, 38:22,
39:7, 39:17,
43:2, 48:5,
53:6, 62:15,
63:9, 66:8,
67:12, 72:4,
73:21, 78:3,
78:7, 81:14,
93:7, 95:1
**siris**
117:12
**sirius**
17:20, 94:5,
98:17, 106:13,
120:5, 120:6,
121:2, 121:4,
121:6, 121:10,
121:14, 126:18,
127:3, 127:9,
127:20, 129:16
**siriusxm**
10:2, 23:19,
24:19, 24:23,
25:2, 25:4,
25:21, 26:7,
26:14, 26:15,
26:19, 27:6,
27:13, 28:7,
28:16, 29:4,
29:21, 29:23,
30:7, 38:11,
40:13, 43:7,
49:6, 57:19,
57:24, 58:1,
58:3, 58:7,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

62:24, 68:13,
77:4, 77:11,
79:22, 83:1,
83:11, 83:23,
84:11, 85:9,
85:12, 85:15,
85:17, 85:23,
86:3, 86:7,
86:16, 86:18,
86:20, 86:21,
86:24, 87:2,
90:19, 90:23,
91:6, 91:12,
91:13, 91:19,
91:21, 91:25,
92:6, 92:9,
92:17, 93:10,
93:11, 93:21,
94:18, 94:24,
97:8, 97:11,
97:20, 98:3,
98:13, 99:3,
99:6, 99:7,
99:11, 99:15,
105:19, 110:10,
118:11, 119:20,
120:15, 120:20,
120:22, 126:19,
127:15, 127:18,
127:23
**siriusxm's**
83:3, 83:8,
83:15, 83:17,
86:15, 86:17,
97:12, 98:7,
98:9, 120:3,
120:9, 127:16
**situation**
64:10, 91:4,
110:8, 130:24
**situations**
63:15
**six**
9:22
**skill**
63:23
**sky**
41:24, 44:9,

44:13, 63:4,
77:19
**slide**
19:19
**slowing**
22:6
**small**
35:13, 35:16,
35:18, 47:12,
55:11, 55:12,
55:15
**smiling**
10:20
**social**
33:13, 33:14,
34:4, 36:21,
112:20, 112:24,
113:15, 115:3
**software**
28:25, 33:20
**sold**
60:25, 63:10,
81:16, 87:24,
88:4, 123:25,
124:2, 124:17
**sole**
20:18, 61:15,
70:24
**solely**
95:8
**solemnly**
6:21
**some**
17:8, 21:3,
25:17, 28:7,
32:2, 37:2,
37:3, 41:10,
45:6, 49:11,
49:12, 49:21,
52:21, 53:1,
54:6, 55:13,
55:17, 70:18,
71:11, 74:12,
85:6, 85:7,
89:8, 89:19,
101:4, 106:20,
107:6, 107:14,
109:5, 109:19,

112:1, 113:10,
113:14, 116:24,
119:4, 119:14,
122:11, 123:7,
127:2
**somebody**
65:10
**someone**
29:19, 74:20,
101:20, 104:7,
109:11, 127:23
**something**
17:14, 24:7,
31:16, 33:25,
38:25, 69:17,
109:16, 109:17,
113:8, 113:20,
122:21, 122:25
**somewhat**
21:14
**somewhere**
71:17
**sorry**
16:11, 60:7,
75:9, 75:10,
75:16, 75:23,
75:25, 76:2,
78:20, 78:24,
90:11, 90:16,
93:25, 125:16
**sort**
109:4, 129:17
**sorts**
97:23
**sought**
71:1
**sound**
22:23, 22:25
**sources**
12:8
**south**
3:14
**southern**
1:2, 5:7
**span**
61:20, 62:13
**spans**
20:24, 32:15

**speak**
9:25, 60:5,
90:8
**speaking**
90:10
**speaks**
64:25, 65:10,
65:16, 66:5,
66:15
**specific**
9:11, 53:20,
62:3, 97:20,
98:1, 99:10,
99:12, 99:14,
106:1
**specifically**
7:24, 10:22,
24:18, 28:13,
33:15, 81:23,
91:3, 92:14,
100:16, 106:17,
120:10, 122:8,
122:19, 130:9
**speculative**
70:22
**spend**
59:13
**spent**
10:3, 10:8,
10:22, 11:1,
58:5, 86:7,
108:10, 108:13,
118:14
**sphere**
99:21
**spiked**
37:7
**spoken**
15:11, 15:16
**sponsor**
102:23
**sponsored**
126:12
**sponsors**
29:6, 129:2
**sponsorship**
125:24
**sport**
38:8, 38:13,

