UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:19-CV-63108-RAR

---------------------------------------------- X

HANK HANEY and                                 :
HANK HANEY MEDIA, LLC,                          :
                                                :
                              Plaintiffs,       :
                                                :
            -against-                           :
                                                :
PGA TOUR, INC.,                                 :
                                                :
                              Defendant.        :
                                                :
---------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S OMNIBUS MOTION *IN LIMINE*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

**Preliminary Statement**...........................................................................................**1**

**Factual Background**.................................................................................................**2**

**Argument** ..................................................................................................................**6**

   I.    Legal Standard ...............................................................................................6

   II.   Plaintiffs Should be Permitted to Introduce Evidence Regarding the Meaning of Terms of Art as They Are Used in the Broadcasting, Media Rights, and Talent Representation Industries .........................................................................................................................7

   III.  The Social Media Sentiment Analyses are Relevant and Admissible Evidence .................9

   IV.  Testimony by Aisenberg and McGee on the Topics Included in Their Amended Expert Disclosures is Admissible and Relevant ...................................................................12

   V.   Evidence of Defendant's Prior Interference with Haney's Business Endeavors is Admissible and Relevant ....................................................................................15

   VI.  Evidence Regarding Incidents Involving Non-parties Kelly Tilghman, Kevin Kisner, and Justin Thomas Is Relevant....................................................................................17

   VII.  Plaintiffs Do Not Intend to Make Any "Golden Rule" References ...................................19

**Conclusion** .............................................................................................................**20**

# TABLE OF AUTHORITIES

Page(s)

Cases

*Action Nissan, Inc. v. Hyundai Motor Am.*,
   2020 WL 9173027 (M.D. Fla. Nov. 5, 2020) ................................................................ 7

*Arch Specialty Ins. Co. v. Balzebre*,
   2013 WL 12065533 (S.D. Fla. Jan. 16, 2013) ....................................................... 6, 12

*Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*,
   2001 WL 617521 (M.D. Ala. Feb. 20, 2001) ................................................................ 7

*Castillo v. United States*,
   2012 WL 13071834 (S.D. Fla. Oct. 4, 2012) ............................................................. 11

*Cummins Alabama, Inc. v. Allbritten*,
   548 So. 2d 258 (Fla. Dist. Ct. App. 1989) ............................................................... 19

*Evanston Ins. Co. v. Xytex Tissue Servs., LLC*,
   378 F. Supp. 3d 1267 (S.D. Ga. 2019) ....................................................................... 7

*Exime v. E.W. Ventures, Inc.*,
   2009 WL 454278 (S.D. Fla. Feb. 11, 2009) .............................................................. 12

*Home Design Servs., Inc. v. Turner Heritage Homes Inc.*,
   825 F.3d 1314 (11th Cir. 2016) .................................................................................. 8

*In re: Chiquita Brands Int'l Inc.*,
   2019 WL 11497632 (S.D. Fla. Sept. 5, 2019) .......................................................... 16

*Lebron v. Wilkins*,
   990 F. Supp. 2d 1280 (M.D. Fla. 2013) ................................................................... 10

*Nationstar Mortg., LLC v. Berdecia*,
   169 So. 3d 209 (Fla. 5th DCA 2015) ....................................................................... 10

*R&R Intern., Inc. v. Manzen, LLC*,
   2010 WL 3605234 (S.D. Fla. Feb. 12, 2010) ........................................................... 13

*Republic of Ecuador v. Hinchee*,
   741 F.3d 1185 (11th Cir. 2013) .................................................................................. 8

*Rink v. Cheminova, Inc.*,
   400 F.3d 1286 (11th Cir. 2005) ................................................................................ 13

*SFR Servs., LLC v. Lexington Ins. Co.*,
   2021 WL 322367 (M.D. Fla. Feb. 1, 2021) ................................................................ 7

*Shaffer v. Ward*,
   510 So. 2d 602 (Fla. Dist. Ct. App. 1987) ............................................................... 19

*Simmonds v. Lowery*,
   563 So. 2d 183 (Fla. Dist. Ct. App. 1990) ............................................................... 19

*Stewart v. Hooters of Am., Inc.*,
   2007 WL 1752873 (M.D. Fla. June 18, 2007) ............................................................ 7

*United States v. Childs*,
   5 F.3d 1328 (9th Cir. 1993) ...................................................................................... 10

*United States v. Lebowitz*,
   676 F.3d 1000 (11th Cir. 2012) ................................................................................ 11

*United States v. Thomas*,
   62 F.3d 1332 (11th Cir. 1995) ............................................................................................... 16

Rules

Fed. R. Evid. 802 ............................................................................................................... 15
Fed. R. Evid. 803 ............................................................................................................. 9, 10
Fed. R. Evid. 804 ............................................................................................................. 16, 17
Fed. R. Evid. 901 ............................................................................................................... 11

Plaintiffs Hank Haney ("Haney") and Hank Haney Media LLC ("HHM" and, collectively, "Plaintiffs") submit this memorandum of law in opposition to Defendant PGA TOUR, Inc. ("Defendant" or "PGA TOUR")'s omnibus motion *in limine* ("Motion" or "Mot."). As with essentially every other PGA TOUR motion and pleading in this case, the PGA TOUR once again fails to recognize the substance of this lawsuit and the gravity of the PGA TOUR's actions.

