## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-63108-RAR

**HANK HANEY** and **HANK HANEY MEDIA, LLC**,

      Plaintiffs,

v.

**PGA TOUR, INC.**,

      Defendant.

_____/

### <u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** comes before the Court on Defendant PGA Tour, Inc.'s Motion for Summary Judgment [ECF No. 82] ("Motion"). The Court has considered the Motion, all related filings, and is otherwise fully advised. As the Court remarked at the outset of this matter, "the allegations teed up in this case—like a well-hit drive on the golf course—[have] avoided pleading hazards . . . remained in bounds, and left Plaintiffs with an opportunity to take their next shot." Order Denying Defendant's Motion to Dismiss [ECF No. 25].

However, Plaintiffs' next shot has not fared as well as their opening drive. In an effort to reach the green and get this matter to trial, Plaintiffs' approach has found the water. And the Federal Rules of Civil Procedure do not provide for mulligans. As explained herein, Defendant is entitled to summary judgment as a matter of law and Plaintiffs' round has come to an end. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant PGA Tour, Inc.'s Motion [ECF No. 82] is **GRANTED**.

## BACKGROUND[1]

### A.  The PGA Tour's License Agreement with SiriusXM Radio, Inc.

The PGA Tour and SiriusXM Radio, Inc. have a business relationship for the purpose of broadcasting golf-focused programming on a PGA Tour branded station known as "*SiriusXM PGA Tour Radio*."  *See* Def.'s Statement of Material Facts [ECF No. 98-1] ("Def.'s SOMF") ¶ 1.  Said business relationship is memorialized by the License Agreement, effective February 15, 2018, between the PGA Tour and SiriusXM ("Agreement").  *Id.* ¶ 2.

Pursuant to the Agreement, in exchange for the ability to use the PGA Tour's intellectual property, including its trademarks, in connection with *SiriusXM PGA Tour Radio*, SiriusXM agreed to ensure that "SiriusXM and its representatives [would] not *incorporate into the* Programming any material which is. . . (iv) *otherwise detrimental* to [PGA Tour]." *See* Agreement, [ECF No. 98-2] at 17 (emphasis added).[2]  The Agreement defines "Programming" as "all programming distributed on the Channel, all of which (aside from the TOUR Coverage that is subject to the Agreement) must be agreed by the parties in advance of distribution on the channel." *Id*. at 15.  The Agreement further defines "Channel" as "the TOUR-branded radio channel on the SiriusXM Service, which channel will carry the TOUR Coverage, and which will be distributed only in the Territory."  *Id.*

---

[1]  In their Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment [ECF No. 87] ("Pls.' SOMF"), Plaintiffs dispute certain facts without citing any supporting evidence.  *See* S.D. Fla. L.R. 56.1(a)(2), (b).  To the extent those "disputed" facts are consistent with the record evidence, they are deemed admitted and undisputed for purposes of ruling on Defendant's Motion.  *See id.*  Accordingly, the facts recited here may not be the "actual" facts on Plaintiffs' account but reflect Plaintiffs' best case as the non-moving party based on the evidence.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).

[2]  The Court cites to the pagination generated by the the Court's CM /ECF system rather than the pagination of the documents themselves.

**B.  The PGA Tour's Relationship with the Ladies Professional Golf Association**

The PGA Tour and the Ladies Professional Golf Association ("LPGA") are parties to a strategic alliance based on mutual interest as industry partners in growing the game of golf and advancing each organization's respective platform and mission.  Def.'s SOMF ¶ 7.  As part of that alliance, the PGA Tour is committed to assist in the expansion of LPGA programming on major networks.  *Id.* ¶ 8.  The PGA Tour is also committed to increasingly promoting the LPGA Tour on its broadcasts over time.  *Id.*

**C.  Hank Haney's Relationship with SiriusXM**

Plaintiff Hank Haney began broadcasting *Hank Haney Golf Radio* on the *SiriusXM PGA Tour Radio* channel in or about 2013.  Def.'s SOMF ¶ 9.  During the period relevant to this action, Haney broadcasted under a Letter Agreement with SiriusXM dated November 30, 2017 ("Haney Agreement").  *See* Compl [ECF No. 1] at 13-20.  The Haney Agreement was set to expire on February 15, 2021 pursuant to its express terms.  *Id*. at 16, ¶ 6(a).

The Haney Agreement states, in pertinent part: "(a) [Hank Haney Media, LLC] shall cause [Haney] to serve as the host of '*Hank Haney Golf Radio*', the sports talk radio program featuring discussions, call-ins and interviews covering various news and topics in the world of golf…such show will air on SiriusXM's PGA Tour Radio…"  *Id*. at 13, ¶ 1.  The Haney Agreement further states:

> (b) SiriusXM may terminate this Agreement with no liability to [Hank Haney Media, LLC] and/or [Haney]…(ii) immediately without notice in the event that…(B) [Haney] engages in any behavior that disparages Sirius XM or satellite radio, brings [Hank Haney Media, LLC] or [Haney] into public disrepute, contempt, scandal, or ridicule or that otherwise reflects unfavorably upon the reputation or the moral or ethical standards of Sirius XM.

*Id*. at 16, ¶ 6.  Haney continuously broadcasted his show on the *SiriusXM PGA TOUR Radio* channel until May 29, 2019.  Def.'s SOMF ¶ 14.  At no time between when Haney began

broadcasting *Hank Haney Golf Radio* on *SiriusXM PGA Tour Radio* and May 29, 2019 did the

PGA Tour take any action against Haney related to Haney's broadcasts.  *Id.* ¶ 15.

**D.  Haney's May 29, 2019 Broadcast**

During the May 29, 2019, broadcast of *Hank Haney Golf Radio* ("May 29th broadcast"),

Haney and his co-host, Steve Johnson, engaged in the following on-air exchange:

> **Johnson:**  This week is the 47th U.S. Women's Open, Hank.
>
> **Haney:**  Oh it is?  I'm gonna predict a Korean.
>
> **Johnson:**  OK, that's a pretty safe bet.
>
> **Haney:**  I couldn't name you six players on the LPGA Tour.  Maybe
> I could.  Well…I'd go with Lee.  If I didn't have to name a first name,
> I'd get a bunch of them right.
>
> **Johnson:**  We've got six Lees.

*See* Compl. [ECF No. 1] ¶¶ 17-18, 20-22.  While Haney was still on air, he learned that his remarks

during the exchange with Johnson elicited a negative reaction from people on the internet.  Def.'s

SOMF ¶ 17.  As a result of the backlash, a senior executive at Callaway Golf urged Haney's talent

agent, Jeremy Aisenberg, to encourage Haney to make an on-air apology.  Aisenberg Dep., [ECF

No. 83-4] at 20-21, 79:1-80:7.[3]  Given Aisenberg's request and because "social media was blowing

up," Haney apologized for his comments while he was on air.  Haney Dep., [ECF No. 83-3] at 13,

58:1; Def.'s SOMF ¶ 18.