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

174

| | | | |
|---|---|---|---|
| 80:23, 84:18, 86:23, 86:25, 89:7, 89:18, 120:24 | 134:3, 134:15, 135:2 | **still** 9:13, 38:3, 47:22, 62:6, 78:24, 98:5, 129:21 | **style** 37:16 |
| **sporting** 55:24 | **stated** 26:2, 116:2 | **stock** 12:19, 12:21 | **subject** 10:18, 12:25, 37:15, 92:7, 109:15 |
| **sports** 15:12, 66:20, 98:3, 115:14, 130:14 | **statement** 51:19, 51:24, 52:2, 52:5, 54:7, 54:13, 96:24 | **stop** 49:15, 73:3, 75:15 | **subjects** 91:16 |
| **sports-media-related** 9:8 | **statements** 14:6, 14:19, 14:23, 51:17, 52:6, 52:7, 52:17, 54:7, 54:9, 54:19, 99:20, 100:14 | **stopped** 46:1 | **subscribers** 127:21 |
| **spreadsheets** 117:14 | | **store** 102:12 | **subscribes** 33:2 |
| **spring** 56:15 | **states** 1:1, 5:6, 105:17, 130:8 | **stores** 43:18 | **subscription** 49:15, 49:25 |
| **st** 5:9, 134:7 | **stating** 6:14 | **stories** 111:2 | **subsequent** 42:19 |
| **stable** 61:22, 70:18 | **statistically** 35:15 | **story** 123:7 | **substantial** 11:5, 46:18, 50:22, 84:9, 89:2, 89:3, 89:21 |
| **staff** 14:11 | **stature** 86:24, 88:25 | **straightforward** 11:12 | **substantially** 41:12, 49:21, 50:3, 64:6, 71:1, 108:15, 120:17 |
| **stakeholders** 104:19, 128:24 | **stay** 90:6, 127:23 | **strategic** 57:19, 58:6, 69:2, 74:22 | |
| **stamped** 60:17 | **stayed** 21:16 | **strategy** 72:3, 109:22 | **substantiated** 75:8 |
| **standard** 96:8, 97:4, 104:9, 117:21 | **steady** 119:19 | **stream** 39:21 | **substantive** 129:20 |
| **standards** 14:8, 93:14, 94:23, 95:3 | **steinberg** 88:17, 90:2, 125:23 | **streaming** 97:14 | **success** 16:21, 71:14, 89:19, 91:5, 119:20, 121:14 |
| **standing** 83:4, 84:14, 85:4 | **stenographer** 6:2, 6:19, 7:1, 131:6, 131:8, 131:12, 131:16, 131:20, 131:24, 132:1, 132:6 | **streams** 12:17, 50:18 | **successful** 18:3, 57:18, 59:15, 69:5, 84:17, 84:20, 84:24, 86:1, 118:11 |
| **standpoint** 22:20 | | **street** 74:14 | |
| **start** 11:20 | | **strike** 15:16, 73:10, 73:17, 114:7, 124:7 | |
| **started** 16:15, 16:16, 87:3 | **stenographic** 135:10 | **structure** 100:17, 128:1 | **successfully** 79:25 |
| **starting** 13:24 | **stenographically** 135:6 | **struggled** 115:2 | **suffers** 81:6 |
| **starts** 36:16 | **stephen** 102:8, 102:21 | **struggles** 89:2 | **sufficient** 23:5, 75:10 |
| **state** 2:21, 5:14, | **steps** 19:19 | **student** 123:8 | **suggest** 64:13, 117:3 |
| | | **studied** 115:23 | |