## PRELMINARY STATEMENT

The PGA TOUR has spent years attacking Haney and his business interests ever since Haney began to use his prominence in the golf industry to expound upon views that differ from the golf world's norms, and most especially when he authored the New York Times #1 best seller *The Big Miss* about his multi-year relationship with the PGA TOUR media darling Tiger Woods. Haney became even more of a threat to the PGA TOUR's domination, not only to its golf industry's business but to the public relations machinery dictating the message of professional golf, when he went to work for Sirius XM Radio, Inc. ("Sirius XM"). Haney's golf talk show became Sirius XM's most important, popular, and profitable golf radio show. When Haney's comments in May 2019 about an upcoming women's professional golf tournament sparked some modicum of controversy, the PGA TOUR seized on that broadcast to force Sirius XM, against its desire and best interests, to terminate Haney.[1] The PGA TOUR's action had no legal justification, was done with malice, and destroyed Haney's ability essentially to make a living, causing significant

---

[1] ███████████████████████████████████████████████████████████████

As Jeremy Aisenberg testified: "I have specific data related to advertisers that reduced their investments in Sirius XM as a result of Haney's show being terminated. I have specific data related to the lack of popularity of the shows that were added in its place, specific reports from advertisers and Sirius XM sales executives regarding the lack of interest in advertising on the program that replaced Hank's show…." (*See* Exh. B, Aisenberg II Tr. 99.) The PGA TOUR made no follow-up inquiries regarding the data or analysis even though Sirius XM had produced all of that information (another fact that the PGA TOUR ignores in its Motion).

financial and reputational injury.  Long after the events in question, and in response to the instant lawsuit, the PGA TOUR manufactured clearly specious pretextual rationalizations for having forced Haney's termination.

By it motions *in limine*, the PGA TOUR wants the Court to rule that terms with special meaning in broadcast contracts and in the media industry should be ignored, that the PGA TOUR's pretextual excuses for forcing Haney's termination based upon a supposed care for women and women's golf cannot be disputed by evidencing the PGA TOUR's consistent course of conduct towards women's professional golf which belies its "concern," and that its supposed sensitivity to such social issues cannot be placed in the context of the PGA TOUR's responses to similar events involving others in the golf industry.

## FACTUAL BACKGROUND

Following his authorship in 2012 of *The Big Miss*, a New York Times #1 best seller, exposing information about Tiger Woods ("Woods") that threatened Woods' previously unblemished reputation and the PGA TOUR's extraordinary profit center, the PGA TOUR commenced a multi-year campaign of retribution.  In coordination with Woods' own vicious attacks on Haney, the PGA TOUR used its unique power in the golf world to force both *PGA Tour Superstores* and *PGA Tour Shops*, as well as smaller shops, to cancel previously placed orders of *The Big Miss*.

Despite the PGA TOUR's attempts to disrupt his business ventures, Haney enjoyed great success with Sirius XM.  Starting in 2013, Haney served as host of "Hank Haney Golf Radio," a sports radio program on Sirius XM covering news and topics in the world of golf.  All that came to an end following a May 29, 2019 broadcast (the "Broadcast") that displayed Haney's confessed

lack of knowledge about the Ladies Professional Golf Tour ("LPGA") and the upcoming U.S. Women's Open.

During the Broadcast, Haney and a co-host discussed the U.S. Women's Open, which was scheduled to begin the next day.  Haney made some remarks during this program about the LPGA and its players regarding an upcoming LPGA event while acknowledging his ignorance about women's professional golf.  While still on the air, Haney learned that some listeners had been offended by his attempt at mocking his own lack of knowledge about the upcoming tournament and favored participants.  During this same broadcast, Haney apologized for what he said, and the next day issued a formal, written apology, expressing regret for saying anything that could be considered insensitive.

█████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

The press statement announcing Plaintiffs' termination, dated May 30, 2019, made it absolutely clear—at Sirius XM's insistence—that the PGA TOUR forced the termination: "[a]t the PGA TOUR's *instruction* Mr. Haney has been suspended from the Sirius XM PGA TOUR Radio Channel." Terminating Haney was contrary to Sirius XM's business interests and undermined the success of its golf network.