Immediately after the broadcast, Haney also issued a written apology via Twitter, which a

SiriusXM representative helped him prepare.  Def.'s SOMF ¶ 19.  In his written apology, Haney

acknowledged his on-air comments were "insensitive."  *Id.*  Haney later explained that he "meant

---

[3]  At the time these events took place, Haney was an endorser for Callaway Golf.  Haney Dep., [ECF No.
83-3] at 16, 69:21-25.

that some people took [his comments] as insensitive, because [he] didn't really think [he] said anything insensitive."  Haney Dep., [ECF No. 83-3] at 15, 60:15-19.

That same day, the media and prominent figures in the golf world, including LPGA players, reacted publicly to Haney's comments.  Def.'s SOMF ¶ 20.  For instance, within hours of Haney's broadcast, Christine Brennan, USA Today sports columnist and CNN sports analyst, published an article in USA Today's online edition titled "Opinion: If Hank Haney isn't fired from his radio job, golf's leaders are condoning racism, sexism" that included the following statement: "Where is the PGA of America's comment condemning Haney?  Augusta National's?  *The PGA Tour's, since it's their show*?"  *Id.*  Additionally, in response to Haney's May 29th comments, Mike Whan, the Commissioner of the LPGA, said "I'm not going to waste my time on people who are never going to get it."  *Id.* ¶ 23.

### E.  The PGA Tour's Response to Haney's May 29th Broadcast

The negative public reaction to Haney's exchange with Johnson prompted Laura Neal, the PGA Tour's Senior Vice President of Communications and Media Content, to ask the PGA Tour's social listening team to monitor the topic across internet forums.  *Id.* ¶ 20.  Within hours, members of the PGA Tour's social listening team identified "1.7k mentions creating a potential reach of 25 million" and noted that "all mentions [were] negative towards Hank."  Monahan Dep. Ex. 13, [ECF No. 98-2] at 34.  In an internal e-mail sent on the night of May 29th, Neal informed several PGA Tour employees, including PGA Tour Commissioner Jay Monahan, of the social listening team's results and the LPGA Commissioner's comments.  *Id.*  In doing so, Neal's "focus was making sure other people at the Tour were aware of what had been said.  It was paying attention to the social conversation, and it was discussing what damage that it could do to our brand and how we should potentially respond."  Neal Dep., [ECF No. 83-5] at 5-6, 30:23 - 31:2.

On the morning of May 30, 2019, Monahan responded to Neal's email about the social listening results and Whan's reaction, stating: "This man needs to lose his job. Please let me know what I can do to assist you to ensure this happens." Def.'s SOMF ¶ 24. Thereafter, Neal communicated with her counterpart at SiriusXM regarding SiriusXM's response to Haney's comments. *Id.* ¶ 25. Also, on May 30, 2019, Monahan spoke with Scott Greenstein, SiriusXM's President and Chief Content Officer. *Id.* ¶ 26. During that conversation, Monahan advised Greenstein that he felt Haney's comments during the May 29th broadcast were "completely unacceptable" and "indefensible."[4] *Id.* Monahan also told Greenstein that Haney's comments were creating issues for the PGA Tour given its affiliation with the *SiriusXM PGA Tour Radio*. *Id.* Specifically, Monahan explained that the negative public reaction to Haney's comments was damaging the PGA Tour's brand and placing its relationship with the LPGA at risk. *Id.*; Greenstein Dep., [ECF No. 83-2] at 10, 97:15-22. Monahan further expressed to Greenstein that if he were "in [Greenstein's] shoes, as his partner, [he] thought [Greenstein] should know that [Haney] would no longer be working for [him]. But, again, [he] recognize[d] that it was [Greenstein's] decision." Monahan Dep., [ECF No. 83-1] at 5, 59:4-9. Greenstein did not come away from the conversation

---

[4] Plaintiffs contend that during said conversation, Greenstein's "response was in sharp contrast" and that Greenstein "did not believe Haney's comments warranted any adverse reaction by SiriusXM or anyone else." *See* Pls.' Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment [ECF No. 87] ("Pls.' SOMF") ¶ 26. However, Plaintiffs provide no evidentiary citations to support these specific assertions in violation of Local Rule 56.1(b)(2)(C), which provides that "if an opponent's Statement of Material Facts disputes a fact in the movant's Statement of Material Facts, then the evidentiary citations supporting the opponent's position must be limited to evidence specific to that particular dispute." Further, Plaintiffs cite to Irving Azoff's deposition testimony for the proposition that Greenstein "told [Azoff] that he did not want to lose Hank off the show and did not believe that whatever the incident created was grounds for dismissal." Pls.' SOMF ¶ 26. However, Azoff's statement, like other statements Plaintiffs rely on, is hearsay and "hearsay statements, even if stated in an affidavit or deposition, cannot be considered." *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment.").

believing that Monahan had threatened the relationship between the PGA Tour and SiriusXM. Greenstein Dep., [ECF No. 87-1] at 11, 73:7-20.

Following the conversation between Monahan and Greenstein, Neal worked to draft a public statement addressing Haney's May 29th broadcast while the PGA Tour waited for a decision regarding what action SiriusXM would take. Def.'s SOMF ¶ 30. Neal drafted several versions of that statement. *Id.* ¶ 31. The drafts were formulated for the following potential outcomes, based on SiriusXM's ultimate decision: (1) Haney being allowed to return to the air after a three-day suspension; (2) Haney being allowed to return to the air after a thirty-day suspension; (3) Haney being placed on an indefinite leave; and (4) Haney's program being removed from the *SiriusXM PGA Tour Radio* channel. *Id.*

Once the decision to suspend Haney had been made, Neal and her counterparts at SiriusXM worked together to prepare a joint public statement by SiriusXM and the PGA Tour. Def.'s SOMF ¶ 32. On the evening of May 30, 2019, SiriusXM and the PGA Tour issued the following joint public statement:

> ### Joint PGA Tour/SiriusXM Statement on Hank Haney
>
> **NEW YORK – May 30, 2019** – Mr. Haney's comments on women's professional golf were insensitive and do not represent the views of the PGA TOUR or Sirius XM. The PGA TOUR is committed to and proud of the increasingly diverse makeup of our fan base, not to mention the power and accomplishments of the game's world-class, global players – both on the PGA TOUR and LPGA, whom we are working with more closely than ever before. SiriusXM proudly covers and supports both women's and men's golf and the athletes that make them great. At the PGA TOUR's instruction Mr. Haney has been suspended from the SiriusXM PGA TOUR Radio channel. SiriusXM is reviewing his status on SiriusXM going forward.
>
> Mr. Haney added, "I accept my suspension and apologize again."

*See* Def.'s SOMF ¶ 33.