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

175

suggested
119:9
suggesting
29:11, 65:15,
66:1
suggestion
21:9
suing
40:3
suite
3:15, 80:22
sum
26:1
summer
130:8
superstore
47:6
superstores
123:24, 124:23
supervision
92:8
supplies
124:23
support
37:3, 46:7,
49:10, 89:17,
91:2, 104:11,
104:14, 104:24,
107:15, 118:25,
128:16, 128:18,
129:15, 130:15
supportive
50:15
supposed
123:4
supreme
6:10
sure
12:14, 19:17,
23:23, 31:9,
33:21, 42:17,
47:21, 50:4,
59:2, 67:21,
71:10, 71:22,
73:24, 79:15,
81:10, 92:17,
108:17, 111:1,
112:21, 114:15,

123:17
surprised
21:11
survey
33:11
suspect
30:20
suspended
112:14
sustainable
86:1, 86:2
sustained
86:6
swatch
45:18
swear
5:25, 6:21
sworn
7:7, 134:7
sync'd
131:22, 132:8

**T**

tab
13:19, 19:13,
20:16, 50:14,
53:4, 53:19,
54:3, 58:9,
58:18, 82:1,
82:2, 92:25,
93:1, 93:3,
93:4, 93:5
table
24:25, 25:16
tabs
50:13
tailor
47:5, 50:17,
51:19, 52:23
take
18:1, 20:4,
31:15, 61:17,
62:21, 63:1,
69:9, 69:11,
69:21, 71:5,
101:12, 105:9,
107:19, 111:13,
116:20, 119:14

takedown
122:16, 122:17
taken
13:25, 14:2,
14:4, 14:7,
29:19, 30:14,
38:11, 112:2,
119:17
takes
51:13, 51:24,
97:15, 101:6
taking
5:12, 112:6
talent
11:13, 11:15,
11:18, 18:6,
46:14, 115:7,
115:11, 121:11
talent-driven
114:23
talk
17:17, 41:25
talked
112:4
talking
27:19, 39:17,
39:18, 47:22,
62:7, 100:13,
112:5
talks
102:22
tarde
105:16
taught
22:16, 22:17
teach
22:15
teacher
22:9
team
92:9, 98:13,
100:24, 103:18
teams
129:2
tech
70:8
technician
3:25

technologies
44:13
technology
127:19
telecast
106:12, 112:11
television
111:15
tell
60:13, 61:6,
67:12, 82:21,
92:2, 104:3
telling
54:15, 64:18,
65:21, 66:23,
66:25
ten
11:4, 20:11,
38:21, 39:22,
112:20
ten-ranged
130:18
ten-year
21:16, 22:21
tens
72:23, 119:7
tenure
130:5
term
20:12, 26:8,
33:17, 42:10,
112:9
terminate
25:21
terminated
43:24, 43:25,
44:25, 45:1,
45:2, 45:16,
99:12
termination
25:13, 43:11,
44:2
terms
26:12, 26:22,
27:9, 35:12,
39:17, 39:18,
42:2, 42:6,
43:24, 44:25,

59:8, 91:19,
95:4, 99:4,
99:6, 108:19,
108:22, 109:24,
129:15
**test**
56:15, 70:8
**testified**
7:7, 8:20,
14:12, 75:20,
108:10, 108:23,
110:17, 125:20
**testify**
7:15, 8:25,
79:11, 79:16,
79:17, 82:24,
88:2, 90:12,
90:20, 91:22,
99:17, 128:17
**testifying**
8:11, 72:4,
127:9
**testimony**
6:21, 37:20,
38:22, 43:2,
82:19, 96:21,
118:5, 124:3,
124:13, 125:23,
133:4, 133:6
**texas**
43:20
**th**
3:5, 26:8,
26:21, 28:19,
32:15, 35:7,
36:15, 36:23,
99:5, 129:8
**thank**
7:1, 77:24,
107:20, 108:4,
108:5, 129:4,
129:11, 132:12,
132:13
**thanks**
58:7, 132:9
**theme**
87:12
**themselves**
5:14, 41:1,