As the evidence at trial will show, the PGA TOUR exercised its influence and wrongfully imposed its domination of the professional golf world to interfere with Plaintiffs' contractual and business relationships with Sirius XM. Despite not being a party to the radio broadcast contract between the Plaintiffs and Sirius XM (the "Talent Agreement"), without any other legal

justification, and acting with malice, the PGA TOUR seized on Haney's May 29 comments to continue its years-long onslaught on Haney's career, ultimately imposing its unique market power and influence to force Sirius XM to terminate the Talent Agreement. All post-event excuses for its wrongful actions are pretextual and the speciousness of those rationalizations is laid bare by the record developed during discovery and which the PGA TOUR now wants to keep from the jury.

Because the evidence overwhelmingly establishes that the PGA TOUR forced Haney's termination without any legal justification and out of malice, since the commencement of this lawsuit the PGA TOUR has fabricated a pseudo-concern for cultural appropriateness and conjured up a phony concern for women's golf to rationalize its actions and defend against the instant action.

The PGA TOUR's professed concern for the LPGA is destroyed by its track record of minimal involvement between the two organizations, a history that belies any claim of support for women's golf, and by the fact that the PGA TOUR ignored the LPGA's conclusion for how to resolve any issues stemming from the Broadcast. Likewise, the cultural sensitivity, made-for-litigation pretext for its actions is belied by the PGA TOUR's consistent failure to act when other individuals associated with its brand – including Kelly Tilghman, Kevin Kisner, and Justin Thomas -- have made racist, violent, homophobic, and generally insensitive public remarks. Further, social media tracking data shows – contrary to the PGA TOUR's made-for litigation-claim – that any minor public reaction adverse to Haney's broadcast dissipated within a matter of days, if not hours.

By its omnibus motion, the PGA TOUR seeks to deprive the jury of evidence showing that: (1) in the media and marketing industry, the terms "programming" and "content" have special, particularized, and industry-recognized and accepted meaning; (2) social media analyses, readily available publicly, to the PGA TOUR, to Aisenberg's employer and to Aisenberg, and retained and referred to by the PGA TOUR and Aisenberg in the ordinary course of their business activities,

belie the PGA TOUR's false narrative that reaction to Haney was overwhelmingly negative and significant; (3) bookstores controlled by the PGA TOUR were forced by the PGA TOUR to cancel orders and act against their own best interests when *The Big Miss* topped the rating charts and became a national and international sensation, evidenced by those stores' conduct, admissions against interest made directly to Aisenberg, and overwhelming circumstantial interest; (4) the PGA TOUR's concerted efforts to punish Haney for his book about Woods was more wide-spread than trying to stop distribution of *The Big Miss*; and (5) based on others' activities, including Tilghman, Kisner, and Thomas, the PGA TOUR's made-for-litigation excuses for forcing Haney's termination is belied by its reaction to similar, albeit more egregious conduct by others in the golf industry.

**ARGUMENT**

I.   <u>Legal Standard</u>

While the function of a motion *in limine* is to present a pretrial issue of admissibility of evidence that is likely to arise at trial, "[a]ny evidence, tending to make the existence of any fact of consequence more probable or less probable, is relevant and admissible, except as the Federal Rules of Evidence otherwise provide …. Thus, in resolving motions *in limine*, the court excludes evidence on a motion *in limine* only if the evidence is clearly inadmissible for any purpose. If evidence is not clearly inadmissible, evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy, and prejudice to be resolved in context." *Arch Specialty Ins. Co. v. Balzebre,* No. 10-23775-CIV, 2013 WL 12065533, at *1 (S.D. Fla. Jan. 16, 2013) (internal citations and quotation marks omitted).

Moreover, "[t]he movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground" and "[t]he court may deny a motion *in limine* when it lacks the necessary

specificity with respect to the evidence to be excluded." *Id.* at 3 (citing *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.,* No. CIV. A. 99-D-880-E, 2001 WL 617521, at *1 (M.D. Ala. Feb. 20, 2001)); *see also SFR Servs., LLC v. Lexington Ins. Co.*, No. 219CV229FTM29NPM, 2021 WL 322367, at *3 (M.D. Fla. Feb. 1, 2021).  Further, a pre-trial order on a motion *in limine* remains subject to reconsideration by the court throughout trial.  *Stewart v. Hooters of Am., Inc.*, No. 8:04-CV-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007).