### F.  Haney's Settlement with SiriusXM

There is no record of anyone from the PGA Tour further communicating with SiriusXM regarding Haney's suspension, including the length of suspension, after SiriusXM and the PGA Tour issued their joint public statement.  Def.'s SOMF ¶ 34.  The evidence shows that almost immediately after his suspension was announced, Haney identified and pursued an opportunity to broadcast a podcast with iHeart Media, Inc.  *Id.* ¶ 38.  For instance, the day Haney's suspension was announced, Irving Azoff, a friend of Haney's, offered to try to speak with the PGA Tour on Haney's behalf with the hope of getting Haney reinstated on *SiriusXM PGA Tour Radio*.  *Id.* ¶ 36. In response to Azoff's offer, Haney stated, in pertinent part: "[U]nder no circumstances will I be returning to PGA Tour Radio. You and Greg can save the call on my behalf to that f***** Monahan but I certainly am appreciative of the offer to make the call.  I have no desire to come back with my tail between my legs walking on eggshells and doing a golf tips show on PGA Tour Radio, so in my mind that ship has sailed and I'm fine with that now.  I've moved on already . . .." *See* Haney Dep. Ex. 10, [ECF No. 83-3] at 80.

Additionally, just one day after the suspension announcement, Haney again communicated with others, including his talent agent Aisenberg, about his intent never to return to broadcasting on *SiriusXM PGA Tour Radio* as long as it remained a PGA Tour-branded station.  Haney Dep. Ex. 12, [ECF No. 83-3] at 82.  In that May 31st communication, Haney wrote, in relevant part: "I'm moving on.  Podcast and whatever else comes my way, if PGA Tour Radio is ever SiriusXM Golf Radio and Scott [Greenstein] can truly run it like he wants then I'm back in but I don't fit the mold there and not interested in changing my style at 64 years old even if I could.  I feel great about where I am going." *Id.*  That e-mail was forwarded to Greenstein.  Def.'s SOMF ¶ 35.

By June 3, 2019—just five days after the May 29th broadcast—Aisenberg was negotiating a financial buyout of the Haney Agreement with SiriusXM on Haney's behalf.  *Id.* ¶ 39.  In July of 2019, Haney and SiriusXM signed a Settlement Agreement, which formally cancelled the Haney Agreement, and discontinued *Hank Haney Golf Radio* on *SiriusXM PGA Tour Radio*.  *Id.* ¶ 40. Plaintiffs and SiriusXM admitted that SiriusXM *did not* breach the Haney Agreement at any time relevant to this action.  *See* Haney Dep., [ECF No. 83-3] at 25, 144:6-18; Greenstein Dep., [ECF No. 83-2] at 11-12, 99:22-100:8; Aisenberg Dep., [ECF No. 83-4] at 23, 115:16-23.  Haney began broadcasting *The Hank Haney Podcast* with iHeartMedia, Inc. in or around the fall of 2019.  Def.'s SOMF ¶ 42.  The *Hank Haney Podcast* is active to date.  *Id.*

### G.  The Instant Action

On December 18, 2019, Plaintiffs Hank Haney and Hank Haney Media, LLC brought this diversity action against the PGA Tour.  *See* Comp. [ECF No. 1].  Plaintiffs allege that the PGA Tour wrongfully interfered with Plaintiffs' contractual and business relationships with SiriusXM by causing SiriusXM to terminate Haney's show on *SiriusXM PGA Tour Radio* after Haney made a series of racially insensitive remarks during the May 29th broadcast.  *Id.*  Specifically, Plaintiffs assert two causes of action: (1) tortious interference with Plaintiffs' contract with SiriusXM; and (2) tortious interference with Plaintiffs' business relationship with SiriusXM.  *Id.*

According to Plaintiffs' Complaint, "PGA Tour has long attempted to disrupt and interfere in Haney's business."  *Id.* ¶ 29.  Plaintiffs claim the PGA Tour's interference began in 2012 when Haney released his book, *The Big Miss*, and the PGA Tour induced its stores to cancel orders of his book.  *Id.* ¶¶ 29, 32.  Nevertheless, Plaintiffs have no personal knowledge or otherwise admissible evidence to support this allegation.  *See* Haney Dep., [ECF No. 83-3] at 4-6, 35:11-37:22 (revealing that, with respect to the book release allegations, Haney *thinks* he was *told*

information by Aisenberg who was *told* that information by an individual at Crown or Booklegger).

Plaintiffs also allege in their Complaint that the PGA Tour pressured the Golf Channel to discontinue Haney's show, "*The Haney Project*," in 2013.  Compl. ¶ 33.  However, Plaintiffs lack personal knowledge to support this allegation, and instead indicated Aisenberg had knowledge.  Def.'s SOMF ¶ 48.[5]  But, when Aisenberg was questioned on the same topic, he also indicated he has no personal knowledge.  Aisenberg Dep., [ECF No. 83-4] at 19, 42:14-18 ("**Q.** Anybody at the PGA Tour bring pressure to bear on the Golf Channel that – such as you described with Tiger Woods?  **A.** Not that I can name, specifically, no.  Not that I'm aware of.").

Further, Plaintiffs also allege that in 2016, the PGA Tour "exerted influence" that resulted in Avis cancelling an unspecified "program" with Haney.  Compl. ¶ 34.  Once again, Plaintiffs lack personal knowledge and rely on several levels of hearsay to support their allegations.  Haney Dep., [ECF No. 83-3] at 7-8, 38:17-39:22 (**Q.** Everything that you know about that or say about that is derived from your conversations with Mr. Aisenberg?  **A.** Yes.").  When asked about the Avis deal, Aisenberg testified that the PGA Tour suggested alternative partners to Avis, which Aisenberg agreed made business sense, but otherwise, he had no knowledge that the PGA Tour's

---

[5]  With regards to the Golf Channel's termination of his show, Haney testified as follows:

> **Q.** When the – the Golf Channel terminated the Haney project, that was back in 2013, wasn't it?
>
> **A.**  I – it seems like that would be correct.
>
> **Q.** And who did you talk to at the Golf Channel regarding the termination of that program?
>
> **A.** I didn't – I didn't talk to anybody.  Jeremy Aisenberg did that.

*See* Haney Dep., [ECF No. 83-3] at 31, 173:6-25.

actions were motivated by animus towards Haney. Aisenberg Dep., [ECF No. 83-4] at 11, 28:14-35:19 (**Q.** Well, do you have any knowledge that the PGA Tour's approach to Allison Botto and Heather Breen [Avis's representatives] regarding this marketing event…was motivated by the fact that they did not like Hank Haney? **A.** I don't have any knowledge of that.").

Lastly, Plaintiffs claim that Callaway Golf Company, "one of Haney's largest collaborators," declined to renew its collaboration agreement with Haney when it expired in December 2019 because Haney lost his broadcasting position with SiriusXM. Compl. ¶¶ 42-43. However, there is no admissible evidence that Haney's collaboration agreement with Callaway Golf would have been renewed on its existing terms at the time it expired. *See* Haney Dep., [ECF No. 83-3] at 16-18, 69:21-71:12.