109:15, 110:13
**theoretical**
23:7
**therefore**
26:10, 29:16,
63:2, 63:18,
95:19, 102:3
**thereof**
37:11, 51:24
**thereupon**
5:1, 7:5,
18:25, 31:22,
32:22, 58:12,
70:1, 73:25,
107:23, 132:14
**things**
15:15, 77:23,
109:5, 115:13,
121:12
**think**
22:22, 26:17,
27:23, 38:25,
43:13, 44:6,
47:22, 48:9,
54:18, 69:20,
69:21, 72:24,
90:1, 113:21,
116:6, 116:11,
119:25, 123:12,
123:14, 130:15,
131:23
**thinking**
108:13
**third**
3:4, 15:4,
40:11, 49:11
**third-party**
28:25, 89:14
**thomas**
29:25, 30:3,
111:7, 111:9,
111:11, 111:14,
111:18, 111:20
**thought**
27:25
**thoughtful**
37:16, 69:2
**thousands**
119:6

**three**
67:4, 89:16,
131:14
**thrived**
115:17
**thriving**
79:7
**through**
10:11, 12:8,
12:18, 12:24,
13:8, 13:11,
14:7, 20:24,
21:4, 21:17,
21:22, 27:5,
28:4, 28:7,
30:9, 32:15,
34:23, 35:11,
37:24, 40:21,
42:9, 43:3,
48:4, 53:2,
53:12, 53:23,
54:14, 56:17,
59:2, 67:25,
80:18, 82:21,
82:22, 83:25,
86:8, 86:10,
88:23, 89:9,
90:3, 98:15,
102:22, 103:5,
105:13, 112:22,
117:25, 119:22,
120:3, 120:21,
126:4, 135:8
**throughout**
16:22, 21:8,
48:21, 50:15,
55:21
**tied**
24:20
**tiger**
88:17, 88:22,
89:6, 89:9,
112:5, 122:10,
122:11, 122:21,
123:3, 123:9,
125:22
**tiger's**
89:1, 89:12,

89:17, 122:18,
122:23
**tilghman**
112:10
**till**
57:16
**time**
5:9, 8:3, 8:6,
9:23, 10:3,
10:4, 10:22,
11:1, 11:4,
11:5, 16:17,
18:1, 20:25,
21:5, 21:25,
22:4, 23:19,
31:14, 34:4,
34:5, 34:7,
36:11, 36:20,
37:3, 40:2,
41:8, 41:15,
45:20, 48:7,
55:25, 56:16,
61:20, 73:19,
77:4, 77:12,
78:5, 86:8,
87:4, 87:25,
89:13, 95:16,
97:15, 103:17,
106:23, 107:1,
107:15, 108:15,
109:7, 112:15,
116:23, 120:8,
120:18, 122:24,
124:15, 126:13,
129:14
**timeframe**
22:12, 39:12,
62:13
**timeline**
118:23
**times**
67:4, 87:20,
108:23, 122:7,
122:11, 130:1
**title**
95:12, 129:1
**titled**
19:21, 20:23