## II.  <u>Plaintiffs Should be Permitted to Introduce Evidence Regarding the Meaning of Terms of Art as They Are Used in the Broadcasting, Media Rights, and Talent Representation Industries</u>

Defendant's opening brief ("Opening Brief" or "Op. Br.") mischaracterizes the evidence Plaintiffs intend to offer through their experts regarding particular industry-accepted and recognized terms of art.  Rather than offering an interpretation and legal effect of certain provisions of Defendant's license agreement with Sirius XM (the "License Agreement"), (Op. Br.at 4-5), Aisenberg, an expert with a wealth of experience in the broadcasting and media rights industries, and McGee, likewise a recognized and highly experienced expert in the field of sports marketing, will provide guidance to the jury on what certain terms of art mean in the broadcasting, media rights and talent representation industries and how those terms are used in the context of the relationship between Defendant and Sirius XM.  "[E]xperts are permitted to offer testimony regarding disputed terms of art within their field of expertise so long as they stop short of offering a legal conclusion regarding the parties' rights based on that definition."  *Action Nissan, Inc. v. Hyundai Motor Am*., No. 618CV380ORL78EJK, 2020 WL 9173027, at *2 (M.D. Fla. Nov. 5, 2020); *Evanston Ins. Co. v. Xytex Tissue Servs., LLC*, 378 F. Supp. 3d 1267, 1279–80 (S.D. Ga. 2019), *appeal dismissed*, No. 19-11368-JJ, 2020 WL 1873216 (11th Cir. Mar. 6, 2020) ("At times, expert testimony is required in contract interpretation to clarify or define terms of art, science, or trade") (internal quotation marks and citations omitted).

Specifically, the terms "programming" and "content" have well-established meanings in the broadcasting and media rights industries.  As Aisenberg explained, the distinction between these terms sheds light on the relationship between Defendant and Sirius XM:  "the PGA TOUR has the ability to approve the programming that is added to the schedule for SiriusXM PTA Tour Radio.  Once those programs are determined, the data content of those programs is subject to the management and production, supervision of the SiriusXM PGA TOUR Radio executive team." (*See* Exh. B, Aisenberg II Tr. at 92:4-9.)  Aisenberg's understanding of these terms is based on "industry standard practices delineating the difference between programming and content" rather than from a legal interpretation of the License Agreement.  (*Id.* at 96:7-11.)

An expert's purpose at trial is to assist jurors regarding topics that may be outside of their purview or experience.  *See Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1331 (11th Cir. 2016); *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1192 (11th Cir. 2013) ("a testifying expert's role is to provide independent, impartial, qualified opinion testimony helpful to the trier of fact").  Aisenberg's and McGee's testimony would aid both the jury and the Court in understanding commonly used terms specifically in the broadcasting and media rights industries.

Defendant claims that allowing evidence and testimony regarding these terms of art would mislead and confuse the jury, yet fails to even attempt to explain how the jury would be misled or how any confusion would arise.  The Court is well-equipped to provide instructions regarding an expert's role in explaining industry-accepted and understood terms of art, on the one hand, and legal issues of contractual interpretation which the Court provides, on the other.  Plaintiffs should be permitted to introduce evidence and testimony regarding the definitions, usage, and understanding of the terms "programming" and "content" as they are used in the trade.

III.     **The Social Media Sentiment Analyses are Relevant and Admissible Evidence**

Defendant also seeks to preclude Plaintiffs from presenting "social media sentiment analyses" at trial.  Op. Br. at 6-7.  Defendant incorrectly argues that these analyses are hearsay and that Plaintiffs would be unable to authenticate them.

As an initial matter, it is noteworthy that Defendant does not contest the relevancy of the social media sentiment analyses or the public perception regarding the Broadcast.  In fact, Defendant has repeatedly argued that the public reaction to Haney was overwhelmingly negative and significant, thus warranting Sirius XM dismissing him.  (*See, e.g.,* Defendant's Opening Brief in support of its Motion for Summary Judgment, ECF. No. 82, at 1, 4-5.)  Plaintiffs challenge that the public reaction was overwhelmingly negative or had any staying power, and thus call into question Defendant's rationalization for its actions, using, in part, available and regularly utilized tracking and analyses of social media reactions.  Defendant cannot use purported public perception and social media reactions toward Haney as a sword to justify its attack on Haney while trying to prevent Plaintiffs from presenting actual and verifiable evidence of the social media reaction to the Broadcast which exposes the falsity of the PGA TOUR's position.