On April 19, 2021, the PGA Tour filed its Motion for Summary Judgment. *See* Motion [ECF No. 82]. Plaintiffs filed a Response in opposition to the Motion, and the PGA Tour replied. *See* [ECF Nos. 86; 89]. In connection with their summary judgment briefs, the parties have also filed factual statements and supporting evidence. *See* [ECF Nos. 83; 87; 88].

## **LEGAL STANDARD**

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the

absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hilburn v. Murata Elecs. North Am., Inc*., 181 F.3d 1220, 1225 (11th Cir. 1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the non-moving parties, there is evidence on which a jury could reasonably find a verdict in their favor. *See Anderson*, 477 U.S. at 251; *Hilburn*, 181 F.3d at 1225; *Allen*, 121 F.3d at 646.

## <u>ANALYSIS</u>

Under Florida law, to prevail on their tortious interference claims—either with respect to a contract or a business relationship—Plaintiffs must show virtually the same elements: (1) the existence of a contract or business relationship; (2) the PGA Tour's knowledge of the contract or business relationship; (3) the PGA Tour's intentional procurement of a breach of the contract or interference with the relationship; (4) the absence of any justification or privilege; and (5) damages as a result of the PGA Tour's actions. *See Mattocks v. Black Entertainment Television LLC*, 43 F. Supp. 3d 1311, 1318 (S.D. Fla. 2014); *accord Sullivan v. Economic Research Properties*, 455 So. 2d 630, 632 (Fla. 5th DCA 1984); *see also Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985).[6]

The PGA Tour seeks summary judgment on the basis that Plaintiffs lack any evidence to support their claims that it tortiously interfered with Plaintiffs' contractual and business relationships with SiriusXM following Haney's May 29th broadcast. First, with respect to Count I (tortious interference with a contract), the PGA Tour argues summary judgment is warranted as

---

[6] The parties agree—and the Court concurs—that the substantive law of Florida governs the claims in this action.

a matter of law because the record is devoid of evidence that SiriusXM breached the Haney Agreement; therefore, Plaintiffs are unable to establish the third element of that claim.  Second, the PGA Tour argues that Plaintiffs cannot show the absence of justification or privilege with respect to either Counts I or II because the evidence shows that (i) the PGA Tour has indisputable rights in its intellectual property and brand's association with the *SiriusXM PGA Tour Radio* channel; (ii) SiriusXM had affirmative obligations to ensure that no programming detrimental to the PGA Tour aired on that station; and (iii) the PGA Tour was fully justified in acting to protect its financial and business interests as associated with that branded radio station.

Plaintiffs, on the other hand, argue that the PGA Tour has not met the legal standard for justified interference and that a genuine issue of material fact exists as to whether the PGA Tour interfered with malice, requiring the denial of summary judgment.  Reviewing all facts and drawing all inferences in Plaintiffs' favor, the Court finds that: with respect to Count I Plaintiffs cannot establish the Haney Agreement was ever breached; with respect to both Counts I and II Plaintiffs cannot establish that the PGA Tour's actions were unjustified; and lastly there is no genuine issue of material fact as to whether the PGA Tour acted with malice.  Consequently, the PGA Tour is entitled to judgment as a matter of law on Plaintiffs' tortious interference claims.

## I. THE PGA TOUR IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TORTIOUS INTERFERENCE WITH A CONTRACT CLAIM.

To state a claim for tortious interference with a contract, Plaintiffs must allege a breach. *Gerber v. Keyes Co.*, 443 So. 2d 199, 201 (Fla. 3d DCA 1983) (affirming dismissal of tortious interference claim where there was no breach because plaintiff received commission as provided in the contract); *see also Hager v. Venice Hospital, Inc., et al.*, 944 F. Supp. 1530, 1534-35 (M.D. Fla. 1996) (granting summary judgment on tortious interference with contractual relationship claim after finding that plaintiff had not presented sufficient evidence that contracts at issue had

been breached).  In other words, there is no cause of action for contractual tortious interference in the absence of a breach.  *Gerber*, 443 So. 2d at 201 (citing *Symon v. J. Rolfe Davis, Inc.*, 245 So. 2d 278 (Fla. 4th DCA), cert. denied, 249 So. 2d 36 (Fla. 1971)).

Here, Count I fails as a matter of law because there is no evidence that SiriusXM breached the Haney Agreement.  Plaintiffs base Count I on their allegations that "[t]he PGA TOUR intentionally and unjustifiably interfered with Plaintiffs' rights under the [Haney Agreement] by inducing SiriusXM's termination of the Agreement."  Compl. ¶ 48.  However, the undisputed evidence does not reveal that SiriusXM breached its agreement with Plaintiffs (or support the contention that the PGA Tour induced any such termination).  In fact, Haney testified as follows on this very point:

> **Q.** Did you ever take the position with SiriusXM that they had breached your contract?
>
> **A.** That they had breached my contract?
>
> **Q.** Yeah.
>
> **A.** By taking me off – what would they have done to breach my contract?
>
> **Q.** I'm asking you.  Did you ever – in any of your discussions –
>
> **A.** No.
>
> **Q.**  –leading up to the settlement, did you ever take the position that SiriusXM had breached the contract?
>
> **A.** No.

*See* Haney Dep., [ECF No. 83-3] at 25, 144:6-18.  Thus, Haney, on his own accord, admits that SiriusXM did not breach the Haney Agreement.

In Response, Plaintiffs argue that they "have presented evidence of *Defendant's* breach of the SiriusXM agreement."  Pls.' Resp. [ECF No. 86] at 23 (emphasis added).  As an initial matter,

this argument is quite puzzling—the Court is not aware of any contract doctrine that would allow Plaintiffs to hold the PGA Tour as being in breach of the Haney Agreement—a contract that the PGA Tour is not a party to. *Mana Internet Sols., Inc. v. Internet Billing Co., LLC*, No. 06-61515, 2007 WL 1455973, at *2 (S.D. Fla. May 16, 2007) (noting that "[i]t is axiomatic that a party may not be held liable for a breach of contract if they were not a party to the contract. . . [.]").