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

177

| | | | |
|---|---|---|---|
| **today**<br>5:11, 5:23,<br>18:2<br>**today's**<br>5:9<br>**together**<br>108:19, 108:20<br>**told**<br>25:21, 26:13,<br>90:6, 102:1<br>**took**<br>31:22, 46:11,<br>70:1, 70:17,<br>107:23, 112:19<br>**tool**<br>33:22, 34:2<br>**tools**<br>28:25, 112:24<br>**top**<br>42:3, 48:1,<br>57:7, 64:12,<br>64:22, 75:6,<br>75:8, 75:9,<br>102:17, 118:16,<br>130:18<br>**top-line**<br>20:19, 61:2,<br>61:15, 63:21,<br>64:5, 67:19,<br>68:9, 70:25,<br>77:12, 118:15<br>**top-line-revenue**<br>61:5<br>**top-line-sales**<br>20:21<br>**topic**<br>40:5, 83:6,<br>84:15, 90:9,<br>90:13, 99:22,<br>120:7, 128:22<br>**topical**<br>79:20, 79:21,<br>80:16, 80:17,<br>80:19<br>**topics**<br>82:19, 82:22,<br>111:2<br>**total**<br>20:7, 25:3, | 35:20, 38:14,<br>45:13, 48:13,<br>51:1, 63:7,<br>67:24<br>**totaled**<br>45:4<br>**tour's**<br>26:17, 28:17,<br>30:14, 38:9,<br>39:5, 88:15,<br>90:18, 91:4,<br>91:6, 94:22,<br>99:18, 104:14,<br>106:7, 110:9,<br>111:11, 113:5<br>**tournament**<br>100:25, 101:11,<br>101:17, 101:24,<br>101:25, 102:2,<br>102:4, 102:18,<br>102:19, 123:10,<br>129:1, 130:17<br>**tournaments**<br>111:19, 111:21,<br>125:25, 130:10<br>**track**<br>78:4<br>**tracking**<br>108:14<br>**tract**<br>70:25<br>**traction**<br>64:4<br>**training**<br>14:7, 14:10,<br>48:24, 56:2<br>**training-practic-<br>e-aid**<br>52:25<br>**transacting**<br>56:3<br>**transaction**<br>13:4, 13:5,<br>13:8<br>**transactions**<br>53:11, 53:20<br>**transcript**<br>135:8, 135:9 | **transcription**<br>133:6<br>**translate**<br>61:10<br>**treated**<br>107:5, 111:12<br>**treatment**<br>129:16<br>**tremendous**<br>85:3, 85:24,<br>105:23<br>**trend**<br>36:10, 36:11,<br>72:15<br>**trends**<br>114:17, 115:23,<br>116:4<br>**trial**<br>89:23, 128:6<br>**tried**<br>77:9, 78:19<br>**true**<br>26:7, 133:5,<br>135:9<br>**truly**<br>115:17<br>**trust**<br>126:12<br>**truth**<br>6:22, 6:23<br>**try**<br>75:20, 114:7<br>**trying**<br>74:3<br>**tube**<br>57:9<br>**turner**<br>54:8<br>**tweet**<br>36:10<br>**twitter**<br>33:14<br>**two**<br>3:14, 35:18,<br>35:20, 47:3,<br>47:19, 47:24,<br>89:6, 89:15,<br>97:17, 101:18, | 102:9, 127:25,<br>131:13, 131:14<br>**type**<br>8:15, 52:6,<br>52:8, 52:10,<br>52:12, 55:25,<br>64:10, 93:20,<br>97:11, 110:14,<br>116:19, 119:12,<br>127:2<br>**types**<br>10:12, 10:14,<br>33:4, 40:17,<br>55:3, 61:4,<br>63:24, 69:4,<br>72:20, 81:4,<br>115:10, 115:12,<br>115:18<br>**typo**<br>87:9<br>— U —<br>**uh-hm**<br>15:9, 50:20<br>**uhm**<br>9:10<br>**ultimately**<br>30:14, 37:10,<br>51:23, 52:1,<br>97:16, 101:1,<br>102:22, 130:7<br>**unable**<br>40:3, 43:9<br>**unavailable**<br>87:23<br>**under**<br>9:15, 17:7,<br>17:10, 24:21,<br>27:15, 42:9,<br>51:13, 82:1,<br>90:24<br>**underlying**<br>17:25<br>**undersigned**<br>134:5<br>**understand**<br>10:10, 17:23,<br>39:24, 65:11, |

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

178

66:13, 76:23,
78:25, 88:20,
93:17, 106:5
**understandable**
27:23, 27:25
**understanding**
43:8, 95:1,
97:5, 106:11,
125:2
**unfair**
59:15, 68:7,
74:9
**unfairly**
107:6, 111:12,
122:15
**unfavorable**
100:5, 122:10
**unique**
58:6, 62:22,
69:7, 78:14,
85:17, 87:6,
87:14, 88:16,
125:21
**uniqueness**
87:19
**unit**
41:7, 61:7
**united**
1:1, 5:6,
105:17, 130:8
**units**
120:12
**university**
14:11, 48:22
**unless**
107:1
**unlimited**
115:9
**unprecedented**
41:5, 55:5
**unreasonable**
30:13, 72:18
**unreasonably**
119:4
**unstoppable**
69:9
**until**
10:3, 25:5,

29:7, 58:3,
69:9, 72:23,
121:7, 125:3,
125:19
**unusual**
72:21
**use**
20:12, 30:7,
33:22, 44:22,
59:6, 71:25,
72:13, 75:4,
105:20, 118:25
**uses**
117:16
**using**
28:24, 63:3