Defendant also incorrectly argues that the social media sentiment analyses are inadmissible hearsay.  The analyses are Records of a Regularly Conducted Activity.  *See* Fed. R. Evid. 803(6).  "A record of an act, event, condition, opinion, or diagnosis meets this exception if:  (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a

statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6). With respect to data compilations, business records are admissible as an exception to the hearsay rule "if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make ... the data compilation." *Lebron v. Wilkins*, 990 F. Supp. 2d 1280, 1296-97 (M.D. Fla. 2013), *aff'd sub nom. Lebron v. Sec'y of Florida Dept. of Children & Families*, 772 F.3d 1352 (11th Cir. 2014) (citation omitted). Additionally, "[i]n Florida, the business records of one business may become the business records of another business when the successor business integrates them within its own records if the successor business regularly relies upon those records and the circumstances indicate the records are trustworthy." *See, e.g., Nationstar Mortg., LLC v. Berdecia*, 169 So. 3d 209, 215 (Fla. 5th DCA 2015) (citing *United States v. Childs*, 5 F.3d 1328, 1333 (9th Cir. 1993)).

The analyses are data compilations which a social media analytics platform called Infegy Atlas collects, analyzes, and retains in the regular course of its business utilizing proprietary algorithms. (Exh. B, Aisenberg II Tr. at 33:1-34:7.) The Infegy Atlas analyses are similar to other social media sentiment analyses tools on the market. (*See id.*) Aisenberg and his employer, Octagon Worldwide Inc., and McGee, in his own business operations for ProVentures, regularly maintain and employ these social media analyses and incorporate them into their own business records for purposes of servicing their clients. (*See id.*) Aisenberg will also testify at trial regarding how these analyses are created and relied upon and how Aisenberg and Octagon Worldwide Inc. would not regularly use the social media analyses were untrustworthy. Separately, even if the Court were to determine that the analyses could not be offered for the truth of the data regularly gathered and compiled for the very purposes it is being offered, the analyses still could

be offered to rebut the PGA TOUR's contention that it was moved to act against Plaintiffs because of overwhelming public reaction has no basis in fact.

Defendant's assertion that Plaintiffs will not be able to authenticate the social media sentiment analyses is both premature and without basis. Under Fed. R. Evid. 901(a), "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must present 'sufficient evidence to make out a *prima facie* case that the proffered evidence is what it purports to be.'" *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012). After meeting the *prima facie* burden, the evidence may be admitted, and the ultimate question of authenticity is then decided by the jury. *See id*. Authentication may be accomplished through the testimony of a witness with knowledge that an item is what it is claimed to be. Fed. R. Evid. 901(b)(1); *see also Castillo v. United States,* No. 09-CR-80056, 2012 WL 13071834, at *8 (S.D. Fla. Oct. 4, 2012), *report and recommendation adopted*, No. (09-80056-CR), 2013 WL 12336163 (S.D. Fla. Mar. 1, 2013), *aff'd*, 816 F.3d 1300 (11th Cir. 2016) (witness properly authenticated a printout of a MySpace page by testifying that it was an accurate representation of a page that she viewed on a computer and that this was "adequate to prove that the item was what she claimed it was"). Aisenberg and McGee, in the ordinary course of their professional responsibilities, regularly access and rely upon the social media data provided by a recognized and legitimate service provider that generated the data set forth in the produced exhibits. Aisenberg regularly guides his clients, including Haney, using such social media data. Given Aisenberg's and McGee's experience in both reviewing and compiling these analyses, each is an appropriate witness to authenticate them and, thus, Plaintiffs have met their *prima facie* burden to authenticate these analyses.

11

Defendant's reliance on *Exime v. E.W. Ventures, Inc.*, No. 08-60099CIV, 2009 WL 454278 (S.D. Fla. Feb. 11, 2009), is misplaced.  In granting the Defendants' motion *in limine*, the *Exime* court noted that Plaintiff made no effort to show that the website printouts at issue were self-authenticating or otherwise admissible through judicial notice.  The court also did not address other avenues of authentication, such as those present here with respect to testimony by a qualified witness.  Moreover, the *Exime* court questioned the relevancy and probative value of the printouts. *Id.* at n.4.  As discussed above, Defendant does not dispute the relevance of the social media sentiment analyses.

For the foregoing reasons, the social media sentiment analyses should be admitted at trial.

## IV. Testimony by Aisenberg and McGee on the Topics Included in Their Amended Expert Disclosures is Admissible and Relevant

Defendant also claims that Aisenberg and McGee should be precluded from offering evidence regarding certain topics identified in their amended disclosures.  With respect to Aisenberg, Defendant identifies the following topics of testimony for preclusion:  1) Sirius XM's business prior to Plaintiffs joining the outlet and the impact of Haney's PGA radio show on Sirius XM's financial condition as well as its standing in the golf industry; 2) an analysis of Haney's monetization as a result of his broadcasting agreement with Sirius XM; 3) an analysis of Sirius XM's monetization as a result of Haney's broadcasting agreement with Sirius XM; and 4) an analysis of immediate and long-term financial and professional damage sustained by Plaintiffs following Haney being removed from Sirius XM.  (Op. Br. at 7-9).  In connection with McGee, Defendant specifically seeks to preclude the introduction of testimony regarding whether the comments Haney made during the Broadcast would have had a negative effect on the PGA TOUR's brand. (*Id*. at 9.)  To the extent that Defendant seeks to preclude other topics of testimony from being introduced, it has failed to specify exactly what should be excluded. *See Arch Specialty*

*Ins. Co.* 2013 WL 12065533, at *3.