Plaintiffs also argue that the mere fact that Plaintiffs and SiriusXM entered into a Settlement Agreement effective June 14, 2019 "alone suffices as evidence of a breach of the [Haney Agreement]." Pls.' Resp. [ECF No. 86] at 19. According to Plaintiffs, "SiriusXM would not have paid . . . any amount of money, without recognizing that Plaintiffs had suffered the consequences of a breach of their legal rights." *Id.* at 20. These assertions are not just contradicted by legal principles related to settlements but also at odds with the evidence in this case. Contrary to Plaintiffs' bold assertions, "[a] settlement, in and of itself, does not establish fault . . . [o]bviously, settlements are made for reasons other than the admission of liability." *D'Angelo v. Fitzmaurice*, 832 So. 2d 135, 137 (Fla. 2d DCA 2002), quashed on other grounds *by D'Angelo v. Fitzmaurice*, 863 So. 2d 311 (Fla. 2003); *Glaze v. G & B Marine, Inc.*, No. 95-01845, 1997 WL 35221, *1 (E.D. La. Jan. 27, 1997) ("Rule 408 states that evidence of settlement agreements is not admissible for a number of purposes including proof of liability."); *accord* Fed. R. Evid. 408. [7]

---

[7]  As a last-ditch effort, Plaintiffs baselessly assert that because the PGA Tour is not named a Released Party in Plaintiffs' and SiriusXM's Settlement Agreement, that necessarily indicates that the PGA Tour procured a breach of the Haney Agreement. Pls.' Resp. [ECF No. 86] at 24. Plaintiffs' assertions cannot be credited for several reasons. *First*, Plaintiffs at times refer to and quote record evidence that was not filed with Plaintiffs' SOMF, and not otherwise referenced therein. *Second*, Plaintiffs cite to their SOMF at paragraph 39 which in turn provides no evidentiary support to substantiate the specific assertions made in that paragraph. As explained *supra* in footnotes 1 and 4, the Court will disregard any factual assertions that are not in compliance with Local Rule 56.1(b)(1)(B). *Third*, in support of their speculative theories, Plaintiffs improperly refer this Court to Aisenberg's testimony regarding "Greenstein['s] belie[f] that [Haney] had a very strong case to be brought against the PGA Tour for interfering with his relationship with SiriusXM [,]" which is inadmissible hearsay. *See Macuba*, 193 F.3d at 1322. *Fourth*, even disregarding the lack of evidence supporting Plaintiffs' assertions, the PGA Tour is not a party to Plaintiffs'

Additionally, Plaintiffs' argument is negated by Aisenberg's testimony regarding the settlement between Plaintiffs and SiriusXM.  According to Aisenberg, SiriusXM's position with respect to the payment at issue was that it would pay Plaintiffs "the remainder of the calendar year of 2019 . . . as a part of the resolution of [Plaintiffs'] agreement with the . . . *agreed termination* of [Plaintiffs'] agreement between the two parties."  Aisenberg Dep., [ECF No. 89-1] at 4-5, 132:20-133:13 (emphasis added).

Despite Plaintiffs' unfounded assertions claiming otherwise, the record is devoid of evidence demonstrating that SiriusXM breached the Haney Agreement.  Plaintiffs are therefore unable to prove an essential element of their tortious interference with a contract claim.  Where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party shall bear the burden of proof at trial," summary judgment on that claim is required.  *Celotex Corp.*, 477 U.S. at 322.  Accordingly, the PGA Tour is entitled to summary judgment on Plaintiffs' Count I as a matter of law.  *See Hager*, 944 F. Supp. at 1535 (granting summary judgment on contractual tortious interference claim because plaintiff "ha[d] not presented sufficient evidence that [p]laintiff's contracts with [defendants] ha[d] been breached."); *Banks Hardwoods Fla., LLC v. Maderas Iglesias, S.A.*, No. 08-23497, 2009 WL 3446736, at *1 (S.D. Fla. Oct. 20, 2009) (granting summary judgment where plaintiff "failed to show the third element" – the "defendant's intentional procurement of the contract's breach"); *Black v. Advanced Neuromodulation Sys., Inc*., No. 11-00539, 2014 WL 1303656, at *9 (N.D. Fla. Mar. 27, 2014) (granting summary judgment on tortious interference with contract claim where "the evidence reveal[ed] that [employer] did not breach its contract with [plaintiff].").

---

Settlement Agreement with SiriusXM and thus it is entirely expected and unremarkable that the PGA Tour was not named a Released Party in that agreement.

II.   **THE PGA TOUR IS OTHERWISE ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT ANY ALLEGED INTERFERENCE BY THE PGA TOUR WAS UNJUSTIFIED.**

Even if Plaintiffs could establish that SiriusXM breached the Haney Agreement, to prevail on their claims for tortious interference with a contract (Count I) and a business relationship (Count II), Plaintiffs must proffer sufficient evidence to demonstrate that the PGA Tour's alleged interference with their contract and business relationship with SiriusXM was *unjustified*—which they have wholly failed to do.

Florida courts have long recognized that, when, as here, "a defendant interferes with a contract in order to safeguard a preexisting economic interest of his own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable." *Heavener, Ogier Servs. Inc., v. R.W. Florida Region Inc.*, 418 So. 2d 1074, 1076 (Fla. 5th DCA 1982); *see also Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998); *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980).

Interference with a contract or business relationship is *unjustified* when the interfering defendant is a "third party" or a "stranger to the business relationship." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 386 (Fla. 4th DCA 1999). A party is not a stranger to the business relationship if it has a "beneficial or economic interest in, or control over, that relationship," including "a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed." *Walter v. Jet Aviation Flight Servs., Inc.*, No. 16-01238, 2017 WL 3237375, at *8 (S.D. Fla. July 31, 2017) (citing *Hamilton v. Suntrust Mortg., Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014)); *Palm Beach Cnty. Health Care Dist. v. Prof'l*

*Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (quoting *Nimbus Tech., Inc. v. SunnData Prods., Inc.*, 484 F.3d 1305, 1309 (11th Cir. 2007)).

Here, the PGA Tour's arguments focus on the fourth element of tortious interference—namely whether Plaintiffs can establish that the PGA Tour's actions following Haney's May 29th broadcast were unjustified.  The PGA Tour argues that Plaintiffs cannot demonstrate that its alleged interference was unjustified because the evidence shows its actions were: (A) consistent with its rights under its Agreement with SiriusXM; (B) justified to protect its economic and business interests; and (C) not motivated by malice or carried out by improper means.  The Court discusses each argument in turn.

### A.   The PGA Tour's Actions Were Consistent With its Rights Under its Agreement with SiriusXM and Thus the PGA Tour was Not a Stranger to Plaintiffs' Relationship with SiriusXM.

Under Florida law, interference is justified where a defendant acts pursuant to contractual authority.  *Textron Fin. Corp. v. RV Having Fun Yet, Inc.*, No. 09-00002, 2011 WL 13176212, at *5 (M.D. Fla. Aug. 3, 2011) (noting that "no cause of action for intentional interference exists which is the consequence of a rightful action.") (citing *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 292-93 (Fla. 3d DCA 2007)).  Stated differently, defendants are generally not liable for tortious interference when they exercise their contractual rights.  *Fla. Tel. Corp. v. Essig*, 468 So. 2d 543, 545 (Fla. 5th DCA 1985) (defendant not liable for exercising its contractual right to forbid its contractor from hiring a particular subcontractor for the defendant's projects).  And, the Eleventh Circuit has explained that a claim for tortious interference "cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party."  *Ford v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001).