**V**

**vague**
66:16, 66:21
**validated**
24:6, 34:6,
74:18
**valley**
102:13
**valuation**
40:6, 71:5
**value**
18:21, 38:18,
38:23, 39:3,
39:9, 39:15,
41:15, 45:13,
48:15, 51:6,
63:13, 77:20,
81:13, 81:17,
85:3, 85:24,
109:24
**valued**
38:3
**values**
34:9
**valuing**
39:21
**vane**
3:25
**variable**
75:21, 76:4
**variables**
23:8

**variety**
28:25, 53:1
**various**
15:1, 15:2,
16:21, 17:10,
24:20, 40:12,
48:19, 88:9,
89:17, 99:24,
104:19
**versus**
74:16, 97:5,
130:1
**vertical**
34:8
**verticals**
85:2
**via**
1:14, 2:1, 3:9,
3:20, 134:6
**vice**
5:20
**victories**
123:4
**victory**
37:6, 122:24
**video**
3:25, 5:10,
5:12, 70:8,
131:22, 132:8
**videoconference**
1:14, 3:9,
3:20, 134:7
**videographer**
3:24, 5:3,
5:10, 5:23,
31:20, 31:25,
69:24, 70:4,
107:21, 108:1,
131:21, 132:7,
132:10
**videotaped**
1:14, 5:4,
135:7
**view**
95:21, 104:4
**viewed**
37:2, 95:13,
95:18, 100:5,

109:11
**violated**
123:7
**virtual**
46:18, 47:11,
47:17
**virtually**
17:13, 37:18,
50:23, 74:12,
74:13, 115:4
**virtue**
80:24
**vis-a-via**
26:25, 46:7
**visibility**
60:1
**vitae**
82:20
**voice**
5:13
**voiced**
121:6
**volume**
1:13
**voodoo**
4:18, 56:13,
56:18, 56:20,
56:24, 57:15,
58:2, 58:21,
58:25, 59:5,
71:21, 77:7,
78:1, 80:8,
107:10, 118:4,
119:10
**vs**
1:8

**W**

**wait**
9:12, 62:6,
68:15, 73:14,
98:5
**waive**
6:12
**wake**
110:25
**wall**
74:14

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

179

**want**
10:21, 65:20,
65:23, 67:5,
67:15, 70:14,
72:18, 73:16,
73:17, 82:21,
98:14, 98:22,
106:17, 114:15,
119:4, 120:2,
132:1, 132:5
**wanted**
26:16, 27:3,
46:21, 101:16,
101:20
**wants**
110:16
**watch**
45:18
**way**
25:9, 94:9,
95:25, 102:23,
106:20, 109:10,
111:19, 124:15
**wdavis@foley**
3:21
**we'll**
58:10
**we're**
19:8, 31:20,
90:18, 123:4,
131:3, 132:3
**we've**
29:25, 86:7,
86:10
**website**
122:1
**wedge**
42:17
**wednesday**
1:17
**weekly**
130:2
**weeks**
9:22
**well-known**
84:17
**wendell**
102:10

**went**
51:25, 78:1,
119:22, 120:1,
123:15
**weren't**
42:12, 46:2
**whan**
105:18, 130:4
**whatever**
11:24, 106:21
**whereas**
63:25
**whether**
28:6, 76:25,
95:2, 100:6,
107:14, 109:18,
113:20, 120:2,
124:23, 132:5
**whole**
6:23, 26:15,
86:7, 86:24
**wide**
87:22, 88:25
**widely**
84:16, 84:19
**widely-held**
97:13
**widespread**
36:1, 36:12,
36:17
**wife**
22:5, 122:23
**william**
3:18, 5:17,
6:18
**win**
123:5
**windfall**
12:24
**window**
18:1, 21:3,
21:16, 22:21,
23:1, 23:5,
109:6
**windows**
130:2
**winner**
130:16