Defendant conflates issues of admissibility with those of credibility which can be addressed through cross-examination. *See Rink v. Cheminova, Inc*., 400 F.3d 1286, 1295 n.7 (11th Cir. 2005) (holding that expert witness cannot be excluded based on credibility and stating that "[v]igorous cross-examination ensures that these issues of general credibility are properly presented for consideration by the trier of fact"); *R&R Intern., Inc. v. Manzen, LLC*, 2010 WL 3605234, *7 (S.D. Fla. Feb. 12, 2010) (noting that the district court's role is not to make decisions on persuasiveness or personal credibility).

Aisenberg is a high-ranking member of the world's largest sports and media agency where he holds the position of Vice President, Strategic Initiatives. Aisenberg has been Haney's agent at all relevant times to this dispute, was intimately involved in the rollout of *The Big Miss* as well as the PGA TOUR's and Woods' retribution for its publication, negotiated the Sirius XM agreement, and continues to represent Haney in his commercial efforts to recover from the damage done to him by Defendant. Aisenberg also is perhaps the country's most prominent representative of media stars in the golf world, has negotiated hundreds of broadcasting and endorsement agreements, is an expert in the field of talents' financial value and expected longevity, and has intimate knowledge of the golf world generally. Likewise, during McGee's 32 years in the business of promoting and conducting sports-related endorsements, events, and appearances, including while at Octagon before establishing his own sports-endorsement business, ProVentures, McGee has worked with Haney, as well as Aisenberg, and helped to shape Haney's career. As an expert with extensive experience in the golf industry, McGee has drafted and negotiated countless endorsement and promotion agreements, studied branding, professional development, and focused on maximizing companies' and media and sports personalities' earning

potential.  Both Aisenberg and McGee can assist the Court and the jury in understanding the unique circumstances of this case.

First, Defendant seeks to exclude Aisenberg's testimony regarding "SiriusXM's business prior to Plaintiffs joining the outlet and the impact of Haney's radio show on SiriusXM's financial condition."  (Op. Br. at 7-8.)  Defendant claims that neither Mr. Aisenberg's Amended Disclosure nor his deposition testimony provides detail about facts or documents that support his opinion.  In fact, during deposition testimony, the PGA TOUR strategically chose not to seek details of such facts or to identify the documents despite them having been produced during discovery in order to examine the bases of the experts' knowledge.  (*See, e.g.,* Exh. B, Aisenberg II Tr. at 83:12-19) (Aisenberg testified, "I've been provided with information regarding the revenue of SiriusXM's PGA TOUR Channel, the popularity of that channel prior to – prior to Mr. Haney's involvement," to which counsel did not inquire further.))  Plaintiffs should not be punished for Defendant's failure to pursue lines of questioning during Aisenberg's deposition.  To the extent that Defendant has questions regarding Aisenberg's expert opinion, the proper time to raise such questions is during cross-examination.  Aisenberg has a wealth of experience in the broadcasting industry and, as he has testified, is intimately familiar with SiriusXM's business.  (*See* Exh. B, Aisenberg II Tr. at 83:1-11.)

Similarly, Defendant challenges the basis of Aisenberg's opinion on SiriusXM's monetization as a result of Plaintiffs' show, Haney's monetization, the immediate and long-term financial and professional damage Plaintiffs sustained, and data and reports that Aisenberg reviewed reflecting the financial and listenership impact on SiriusXM in reaction to the Broadcast had Haney not been forced off his radio show, (Op. Br. at 8-9.)  However, the PGA TOUR did not ask any follow up questions regarding his opinions on these topics during his deposition.  (*See*

Exh. B, Aisenberg II Tr. at 85:10-87:5; 99:3-17.)  Again, Plaintiffs should not be prejudiced and have relevant evidence excluded because Defendant failed to ask probing questions during Aisenberg's deposition.

Defendant also attacks McGee's testimony as being "unsupported and unreliable."  (Op. Br. at 9.)    Specifically, Defendant claims that McGee reviewed "generic, undisclosed 'information.'"   The PGA TOUR ignores that McGee testified that the information that he reviewed included information relating to social media that is generally available to the public. (*See* Exh. C, McGee Tr. at 42:10-13.)  Rather than pose follow-up questions to identify the specific social media data McGee analyzed, the PGA TOUR, seemingly for strategic purposes, opted not to ask McGee to identify the sources of his information or to delve deeper into these issues.  Just as Defendant attempts to do with Aisenberg's testimony, Defendant seeks to use its own failure to question McGee as the basis for claiming that his testimony is unsupported.