The case of *Florida Telephone Corp.* ("FTC") is instructive here.  FTC entered a contract with Edwards Corporation for Edwards to splice telephone cable.  468 So. 2d at 544.  Edwards

then subcontracted an independent splicing company—the Essigs—to work on FTC jobs. *Id.* The Essigs were eventually terminated at the request of FTC. *Id.* As a result, they sued FTC for tortious interference with their contractual relationship with Edwards. *Id.* at 545. The trial court entered judgment for the Essigs. *Id.* The Fifth District Court of Appeal ("DCA") reversed given the contract between FTC and Edwards, which provided, in relevant part:

> (f) The Telephone Company reserves the right to request the Contractor to promptly remove from the job any employee(s) of the Contractor or its sub-contractors who, in the sole opinion of the Telephone Company, is not doing an adequate job or is conducting himself in a manner as to reflect unfavorably upon the Telephone Company, and the Contractor agrees to comply with such requests.

*Id.* Based on that language, the Fifth DCA found that "FTC was privileged to forbid Edwards from using the Essigs on FTC jobs." *Id.* Because the Essigs could not establish an element of their tortious interference claim—the absence of any justification or privilege—the Fifth DCA reversed and instructed the trial court to enter final judgment for FTC. *Id.*

In this case, the PGA Tour—like FTC—was justified in the actions it took based on its Agreement with SiriusXM. The Agreement provides the PGA Tour a broad right of consent to all programming aired on the *SiriusXM PGA Tour Radio* channel in exchange for SiriusXM's ability to use the PGA Tour's intellectual property, including its trademarks, in connection therewith. Def.'s SOMF ¶¶ 1, 2, 3, 4, 5, 6, Ex 1-1. More specifically, Article II § 2.01 sets forth certain rights and obligations with respect to the "Production" of *SiriusXM PGA Tour Radio*. *See* Agreement [ECF No. 98-2] at 16. According to Article II § 2.01(f), in exchange for the ability to use the PGA Tour's intellectual property in connection with the PGA Tour Radio channel, the parties agreed that:

> SiriusXM *shall* ensure that SiriusXM and its representatives *do not incorporate into* Programming any material which is: . . . (iv) *otherwise detrimental to* [PGA] Tour *or* inconsistent with [PGA]

> Tour's standards of appropriateness as may be provided to
> SiriusXM in writing[.]

*Id.* at 17 (emphasis added).[8]   Based on the Agreement's express language, the PGA Tour reasonably expected that no material that could be damaging to its brand would be *incorporated into* programming for *SiriusXM PGA Tour Radio*.  The record evidence shows that Haney's May 29th comments were met with a swift and intense negative public reaction and generated scathing editorials condemning the PGA Tour's association with Haney.  *See, e.g.*, Def.'s SOMF ¶¶ 17, 18, 20, 23.  Thus, the PGA Tour identified Haney's May 29th comments as detrimental to its brand and justifiably—as well as consistent with its contractual rights—took actions to discuss the same with SiriusXM in light of SiriusXM's contractual obligations under Article II § 2.01(f) of their Agreement.

Further, Plaintiffs cannot support their claim that the PGA Tour was a stranger to their relationship with SiriusXM.  The tortious interference analysis in *Mattocks*, which the PGA Tour cites throughout its briefing, is instructive as to why the PGA Tour cannot be considered a stranger to Plaintiffs' relationship with SiriusXM.   In that case, plaintiff Stacey Mattocks created an unofficial Facebook Fan Page for the television series *The Game*.  *Mattocks*, 43 F. Supp. 3d at 1315.  Roughly one year after Mattocks created the Fan Page, defendant Black Entertainment Television ("BET") acquired syndication rights to *The Game* as well as rights to produce new

---

[8]  In their Response, Plaintiffs argue that the "PGA Tour did not provide Sirius XM with standards of appropriateness in writing" and therefore "having failed to fulfill that predicate condition" the PGA Tour "abandoned any role which it may have negotiated about determining who would be given a show on the air." Pls.' Resp. [ECF No. 86] at 14.  Plaintiffs' argument conveniently glosses over the portion of Section 2.01(f) which obligates SiriusXM to "ensure that" it and its representatives "do not incorporate into the Programming any material which is: . . . (iv) *otherwise detrimental* to [PGA] Tour . . .."  Additionally, Plaintiffs' contention that the Agreement "provided PGA Tour with *absolutely no role* in content, i.e., what the talent broadcast after they had been hired and were on the air" is contradicted by the express terms of the Agreement which specifically require that SiriusXM not "incorporate into Programming" any content that is "detrimental" to the PGA Tour.  *Id.*; *see also* Agreement, [ECF No. 98-2] at 16, Article II, Section 2.01(f).

episodes of the show. *Id.* at 1314. BET learned about Mattocks's page and contacted her to perform part-time work managing and adding BET-provided and approved content to her Fan Page for *The Game*. *Id.* In doing so, BET allowed Mattocks to post proprietary content, trademarks, and logos to her Fan Page and even directed users to "like" Mattocks's Fan Page. *Id.* at 1316.

Eventually, Mattocks and BET entered into a letter agreement in which BET agreed not to exclude Mattocks from the Fan Page and Mattocks granted BET full administrative access to the page. *Id.* A year later, while negotiating a full-time position with BET, Mattocks demoted BET's administrative access to the Facebook page. *Id.* BET responded by terminating Mattocks's license to use BET's intellectual property and asking Facebook and Twitter to essentially disable Mattocks's accounts for *The Game*. *Id.* Facebook and Twitter complied, disabling Mattocks's Fan Page and Twitter according to their policies protecting brand owners' rights. *Id.* at 1317. Mattocks brought several causes of action against BET including claims for tortious interference with her contracts with Facebook and Twitter. *Id.* BET moved for summary judgment. *Id.*

The Honorable Judge James I. Cohn granted BET's motion for summary judgment in its entirety. *Id.* at 1321. Relevant here, Judge Cohn determined that BET did not tortiously interfere with Mattocks's user agreements with Facebook and Twitter when it asked them to shut down the accounts. *Id.* at 1319. The Court found the record conclusively showed BET "was not a 'stranger' to Mattocks's user agreements with Facebook and Twitter" given its collaboration with Mattocks and that it had a beneficial supervisory interest in the accounts and in the use of its intellectual property. *Id.* Because BET had a legitimate financial interest in how the accounts were run— especially since they concerned a show being aired by BET—Mattocks could not establish the absence of justification or privilege supporting BET's requests to terminate Mattocks's Facebook page and Twitter account. *Id.*

As in *Mattocks*, the record evidence here conclusively demonstrates that the PGA Tour is not a "stranger" to the relationship between Haney and SiriusXM given its active collaboration with SiriusXM on *SiriusXM PGA Tour Radio*'s golf-focused programming and the fact it has a beneficial supervisory interest in the radio channel and in the use of its own intellectual property. Like BET's interest in the Facebook and Twitter accounts for *The Game*, the PGA Tour has a legitimate financial interest in how *SiriusXM PGA Tour Radio* is run. Additionally, by virtue of its Agreement with SiriusXM, the PGA Tour has control over *SiriusXM PGA Tour Radio*'s programming—and anything *incorporated into* said programming—which is necessarily intertwined with the broadcasting relationship between Haney and SiriusXM in connection with Haney's show on *SiriusXM PGA Tour Radio*. Because it is not a stranger to Haney and SiriusXM's relationship, the PGA Tour cannot be held liable for tortious interference and is therefore entitled to summary judgment on Plaintiffs' claims.