**winning**
34:19
**within**
29:2, 36:3,
37:17, 86:22
**without**
18:5, 37:16,
39:5, 43:7,
51:6, 85:2,
112:15, 120:22,
127:19
**withstanding**
37:21
**witness**
4:6, 6:1, 6:25,
7:15, 8:21, 9:1,
9:3, 9:15,
12:16, 16:9,
16:11, 17:24,
19:18, 19:23,
23:25, 31:4,
32:4, 47:24,
53:17, 62:8,
62:19, 65:2,
65:21, 66:17,
67:10, 68:16,
68:17, 73:9,
73:12, 74:2,
75:16, 84:8,
95:11, 96:7,
97:2, 98:7,
98:15, 101:10,
104:23, 108:5,
111:25, 113:12,
114:19, 114:21,
116:2, 116:16,
124:10, 124:17,
125:2, 125:12,
125:14, 126:22,
130:22
**women**
105:22
**women's**
30:9, 34:18,
34:20, 104:20,
105:7, 105:11,
105:12, 105:21
**woods**
88:17, 88:18,

88:22, 112:5,
122:10, 122:21,
123:9, 125:22,
125:24
**word**
59:25, 65:18,
111:14, 116:11
**work**
10:11, 16:24,
18:2, 18:5,
22:2, 23:3,
27:3, 41:2,
46:6, 46:15,
76:9, 82:12,
83:10, 101:3,
110:2
**worked**
85:25, 90:2,
121:23
**working**
22:2
**world**
18:4, 114:18,
122:10, 123:2,
126:8
**world-class**
46:6
**worse**
109:9
**worth**
29:19, 108:24,
109:18, 110:5,
110:15
**wouldn't**
11:18, 27:24,
112:23
**write**
87:8
**writing**
94:24
**written**
7:24, 8:1,
123:11, 123:12
**wyeth**
64:1

**X**

**xenophobe**
38:6

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

180

**xenophobic**
109:12
**xm**
83:21

**Y**

**yeah**
19:17, 31:13,
31:15, 32:14,
35:17, 50:22,
53:18, 58:16,
59:9, 60:15,
72:9, 87:9,
90:11, 95:11,
96:8, 103:11,
123:16, 125:2,
127:7
**year**
23:10, 23:18,
24:3, 25:4,
25:8, 25:13,
25:18, 25:25,
38:21, 41:18,
45:10, 45:21,
48:4, 50:22,
50:23, 68:2,
70:19, 71:10,
71:20, 72:22,
75:19, 82:11,
84:22
**year's**
83:21
**year-over-year**
61:22, 118:21
**years**
10:8, 12:2,
12:4, 12:5,
12:6, 20:11,
21:19, 22:10,
22:11, 28:4,
29:14, 38:21,
39:22, 41:10,
45:14, 49:21,
49:22, 52:9,
54:25, 55:18,
61:4, 61:21,
72:23, 89:10,
90:3, 104:18,

109:24, 112:20,
118:22, 126:4
**york**
3:6, 87:20,
122:7
**young**
22:5, 22:6
**yourself**
14:19, 110:19
**yup**
20:1, 58:22,
93:9, 93:16

**Z**

**zero**
36:16, 72:22,
107:13
**zeros**
119:5
**zoom**
2:1

**$**

**$1,200,000**
26:1
**$1,400,000**
57:13
**$1.2**
25:22
**$10,000**
47:16
**$100**
119:9
**$100,000**
59:17
**$11**
71:19, 72:7,
75:19
**$11,000**
59:4
**$13,500,000**
38:15
**$200,000**
25:5, 41:17,
41:22, 42:22,
45:5
**$250,000**
49:3

**$3**
12:3
**$3,500,000**
71:19, 72:7
**$3.5**
75:19
**$300,000**
25:7, 25:11,
25:12
**$36,000**
51:20
**$38**
75:3, 81:15
**$38,170**
62:11
**$5,700,000**
48:14
**$5,750,000**
51:1
**$50,000**
42:25, 44:6
**$500,000**
45:11, 48:3
**$680,000**
25:1, 25:6
**$69,400,000**
63:8, 63:9,
67:24, 78:9,
81:12
**$80,000**
45:21
**$900,000**
25:11