For the foregoing reasons, the PGA TOUR's effort to exclude Aisenberg's and McGee's testimony on the topics included in their Amended Disclosures cannot succeed.

## V.   Evidence of Defendant's Prior Interference with Haney's Business Endeavors is Admissible and Relevant

Defendant seeks to exclude on hearsay grounds evidence that Defendant pressured *PGA Tour Superstores* and *PGA Tour Shops* to cancel orders of Haney's book, *The Big Miss*.  This evidence is probative of the fact that Defendant had an agenda to disrupt Haney's career and seized upon the Broadcast as another opportunity to interfere, as it had done upon publication of Haney's book.  Haney and Aisenberg have direct knowledge of this interference.  In addition to failing to recognize the admissibility of their testimony, Defendant also ignores Fed. R. Evid. 802, an

exception to the hearsay evidentiary rule permitting a third-party's statements that were against its own pecuniary interests when made and when the third-party is unavailable to testify.

Fed. R. Evid. 804(b)(3) allows admission of a "statement against interest" when the proponent of an inculpatory hearsay statement can show that "(1) the declarant is unavailable to testify at trial and (2) the statement was 'so contrary' to the declarant's pecuniary or penal interests that no reasonable person in the declarant's position would have made it unless he or she believed it to be true." *In re: Chiquita Brands Int'l Inc.*, No. 07-60821-CIV, 2019 WL 11497632, at \*26 (S.D. Fla. Sept. 5, 2019) (citing *United States v. Thomas*, 62 F.3d 1332 (11th Cir. 1995)).  Evidence at trial will show that, in coordination with Woods' attacks on Haney, the PGA TOUR forced both *PGA Tour Superstores* and *PGA Tour Shops*, as well as smaller shops, to cancel previously placed orders of *The Big Miss* after the first orders immediately sold out.  Aisenberg has been Haney's agent at all relevant times to this dispute, was involved in the rollout of *The Big Miss* as well as the PGA TOUR's and Woods' retribution for its publication, negotiated the Sirius XM agreement, and continues to represent Haney in his commercial efforts to recover from the damage done to him by Defendant.  Aisenberg has firsthand knowledge of the PGA Tour's scheme to reduce Haney's book sales in order to squelch public dissemination that is not based on hearsay but instead upon his knowledge of the book sales, the selling out of the first orders and cancellation of the re-orders, and the lack of any business decision justifying the cancelled re-orders.  Aisenberg is intimately aware of information surrounding sales of *The Big Miss* (*see* Exh. E, Aisenberg I Tr. 18:16-20:7.), and the book's enormous success.  Aisenberg will testify that the only rational explanation for the *PGA Tour Superstores* and *PGA Tour Shops* cancelling the re-orders after enjoying such enormous success with the initial orders was pressure the PGA TOUR exerted.

16

"A declarant is considered to be unavailable if the declarant:  …. is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure …. the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).  Fed. R. Evid. 804(a)(5)(B).  As stated above, Fed. R. Evid. 804(b)(3) concerns statements against interest.

Aisenberg testified that he spoke to Tina Constable, Rick Horgan, and Tammy Blake of Crown Archetype at Penguin Random House.  Each independently admitted that a representative of the "PGA TOUR called the PGA Tour Shops and said that Tour-related enterprise shouldn't be supporting this book that is not favorable for our -- our biggest star."  (*See* Exh. E, Aisenberg I Tr. 20:9-21:6.)  These statements are against the declarants' interest.  As representatives of the publisher, they put themselves in a precarious situation by admitting that a key customer was pressured by the PGA TOUR to cancel re-orders of such a successful product.  The admission could discredit both Penguin Random House as an organization and place Constable, Horgan, and Blake in a compromised situation in connection with their employment.

Notwithstanding their best efforts, Plaintiffs have been unable to locate the individuals from Penguin Random House who made these statements and have not been able to secure their testimony.  Therefore, these declarants are unavailable.  These statements should be admitted under Fed. R. Evid. 804(b)(3).

For the above reasons, this relevant evidence should be admitted at trial.