### B. The PGA Tour's Actions were Justified to Protect its Economic and Business Interests—Which Are Closely Associated with *SiriusXM PGA Tour Radio*.

Setting aside the PGA Tour's contractual rights under its Agreement with SiriusXM, to prevail on their tortious interference claims, Plaintiffs must show that any alleged interference by the PGA Tour was unjustified. Plaintiffs can make no such showing here because the record evidence reflects that the actions the PGA Tour took in response to Haney's May 29th broadcast were intended to safeguard its economic and business interests.

As a matter of law, there can be no claim for tortious interference where, as here, the actions complained of were undertaken to safeguard or promote one's financial or economic interest. *Barco Holdings*, 967 So. 2d at 293; *Genet Co. v. Annheuser-Busch, Inc.*, 498 So. 2d 683, 684 (Fla. 3d DCA 1986). When an entity acts to protect its "own economic interest to reduce the risk of incurring further loss," those actions do "not constitute intent to damage within the meaning of a

cause of action for intentional interference with [a] business relationship." *Networkip, LLC v. Spread Enterprises, Inc*., 922 So. 2d 355, 358 (Fla 3d DCA 2006). Florida law views said actions as privileged and non-actionable. *Id.*

For instance, in *Ethyl Corp. v. Balter*, 386 So. 2d 1220 (Fla. 3d DCA 1980), the court ruled that the defendant "was, as a matter of law, privileged to act as it did" where its "actions were reasonably directed to the recovery of" a debt owed to the defendant by the corporation of which plaintiff was once president. *Id.* at 1221-22, 1224-25. Because the defendant's actions to recover the debt were taken to safeguard or promote its own financial interests, the plaintiff's tortious interference claim was "entirely non-actionable," and judgment was entered for the defendant. *Id.* Similarly, in *Burger King Corp. v. H&H Restaurants*, *LLC*, No. 99-02855, 2001 WL 1850888, *3 (S.D. Fla. Nov. 30, 2001), H&H filed a counterclaim against BK claiming that BK tortiously interfered with its contract with a potential buyer for the sale of 29 franchise restaurants by meeting with the potential buyer and advising him that H&H's sale price was excessive. The court granted summary judgment in favor of BK on H&H's tortious interference claim based on its finding that BK "had a non-malicious business reason for its refusal of H&H's sale to the [potential buyer], namely that the [potential buyer] did not have adequate financial resources to operate the franchises, and the sale would place the 'Burger King *brand at unreasonable risk*.'" *Id.* at *8 (emphasis added).

Here, the evidence reflects that the PGA Tour acted to protect economic interests related to its brand and burgeoning business relationship with the LPGA. As an initial matter, it is indisputable that the PGA Tour has a valid interest in *SiriusXM PGA Tour Radio* given that the channel is marketed as falling under the PGA Tour umbrella and that SiriusXM operates that channel using the PGA Tour's trademarks and other intellectual property granted to SiriusXM

pursuant to the terms and conditions of the Agreement.  Second, as further explained below, the evidence confirms the PGA Tour acted to protect its own economic interests and to reduce the risk of damage to its brand and reputation.

As the evidence and witness testimony demonstrates, immediately following Haney's May 29th broadcast the internet was flooded with thousands of scathing posts condemning Haney's comments.  Monahan Dep. Ex. 13, [ECF No. 98-2] at 34.  In certain instances, those reaction posts linked Haney's words to the PGA Tour or otherwise rumored that Haney's comments must have been sanctioned by the PGA Tour simply because Haney's show was disseminated on *SiriusXM PGA Tour Radio*.  Def.'s SOMF ¶ 21.[9]  Thus, like BK in *H&H Restaurants*, the PGA Tour took several actions to protect its public standing and minimize the risk to its brand in the wake of Haney's controversial comments.  2001 WL 1850888 at *8.  The actions taken by the PGA Tour— including tracking the social media conversation after the May 29th broadcast, reaching out to SiriusXM to express its disapproval of Haney's conduct, and collaborating with SiriusXM on a joint statement—were motivated by its desire to safeguard the PGA Tour brand and protect its ongoing business dealings with the LPGA.  To that end, Monahan and Neal testified during their depositions that, while they each found Haney's comments offensive and contrary to the PGA Tour's values, the PGA Tour felt pressured to act mainly to protect the brand's integrity in the public sphere.  Def.'s SOMF ¶¶ 20, 22, 23, 26, 27.  Additionally, it is undisputed that Monahan reached out to Greenstein to express his disapproval of Haney's comments primarily due to his concerns over the undesirable impact to the PGA Tour's brand and the potential negative

---

[9]  For example, within hours of Haney's broadcast, Christine Brennan, USA Today sports columnist and CNN sports analyst, published an article in USA TODAY's online edition titled "Opinion: If Hank Haney isn't fired from his radio job, golf's leaders are condoning racism, sexism" that included the following statement: "Where is the PGA of America's comment condemning Haney?  Augusta National's? The PGA TOUR's, since it's their show?"  Def.'s SOMF ¶ 21.

implications of said comments with respect to the PGA Tour's business relationship with the LPGA. *Id.* ¶¶ 24, 26, 27. As Monahan explained, the PGA Tour and the LPGA are industry partners and around the time in question the two organizations were working out a media rights deal that was not publicly announced until March 2020. *See* Monahan Dep., [ECF No. 98-2] at 6, 113:9-114:21.

In their opposition, Plaintiffs rely on conclusory allegations to support their theory that the PGA Tour tortiously interfered with Plaintiffs' contract and business relationship with SiriusXM by pressuring SiriusXM to terminate Haney due to the PGA Tour's "long-standing" animosity towards him. *See generally* Pls.' Resp. Unfortunately for Plaintiffs, their theory is simply not supported by the record. Rather than rely on the record, Plaintiffs base their arguments on speculation or otherwise inadmissible evidence. Plaintiffs question the sincerity of the PGA Tour's business interest in protecting its relationship with the LPGA. Pls.' Resp. at 18-19. For instance, Plaintiffs note the PGA Tour has not been committed to promoting the LPGA since the organization's inception and that the PGA Tour's Senior Vice President of Communications and Media Content was unable to recall the top-ranked LPGA golfers during a deposition. *Id.*

However, this information, even if true, is of no moment and the Court refuses to rely on Plaintiffs' characterization of the evidence to extrapolate that the PGA Tour's relationship with the LPGA is a sham and "made-for-litigation", Pls.' Resp. at 10, —especially when undisputed record evidence suggests otherwise. For example, several witnesses, including SiriusXM's President and Chief Content Officer, verify that from the outset, the PGA Tour was concerned about the impact Haney's comments would have on its business relationship with the LPGA. *See* Greenstein Dep., [ECF No. 83-2].[10] Further, Plaintiffs' mischaracterization of the testimony