**0**

**00120**
54:8
**00121**
54:8
**00122**
54:8
**019**
5:8
**03**
31:23, 32:1
**04**
134:17
**09**
1:18, 5:2,

5:10, 69:25,
70:3
**0x**
74:9

**1**

**1**
107:24, 107:25
**1.2**
25:3
**10**
1:18, 5:2,
5:10, 21:19,
31:16, 31:21,
31:24, 61:22,
69:12, 69:21,
74:9, 108:11,
108:16, 111:8
**100**
21:12, 43:6,
74:9
**10022**
3:6
**108**
4:8
**11**
31:23, 32:1,
72:23
**12**
21:20, 41:4,
47:12, 55:9,
58:2, 69:25,
70:2, 70:3, 70:5
**123**
54:9
**124**
54:9
**129**
4:9, 4:10
**13**
10:8, 58:2,
107:22, 108:2
**132**
135:8
**133**
4:21
**134**
4:22

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

181

**135**
1:23, 4:23
**14**
82:15, 132:11
**1421**
34:12
**15**
21:20, 26:8,
26:21, 50:13,
82:15
**17**
70:2, 70:5
**18**
4:16, 59:2
**19**
1:3, 59:13,
113:13
**1900**
3:15
**1997**
88:23
**1st**
32:15, 35:8

___ 2 ___

**2**
1:18, 132:15
**20**
1:18, 6:10,
104:18, 132:11,
132:15
**200,000**
44:4
**2000**
12:20
**2001**
16:16
**2002**
16:16
**2006**
11:22, 117:24
**2009**
88:24
**2010**
88:24
**2012**
12:20
**2013**
95:16, 120:21

**2016**
12:21
**2018**
42:25, 50:15,
50:19, 50:21,
51:19, 56:14,
56:15, 78:2
**2019**
20:24, 24:24,
25:9, 25:13,
28:19, 35:7,
35:8, 41:10,
41:14, 41:17,
42:6, 42:10,
42:20, 45:5,
45:21, 49:2,
57:12, 99:5,
120:21, 129:8,
130:17
**2020**
25:15, 25:18,
25:23, 40:22,
45:11, 45:15,
45:24, 46:24,
47:18
**2021**
1:17, 5:9,
13:17, 25:25,
26:4, 26:11,
26:21, 27:5,
28:4, 37:24,
40:21, 40:22,
45:23, 47:25,
134:8, 134:9,
135:16
**2022**
48:4, 51:4,
54:22, 67:25,
71:18, 72:6,
76:14, 79:5,
80:4
**2025**
55:18
**2026**
55:18, 70:16,
119:10
**2030**
20:24, 21:4,

21:17, 21:22,
22:11, 23:10,
27:5, 28:5,
37:24, 48:4,
51:4, 54:22,
67:25, 71:18,
72:6, 75:19,
76:14, 79:6,
80:4
**21**
59:3
**212**
3:7
**2121**
26:8
**22**
28:4
**23**
6:10, 134:17
**24**
3:5, 37:4,
107:22, 107:25
**25**
108:21
**26**
53:5
**262**
60:17
**263**
60:17
**264**
60:17
**28**
32:15, 35:7,
36:15
**29**
28:19, 36:23,
129:8

___ 3 ___

**3**
82:16
**30**
99:5, 108:21,
134:17
**303687**
134:16
**305**
3:17

**31**
1:17, 5:9,
134:7
**32**
4:17
**33131**
3:16
**36**
107:24, 108:2
**363245**
1:22
**3rd**
34:15, 34:17

___ 4 ___

**40**
4:15, 18:25,
19:6, 19:8,
36:24, 57:24,
81:19, 81:24
**41**
4:17, 30:21,
32:21, 32:22,
37:22
**42**
4:18, 58:11,
58:12, 58:15,
60:3, 60:9,
60:13, 60:14
**45**
61:18
**482**
3:17

___ 5 ___

**5,000**
47:16
**500,000**
47:20
**55**
31:21, 31:24,
61:7, 64:1, 75:2
**58**
4:18
**5th**
13:17, 134:9,
135:16

___ 6 ___

**600**
25:1

Transcript of Jeremy Aisenberg, Volume II
Conducted on March 31, 2021

**631008**
5:8
**63108**
1:3

| 7 |
| --- |

**70**
21:5
**71**
135:20
**730**
3:7
**75**
22:10, 45:20
**7700**
3:7

| 8 |
| --- |

**80**
22:15, 22:16
**800**
3:4
**8400**
3:17
**85**
22:11