## VI.    <u>Evidence Regarding Incidents Involving Non-parties Kelly Tilghman, Kevin Kisner, and Justin Thomas Is Relevant</u>

Defendant's narrative that its actions with respect to Plaintiffs were justified to protect its brand is contradicted by the PGA TOUR's history, which evidences the speciousness of its pretextual rationalizations.  The PGA TOUR historically has tolerated, ignored, and failed to take

a stand on racist, misogynistic, homophobic, and otherwise culturally insensitive remarks that are far more offensive than any interpretation of Haney's comments.  The PGA TOUR's course of conduct, prior to, essentially simultaneous with, and following the Broadcast, is compelling evidence of the hollowness of Defendant's effort now to justify its actions against Haney.

PGA TOUR golfer and member of the prestigious PGA TOUR Policy Board Kevin Kisner, in a tweet, callously attributed COVID-19 deaths to the inability of former basketball player Rex Chapman's family members and friends to follow guidelines.  Kisner apologized and, rather than rejecting and ignoring the apology, as it did with Haney, the PGA TOUR chose not to impose discipline upon Kisner, as it had a right to do.  Instead, the PGA TOUR issued a public statement that "We were pleased to see Kevin take ownership of the situation and have since spoken to him directly." ██████████████████████████████████████████████████

██████████████████████████████████████████████████ Similarly, when Golf Channel Anchor Kelly Tilghman said that other players should gang up on Woods— one of the few African American professional golfers—because of his playing and "lynch him in a back alley," the PGA TOUR took no action other than forcing a two-week suspension in response to this potential incitement of racial violence.  Most recently, Justin Thomas, a PGA TOUR golfer, publicly made a blatantly homophobic slur during a PGA TOUR-sponsored tournament. █████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████

Evidence of Defendant's response to analogous, albeit significantly more offensive, comments by others in the golf industry is an important consideration for the jury in weighing the disingenuousness of the PGA TOUR's professed sensitivity about such social issues.

Similarly, the PGA TOUR's fictionalized concern for the LPGA is refuted by its track record of ignoring women's professional golf.  Indeed, evidence will show that the lone joint venture between the two organizations was an unfortunately successful effort by the PGA TOUR to deprive the LPGA of its, albeit minimal, media rights revenue.  Further, the PGA TOUR's lack of concern about women's golf was evidenced by Defendant ignoring the LPGA's conclusion for how to resolve any issues stemming from the Broadcast, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

## VII.    Plaintiffs Do Not Intend to Make Any "Golden Rule" References

Plaintiffs do not intend to make any references to the "Golden Rule" or violate Florida precedent which makes it improper to instruct a juror to put him or herself in Plaintiffs' shoes.[2]

"The 'Golden Rule' argument urges the jury to place themselves in a party's position to allow recovery as they would want if they were the party.  To be impermissible, the argument must strike at that sensitive area of financial responsibility and hypothetically request the jury to consider how much they would wish to receive in a similar situation." *Shaffer v. Ward*, 510 So. 2d 602, 603 (Fla. Dist. Ct. App. 1987).  Not all statements which may garner empathy are violations of the Golden Rule.  *See, e.g., id* (asking the jurors to use their common, everyday experience in deciding a case is not a violation of the Golden Rule); *Simmonds v. Lowery*, 563 So. 2d 183, 184 (Fla. Dist. Ct. App. 1990) (no violation of the Golden Rule when counsel asked the jury to determine how much to award plaintiff for her injuries "[r]ather than asking the jury what they might wish to *receive* as compensation themselves …") (emphasis original); *Cummins Alabama, Inc. v. Allbritten*, 548 So. 2d 258, 263 (Fla. Dist. Ct. App. 1989) (asking jurors what

---

[2] Similarly, Plaintiffs do not intend to reference the size of Defendant's law firm or the effect that the jury's verdict will have on the parties.

they would have done "*as reasonable people*" not a violation of the Golden Rule) (emphasis original).  This portion of Defendant's Motion should not be an attempt unreasonably to limit Plaintiffs' opening or closing arguments, *ex ante*, and any objection is more appropriately raised at trial.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the Court should deny Defendant's Omnibus Motion *In Limine*.

Dated:   New York, New York
         June 14, 2021

Respectfully submitted,

MICHELMAN & ROBINSON, LLP

 /s/ Peter R. Ginsberg
Peter R. Ginsberg (*admitted pro hac vice*)
800 Third Avenue, 24th Floor
New York, New York 10022
Telephone:  (212) 730-7700
Facsimile:  (212) 730-7725
prginsberg@mrllp.com

RICE PUGATCH ROBINSON STORFER & COHEN PLLC

By: /s/ Arthur H. Rice
    Arthur H. Rice
    Riley W. Cirulnick
    101 NE 3rd Ave., Suite 1800
    Fort Lauderdale, Florida 33301
    Telephone: (954) 462-8000
    Facsimile: (954) 462-4300
    arice@rprslaw.com
    rcirulnick@rprslaw.com