---

[10] Greenstein testified as follows on this very point:

regarding the details of the PGA Tour's dealings with the LPGA is not evidence but rather mere conjecture and thus insufficient to create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

Accordingly, because the PGA Tour's conduct, in whole or in part, was demonstrably motivated by its desire to safeguard its brand and its relationship with the LPGA, the actions Plaintiffs complain of are justified, and the PGA Tour is entitled to summary judgment on Plaintiffs' tortious interference claims. *See Barco Holdings*, 967 So. 2d at 293 (finding no tortious interference claim where allegedly improper action was taken to further valid business interests); *see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490, 2011 WL 2174012 at *15 (S.D. Fla. June 2, 2011) (granting summary judgment on tortious interference with business relationship claim where defendant "pointed to evidence" that indicated it acted "to control the integrity of its brand"); *accord Mattocks*, 43 F. Supp. 3d at 1319 (finding BET had a valid

---

               **Q.** To the best of your knowledge, was the PGA Tour working to integrate or modify its relationship with the LPGA Tour in the spring and summer of 2019?

               **A.** I'm only aware of what Mr. Monahan told me, that they were working with the LPGA on some transaction upcoming.

               **Q.** When did he tell you that?

               **A.** In that one call on—I believe it was May 30.

               **Q.** Can you tell me more specifically what Mr. Monahan said about that?

               **A.** That the PGA was either working or working to represent the LPGA in an upcoming transaction, and this was very detrimental, potentially, to that transaction.

*See* Greenstein Dep., [ECF No. 83-2] at 5-6, 46:21-47:11.

economic interest because plaintiff deprived BET of "control over its intellectual property" on a social media platform, and further holding BET's actions were justified to protect its rights as a "brand owner[]").

### C. The PGA Tour Did Not Act with Malice, Nor Did It Employ Improper Means.

Finally, "under Florida law, a tortious interference claim is actionable where malice is the *sole* basis for interference." *Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113, 2007 WL 473273, at *4 (S.D. Fla. Feb. 8, 2007); *see also Ernie Haire Ford v. Ford Motor Co*., 260 F.3d 1285, 1294 n.9 (11th Cir. 2004) ("The privilege is qualified only where malice is the sole basis for the interference.  In other words, the party must be interfering solely out of spite, to do harm, or for some other bad motive.") (internal citation omitted).  And "even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used." *KMS Rest. Corp. v. Wendy's Int'l, Inc*., 361 F.3d 1321, 1327 (11th Cir. 2004) (collecting Florida cases).

Here, Plaintiffs cite to no evidence suggesting that the PGA Tour's response to Haney's May 29th broadcast was motivated *solely* out of malice towards Haney or even that improper methods were used.  Plaintiffs assert, without providing any supporting evidence, that the PGA Tour's justifications for interfering were pre-textual and that its actions were instead motivated by a long-standing feud between the PGA Tour and Haney.  However, the record does not support Plaintiffs' theory and this Court is not in a position to second guess the PGA Tour's business judgment or to infer malice or pretext based upon mere conjecture of an ongoing feud between Haney and the PGA Tour.  To do so would require this Court to completely disregard all the evidence substantiating the PGA Tour's reputational and business concerns following Haney's controversial broadcast.  In a thin-veiled attempt to inject issues of fact, Plaintiffs raise completely

unrelated events pertaining to non-party professional golfers that have nothing to do with Plaintiffs or the allegations in this case. Pls.' Resp. at 16-18. At bottom, the evidence reflects that the PGA Tour's actions in this case were simply not the type of conduct that a claim for tortious interference was designed to remedy. This was not, for example, a situation in which the PGA Tour was losing market share because Haney was actively competing with *SiriusXM PGA Tour Radio*.

Lastly, the record reflects that the PGA Tour made no more calls to SiriusXM once the May 30th joint statement was issued, which further belies any suggestion that the PGA Tour interfered solely out of malice or that it used improper methods.[11] On the contrary; evidence before the Court demonstrates that the PGA Tour justifiably acted to protect economic interests related to its brand and its developing business relationship with the LPGA. Plaintiffs thus cannot succeed on their tortious interference claims as a matter of law.[12]

---

[11] Notably, even if the evidence reflected that additional calls or contacts were made, that would not serve as indicia of malice given the PGA Tour's ongoing interest in *SiriusXM PGA Tour Radio*.

[12] Throughout their Response, Plaintiffs broadly assert that whether the PGA Tour's actions were justified or privileged is a question that must be determined by a jury. Plaintiffs' assertions are nothing but attempts to recast their own legal burden in order to avoid summary judgment. As the party seeking summary judgment, the PGA Tour does not have to provide proof to negate the adverse party's claims. Rather, this Court must grant a motion for summary judgment against a party who does not establish an essential element of their case for which they have the burden of proof. *See Celotex Corp.*, 477 U.S. at 318-19. In this case, it is Plaintiffs' burden to establish: (1) the existence of a contract or business relationship; (2) the PGA Tour's knowledge of the contract or business relationship; (3) the PGA Tour's *intentional procurement of a breach of the contract or interference with the relationship*; (4) *the absence of any justification or privilege*; and (5) damages because of the PGA Tour's actions. *See Mattocks*, 43 F. Supp. 3d at 1318. Thus, it is *Plaintiffs' burden*, and not the PGA Tour's, to establish the absence of any justification or privilege. And, as discussed above, the evidence before the Court shows that Plaintiffs are unable to establish element 3 as to their tortious interference with a contract claim (Count I) and element 4 as to both tortious interference claims (Counts I and II).

## CONCLUSION

Rule 9 of the USGA Rules of Golf states a key principle of the game: "play the ball as it lies."[13]  In other words, absent a few exceptions, players cannot improve their position by simply moving the golf ball.  Here, under Rule 56, the Court must similarly take the evidence as it lies in the record.  And that evidence makes clear that Plaintiffs are unable to establish the necessary elements of their claims.  Thus, for the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [ECF No. 82] is **GRANTED**.

2. All other pending motions are **DENIED** as moot. [14]

3. Final Judgment will be entered by separate order.

4. The Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 19th day of August, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[13]  United States Golf Association, *Player's Edition of the Rules of Golf*, https://www.usga.org/content/usga/home-page/rules/rules-2019/rules-of-golf/rule-9.html (last visited Aug. 19, 2021).

[14]  Pending before the Court are the PGA Tour's Motion to Exclude Testimony of Jeremy Aisenberg and Patrick McGee [ECF No. 80] and the PGA Tour's Omnibus Motion *in Limine* [ECF No. 104].  Because the PGA Tour is entitled to summary judgment without regard to the disputed expert testimony, the Court need not resolve the parties' expert-related motions.  Accordingly, all motions other than Defendant's Motion for Summary Judgment are denied as moot.